# 24-1568-cv

## In the United States Court of Appeals for the Second Circuit

---

THE CITY OF NEW YORK,
PLAINTIFF-APPELLEE

*v.*

EXXON MOBIL CORPORATION; EXXONMOBIL OIL CORPORATION;
ROYAL DUTCH SHELL PLC; SHELL OIL COMPANY; BP P.L.C.;
BP AMERICA INC.; AMERICAN PETROLEUM INSTITUTE,
DEFENDANTS-APPELLANTS

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (CIV. NO. 21-CV-4807)
(THE HONORABLE VALERIE CAPRONI, J.)*

---

**JOINT APPENDIX**

---

KANNON K. SHANMUGAM
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*2001 K Street, N.W.
Washington, DC 20006
(202) 223-7300
kshanmugam@paulweiss.com*

*Counsel for Appellants
Exxon Mobil Corporation and
ExxonMobil Oil Corporation*

JESSE A. TOWNSEND
NEW YORK CITY LAW DEPARTMENT
*100 Church Street
New York, NY 10007
(202) 356-2067
jtownsend@law.nyc.gov*

*Counsel for Appellee*

*(additional counsel on inside cover)*

DAVID C. FREDERICK
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
*1615 M Street, N.W., Suite 400*
*Washington, DC 20036*

*Counsel for Appellants*
*Shell plc (f/k/a Royal Dutch Shell plc)*
*and Shell USA Inc. (f/k/a Shell Oil*
*Company)*

BRIAN D. SCHMALZBACH
MCGUIREWOODS LLP
  *800 East Canal Street*
  *Richmond, VA 23219*

*Counsel for Appellant*
*American Petroleum Institute*

DIANA E. REITER
ARNOLD & PORTER KAYE SCHOLER LLP
  *250 West 55th Street*
  *New York, NY 1001*

*Counsel for Appellants*
*BP p.l.c. and BP America Inc.*

# TABLE OF CONTENTS

Page

List of district-court docket entries.................................................................J.A. 1

Complaint and summons, D. Ct. Dkt. 1-5 ...................................................J.A. 10

Notice of removal, D. Ct. Dkt. 1 .................................................................J.A. 109

Stay order, D. Ct. Dkt. 58 ............................................................................J.A. 206

Order lifting stay, D. Ct. Dkt. 63 ...............................................................J.A. 208

Communications regarding scope of issues for renewed
motion to remand, D. Ct. Dkt. 69-3, Ex. B...............................................J.A. 210

Opinion on motion to remand, D. Ct. Dkt. 81 ..........................................J.A. 215

Notice of appeal, D. Ct. Dkt. 82 .................................................................J.A. 239

Stipulation and order regarding costs and fees, D. Ct. Dkt. 84 .............J.A. 242

CLOSED,APPEAL,ECF

**U.S. District Court**
**Southern District of New York (Foley Square)**
**CIVIL DOCKET FOR CASE #: 1:21−cv−04807−VEC**

City Of New York v. Exxon Mobil Corporation et al
Assigned to: Judge Valerie E. Caproni
Demand: $75,000
Case in other court: State Court− Supreme, 451071/2021
Cause: 28:1331 Fed. Question

Date Filed: 05/28/2021
Date Terminated: 05/13/2024
Jury Demand: Defendant
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 05/28/2021 | 1 | NOTICE OF REMOVAL from Supreme Court, County of New York. Case Number: 451071/2021. (Filing Fee $ 402.00, Receipt Number ANYSDC−24606788).Document filed by ExxonMobil Oil Corporation, Exxon Mobil Corporation. (Attachments: # 1 Exhibit 1 − Union of Concerned Scientists Report, # 2 Exhibit 2 − Email Re Exxon Campaign, # 3 Exhibit 3 − Email from Lemuel Srolovic to Matthew Pawa, # 4 Exhibit 4 − AGs United for Clean Power Press Conference, # 5 Exhibit 5 − Complaint and All Process and Filings in State Court, # 6 Exhibit 6 − City of New York 2018 Amended Complaint, # 7 Exhibit 7 − Wilson Declaration, # 8 Exhibit 8 − Navy Supply Corps Newsletter, # 9 Exhibit 9 − A History of the Petroleum Administration for War, # 10 Exhibit 10 − CIA & Overhead Reconnaissance, # 11 Exhibit 11 − Development of the Lockheed SR−71 Blackbird, # 12 Exhibit 12 − Contract 1962.08.14, # 13 Exhibit 13 − Contract 1963.08.26, # 14 Exhibit 14 − Contract 1963.09.20, # 15 Exhibit 15 − Contract 1964.06.30, # 16 Exhibit 16 − Contract 1963.09.20, # 17 Exhibit 17 − Contract 1963.06.28, # 18 Exhibit 18 − Contract 1963.02.25, # 19 Exhibit 19 − Contract 1962.09.13, # 20 Exhibit 20 − Contract 1963.08.23, # 21 Exhibit 21 − Report Reflecting Procurement Contract, # 22 Exhibit 22 − Report Reflecting Procurement Contract, # 23 Exhibit 23 − Report Reflecting Procurement Contract, # 24 Exhibit 24 − Report Reflecting Procurement Contract, # 25 Exhibit 25 − Solicitation, # 26 Exhibit 26 − Solicitation and Addendum, # 27 Exhibit 27 − Report Re Bid Summary of Award Information for Certain Products, # 28 Exhibit 28 − Minimum Cost Solution Bid Award Sheet, # 29 Exhibit 29 − Solicitation Award Report, # 30 Exhibit 30 − DLA Detail Specs for Certain Products, # 31 Exhibit 31 − DLA Spec for Turbine Fuels Grades JP−4 and JP−5, # 32 Exhibit 32 − Tables Summarizing BP Contracts, # 33 Exhibit 33 − Handbook Re Aerospace Fuels Certification, # 34 Exhibit 34 − Military Jet Fuels, # 35 Exhibit 35 − Detail Specs for JP−8 etc., # 36 Exhibit 36 − BP Additional Tables Part 1, # 37 Exhibit 36 − BP Additional Tables Part 2, # 38 Exhibit 36 − BP Additional Tables Part 3, # 39 Exhibit 37 − Contract 1999.06.15 FSII Specifications, # 40 Exhibit 38 − Dept of Army Technical Manual, # 41 Exhibit 39 − DOD Performance Specs, # 42 Exhibit 40 − DOD Performance Specs, # 43 Exhibit 41 − DOD Specs for Turbine Fuel Grades JP−4 and 5, # 44 Exhibit 42 − Contract, # 45 Exhibit 43 − Contract 2017.09.26, # 46 Exhibit 44 − Contract 2016.10.03, # 47 Exhibit 45 − Contract 2020.05.01, # 48 Exhibit 46 − Annual Report by Joint Committee on Defense Production, # 49 Exhibit 47 − S.J Res. 176 Naval Pet Res Bo 1, Elk Hills, CA, # 50 Exhibit 48 − Finney Article Fuel is Diverted for Military, # 51 Exhibit 49 − Sen O'Mahoney S. Res. 36, # 52 Exhibit 50 − Wilson Statement S. Res. 36 (1945), # 53 Exhibit 51 − Ickes Davis Speech, # 54 Exhibit 52 − Telegram RE PAW, # 55 Exhibit 53 − DLA Energy Fiscal Year 2019 Fact Book, # 56 Exhibit 54 − Brief of Myers Admiral Mullen, # 57 Exhibit 55 − Hist American Engineering Rcd No. TX−76, # 58 Exhibit 56 − Certificate of Dissolution of War Emergency Pipelines Inc., # 59 Exhibit 57 − Statement of W. Alton Jones, # 60 Exhibit 58 − Stipulated Facts in US v. Shell Oil Co, # 61 Exhibit 59 − 1946 Sweeney Aircraft Fuels & Propellants, Rpt, # 62 Exhibit 60 − Handbook of Aviation Fuel Properties, # 63 Exhibit 61 − Statement of Hon. OLeary before Senate Committee, # 64 Exhibit 62 − 2010 SPR Annual Report, # 65 Exhibit 63 − Dear Operator Letter from L. Denett, # 66 Exhibit 64 − Dept of Interior Minerals Mgt Serv, # 67 Exhibit 65 − Report of Minority Staff on US Strategic Petroleum Reserve, # 68 Exhibit 66 − History of SPR Releases, # 69 Exhibit 67 − Strategic Petroleum Reserve Annual Report 2018, # 70 Exhibit 68 − Sawhill Statement Part 1, # 71 Exhibit 68 − Sawhill Statement Part 2, # 72 Exhibit 69 |

| | | |
|---|---|---|
| | | – Comprehensive Energy Plan, # <u>73</u> Exhibit 70 – Priest Affidavit, # <u>74</u> Exhibit 71 – Form MMS−2004, # <u>75</u> Exhibit 72 – Oil and Gas Lease of Submerged Lands under the OCSLA, # <u>76</u> Exhibit 73 – Standard Navy UPC, # <u>77</u> Exhibit 74 – Form 3100−11, # <u>78</u> Exhibit 75 – About BLM Oil and Gas Program, # <u>79</u> Exhibit 76 – Tx Lease Agreement, # <u>80</u> Exhibit 77 – Hakes Declaration of Energy Independence, # <u>81</u> Exhibit 78 – Yergin The Prize, # <u>82</u> Exhibit 79 – Excerpts from Nixon, # <u>83</u> Exhibit 80 – Remarks of Rep Harris, # <u>84</u> Exhibit 81 – Notice of Filing).(Wells, Theodore) (Entered: 05/28/2021) |
| 05/28/2021 | 2 | CIVIL COVER SHEET filed..(Wells, Theodore) (Entered: 05/28/2021) |
| 05/28/2021 | 3 | STATEMENT OF RELATEDNESS re: that this action be filed as related to 18−cv−182. Document filed by Exxon Mobil Corporation, ExxonMobil Oil Corporation..(Wells, Theodore) (Entered: 05/28/2021) |
| 05/28/2021 | 4 | NOTICE OF APPEARANCE by Patrick J Conlon on behalf of Exxon Mobil Corporation, ExxonMobil Oil Corporation..(Conlon, Patrick) (Entered: 05/28/2021) |
| 05/28/2021 | 5 | NOTICE OF APPEARANCE by Justin Anderson on behalf of Exxon Mobil Corporation, ExxonMobil Oil Corporation..(Anderson, Justin) (Entered: 05/28/2021) |
| 05/28/2021 | 6 | NOTICE OF APPEARANCE by Daniel John Toal on behalf of Exxon Mobil Corporation, ExxonMobil Oil Corporation..(Toal, Daniel) (Entered: 05/28/2021) |
| 05/28/2021 | 7 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent Mobil Corporation, Corporate Parent Exxon Mobil Corporation for ExxonMobil Oil Corporation. Document filed by Exxon Mobil Corporation, ExxonMobil Oil Corporation..(Wells, Theodore) (Entered: 05/28/2021) |
| 06/01/2021 | 8 | NOTICE OF APPEARANCE by Daniel Severson on behalf of Royal Dutch Shell PLC, Shell Oil Company..(Severson, Daniel) (Entered: 06/01/2021) |
| 06/01/2021 | 9 | MOTION for David C. Frederick to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−24612235. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Royal Dutch Shell PLC, Shell Oil Company. (Attachments: # <u>1</u> Declaration of David C. Frederick, # <u>2</u> Exhibit Certificate of Good Standing, # <u>3</u> Exhibit Certificate of Good Standing, # <u>4</u> Text of Proposed Order).(Frederick, David) (Entered: 06/01/2021) |
| 06/01/2021 | 10 | MOTION for James M. Webster, III to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−24612282. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Royal Dutch Shell PLC, Shell Oil Company. (Attachments: # <u>1</u> Declaration of James M. Webster, III, # <u>2</u> Certificate of Good Standing, # <u>3</u> Certificate of Good Standing, # <u>4</u> Text of Proposed Order).(Webster, James) (Entered: 06/01/2021) |
| 06/01/2021 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. <u>9</u> MOTION for David C. Frederick to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−24612235. Motion and supporting papers to be reviewed by Clerk's Office staff., <u>10</u> MOTION for James M. Webster, III to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−24612282. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (vba)** (Entered: 06/01/2021) |
| 06/01/2021 | 11 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent Royal Dutch Shell plc for Shell Oil Company. Document filed by Royal Dutch Shell PLC, Shell Oil Company..(Severson, Daniel) (Entered: 06/01/2021) |
| 06/01/2021 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above−entitled action is assigned to Judge Analisa Torres. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district−judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf−related−instructions..(vf) (Entered: 06/01/2021) |

| 06/01/2021 | | Magistrate Judge Stewart D. Aaron is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018−06/AO−3.pdf. (vf) (Entered: 06/01/2021) |
|---|---|---|
| 06/01/2021 | | Case Designated ECF. (vf) (Entered: 06/01/2021) |
| 06/01/2021 | 12 | MOTION for Grace W. Knofczynski to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−24615103. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Royal Dutch Shell PLC, Shell Oil Company. (Attachments: # 1 Declaration of Grace W. Knofczynski, # 2 Certificate of Good Standing, # 3 Certificate of Good Standing, # 4 Text of Proposed Order).(Knofczynski, Grace) (Entered: 06/01/2021) |
| 06/01/2021 | 13 | CERTIFICATE OF SERVICE of Notice of Removal (including Exhibits 1−81), Civil Cover Sheet, Related Case Statement, Notice of Appearance of Patrick J. Conlon, Notice of Appearance of Justin Anderson, Notice of Appearance of Daniel Toal and Corporate Disclosure Statement served on The City of New York on 5/28/2021. Service was made by FTP and FedEx. Document filed by Exxon Mobil Corporation, ExxonMobil Oil Corporation..(Anderson, Justin) (Entered: 06/01/2021) |
| 06/02/2021 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 12 MOTION for Grace W. Knofczynski to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−24615103. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu)** (Entered: 06/02/2021) |
| 06/02/2021 | 14 | NOTICE OF APPEARANCE by Nancy Gordon Milburn on behalf of BP America Inc., BP P.L.C...(Milburn, Nancy) (Entered: 06/02/2021) |
| 06/02/2021 | 15 | NOTICE OF APPEARANCE by Matthew Kendall Edling on behalf of The City of New York..(Edling, Matthew) (Entered: 06/02/2021) |
| 06/02/2021 | 16 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent BP p.l.c. for BP America Inc.. Document filed by BP America Inc...(Milburn, Nancy) (Entered: 06/02/2021) |
| 06/02/2021 | 17 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by BP P.L.C...(Milburn, Nancy) (Entered: 06/02/2021) |
| 06/02/2021 | 18 | NOTICE OF APPEARANCE by Diana Elizabeth Reiter on behalf of BP America Inc., BP P.L.C...(Reiter, Diana) (Entered: 06/02/2021) |
| 06/02/2021 | 19 | JOINT LETTER MOTION for Extension of Time *and to Extend Page Limits* addressed to Judge Analisa Torres from all parties dated June 2, 2021. Document filed by Exxon Mobil Corporation, ExxonMobil Oil Corporation..(Wells, Theodore) (Entered: 06/02/2021) |
| 06/03/2021 | | NOTICE OF CASE REASSIGNMENT to Judge Valerie E. Caproni. Judge Analisa Torres is no longer assigned to the case..(wb) (Entered: 06/03/2021) |
| 06/03/2021 | 20 | ORDER granting 19 Letter Motion for Extension of Time. Application GRANTED. Plaintiff's motion to remand, not to exceed 45 pages, is due by July 7, 2021. Defendants' opposition, not to exceed 45 pages, is due by August 16, 2021. Plaintiff's reply, not to exceed 25 pages, is due by September 6, 2021. Defendants' deadline to answer or move against the complaint is stayed pending resolution of Plaintiff's motion to remand. The deadline to serve Rule 26(a) Initial Disclosures and to confer as required under Federal Rule 26(f), and the issuance of a Rule 16(b) Scheduling Order, shall be stayed until further order of the Court. Motions due by 7/7/2021. (Signed by Judge Valerie E. Caproni on 6/3/2021) (cf) (Entered: 06/03/2021) |
| 06/03/2021 | | Set/Reset Deadlines: Responses due by 8/16/2021 Replies due by 9/6/2021. (cf) (Entered: 06/03/2021) |
| 06/03/2021 | 21 | ORDER GRANTING ADMISSION PRO HAC VICE 12 Motion for Grace W. Knofczynski to Appear Pro Hac Vice. (As further set forth in this Order.) (Signed by Judge Valerie E. Caproni on 6/3/2021) (cf) (Entered: 06/03/2021) |

| 06/03/2021 | 22 | ORDER GRANTING ADMISSION PRO HAC VICE 10 Motion for James M. Webster, III to Appear Pro Hac Vice. (As further set forth in this Order.) (Signed by Judge Valerie E. Caproni on 6/3/2021) (cf) (Entered: 06/03/2021) |
|---|---|---|
| 06/03/2021 | 23 | ORDER GRANTING ADMISSION PRO HAC VICE 9 Motion for David C. Frederick to Appear Pro Hac Vice. (As further set forth in this Order.) (Signed by Judge Valerie E. Caproni on 6/3/2021) (cf) (Entered: 06/03/2021) |
| 06/09/2021 | 24 | NOTICE OF APPEARANCE by Theresa Dernbach on behalf of The City of New York..(Dernbach, Theresa) (Entered: 06/09/2021) |
| 06/09/2021 | 25 | NOTICE OF APPEARANCE by Hilary Michele Meltzer on behalf of The City of New York..(Meltzer, Hilary) (Entered: 06/09/2021) |
| 06/09/2021 | 26 | MOTION for John D. Lombardo to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−24651347. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by BP America Inc., BP P.L.C.. (Attachments: # 1 Declaration of John D. Lombardo in Support of Motion for Admission Pro Hac Vice, # 2 Certificate of Good Standing from the State of California, # 3 Text of Proposed Order).(Lombardo, John) (Entered: 06/09/2021) |
| 06/09/2021 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 26 Lombardo to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−24651347. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 06/09/2021) |
| 06/09/2021 | 27 | MOTION for Jonathan W. Hughes to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−24651392. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by BP America Inc., BP P.L.C.. (Attachments: # 1 Declaration of Jonathan W. Hugheshn in Support of Motion for Admission Pro Hac Vice, # 2 Certificate of Good Standing from the State of California, # 3 Text of Proposed Order).(Hughes, Jonathan) (Entered: 06/09/2021) |
| 06/09/2021 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 27 MOTION for Jonathan W. Hughes to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−24651392. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 06/09/2021) |
| 06/09/2021 | 28 | MOTION for Matthew Thomas Heartney to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−24651468. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by BP America Inc., BP P.L.C.. (Attachments: # 1 Declaration of Matthew T. Heartney, # 2 Certificate of Good Standing California, # 3 Text of Proposed Order).(Heartney, Matthew) (Entered: 06/09/2021) |
| 06/09/2021 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 28 MOTION for Matthew Thomas Heartney to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−24651468. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 06/09/2021) |
| 06/09/2021 | 29 | ORDER GRANTING ADMISSION PRO HAC VICE: granting 26 Motion for John D. Lombardo to Appear Pro Hac Vice. (Signed by Judge Valerie E. Caproni on 6/09/2021) (ama) (Entered: 06/09/2021) |
| 06/09/2021 | 30 | ORDER GRANTING ADMISSION PRO HAC VICE: granting 27 Motion for Jonathan W. Hughes to Appear Pro Hac Vice. (Signed by Judge Valerie E. Caproni on 6/09/2021) (ama) (Entered: 06/09/2021) |
| 06/09/2021 | 31 | ORDER GRANTING ADMISSION PRO HAC VICE: granting 28 Motion for Matthew Thomas Heartney to Appear Pro Hac Vice. (Signed by Judge Valerie E. Caproni on 6/09/2021) (ama) (Entered: 06/09/2021) |
| 06/10/2021 | 32 | NOTICE OF APPEARANCE by Alice R Baker on behalf of The City of New York..(Baker, Alice) (Entered: 06/10/2021) |

| | | |
|---|---|---|
| 06/14/2021 | 33 | MOTION for Victor M. Sher to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by The City of New York. (Attachments: # 1 Declaration of Victor M. Sher, # 2 Certificate of Good Standing, # 3 Text of Proposed Order).(Sher, Victor) (Entered: 06/14/2021) |
| 06/14/2021 | | Pro Hac Vice Fee Payment: for 33 MOTION for Victor M. Sher to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.**. Filing fee $ 200.00, receipt number ANYSDC−24671437..(Sher, Victor) (Entered: 06/14/2021) |
| 06/14/2021 | 34 | MOTION for Katie H. Jones to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−24671682. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by The City of New York. (Attachments: # 1 Declaration of Katie H. Jones, # 2 Certificate of Good Standing, # 3 Text of Proposed Order).(Jones, Katherine) (Entered: 06/14/2021) |
| 06/15/2021 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 33 MOTION for Victor M. Sher to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (vba)** (Entered: 06/15/2021) |
| 06/15/2021 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 34 MOTION for Katie H. Jones to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−24671682. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (vba)** (Entered: 06/15/2021) |
| 06/15/2021 | 35 | ORDER GRANTING ADMISSION PRO HAC VICE: granting 33 Motion for Victor M. Sher to Appear Pro Hac Vice. (Signed by Judge Valerie E. Caproni on 6/15/2021) (ama) (Entered: 06/15/2021) |
| 06/15/2021 | 36 | ORDER GRANTING ADMISSION PRO HAC VICE: granting 34 Motion for Katie H. Jones to Appear Pro Hac Vice. (Signed by Judge Valerie E. Caproni on 6/15/2021) (ama) (Entered: 06/15/2021) |
| 06/25/2021 | 37 | MOTION to Remand to State Court . Document filed by The City of New York..(Edling, Matthew) (Entered: 06/25/2021) |
| 07/07/2021 | 38 | MEMORANDUM OF LAW in Support re: 37 MOTION to Remand to State Court . . Document filed by The City of New York..(Edling, Matthew) (Entered: 07/07/2021) |
| 08/05/2021 | 39 | MOTION for Brian D. Schmalzbach to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−24894336. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by American Petroleum Institute. (Attachments: # 1 Affidavit of Brian D. Schmalzbach, # 2 Exhibit A − Certificate of Good Standing, # 3 Proposed Order, # 4 Certificate of Service).(Schmalzbach, Brian) (Entered: 08/05/2021) |
| 08/06/2021 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 39 MOTION for Brian D. Schmalzbach to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−24894336. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu)** (Entered: 08/06/2021) |
| 08/06/2021 | 40 | ORDER FOR ADMISSION PRO HAC VICE: granting 39 Motion for Brian D. Schmalzbach to Appear Pro Hac Vice. (Signed by Judge Valerie E. Caproni on 8/06/2021) (ama) (Entered: 08/06/2021) |
| 08/09/2021 | 41 | NOTICE OF APPEARANCE by Brian David Schmalzbach on behalf of American Petroleum Institute..(Schmalzbach, Brian) (Entered: 08/09/2021) |
| 08/09/2021 | 42 | MOTION for Kathryn M. Barber to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−24905169. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by American Petroleum Institute. (Attachments: # 1 Affidavit of Kathryn M. Barber, # 2 Exhibit A − Certificate of Good Standing, # 3 Proposed Order, # 4 Certificate of Service).(Barber, Kathryn) (Entered: 08/09/2021) |

| 08/10/2021 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 42 MOTION for Kathryn M. Barber to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−24905169. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu)** (Entered: 08/10/2021) |
|---|---|---|
| 08/11/2021 | 43 | ORDER FOR ADMISSION PRO HAC VICE: granting 42 Motion for Kathryn M. Barber to Appear Pro Hac Vice. (Signed by Judge Valerie E. Caproni on 8/11/2021) (ama) (Entered: 08/11/2021) |
| 08/11/2021 | 44 | NOTICE OF APPEARANCE by Kathryn M. Barber on behalf of American Petroleum Institute..(Barber, Kathryn) (Entered: 08/11/2021) |
| 08/16/2021 | 45 | NOTICE OF APPEARANCE by Andrew G. McBride on behalf of American Petroleum Institute..(McBride, Andrew) (Entered: 08/16/2021) |
| 08/16/2021 | 46 | NOTICE OF APPEARANCE by Michael Lawrence Simes on behalf of American Petroleum Institute..(Simes, Michael) (Entered: 08/16/2021) |
| 08/16/2021 | 47 | MEMORANDUM OF LAW in Opposition re: 37 MOTION to Remand to State Court . . Document filed by American Petroleum Institute, BP America Inc., BP P.L.C., Exxon Mobil Corporation, ExxonMobil Oil Corporation, Royal Dutch Shell PLC, Shell Oil Company..(Wells, Theodore) (Entered: 08/16/2021) |
| 08/30/2021 | 48 | MOTION for Leave to File Amicus Curiae Brief . Document filed by Energy Policy Advocates. (Attachments: # 1 Proposed Amicus Curiae Brief).(Hardin, Matthew) (Entered: 08/30/2021) |
| 09/06/2021 | 49 | REPLY MEMORANDUM OF LAW in Support re: 37 MOTION to Remand to State Court . . Document filed by The City of New York..(Edling, Matthew) (Entered: 09/06/2021) |
| 09/07/2021 | 50 | MEMO ENDORSED ORDER granting 48 Motion for Leave to File Document. ENDORSEMENT: Application GRANTED. EPA, as Amicus Curiae, is hereby granted leave to file the brief attached to this Motion in the above−captioned case. (Signed by Judge Valerie E. Caproni on 9/7/2021) (ate) Modified on 9/13/2021 (ate). Modified on 9/13/2021 (ate). (Entered: 09/07/2021) |
| 09/09/2021 | 51 | NOTICE of Supplemental Authority re: 37 MOTION to Remand to State Court ., 38 Memorandum of Law in Support of Motion. Document filed by The City of New York. (Attachments: # 1 Exh A).(Edling, Matthew) (Entered: 09/09/2021) |
| 09/20/2021 | 52 | MOTION for Quentin C. Karpilow to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number BNYSDC−25084464. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by The City of New York. (Attachments: # 1 Declaration of Quentin C. Karpilow, # 2 Certificate of Good Standing, # 3 Proposed Order Granting PHV Admission).(Karpilow, Quentin) (Entered: 09/20/2021) |
| 09/21/2021 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 52 MOTION for Quentin C. Karpilow to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number BNYSDC−25084464. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu)** (Entered: 09/21/2021) |
| 09/21/2021 | 53 | ORDER GRANTING ADMISSION PRO HAC VICE 52 Motion for Quentin C. Karpilow to Appear Pro Hac Vice. (Signed by Judge Valerie E. Caproni on 9/21/2021) (tg) Modified on 9/30/2021 (tg). (Entered: 09/21/2021) |
| 09/21/2021 | 54 | RESPONSE re: 51 Notice (Other) . Document filed by Exxon Mobil Corporation, ExxonMobil Oil Corporation. (Attachments: # 1 Exhibit 1 − Order, No. 20−14243, City of Hoboken v. Exxon Mobil Corp. (D.N.J. Sept. 9, 2021)).(Wells, Theodore) (Entered: 09/21/2021) |
| 10/06/2021 | 55 | ORDER TO SHOW CAUSE: WHEREAS on October 5, 2021, the Second Circuit stayed a decision by the District of Connecticut to remand a case similar to this action to Connecticut state court pending the defendants appeal. See Conn. v. Exxon Mobil Corp., No. 21−1446, Dkt. 80 (2d Cir. Oct. 5, 2021); IT IS HEREBY ORDERED that Plaintiff must, no later than October 20, 2021, show cause, in writing, why this action should not be stayed pending the Second Circuits decision in Connecticut v. Exxon |

**J.A. 6**

| | | |
|---|---|---|
| | | Mobil Corporation. Defendants response is due by November 3, 2021. Plaintiffs reply is due by November 10, 2021. SO ORDERED. (Signed by Judge Valerie E. Caproni on 10/6/2021) (tg) (Entered: 10/07/2021) |
| 10/06/2021 | | Set/Reset Deadlines: Replies due by 11/10/2021. Show Cause Response due by 11/3/2021. (tg) (Entered: 10/14/2021) |
| 10/19/2021 | 56 | LETTER addressed to Judge Valerie E. Caproni from Matthew K. Edling dated October 19, 2021 re: Plaintiff's Response to the Court's Order to Show Cause (dkt. 55). Document filed by The City of New York..(Edling, Matthew) (Entered: 10/19/2021) |
| 11/03/2021 | 57 | LETTER addressed to Judge Valerie E. Caproni from Justin Anderson dated November 3, 2021 re: Response to the Court's Order to Show Cause. Document filed by Exxon Mobil Corporation, ExxonMobil Oil Corporation..(Anderson, Justin) (Entered: 11/03/2021) |
| 11/12/2021 | 58 | ORDER with respect to 37 Motion to Remand to State Court. IT IS HEREBY ORDERED that this case is STAYED pending the Second Circuits decision in Connecticut v. Exxon Mobil. The parties must inform the Court within one week of the Second Circuits final order resolving the appeal in that case.The Clerk of Court is respectfully directed to stay the open motion at docket entry 37. SO ORDERED. (Signed by Judge Valerie E. Caproni on 11/12/2021) (tg) (Entered: 11/12/2021) |
| 11/17/2021 | | Case Stayed (tg) (Entered: 11/17/2021) |
| 03/15/2022 | 59 | NOTICE of of Change of Party Names. Document filed by Royal Dutch Shell PLC, Shell Oil Company..(Frederick, David) (Entered: 03/15/2022) |
| 03/15/2022 | 60 | SUPPLEMENTAL RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent Shell plc for Shell Oil Company. Document filed by Royal Dutch Shell PLC, Shell Oil Company..(Frederick, David) (Entered: 03/15/2022) |
| 10/02/2023 | 61 | NOTICE of Supplemental Authority. Document filed by The City of New York. (Attachments: # 1 Exhibit A).(Edling, Matthew) (Entered: 10/02/2023) |
| 10/02/2023 | 62 | LETTER addressed to Judge Valerie E. Caproni from Matthew K. Edling dated October 2, 2023 re: City of New York v. Exxon Mobil Corp., et al., Case No. 1:21−cv−04807−VEC. Document filed by The City of New York. (Attachments: # 1 Exhibit A).(Edling, Matthew) (Entered: 10/02/2023) |
| 10/04/2023 | 63 | ORDER: IT IS HEREBY ORDERED that the stay of all proceedings entered on November 12, 2021, is LIFTED. IT IS FURTHER ORDERED that Plaintiff's motion to remand to state court is DENIED without prejudice and with leave to refile. Plaintiff may resubmit its motion for remand, in light of the Second Circuit's decision in Connecticut v. Exxon Mobil Corp., No. 21−1446, 2023 WL 6279941 (2d Cir. Sept. 27, 2023), not later than Friday, October 20, 2023. Defendant must respond by Tuesday, November 14, 2023. Plaintiff's reply brief must be filed not later than Friday, December 8, 2023. IT IS FURTHER ORDERED that the Clerk of Court is respectfully directed to terminate the open motion at docket entry 37. SO ORDERED. ( Motions due by 10/20/2023., Replies due by 12/8/2023., Responses due by 11/14/2023), (Signed by Judge Valerie E. Caproni on 10/4/2023) (tg) (Entered: 10/04/2023) |
| 10/05/2023 | 64 | NOTICE OF APPEARANCE by Aaron Fong Jaroff on behalf of American Petroleum Institute..(Jaroff, Aaron) (Entered: 10/05/2023) |
| 10/05/2023 | 65 | NOTICE OF APPEARANCE by Loly Garcia Tor on behalf of Royal Dutch Shell PLC, Shell Oil Company..(Tor, Loly) (Entered: 10/05/2023) |
| 10/18/2023 | 66 | JOINT LETTER MOTION for Leave to File Excess Pages *on behalf of all parties* addressed to Judge Valerie E. Caproni from Daniel J. Toal dated October 18, 2023. Document filed by Exxon Mobil Corporation, ExxonMobil Oil Corporation..(Toal, Daniel) (Entered: 10/18/2023) |
| 10/19/2023 | 67 | ORDER granting 66 Letter Motion for Leave to File Excess Pages. Application GRANTED. Plaintiff's motion to remand, not to exceed 35 pages, is due by October 20, 2023. Defendants' opposition, not to exceed 35 pages, is due by November 14, 2023. Plaintiff's reply, not to exceed 20 pages, is due by December 8, 2023. SO ORDERED. (Signed by Judge Valerie E. Caproni on 10/19/2023) (tg) (Entered: |

| | | 10/19/2023) |
|---|---|---|
| 10/19/2023 | | Set/Reset Deadlines: Motions due by 10/20/2023. Responses due by 11/14/2023 Replies due by 12/8/2023. (tg) (Entered: 10/19/2023) |
| 10/20/2023 | 68 | MOTION to Remand to State Court . Document filed by The City of New York..(Edling, Matthew) (Entered: 10/20/2023) |
| 10/20/2023 | 69 | MEMORANDUM OF LAW in Support re: 68 MOTION to Remand to State Court . . Document filed by The City of New York. (Attachments: # 1 Affidavit of K. Jones in support of Motion to Remand, # 2 Exhibit A−Order and Opinion from City of Charleston matter, # 3 Exhibit B−Email communications between parties).(Edling, Matthew) (Entered: 10/20/2023) |
| 11/13/2023 | 70 | MOTION for Matthew T. Heartney to Withdraw as Attorney . Document filed by BP America Inc., BP P.L.C.. (Attachments: # 1 Proposed Order Proposed Order).(Milburn, Nancy) (Entered: 11/13/2023) |
| 11/14/2023 | 71 | ORDER GRANTING MOTION TO WITHDRAW THE APPEARANCE OF MATTHEW T. HEARTNEY granting 70 Motion to Withdraw as Attorney. The motion to withdraw the appearance of Matthew T. Heartney as pro hac vice counsel for Defendants BP p.l.c. and BP America Inc. in the above−captioned matter is GRANTED. IT IS HEREBY ORDERED that Mr. Heartney's appearance is withdrawn as of the date of this Order. The clerk is directed to terminate Mr. Heartney's appearance on the docket and to remove him from all applicable service lists with immediate effect. Attorney Matthew T. Heartney terminated. (Signed by Judge Valerie E. Caproni on 11/14/2023) (tg) (Entered: 11/14/2023) |
| 11/14/2023 | 72 | MEMORANDUM OF LAW in Opposition re: 68 MOTION to Remand to State Court . . Document filed by American Petroleum Institute, BP America Inc., BP P.L.C., Exxon Mobil Corporation, ExxonMobil Oil Corporation, Royal Dutch Shell PLC, Shell Oil Company..(Toal, Daniel) (Entered: 11/14/2023) |
| 11/21/2023 | 73 | SECOND MOTION for Leave to File Amicus Brief *in opposition to remand*. Document filed by Energy Policy Advocates. (Attachments: # 1 Supplement Proposed Amicus Brief, # 2 Exhibit A (Public Records obtained under FOIL)).(Hardin, Matthew) (Entered: 11/21/2023) |
| 11/27/2023 | 74 | MEMO ENDORSEMENT granting 73 Motion for Leave to File Document. ENDORSEMENT: Application GRANTED. EPA, as Amicus Curiae, is hereby granted leave to file the brief attached to this Motion in the above captioned case. SO ORDERED. (Signed by Judge Valerie E. Caproni on 11/27/2023) (tg) Modified on 12/18/2023 (tg). (Entered: 11/27/2023) |
| 12/08/2023 | 75 | REPLY MEMORANDUM OF LAW in Support re: 68 MOTION to Remand to State Court . . Document filed by The City of New York..(Edling, Matthew) (Entered: 12/08/2023) |
| 12/18/2023 | 76 | LETTER addressed to Judge Valerie E. Caproni from Daniel J. Toal dated December 18, 2023 re: Request for Oral Argument for Motion to Remand (ECF No. 68). Document filed by Exxon Mobil Corporation, ExxonMobil Oil Corporation..(Toal, Daniel) (Entered: 12/18/2023) |
| 12/26/2023 | 77 | MOTION for Jeannie S. Rhee to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−28740270. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Exxon Mobil Corporation, ExxonMobil Oil Corporation. (Attachments: # 1 Exhibit − Declaration of Jeannie S. Rhee, # 2 Exhibit − Certificate of Good Standing, # 3 Exhibit − Proposed Order).(Rhee, Jeannie) (Entered: 12/26/2023) |
| 12/27/2023 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 77 MOTION for Jeannie S. Rhee to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−28740270. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (rju)** (Entered: 12/27/2023) |
| 01/02/2024 | 78 | ORDER GRANTING ADMISSION PRO HAC VICE granting 77 Motion to Appear Pro Hac Vice. The motion of JEANNIE S. RHEE for admission to practice pro hac |

| | | |
|---|---|---|
| | | vice in the above−captioned action is GRANTED. As further set forth by this Order. (Signed by Judge Valerie E. Caproni on 1/2/2024) (tg) (Entered: 01/02/2024) |
| 02/13/2024 | 79 | NOTICE of of Supplemental Authority re: 68 MOTION to Remand to State Court .. Document filed by The City of New York. (Attachments: # 1 Exhibit A − Vermont v. Exxon Mobil − Order on Remand).(Edling, Matthew) (Entered: 02/13/2024) |
| 02/29/2024 | 80 | NOTICE of of Supplemental Authority re: 68 MOTION to Remand to State Court .. Document filed by The City of New York. (Attachments: # 1 Exhibit A − 4th Circuit Remand Order).(Edling, Matthew) (Entered: 02/29/2024) |
| 05/08/2024 | 81 | OPINION re: 68 MOTION to Remand to State Court . filed by The City of New York. For the reasons stated above, this Court joins the overwhelming majority of federal district and circuit courts around the country to conclude that these municipal law claims belong in state court. The City's Motion to Remand is GRANTED, and its request for costs and fees is GRANTED in part. The Clerk of Court is directed to terminate the open motion at Dkt. 68 and remand the case to the Supreme Court of the State of New York, County of New York. SO ORDERED. (Signed by Judge Valerie E. Caproni on 5/8/2024) (tg) Transmission to Docket Assistant Clerk for processing. (Entered: 05/09/2024) |
| 05/13/2024 | | CASE REMANDED OUT from the U.S.D.C. Southern District of New York to the State Court − Supreme Court of the State of New York, County of New York. Sent certified copy of docket entries and remand order. Mailed via UPS Tracking Number 1ZE22E53021005091 on 5/10/2024. (tg) (Entered: 05/13/2024) |
| 06/07/2024 | 82 | NOTICE OF APPEAL from 81 Memorandum & Opinion,,. Document filed by American Petroleum Institute, BP America Inc., BP P.L.C., Exxon Mobil Corporation, ExxonMobil Oil Corporation, Royal Dutch Shell PLC, Shell Oil Company. Filing fee $ 605.00, receipt number ANYSDC−29460210. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Toal, Daniel) (Entered: 06/07/2024) |
| 06/10/2024 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 82 Notice of Appeal. (tp) (Entered: 06/10/2024) |
| 06/10/2024 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 82 Notice of Appeal. (tp) (Entered: 06/10/2024) |
| 06/10/2024 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 82 Notice of Appeal, filed by Shell Oil Company, ExxonMobil Oil Corporation, BP P.L.C., Royal Dutch Shell PLC, BP America Inc., American Petroleum Institute, Exxon Mobil Corporation, Royal Dutch Shell plc were transmitted to the U.S. Court of Appeals. (tp) (Entered: 06/10/2024) |
| 07/09/2024 | 83 | PROPOSED STIPULATION AND ORDER. Document filed by The City of New York..(Karpilow, Quentin) (Entered: 07/09/2024) |
| 07/10/2024 | 84 | STIPULATION AND ORDER REGARDING COSTS AND FEES: NOW THEREFORE, IT IS HEREBY STIPULATED AND AGREED, as follows: 1. In the event the order awarding Plaintiff costs and fees is affirmed, Defendants agree collectively to pay $68,262.46 to the City within 30 days following entry of the mandate; 2. By agreeing now to pay the City $68,262.46 in the event the appeal results in an affirmance, Defendants do not in any way waive any rights or arguments they have with respect to the pending appeal, nor shall this agreement be asserted by the City or Defendants in support of any argument raised in Defendants' appeal of the award of costs and fees; 3. By entering into this stipulation, the City does not waive any rights or arguments they have with respect to Defendants pending appeal or with respect to seeking costs and fees incurred in litigating that appeal; 4. Because the parties have reached an agreement as to the amount of costs and fees to be awarded to Plaintiff, Plaintiff will not be submitting a fee application, and no further action from the district court is required. Accordingly, the May 8, 2024 Remand Order is a final order for the purposes of the Second Circuit's appellate jurisdiction under 28 U.S.C. § 1291. SO ORDERED. (Signed by Judge Valerie E. Caproni on 7/10/2024) (tg) Transmission to Finance Unit (Cashiers) for processing. (Entered: 07/10/2024) |

# EXHIBIT 5

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| The City of New York, | **SUMMONS** |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| -against- | |
| Exxon Mobil Corp., ExxonMobil Oil Corporation, Royal Dutch Shell plc, Shell Oil Company, BP p.l.c., BP America Inc., and American Petroleum Institute, | Index No. |
| | Date: |
| Defendants. | |

**TO THE ABOVE-NAMED DEFENDANTS:**

Exxon Mobil Corp.

ExxonMobil Oil Corporation

Royal Dutch Shell plc

Shell Oil Company

BP p.l.c.

BP America Inc.

American Petroleum Institute

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve

a copy of your answer on Plaintiff's attorney within 20 days after the service of this summons,

exclusive of the day of service (or within 30 days after the service is complete if this summons is

not personally delivered to you within the State of New York); and in case of your failure to appear

or answer, judgment will be taken against you by default for the relief demanded in the complaint.

The action will be heard in the Supreme Court of the State of New York in the County of New

York. Venue is proper under CPLR § 505(a) because Plaintiff's principal office is at City Hall

Park, New York, NY 10007.

Dated:  April 22, 2021             JAMES E. JOHNSON
                                   Corporation Counsel of the City of New York


                          By:   */s/ Hilary Meltzer* _____
                                Hilary Meltzer [506619]
                                  Chief, Environmental Law Division
                                Alice R. Baker [5023916]
                                  Senior Counsel
                                Tess Dernbach [5752290]
                                  Assistant Corporation Counsel
                                Samantha Peltz[1]
                                100 Church Street
                                New York, NY 10007
                                212-356-2070
                                hmeltzer@law.nyc.gov
                                albaker@law.nyc.gov
                                tdernbac@law.nyc.gov
                                speltz@law.nyc.gov

                                **SHER EDLING LLP**
                                Matthew K. Edling [1020217]
                                Victor M. Sher (*pro hac vice* forthcoming)
                                Michael Burger [4233094]
                                Katie H. Jones (*pro hac vice* forthcoming)
                                Quentin C. Karpilow (*pro hac vice* forthcoming)
                                100 Montgomery St., Ste. 1410
                                San Francisco, CA 94104
                                (628) 231-2500
                                matt@sheredling.com
                                vic@sheredling.com
                                michael@sheredling.com
                                katie@sheredling.com
                                quentin@sheredling.com

                                *Attorneys for Plaintiff*
                                *The City of New York*

---

[1] Special Assistant Corporation Counsel (passed the October 2020 Uniform Bar Exam).

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

The City of New York,

               Plaintiff,

     -against-

Exxon Mobil Corp., ExxonMobil Oil
Corporation, Royal Dutch Shell plc, Shell Oil
Company, BP p.l.c., BP America Inc., and
American Petroleum Institute,

           Defendants.

<u>**VERIFIED COMPLAINT**</u>

<u>**JURY TRIAL DEMANDED**</u>

Index No.

Date:

## TABLE OF CONTENTS

**INTRODUCTION** ............................................................................................................ **1**

**PARTIES** ...................................................................................................................... **4**

    A.   Plaintiff ................................................................................................... 4

    B.   Defendants .............................................................................................. 4

**VENUE AND JURISDICTION** ...................................................................................... **14**

**RELEVANT LAW** .......................................................................................................... **15**

**STATEMENT OF FACTS** .............................................................................................. **15**

**I.**    **Information Regarding the Role of Defendants' Fossil Fuel Products in Causing the Climate Crisis Is Material to NYC Consumers' Purchasing Decisions**................. **15**

**II.**   **ExxonMobil, Shell, and BP Mislead NYC Consumers by Misrepresenting the Climate Impacts of Specific Fossil Fuel Products.** ..................................................... **18**

**III.**  **ExxonMobil, Shell, and BP Misleadingly Greenwash Their Corporate Brands by Exaggerating Their Investments in Clean Energy Resources and by Inflating the Climate Benefits of Their Natural Gas Products and Investments in "Alternative Energy Sources."**.................................................................................................... **24**

    A.   Misrepresentations About Investments in Clean Energy Resources ......................... 27

    B.   ExxonMobil, Shell, and BP's Misrepresentations About the Climate Benefits of Natural Gas, Biofuels, and "Alternative Energy Resources" ..................................... 40

**IV.**  **API Misleadingly Greenwashes Fossil Fuels' Role in Climate Change** ....................... **43**

**FIRST CAUSE OF ACTION**
    *Engaging in deceptive trade practices in violation of NYC Code § 20-700*
    ExxonMobil, Shell, and BP have deceived NYC consumers by misrepresenting
    the purported environmental benefit of using their fossil fuel products and
    failing to disclose the risks of climate change caused by those products. .......................... 46

**SECOND CAUSE OF ACTION**
    *Engaging in deceptive trade practices in violation of NYC Code § 20-700*
    ExxonMobil, Shell, and BP have deceived NYC consumers by
    engaging in false and misleading greenwashing campaigns .................................................. 48

**THIRD CAUSE OF ACTION**
    *Engaging in deceptive trade practices in violation of NYC Code § 20-700*
    API has deceived NYC consumers by
    engaging in false and misleading greenwashing campaigns .................................................. 51

**RELIEF SOUGHT** ........................................................................................................ **53**

i

The City of New York ("the City" or "Plaintiff"), by its attorney James E. Johnson, Corporation Counsel of the City of New York, brings this action against Exxon Mobil Corp., ExxonMobil Oil Corporation, Royal Dutch Shell plc, Shell Oil Company, BP p.l.c., and BP America Inc., and the American Petroleum Institute (collectively "Defendants"), for violations of the City's Consumer Protection Law ("CPL"), New York City Administrative Code ("NYC Code") §§ 20-700 *et seq.* In support of its claims, the City pleads as follows:

## INTRODUCTION

1.  Climate change is one of the greatest threats facing humanity and a central focus of consumers' anxiety about the future. This concern is driving consumer choices between fossil fuels and transportation and energy alternatives.

2.  Defendants—three of the largest oil and gas companies and their top industry trade association—have systematically and intentionally misled consumers in New York City ("NYC consumers") about the central role their products play in causing the climate crisis. They have engaged in this deceptive conduct both to compete against growing safer energy options and to distinguish themselves from industry competitors as they vie for consumer dollars.

3.  Defendants know that their crude oil, petroleum, natural gas, and related hydrocarbon products (together, "fossil fuels") warm the planet by creating greenhouse gas pollution. They know that the extraction, refinement, and combustion of fossil fuels are the primary driver of climate change. And they know that continued use of their fossil fuel products will wreak havoc on the planet, causing irreversible changes to the climate system with severe and deadly consequences for people and the environment. In light of their sophisticated understanding of the causes and effects of climate change—and their products' central role in causing it—Defendants' multipronged efforts to mislead consumers about the climate impacts of their products and businesses are all the more the egregious.

1

4. As Defendants are aware, NYC consumers are seeking out products and services that have less of an adverse impact on the environment and are supporting companies that purport to align with these values. In particular, there is a growing desire among consumers to reduce fossil fuel consumption, and to find other opportunities to fulfill their energy needs with energy generated through means considered to be less harmful to the environment and to the climate in particular. *See* Section I, *infra*.

5. ExxonMobil, Shell, and BP deceive NYC consumers by misrepresenting the climate impacts of various gasoline products sold at their branded service stations in the City. In a bid to reassure consumers that purchasing these products is good for the planet, ExxonMobil, Shell, and BP advertise them as "cleaner" and "emissions-reducing," but fail to disclose their harmful effects on the climate. This strategy comes straight out of the advertising playbook of Big Tobacco, which deceptively promoted "low tar" and "light" cigarettes as healthier smoking options, when they knew that any use of cigarettes was harmful. *See* Section II, *infra*.

6. At the same time, through advertisements, social media posts, and other promotional materials directed at NYC consumers, ExxonMobil, Shell, and BP falsely present themselves as corporate leaders in the fight against climate change, knowing that they can sell more products if they are viewed as environmentally responsible. They claim to invest substantially in low-emission technologies and zero-emission renewable energy, such as solar, wind, and battery storage ("clean energy resources"). In fact, as underscored in Figure 1 below, these investments constitute only a miniscule percentage of their total business. In light of this discrepancy, these defendants mislead NYC consumers by presenting clean energy resources as a significant portion of their overall businesses, which instead continues to be overwhelmingly focused on fossil fuel production and sales. Additionally, as with their gasoline products,

ExxonMobil, Shell, and BP misleadingly advertise their other fossil fuel products, such as natural gas, as "green" or "cleaner," giving NYC consumers the false impression that they can help combat climate change by purchasing these products. In reality, though, Defendants know the supposed environmental benefits are a mirage. *See* Section III, *infra*.



*Figure 1: Oil and gas industry capital investment in 2019*
*Data source: International Energy Agency[2]*

7.      The American Petroleum Institute ("API"), the oil and gas industry's largest trade association, spreads its own deceptive advertising on behalf of ExxonMobil, Shell, and BP (three of its leading members) and its other member companies. API misleads NYC consumers by promoting fossil fuels as integral to "climate solutions" without disclosing that fossil fuels are the primary *cause* of climate change. This and other messaging aim to ensure a continued and growing market for API's member companies' oil and gas products by deceptively portraying their use as compatible with NYC consumers' environmental values. *See* Section IV, *infra*.

8.      In waging these deceptive advertising campaigns, Defendants are intentionally depriving NYC consumers of information that is material to their purchasing decisions, all with the goal of attracting new consumers to their fossil fuel products and preventing the mass defection

---

[2] International Energy Agency, *The Oil and Gas Industry in Energy Transitions* (Jan. 2020), https://www.iea.org/reports/the-oil-and-gas-industry-in-energy-transitions.

of existing consumers to cleaner alternatives that contribute substantially less to climate change. That deception is working: ExxonMobil, Shell, and BP are realizing massive profits, which in turn have enabled the unabated and expanded extraction, production, promotion, marketing, and sale of fossil fuel products.

9.     Defendants' conduct violates the CPL, NYC Code §§ 20-700 *et seq*. The City seeks injunctive relief, civil penalties, and costs to stop Defendants from continuing these and similar unlawful trade practices.

## PARTIES

### A.     Plaintiff

10.     Plaintiff City of New York is a municipal corporation incorporated under the laws of the State of New York. The City is responsible for the welfare of its more than 8.5 million residents, as well as the millions of additional people who work in or visit New York City each day. The CPL charges the City with protecting the public from deceptive and unconscionable business practices.

### B.     Defendants

11.     **ExxonMobil Entities**

a.     Exxon Mobil Corporation is a multi-national, vertically integrated, energy and chemicals company incorporated in New Jersey with its headquarters and principal place of business in Irving, Texas. Exxon Mobil Corporation is among the largest publicly traded oil and gas companies in the world. Exxon Mobil Corporation was formerly known as, did or does business as, and/or is the successor in liability to ExxonMobil Refining and Supply Company; Exxon Chemical U.S.A.; ExxonMobil Chemical Corporation; ExxonMobil Chemical U.S.A.; ExxonMobil Refining & Supply Corporation; Exxon Company, U.S.A.; Exxon Corporation; and Mobil Corporation.

4

b.      Exxon Mobil Corporation controls and directs companywide decisions related to all aspects of the allegations contained herein, including but not limited to advertising and messaging strategy, and including, in particular, companywide advertising and public communications concerning climate change and the relationship between fossil fuel use and climate change. Exxon Mobil Corporation's control over companywide advertising and messaging includes control over positions taken in communications directed at NYC consumers.

c.      Exxon Mobil Corporation has been registered to do business in New York since 1950. For decades, Exxon Corporation and Mobil Corporation (which later merged) were headquartered in the state of New York, and Mobil Corporation was headquartered in New York City for 30 years.

d.      ExxonMobil Oil Corporation is a wholly owned subsidiary of Exxon Mobil Corporation that acts on Exxon Mobil Corporation's behalf and subject to Exxon Mobil Corporation's control. ExxonMobil Oil Corporation is incorporated in New York with its principal place of business in Irving, Texas. ExxonMobil Oil Corporation was formerly known as, did or does business as, and/or is the successor in liability to Mobil Oil Corporation.

e.      As used in this Complaint, "ExxonMobil" refers collectively to Exxon Mobil Corporation and ExxonMobil Oil Corporation, and their predecessors, successors, parents, subsidiaries, affiliates, and divisions.

f.      ExxonMobil consists of numerous divisions and affiliates in all areas of the fossil fuel industry, including exploration for and production of crude oil and natural gas; manufacture of petroleum products; and transportation, promotion, marketing, and sale of

crude oil, natural gas, and petroleum products. Exxon is also a major manufacturer and marketer of commodity petrochemical products.

g.     ExxonMobil transacts and has transacted substantial fossil fuel-related business in New York City and New York State. ExxonMobil supplies gasoline to New York State from a number of its refineries to the New York Harbor area via the Colonial Pipeline and other pipelines, with a substantial portion supplying New York State. ExxonMobil markets or has marketed gasoline and other fossil fuel products to NYC consumers, including through Exxon-branded and Mobil-branded petroleum service stations in the City, displaying and using ExxonMobil trademarks, and selling ExxonMobil-branded gasoline and other branded products. ExxonMobil maintains gasoline stations throughout New York State and the New York City metropolitan area as well, all bearing the Exxon or Mobil banner.

h.     ExxonMobil directs NYC consumers to this network of retail gas stations through its interactive website, which identifies the locations of such stations by street address following the input of the consumer's location or by zip code.[3]

i.     ExxonMobil also markets and sells petroleum products to NYC consumers through retail automotive stores and other retail locations in the City. Those products include engine lubricants and motor oils sold under the Mobil 1 brand name, which is owned by ExxonMobil.

j.     ExxonMobil offers NYC consumers a proprietary credit card known as the "ExxonMobil Smart Card," which allows NYC consumers to pay for gasoline and other products at Exxon- and Mobil-branded service stations, including in the City. Consumers

---

[3] *See* ExxonMobil "Find a gas station near me," https://www.exxon.com/en/find-station.

who use the ExxonMobil Smart Card receive various rewards, including discounts on gasoline purchases.

k.    ExxonMobil developed and supports a smartphone application known as Rewards+, through which NYC consumers set up personal accounts and use the application as a payment platform for buying gasoline, diesel fuel, and other products at Exxon- and Mobil-branded retail gas stations. Both the ExxonMobil Smart Card and the Rewards+ application are designed to induce customer affinity and brand loyalty and to capture ExxonMobil market share in the gasoline market.

l.    ExxonMobil has engaged in national print and online advertising campaigns that have deliberately targeted consumers throughout the United States, including in New York City, in order to increase its sales. ExxonMobil has purposely availed itself of New York's marketplace through nationwide advertising it knew would reach NYC consumers.

12.    **Shell Entities**

a.    Royal Dutch Shell plc is a vertically integrated, multinational energy and petrochemical company. Royal Dutch Shell plc is incorporated in England and Wales, with its headquarters and principal place of business in the Hague, Netherlands. Royal Dutch Shell PLC consists of over a thousand divisions, subsidiaries, and affiliates engaged in all aspects of the fossil fuel industry, including exploration, development, extraction, manufacturing, and energy production, transport, trading, marketing, and sales.

b.    Royal Dutch Shell plc controls and directs companywide decisions related to all aspects of all allegations contained herein, including but not limited to advertising and messaging strategy, such as companywide advertising and public communications concerning climate change and the relationship between fossil fuel use and climate change.

J.A. 21

Royal Dutch Shell PLC's control over companywide advertising and messaging includes control over positions taken in communications directed at NYC consumers.

c.      Shell Oil Company is a wholly owned subsidiary of Royal Dutch Shell PLC that acts on Royal Dutch Shell plc's behalf and subject to Royal Dutch Shell plc's control. Shell Oil Company is incorporated in Delaware with its principal place of business in Houston, Texas. Shell Oil Company was formerly known as, did or does business as, and/or is the successor in liability to Deer Park Refining LP; Shell Oil; Shell Oil Products; Shell Chemical; Shell Trading US; Shell Trading (US) Company; Shell Energy Services; The Pennzoil Company; Shell Oil Products Company LLC; Shell Oil Products Company; Star Enterprise LLC; and Pennzoil-Quaker State Company. Shell Oil Company has been registered to do business in New York since 1936. Shell's agent and subsidiary Shell Oil Company had an office in New York City at least as early 1939 and had its headquarters in New York City for over 20 years.

d.      Defendants Royal Dutch Shell plc, Shell Oil Company, and their predecessors, successors, parents, subsidiaries, affiliates, and divisions are collectively referred to as "Shell."

e.      Shell transacts and has transacted substantial fossil fuel-related business in New York, including the marketing and promotion of gasoline and other fossil fuel products to consumers, including through dozens of Shell-branded petroleum service stations in New York City, displaying and using Shell trademarks, and selling Shell-branded gasoline and other branded products. In 2006, after Shell added numerous branded gas stations in New York City, a spokesperson said: "By signing supply agreements with

the retail operators of the 59 sites in New York City, we are reinforcing our goal of becoming a preferred fuels supplier by doubling our presence in that market."[4]

f.       Shell markets and sells other products including engine lubricant and motor oils to NYC consumers under its Pennzoil brand name, at retail outlets within New York City, including Advance Auto Parts, Target, Autozone, Shell-branded service stations, and other local automotive supply businesses.

g.       Shell offers a proprietary credit card known as the "Shell Fuel Rewards Card," which allows NYC consumers to pay for gasoline and other products at Shell-branded service stations, including in the City. NYC Consumers who use the Shell Fuel Rewards Card receive various rewards, including discounts on gasoline purchases at Shell service stations and cash rebates.

h.       Shell maintains an interactive website that allows NYC consumers to locate Shell-branded gas stations in the City.[5] Shell further maintains a smartphone application known as the "Shell US App" that offers NYC consumers a cashless payment method for gasoline and other products at Shell-branded service stations. NYC consumers use the payment method by providing their credit card information through the application. NYC consumers can also receive rewards including discounts on gasoline purchases by registering their personal identifying information into the Shell US App and using the application to identify and activate gas pumps at Shell service stations during a purchase. Both the Shell Fuel Rewards Card and the Shell US App are designed to induce customer affinity and brand loyalty and to capture Shell market share in the gasoline market.

---

[4]     *Shell to 'Make It There' in NY, NY,* CSP DAILY NEWS (June 6, 2006), https://www.cspdailynews.com/fuels/shell-make-it-there-ny-ny.

[5] Shell, "Gas station near me," https://www.shell.us/motorist/gas-station-near-me.html.

i.     Shell also owns and operates refineries that supply gasoline to the New York Harbor area and is a partial owner of the Colonial Pipeline which supplies substantial quantities of gasoline to the northeastern United States, including New York State.

j.     Shell has engaged in national print and online advertising campaigns that have deliberately targeted consumers throughout the United States, including in New York City, in order to increase its sales. Shell has purposely availed itself of New York's marketplace through nationwide advertising it knew would reach NYC consumers.

13.    **BP Entities**

a.     BP p.l.c. is a multinational, vertically integrated energy and petrochemical public limited company, registered in England and Wales with its principal place of business in London, England. BP p.l.c. consists of three main operating segments: (1) exploration and production; (2) refining and marketing; and (3) gas power and renewables. BP p.l.c. is the ultimate parent company of numerous subsidiaries, which explore for and extract oil and gas worldwide; refine oil into fossil fuel products such as gasoline; and market and sell oil, fuel, other refined petroleum products, and natural gas worldwide. BP p.l.c.'s subsidiaries explore for oil and natural gas under a wide range of licensing, joint arrangement, and other contractual agreements.

b.     BP p.l.c. controls and directs companywide decisions related to all aspects of all allegations contained herein, including but not limited to advertising and messaging strategy, including, in particular, companywide advertising and public communications concerning climate change and the relationship between fossil fuel use and climate change. BP p.l.c.'s control over companywide advertising and messaging includes control over positions taken in communications directed at NYC consumers.

c.      BP America Inc. is a wholly owned subsidiary of BP p.l.c. that acts on BP

p.l.c.'s behalf and is subject to BP p.l.c.'s control. BP America Inc. is a vertically integrated

energy and petrochemical company incorporated in Delaware with its headquarters and

principal place of business in Houston, Texas. BP America Inc. consists of numerous

divisions and affiliates in all aspects of the fossil fuel industry, including exploration for

and production of crude oil and natural gas; manufacture of petroleum products; and

transportation, marketing, and sale of crude oil, natural gas, and petroleum products. BP

America Inc. has been registered to do business in New York since 1978. BP America Inc.

was formerly known as, did or does business as, and/or is the successor in liability to

Amoco Corporation; Amoco Oil Company; ARCO Products Company; Atlantic Richfield

Delaware Corporation; Atlantic Richfield Company (a Delaware Corporation); BP

Exploration & Oil, Inc.; BP Products North America Inc.; BP Amoco Corporation; BP

Amoco plc; BP Oil, Inc.; BP Oil Company; Sohio Oil Company; Standard Oil of Ohio

(SOHIO); Standard Oil (Indiana); The Atlantic Richfield Company (a Pennsylvania

corporation) and its division, the Arco Chemical Company. Atlantic Richfield Company's

headquarters were located in New York State until 1972.

d.      Defendants BP p.l.c. and BP America Inc., and their predecessors,

successors, parents, subsidiaries, affiliates, and divisions are collectively referred to herein

as "BP."

e.      BP transacts and has transacted substantial fossil fuel-related business in

New York, including the marketing and promotion of gasoline and other fossil fuel

products to NYC consumers, including through BP-branded petroleum service stations in

the City, displaying and using BP trademarks, and selling BP-branded gasoline and other branded products.

      f.      BP markets and sells other products including engine lubricant and motor oils to NYC consumers under its Castrol brand name at retail outlets within the City, including Autozone, Advance Auto Parts, BP-branded service stations, and other local automotive supply businesses.

      g.      BP offers a proprietary credit card known as the "BP Credit Card," which allows NYC consumers to pay for gasoline and other products at BP- and Amoco-branded service stations, including in the City. NYC consumers who use the BP Credit Card receive various rewards, including discounts on gasoline purchases at BP and Amoco service stations.

      h.      BP maintains an interactive website that allows consumers to locate BP- and Amoco-branded gas stations in New York City.[6] BP further maintains a smartphone application known as "BPme Rewards" that offers NYC consumers a cashless payment method for gasoline and other products at BP- and Amoco-branded service stations. NYC consumers use the payment method by providing their credit card information through the application. NYC consumers can also receive rewards including discounts on gasoline purchases by registering their personal identifying information into the BPme Rewards application and using the application to identify and activate gas pumps at BP and Amoco service stations during a purchase. Both the BP Credit Card and BPme Rewards are

---

[6] BP, "Find a gas station," https://www.bp.com/en_us/united-states/home/find-a-gas-station.html.

designed to induce customer affinity and brand loyalty and to capture BP market share in the gasoline market.

      i.     BP has engaged in national print and online advertising campaigns that have deliberately targeted consumers throughout the United States, including in New York City, in order to increase its sales. BP has purposely availed itself of New York's marketplace through nationwide advertising it knew would reach NYC consumers.

14.    **American Petroleum Institute**

      a.     Defendant American Petroleum Institute ("API") is a nonprofit corporation based in Washington, D.C., and is registered to do business in New York. API was founded in 1919 in New York City to advocate for the interests of the petroleum industry.[7] Today, API has nearly 600 members, making it the United States' largest oil and gas trade association.

      b.     API's mission is to promote "a strong, viable U.S. oil and natural gas industry,"[8] which includes increasing consumer consumption of oil and gas. Among other functions, API also coordinates among members of the petroleum industry to gather information of interest to that industry and disseminate that information to its members. In effect, API acts and has acted as a marketing arm for its member companies. API has published advertisements in New York City, including billboards in Times Square, and advertises in national media and social media that reaches NYC consumers.

      c.     API has participated in and led several coalitions, front groups, and organizations that have promoted disinformation about fossil fuel products to consumers,

---

[7] API, *API History,* https://web.archive.org/web/20130424045926/
http://api.org/globalitems/globalheaderpages/about-api/api-history.
[8] API, *About API*, https://www.api.org/about.

including Partnership for a Better Energy Future, Coalition for American Jobs, Alliance for Energy and Economic Growth, and Alliance for Climate Strategies. These front groups were formed to provide misleading climate-related advocacy from an ostensibly objective source, when, in fact, they were financed and controlled by API.

        d.       Member companies participate in API strategy, governance, and operation through membership dues and by contributing company officers and other personnel to API boards, committees, and task forces. ExxonMobil, Shell, and BP are core API members. Executives from these companies frequently serve on the API Executive Committee and/or as API Chairman, which is akin to serving as a corporate officer. For example, ExxonMobil's CEO Darren Woods recently served as chairman of API's board from 2018 to 2020 and currently remains a member of the executive committee.[9] The chairman and president of BP America also recently served on API's board, as did the president of Shell Oil Company.[10]

## VENUE AND JURISDICTION

15.     This Court has jurisdiction over this action pursuant to New York Constitution, article VI, § 7(a), and New York Civil Practice Law and Rules §§ 301 and 302.

16.     Pursuant to New York Civil Practice Law and Rules § 503(a), venue is proper in New York County because that is the county of Plaintiff's principal place of business and because it is the county in which a substantial part of the events or omissions giving rise to the claim occurred.

---

[9] Rigzone, *API Names New Chairman* (Jan. 23, 2020), https://www.rigzone.com/news/api_names_new_ chairman-23-jan-2020-160869-article.

[10] ProPublica, *American Petroleum Institute*, Nonprofit Explorer, https://projects.propublica.org/ nonprofits/organizations/130433430/201903199349305980/full.

Case 1:16-cv-03545-Unknown Document 32 of 249

## RELEVANT LAW

17.     The New York City Consumer Protection Law ("CPL") bars "any deceptive or

unconscionable trade practice in the sale . . . or in the offering for sale . . . of any consumer goods

or services[.]" NYC Code § 20-700. Deceptive trade practices are "[a]ny false, falsely disparaging,

or misleading oral or written statement, visual description or other representation of any kind made

in connection with the sale . . . or in connection with the offering for sale . . . of consumer goods

or services . . . which has the capacity, tendency or effect of deceiving or misleading consumers."

NYC Code § 20-701(a). Deceptive trade practices include but are not limited to "representations

that goods or services have . . . characteristics, ingredients, uses, benefits, or quantities that they

do not have" and "the use . . . of exaggeration, innuendo, or ambiguity as to a material fact or

failure to state a material fact if such use deceives or tends to deceive[.]" *Id.* Deceptive trade

practices are not limited to representations made directly to consumers but may include those made

to third parties in a way that tends to deceive consumers.

## STATEMENT OF FACTS

### I.     Information Regarding the Role of Defendants' Fossil Fuel Products in Causing the Climate Crisis Is Material to NYC Consumers' Purchasing Decisions.

18.     Consumer use of fossil fuel products, by driving gasoline-powered cars and other

vehicles as well as electric and home energy choices, is a significant contributor to climate change,

which is driving up global temperatures, increasing the frequency of deadly weather events,

eroding coastal shorelines, and creating other unprecedented threats to people in New York City

and elsewhere.

19.     By misleading NYC consumers about the climate impacts of using fossil fuel

products, even to the point of claiming that certain of their fossil fuel products may benefit the

environment, and by failing to disclose to consumers the climate risks associated with their use of

those products, Defendants have deprived and are continuing to deprive consumers of information about the consequences of their purchasing decisions—information Defendants know influences both public perception of their products and consumer purchasing behavior.

20.    Additionally, as a result of Defendants' widespread advertising exaggerating their environmental credentials and investments in clean energy resources and failing to disclose the known climate harms from their products, many NYC consumers have been unaware of the magnitude of the threat posed by their use of fossil fuels, or of the relationship between their purchasing behavior and climate change. Defendants have sought to mislead consumers, and induce purchases and brand affinity, with greenwashing advertisements designed to represent Defendants as environmentally responsible companies developing innovative green technologies and products. In reality, Defendants' investment in clean energy sources is miniscule and their business models continue to center on developing, producing, and selling more of the very same fossil fuel products driving climate change.

21.    Knowledge of the risks associated with the routine use of fossil fuel products is material to NYC consumers' decisions to purchase and use those products. Numerous consumer surveys back this up. In a Harris Poll conducted in December 2019 on behalf of the American Psychological Association, more than half of U.S. adults said climate change is the most important issue facing society today; 6 in 10 reported changing their habits to reduce their contribution to climate change, including becoming more reliant on renewable energy sources.[11]

22.    Defendants themselves recognize that consumers find the industry's environmental commitments material to their purchasing decisions. For example, API represents on its website that "88% of Americans favor energy companies helping meet environmental challenges."

---

[11] American Psychological Association, *Majority of US Adults Believe Climate Change Is Most Important Issue Today* (Feb. 6, 2020), https://www.apa.org/news/press/releases/2020/02/climate-change.



*Figure 2: API "Energy for a Cleaner Environment" website*[12]

23.     As in the case of cigarettes, history demonstrates that when consumers are made aware of the harmful effects or qualities of the products they purchase, they often choose not to purchase them, to reduce their purchases, or to make different purchasing decisions. This phenomenon holds especially true when products have been shown to harm public health or the environment. For example, increased consumer awareness of the role of pesticides in harming human health, worker health, and the environment has spurred a growing market for food grown organically and without the use of pesticides. With access to information about how their food is grown, consumers have demanded healthier choices, and the market has responded.

24.     A NYC consumer might purchase fewer—or no—fossil fuel products if provided with accurate information that fossil fuel use was a primary driver of climate change and the resultant dangers to the environment and people. NYC consumers might opt to use the City's vast public transit system, bike, or walk; avoid or combine car travel trips; carpool; switch to more fuel-efficient vehicles, hybrid vehicles, or electric vehicles; use a car-sharing service; purchase electric instead of natural gas appliances; or choose any combination of these.

---

[12] API, "Energy for a Cleaner Environment," https://www.api.org/news-policy-and-issues/state-of-american-energy/soae-2019-cleaner.

25.    Informed consumers contribute toward solving environmental problems by supporting companies that they perceive to be developing "green" or more environmentally friendly products. Defendants take advantage of NYC consumers and prevent them from making informed choices by falsely buying consumer goodwill, and by misrepresenting their investments in renewable energy or playing up environmental aspects of their products without disclosing that their primary business—fossil fuels—is also the primary driver of climate change.

## II.    ExxonMobil, Shell, and BP Mislead NYC Consumers by Misrepresenting the Climate Impacts of Specific Fossil Fuel Products.

26.    ExxonMobil, Shell, and BP misrepresent the environmental benefits of various fossil fuel products sold at their gasoline service stations in the City, knowing that NYC consumers want their purchases to help—not hinder—the fight against climate change. In a strategic move to protect and expand their share of the energy market, ExxonMobil, Shell, and BP promote these gasoline products as environmentally beneficial and "emissions-reducing." Yet they conceal from consumers the material fact that using these products still significantly increases greenhouse gas emissions. And they never disclose the material fact that fossil fuels—"emissions-reducing" or otherwise—are the primary cause of climate change.

27.    This marketing strategy is reminiscent of the tobacco industry's advertising campaigns to conceal and downplay the deadly effects of cigarettes. Just as tobacco companies promoted "low-tar" and "light" cigarettes as healthy alternatives to quitting smoking, so too are ExxonMobil, Shell, and BP promoting "emissions-reducing" gasoline products as climate-friendly alternatives to quitting fossil fuels. And just as tobacco companies failed to disclose that smoking "low-tar" and "light" cigarettes is deadly to human health,[13] so too are ExxonMobil, Shell, and BP

---

[13] National Cancer Institute, *"Light" Cigarettes and Cancer Risk* (Oct. 28, 2010), https://www.cancer.gov/about-cancer/causes-prevention/risk/tobacco/light-cigarettes-fact-sheet ("The bottom line is that light cigarettes do not reduce the health risks of smoking.").

hiding that using their "cleaner" and "emissions-reducing" gasoline products is harmful to the climate, the planet, and its people.

28.    Indeed, ExxonMobil, Shell, and BP even use the same kind of scientific jargon that Big Tobacco deployed to give their misleading statements the imprimatur of scientific credibility. Advertising for Decade brand cigarettes, for example, referenced a "patented tobacco flavorant," "modern laser technology," "exclusive research design," and the "total system" of cigarette manufacturing developed by Decade over a ten-year period to deliver a "low tar cigarette." In a similar vein, for example, Exxon's advertisements of its Synergy™ products reference "meticulous[] engineer[ing]" and "rigorously test[ing] in the lab."[14]

29.    As with the tobacco companies' use of scientific terms to promote "light" cigarettes, ExxonMobil, Shell, and BP's claims that their purportedly high-tech new fossil fuel products help consumers reduce emissions renders their promotional materials misleading, because they seek to convey—under the guise of scientific rigor—an overall message that is false, and contradicted by ExxonMobil, Shell, and BP's own knowledge regarding the dangers of fossil fuel use in causing climate change.

30.    Below is a selection of fossil fuel products that ExxonMobil, Shell, and BP advertise to NYC consumers as environmentally beneficial, while simultaneously omitting any mention of the products' role in aggravating climate change. These advertisements are representative of other advertisements and public communications, all of which reinforce ExxonMobil, Shell, and BP's strategies to influence consumer demand for their products by misleading consumers that their fossil fuel products will help consumers reduce emissions.

---

[14] ExxonMobil, "Fuels," https://www.exxon.com/en/fuels; ExxonMobil, "New Synergy Diesel Efficient™ Fuel," https://www.exxon.com/en/diesel-fuel.

31.    **ExxonMobil Synergy™ Fuels**

a.      In July 2016, ExxonMobil began to supply and market its Synergy™ fuel, including
at Exxon- and Mobil-branded gas stations in New York City.

b.      All gasoline sold at ExxonMobil-branded stations in the New York City has
received the Synergy additive, and therefore constitutes Exxon Synergy™ fuel.

c.      In July 2019, ExxonMobil began offering "Synergy™ Supreme+," targeted to
purchasers of so-called "premium" gasoline, including NYC consumers. The messaging for this
product states that Synergy™ Supreme+ is "Our Best Fuel Ever," and "2X cleaner for better gas
mileage." According to ExxonMobil, Synergy Supreme+ will enhance vehicle fuel economy in
newer engines designed to meet tougher vehicle emissions standards.

d.      Similarly, ExxonMobil advertises its Synergy Diesel Efficient™ fuel as a
"breakthrough formulation" that helps consumers "[r]educe emissions and burn cleaner," and "was
created to let you drive cleaner, smarter and longer."[15]

e.      As shown in the screenshot below, ExxonMobil's website advertises that
Synergy™ gasolines are "engineered for" "[l]ower emissions"—but then explains in smaller print
that it "[h]elps remove deposits, which can lead to fewer emissions."[16]

---

[15] ExxonMobil, "Synergy Diesel Efficient™ fuel for passenger vehicles," https://www.exxon.com/en/
synergy-diesel-efficient-passenger.
[16] ExxonMobil Fuels, "Synergy Unleaded Gasoline," https://www.exxon.com/en/unleaded-gasoline.



*Figure 3: ExxonMobil Fuels website screenshot*

f.      Additional promotional materials for Synergy™ gasolines appearing on ExxonMobil's website features a photograph of a mountain sunrise with trees in the foreground and text expressly suggesting that its Synergy™ products help reduce greenhouse gas emissions (emphasis added):

> ***Environmental performance***
> ***Conscientious practices. Rigorous standards.***
> Continually ***improving environmental performance*** while pursuing reliable and affordable energy
>> Ten years ago, we introduced Protect Tomorrow. Today. – a set of expectations that serves as the foundation for our environmental performance. Guided by a scientific understanding of the environmental impacts and related risks of our operations, these rigorous standards and good practices have become an integral part of our day-to-day operations. . . .
>>
>> The following are the three major areas in which we've concentrated our efforts to ***reduce environmental impacts***. . . .
>
> Improve efficiency in consumer use of fuels
>> We're continually innovating to develop products that enable customers ***to reduce their energy use and CO2 emissions***. For example, we have:
>> . . . .

21

> • ***Engineered Fuel Technology Synergy™ fuels to help improve fuel economy and reduce CO2 emissions . . . .***

Below is a screenshot of the portion of the ExxonMobil webpage featuring this promotion:



*Figure 4: ExxonMobil Fuels Environmental Performance webpage screenshot[17]*

g. ExxonMobil's 2021 Energy and Carbon Summary sets forth "four pillars of the Company's climate strategy" in support of its "commit[ment] to supporting efforts to mitigate the risk of climate change."[18] One of those pillars is "providing products to help customers reduce

---

[17] ExxonMobil, "Environmental performance," https://www.exxon.com/en/environment.

[18] ExxonMobil, *2021 Energy & Carbon Summary* (Jan. 2021), at 3, https://corporate.exxonmobil.com/-/media/Global/Files/energy-and-carbon-summary/Energy-and-Carbon-Summary.pdf. In previous years ExxonMobil has released similar Energy & Carbon Summary reports with similar deceptive statements about ExxonMobil fuels helping to reduce greenhouse gas emissions.

their emissions," and ExxonMobil specifically represents that its Synergy™ fossil fuel product

line reduces greenhouse gas emissions:

> Premium fuels such as Synergy™ gasoline and diesel also help consumers improve
> gas mileage. By improving engine efficiency and fuel economy, these products can
> help reduce greenhouse gas emissions compared to conventional lubricants and
> fuels. ExxonMobil is progressing several multibillion-dollar refinery expansion
> projects to supply the growing demand for these advanced fuel products.[19]



**EXXONMOBIL'S CLIMATE STRATEGY,** *continued*

## Providing products to help customers reduce their emissions

- ExxonMobil is responding to product demand growth by delivering solutions that
  enable customers to meet product performance requirements while reducing
  greenhouse gas emissions. These products and solutions include: natural gas,
  lightweight materials and packaging, and advanced fuels and lubricants.

*Figure 5: ExxonMobil 2021 Energy & Carbon Summary[20]*

        h.     In its advertising to NYC consumers, including at City gas and service stations,

ExxonMobil emphasizes positive environmental qualities, e.g., the "cleanliness," fuel efficiency

benefits, and "lower emissions," of its Synergy™ fossil fuel products, which are misleading

without mention of the key role these fossil fuels play in causing climate change.

        32.     **Shell Nitrogen Enriched Cleaning System and Shell V-Power NITRO+
Premium**

        a.     All grades of Shell gasoline sold in New York City have the Shell Nitrogen

Enriched Cleaning System, and Shell introduced a line for its premium-grade gasoline called V-

Power Nitro+ Premium.

---

[19] *Id.* at 31.
[20] *Id.* at 4.

b.      Shell advertises on its website that these fuels "produce[] fewer emissions"[21] and that not using them can lead to "higher emissions."[22]

c.      Such representations are misleading because they emphasize the fuels' supposedly environmentally beneficial qualities without disclosing the key role these fossil fuels play in causing climate change.

33.      **BP Invigorate Fuels**

a.      All grades of BP gasoline sold in the New York City have Invigorate, an additive that BP describes on its website as better than "ordinary fuels" that have problems like "increased emissions."

b.      BP's website advertises its fuel selection as "including a growing number of lower-carbon and carbon-neutral products."[23]

c.      Such representations are misleading because they emphasize the fuels' supposedly environmentally beneficial qualities without disclosing the key role these fossil fuels play in causing climate change.

III.    **ExxonMobil, Shell, and BP Misleadingly Greenwash Their Corporate Brands by Exaggerating Their Investments in Clean Energy Resources and by Inflating the Climate Benefits of Their Natural Gas Products and Investments in "Alternative Energy Sources."**

34.      Defendants know that today's consumers are more likely to buy from companies that are perceived to be environmental stewards. In response to growing public concern over climate change, ExxonMobil, Shell, and BP have worked tirelessly to greenwash their corporate

---

[21] Shell, "Nitrogen Enriched Gasolines," https://www.shell.us/motorist/shell-fuels/shell-nitrogen-enriched-gasolines.html.

[22] Shell, "Shell V-Power NiTRO+ Premium Gasoline," https://www.shell.us/motorist/shell-fuels/shell-v-power-nitro-plus-premium-gasoline.html.

[23] BP, "Fuels and lubricants," https://www.bp.com/en_us/united-states/home/who-we-are/what-we-do/fuels-and-lubricants.html.

brands and reputations, going to great lengths to portray themselves as leaders in the fight against climate change, even though their products are the primary driver in causing it.

35.     These misleading greenwashing campaigns primarily take two forms. First, in advertisements directed at the NYC consumers, ExxonMobil, Shell, and BP exaggerate their overall investments in non-fossil fuel energy resources. These advertisements create the impression that these investments are substantial, and that ExxonMobil, Shell, and BP are diligently working to reduce the carbon footprint of their business models. But in fact, ExxonMobil, Shell, and BP each spend negligible amounts on clean energy resources, and they continue to ramp up fossil fuel production and invest in new fossil fuel development.

36.     Second, ExxonMobil, Shell, and BP misrepresent the climate benefits associated with their investments in what they call "alternative energy sources." For example, they play up their natural gas products as evidence of their supposed leadership in bringing about a clean energy future. But these advertisements fail to disclose the lifecycle emissions of methane, which is a highly potent greenhouse gas, with more than 80 times the climate change impact compared to $CO_2$ over the short term, and thus such advertisements fail to acknowledge that natural gas is a major contributor to climate change. Likewise, ExxonMobil and Shell advertise their research on fuel sources such as algae biofuels and hydrogen fuel cells, claiming that these energy sources are clean, cheap, and capable of mitigating climate change. Defendants conceal, however, that these fuels release significant amounts of greenhouse gases and that they are currently not scalable for mass production. The prominence of these "alternative energy sources" in their promotions is likely to mislead NYC consumers into believing ExxonMobil, Shell, and BP are substantially shifting away from what in reality remains their primary products: fossil fuels.

37.     Through these various greenwashing campaigns, ExxonMobil, Shell, and BP seek

to divert attention away from the existential threats posed by their core business of selling fossil fuels, and instead reposition themselves in the eyes of consumers as diversified energy companies that are serious about tackling climate change. In doing so, ExxonMobil, Shell, and BP are deploying deceptive marketing tactics in a transparent bid to capture the large and growing segment of consumers—including NYC consumers—who care about the planet and who want to make purchases that contribute to the solution to, rather than the problem of, climate change. They recognize that their corporate image matters to their bottom line, and so they are spending millions of dollars trying to cut greenhouse gas emissions from their brand but not their business. Indeed, one recent report estimates that, in 2019 alone, ExxonMobil spent $56 million, Shell spent $55 million, and BP $30 million on "climate branding" initiatives—efforts to underscore the company's commitment to clean energy and climate change mitigation, position the company as a climate expert, and conceal the central role of fossil fuels in causing climate change.[24]

38.    Defendants were also on notice that these types of greenwashing campaigns are deceptive and misleading. In 2017, Shell and ExxonMobil were censured for such misleading advertising by the Dutch Advertising Code Authority for describing natural gas as "the cleanest fossil fuel." The agency's ruling stated that this description was misleading because it "suggested that fossil fuels can be clean in that they do not cause environmental damage. It is firm . . . that that suggestion is not correct."[25]

39.    Defendants have nevertheless continued to engage in similarly deceptive advertising practices in the City. As detailed below and in the attached Appendix, such deceptive

---

[24] InfluenceMap, *Big Oil's Real Agenda on Climate Change* 12 (March 2019), https://influencemap.org/report/How-Big-Oil-Continues-to-Oppose-the-Paris-Agreement-38212275958aa21196dae3b76220bddc.

[25] Arthur Nelsen, *Shell and Exxon Face Censure Over Claim Gas Was 'Cleanest Fossil Fuel'*, THE GUARDIAN (Aug. 14, 2017), https://www.theguardian.com/environment/2017/aug/14/shell-and-exxon-face-censure-over-claim-gas-was-cleanest-fossil-fuel.

greenwashing advertisements are squarely prohibited by the CPL, and they cannot be allowed to continue.

### A. Misrepresentations About Investments in Clean Energy Resources

40.     Although clean energy resources play a negligible part in ExxonMobil, Shell, and BP's businesses, they are front and center when it comes to their advertising. To create brand loyalty and to enlarge their customer base, ExxonMobil, Shell, and BP are bombarding NYC consumers with advertisements that give the false impression that renewable and low-carbon energy is an extensive portion of their business. Yet in none of their consumer messaging do they disclose that those investments are negligible in comparison to the billions of dollars that they spend (and make) annually on fossil fuels.

41.     ExxonMobil, Shell, and BP invest minimally in clean energy resources. Between 2010 and 2018, for example, ExxonMobil expended just 0.2% of total capital spending on low carbon energy sources; Shell spent 1.2%; and BP, 2.3%.[26] The actual energy they produced from clean energy resources compared to fossil fuels during those years is smaller still.

42.     ExxonMobil, Shell, and BP show little sign of increasing those shares in the near future. To the contrary, they have been doubling down on fossil fuel extraction, production, and sales. ExxonMobil, Shell, and BP have adjusted their projections somewhat in response to the COVID-19 pandemic, but they have not wavered in their commitment to maintaining fossil fuels as the core driver of their business model during the next decade, the crucial window of time in which the world must drastically slash greenhouse gas emissions in order to avoid the most catastrophic effects of the climate crisis.

a.     Indeed, according to a recent report published in 2019 by a reputable oil and gas

---

[26] Anjli Raval & Leslie Hook, *Oil and Gas Advertising Spree Signals Industry's Dilemma*, FINANCIAL TIMES (Mar. 6, 2019), https://www.ft.com/content/5ab7edb2-3366-11e9-bd3a-8b2a211d90d5.

consulting firm, ExxonMobil is projected to increase oil production by more than 35% between 2018 and 2030—a sharper rise than over the previous 12 years.[27] In October 2020, leaked ExxonMobil internal documents show that, due to its expanded fossil fuel production growth strategy, the company was projecting a 17% *increase* in greenhouse gas emissions by 2025 (not including emissions from consumer use of its products).[28] As one top ExxonMobil executive put it succinctly in September 2020: "We believe in the fundamentals of the oil and gas business . . . . We believe societies and economies will continue to need oil and gas. In the upcoming years, *the alternatives really can only fulfill a small amount, or a relatively modest amount*, of the overall demand that exists" (emphasis added).[29]

    b.   Shell recently forecast to increase output by 38% by 2030, expanding its crude oil production by more than half and its gas production by over a quarter.[30]

    c.   And BP is predicted to increase production of oil and gas by 20% by 2030.[31]

43.    ExxonMobil, Shell, and BP's advertising campaigns therefore misleadingly "greenwash" their businesses to make them appear substantially more in line with consumers' preferences for forms of energy that do not contribute to climate change or other environmental

---

[27] Jonathan Watts et al., *Oil Firms to Pour Extra 7m Barrels Per Day Into Markets, Data Shows*, THE GUARDIAN (Oct. 10, 2019), https://www.theguardian.com/environment/2019/oct/10/oil-firms-barrels-markets.

[28] Kevin Crowley & Ashkat Rathi, *Exxon's Plan for Surging Carbon Emissions Revealed in Leaked Documents, Internal Projections From one of World's Largest Oil Producers Show an Increase in Its Enormous Contribution to Global Warming*, BLOOMBERG (Oct. 5, 2020), https://www.bloomberg.com/news/articles/2020-10-05/exxon-carbon-emissions-and-climate-leaked-plans-reveal-rising-co2-output.

[29] S&P Global, *ExxonMobil Focused on Core Oil and Gas as Renewable Returns Too Weak: Official*, (Sept. 30, 2020), https://www.spglobal.com/platts/en/market-insights/latest-news/electric-power/093020-exxonmobil-focused-on-core-oil-and-gas-as-renewable-returns-too-weak-official.

[30] Watts et al., *supra* note 26.

[31] *Id.*

harms, all the while masking their core business in fossil fuels. The examples below illustrate this deceptive conduct.

44.    ExxonMobil touts its investments in clean energy resources while failing to disclose to consumers that those investments represent a fringe part of its fossil fuel-focused business.

45.    For example, in one *New York Times* advertisement titled "The Future of Energy? It May Come From Where You Least Expect: How scientists are tapping algae and plant waste to fuel a sustainable energy future," ExxonMobil claims that the company is "working to decrease our overall carbon footprint," markets itself as an innovator in the development of alternative fuels, such as fuel from algae and from farm waste, and falsely represents itself as an environmentally responsible company, concluding with the statement: "A Greener Energy Future. Literally."[32] In another *New York Times* advertisement titled "From Farm Waste to Fuel Tank," ExxonMobil declares that its scientists are "exploring how to . . . create biofuel on a vast scale," adding that biofuels have "the power to make a big difference" because biomass (one of the primary ingredients in biofuels) is "cheap and abundant."[33]

46.    None of ExxonMobil's consumer-facing advertisements, however, disclose that its current investments in biofuels research and production are dwarfed by its fossil-fuel operations. (In 2016, for example, ExxonMobil invested less than 1% of its $ 198 billion in revenue in biofuels research). And none of them disclose that Exxon's biofuel production will continue to be dwarfed by its fossil fuel production. Indeed, one 2019 analysis shows that ExxonMobil's advertised goal

---

[32] *The Future of Energy? It May Come From Where You Least Expect* (ExxonMobil Paid Post), N.Y. TIMES, https://www.nytimes.com/paidpost/exxonmobil/the-future-of-energy-it-may-come-from-where-you-least-expect.html.

[33] *From Farm Waste to Fuel* (ExxonMobil Paid Post), N.Y. TIMES, https://www.nytimes.com/paidpost/exxonmobil/from-farm-waste-to-fuel-tank.html#100000006080624.

of producing 10,000 barrels of biofuel per day by 2025 would equate to only 0.2% of its current refinery capacity—what the report called "a rounding error."[34] By contrast, Exxon's oil production is projected to increase by more than 35% in the coming years, meaning that any marginal emission reductions achieved through its proposed biofuel efforts would be offset by massive emission increases from its oil operations.[35]

47.    Similarly, in countless social media advertisements posted on Instagram, Twitter, Facebook, and LinkedIn and viewed by hundreds of thousands of consumers (including NYC consumers), ExxonMobil extolls its plans to reduce greenhouse gas emissions, boasts of its investments and research in clean energy resources, and characterizes itself as a corporate leader in the fight against climate change.

48.    To take just few recent examples, in a LinkedIn post from March 2021, ExxonMobil wrote: "We recently announced a plan to further reduce greenhouse gas emissions in our global operations by 2025, while aiming for industry-leading GHG performance by 2030. We are positioning for a lower-carbon-energy future and this plan represents some of the most aggressive reductions in the industry." The accompanying image with a blue sky and green grass continued: "our 2025 plans are expected to reduce absolute greenhouse gas emissions by an estimated ~30%," and in smaller text, "for the company's upstream business."[36]

---

[34]    INFLUENCEMAP, *Big Oil's Real Agenda on Climate Change* (Mar. 2019), https://influencemap.org/report/How-Big-Oil-Continues-to-Oppose-the-Paris-Agreement-38212275958aa21196dae3b76220bddc.

[35] Watts et al., *supra* note 25.

[36] ExxonMobil, LinkedIn (March 2021), https://www.linkedin.com/posts/exxonmobil_energy-carbon-summary-activity-6769727442681655296-CoDp.



*Figure 6: ExxonMobil March 2021 LinkedIn post*

49.    In a January 2021 tweet, ExxonMobil stated: "We support the ambition to achieve net-zero emissions by 2050 and the goals of the Paris Agreement. Our newly released Energy & Carbon Summary outlines efforts to develop energy solutions that power modern life and progress toward a lower-carbon future."[37]

50.    In a November 2020 Instagram post, ExxonMobil boasted that, "over the last 40 years, we have cumulatively captured the most CO2 of any company." The ad omitted that during that same period of time, ExxonMobil's operations and the use of its fossil fuel products have been one of the single largest sources of greenhouse gas emissions emitted into the earth's atmosphere.[38] It also failed to disclose that ExxonMobil captures only about 2 percent of its annual emissions, and that the company's investments in carbon capture and sequestration are a drop in the bucket

---

[37] @exxonmobil, Twitter (Jan. 5, 2021), https://twitter.com/exxonmobil/status/1346526004223877126.

[38] @exxonmobil, Instagram (Nov. 24, 2020), https://www.instagram.com/p/CH_JQugBNjc.

when compared to its current and planned spending on fossil fuel exploration, extraction, and development.[39]



*Figure 7: ExxonMobil March 2021 Instagram post*

51.    And as of April 12, 2021, the description of ExxonMobil's profile page on Instagram including the following subtitle:



*Figure 8: ExxonMobil Instagram Bio*

---

[39] *See, e.g.*, Greenwashing Files: ExxonMobil, ClientEarth, https://www.clientearth.org/the-greenwashing-files/exxonmobil.

52.     None of ExxonMobil's social media advertisements tell consumers that its primary business remains the extraction, production, and sale of planet-warming fossil fuels. None of them disclose the company's plans to *increase* the sale of fossil fuels in the next decade. And none of them reveal that Exxon's clean energy portfolio continues to constitute a negligible part of its business model. As a result, these and countless other ExxonMobil advertisements leave consumers with the false impression that the company is taking ambitious steps towards cutting greenhouse gas emissions, shifting its investments towards clean energy, and researching next generation solutions to climate change.

53.     Meanwhile, Shell has mastered the art of greenwashing their corporate brand with misleading advertisements designed to look like newspaper articles in the *New York Times* and *Washington Post*, rather than paid ads. Consider, for instance, Shell's interactive tutorial titled "The Making of Sustainable Mobility."[40] In it, Shell outlines the challenges of reducing greenhouse gas emissions from the transportation sector. It then situates itself at the center of the solution. "Thankfully," the ad states, "an array of scientists, innovators and businesses are hard at work creating more efficient ways of moving around." And "Shell," the ad continues in the next sentence, "is one of them." The advertisement proceeds to extoll Shell's investments in so-called "lower-carbon transport fuels," focusing on its projects in liquified natural gas, biofuels, hydrogen, and charging stations for electric vehicles.

---

[40] *The Making of Sustainable Mobility* (Content from Shell), WASH. POST, https://www.washingtonpost.com/brand-studio/shell/the-making-of-sustainable-mobility.

FILED: NEW YORK COUNTY CLERK 04/22/2021 09:12 AM
Case 24-1580, Document 116, 03/20/2024, Entry 36:1, Page 51 of 249
NYSCEF DOC. NO. 1

INDEX NO. 451071/2021
RECEIVED NYSCEF: 04/22/2021



*Figure 9: Shell The Making of Sustainable Mobility Advertisement*

54.     As displayed in the figure below, the ad ends by portraying Shell's leadership in

"setting the course" to develop the "cleaner fuel alternatives" that "[t]he world will need."



*Figure 10: Shell The Making of Sustainable Mobility Advertisement*

55.    Shell never discloses, however, that natural gas is a leading cause of climate change; that its investments in clean energy resources are negligible when compared to its spending on fossil fuels; or that it plans to continue to ramp up the production and sale of fossil fuels, including those used in transportation. As a result, NYC consumers are left with the misleading impression that Shell's business is significantly involved in developing and producing clean energy resources.

56.    Another advertisement from Shell in the *New York Times* describes "a path towards net-zero emissions," stating that if "the world's nations are going to meet the aims of the Paris Agreement, they'll have to completely transform the way energy is used—and produced—across the global economy." Despite this and other public-facing endorsements of Shell's role in an

overhaul of the energy system and the possibility of addressing climate change, a disclaimer in

Shell's recent public "Climate Target" report reveals their misleading and illusory nature:

> As of February 11, 2021, Shell's operating plans and budgets do not reflect Shell's
> Net-Zero Emissions targets. Shell's aim is that, in the future, its operating plans and
> budgets will change to reflect this movement towards its new Net-Zero Emissions
> target. However, these plans and budgets need to be in step with the movement
> towards a Net Zero Emissions economy within society and among Shell's
> customers.[41]

In fact, Shell's actual "plans and budgets" call for it to expand its liquefied-natural gas production

capacity throughout the next decade.[42]

57.     As for BP, in 2019, the company launched an advertising campaign called

"Possibilities Everywhere." The advertisements were targeted at NYC consumers, appearing in

media targeting and circulated to NYC consumers, including, for example, the New York City-

based *Wall Street Journal*, as well as Twitter, CNN, the *Financial Times*, and *The Economist,* and

*POLITICO.*[43]

58.     One Possibilities Everywhere advertisement, called "Better fuels to power your

busy life," stated:

> We [] want—and need—[ ] energy to be kinder to the planet. At BP, we're working
> to make our energy cleaner and better. [...] At BP, we're leaving no stone unturned
> to provide [the] extra energy the world needs while finding new ways to produce
> and deliver it with fewer emissions. [...] We're bringing solar and wind energy to
> homes from the US to India. We're boosting supplies of cleaner-burning natural

---

[41] Shell, *Our Climate Target,* 2021, https://web.archive.org/web/20210307100028/
https://www.shell.com/energy-and-innovation/the-energy-future/our-climate-
target.html#iframe=L3dlYi8yMDIxMDMwNzEyMjgwMm9lXy9odHRwczovL2ZvdXJsZWFmZGlnaXR
hbC5zaGVsbC5jb20vd2ViYXBwcy9jbGltYXRlX2FtYml0aW9aW9uLw.

[42] Jillian Ambrose, *Shell to expand business despite pledge to speed up net zero carbon drive*, THE
GUARDIAN (Feb. 11, 2021), https://www.theguardian.com/business/2021/feb/11/shell-grow-gas-business-
energy-net-zero-drive.

[43] Campaign US, *BP Launches Biggest Campaign in a Decade,* January 21, 2019,
https://www.campaignlive.com/article/bp-launches-biggest-global-campaign-decade/1523391.

gas. […] More energy with fewer emissions? We see possibilities everywhere to help the world keep advancing.[44]

The accompanying video showed a busy household while a voiceover said, "We all want more energy, but with less carbon footprint. That's why at BP we're working to make energy that's cleaner and better."[45]

59.     In another advertisement called "Blade runners," BP boasts that it is "one of the major wind energy businesses in the US." [46]

60.     In yet another promotion titled "Rise and shine," BP touts its investments in solar. "Our economics gurus believe [solar power] could account for 10% of the world's power by 2040," it states, and "to help make that a reality, we've teamed up with Europe's largest solar company, [Lightsource BP]."[47] The ad highlights Lightsource BP's 6.3 MW floating solar power station near London and Lightsource BP's deal with Budweiser to supply renewable energy to its U.K. breweries. "Projects like these are advancing the possibilities of solar," BP declares, "and even rainy days can't dampen the excitement for this fast-growing energy source. That's because, whatever the weather, our cleaner-burning natural gas can play a supporting role to still keep your kettle ready for action."

61.     Together and individually, these advertisements create the false and misleading impression that BP is a leading developer of wind, solar, and other clean energy resources.

---

[44] BP, *Better fuels to power your busy life*, https://web.archive.org/web/20191130155554/
https://www.bp.com/en/global/corporate/who-we-are/possibilities-everywhere/energy-for-busy-lives.html.

[45] *Id*.

[46] BP, *Blade runners*, https://web.archive.org/web/20191130192545/https://www.bp.com/
en/global/corporate/who-we-are/possibilities-everywhere/wind-and-natural-gas.html.

[47] BP, *Rise and Shine*,
https://web.archive.org/web/20190329004210/https://www.bp.com/en/global/corporate/who-we-are/possibilities-everywhere/solar-and-natural-gas.html.

Between 2010 and 2018, for example, BP expended just 2.3% of its total capital on clean energy resources.[48]

    a. BP's investments in wind energy are negligible, both when compared to its own investments in fossil fuels and to other companies' investments in wind resources. Indeed, as summarized in the chart below, when NYC consumers were viewing these advertisements, BP owned only approximately 1 gigawatt ("GW") of wind capacity, less than 5% of the wind capacity owned by GE, Siemens, and Vestas (39 GW, 26 GW, and 23 GW, respectively),[49] and a mere 1% of total installed wind capacity in the United States (approximately 100 GW).[50]



*Figure 11: U.S. Wind Energy Capacity 2018–2019*

---

[48] Raval & Hook, *supra* note 25.

[49] For BP's wind capacity, *see* Press Release, *BP restructures U.S. Wind Energy Business for growth* (Dec. 21, 2018), https://www.bp.com/en/global/corporate/news-and-insights/press-releases/bp-restructures-us-wind-energy-business-for-growth.html. For wind capacity of GE, Siemens, and Vestas, *see* Greg Zimmerman, *Who's Powering the Wind Industry in 2019? Top 10 Wind Power Companies*, ENERGY ACUITY (Jan. 7, 2019), https://energyacuity.com/blog/top-wind-power-companies.

[50] *See* Elizabeth Ingram, *U.S. wind capacity grew 8% in 2019, AWEA says*, RENEWABLE ENERGY WORLD (Apr. 10, 2019), https://www.renewableenergyworld.com/articles/2019/04/u-s-wind-capacity-grew-8-in-2018-awea-says.html.

b.   The same is true for BP's activities in solar energy, which consist predominantly

of its purchase of a minority interest in the solar company Lightsource (rebranded

Lightsource BP).[51] The purchase price for this interest represents only 0.4% of BP's

annual capital expenditure of approximately $16 billion, nearly all of which focuses

on fossil fuels.[52] These investments are a far cry from BP's claim that it was

"leaving no stone unturned" to find "new" ways to produce lower-emissions

energy[53] and that it was playing a "leading role" in "a rapid transition to a low

carbon future."[54] Following a complaint filed against BP at the Organisation for

Economic Co-operation and Development, BP announced that it would "stop

corporate reputation advertising" and pulled down the Possibilities Everywhere

campaign worldwide.

62.   These advertisements are illustrative of Defendants' efforts to greenwash their

corporate image by exaggerating their businesses' involvement in the clean energy sector. They

are not exhaustive, however. The Appendix identifies additional deceptive advertisements of this

kind, and there are many more blitzing NYC consumers on a daily basis through newspapers,

social media, and other advertising platforms. This deceptive conduct violates the CPL, and it must

be stopped.

---

[51] BP ANNUAL REPORT AND FORM 20-F 42 (2017), https://www.bp.com/content/dam/bp/business-sites/en/global/corporate/pdfs/investors/bp-annual-report-and-form-20f-2017.pdf.
[52] *See BP to maintain reduced capital spending through 2021*, OIL & GAS JOURNAL (Feb. 28, 2017), https://www.ogj.com/general-interest/article/17290398/bp-to-maintain-reduced-capital-spending-through-2021.
[53] @bp_plc, Twitter (March 1, 2019), https://twitter.com/bp_plc/status/1101522924245151744.
[54] @bp_plc, Twitter (Aug. 18, 2019), https://twitter.com/bp_plc/status/1163077936452259840?lang=en.

**B. ExxonMobil, Shell, and BP's Misrepresentations About the Climate Benefits of Natural Gas, Biofuels, and "Alternative Energy Resources"**

63.     ExxonMobil, Shell, and BP also misrepresent the climate benefits from their natural gas products and their so-called "alternative energy portfolio," which they typically define to include investments in liquified natural gas (LNG), hydrogen fuel cells, and biofuels.

64.     Natural gas is a significant driver of climate change because the extraction, transportation, and combustion of this fossil fuel releases large quantities of greenhouse gas emissions—with particularly significant extraction and transportation emissions of methane, a greenhouse gas that is more than 80 times more potent than carbon dioxane at trapping heat in the atmosphere in the near term, and that therefore accelerates climate disruption at a faster rate than carbon dioxide. In fact, reducing methane emissions is among the most immediate and highest impact actions to be taken to combat climate change.

65.     In advertisements directed at NYC consumers, however, Defendants omit those material facts about the lifecycle emissions of natural gas. They misleadingly portray gas as a "cleaner burning" or "sustainable" source of low-emission energy that is critical to combatting climate change.[55] For example:

    a.   In Shell's "In for the Long Haul" advertisement, for instance, the company claimed that expanding LNG would "help prevent climate change from advancing," including by fueling ships "with low to no emissions."[56] And in Shell's "The Making of Sustainable Mobility" advertisement, Shell misleadingly associates

---

[55] *See, e.g.*, *The Mobility Quandary* (Content from Shell), WASH. POST, https://www.washingtonpost.com/brand-studio/shell/the-mobility-quandary ("Another critical component of a sustainable energy mix in transportation is further investment in natural gas, a cleaner-burning fossil fuel . . . .").

[56] *Moving Forward: A Path to Net-Zero Emissions by 2070* (Content from Shell), N.Y. TIMES, https://www.nytimes.com/paidpost/shell/ul/moving-forward-a-path-to-net-zero-emissions-by-2070.html.

LNG with non-fossil fuel energy by calling it "part of a mosaic of alternative energy sources."[57]

b. ExxonMobil partners natural gas with renewables in its advertisements and social media posts, comparing them to "peanut butter and jelly"[58] or "chips and guacamole." ExxonMobil boasted in these ads: "When it comes to cleaner energy, some things just work better together. We're leaders in natural gas which is reliable and abundant and supports renewable energy. Combined they're the perfect pair for a cleaner energy future."[59]

c. And in a similar vein, BP has consistently portrayed its "cleaner-burning" natural gas products as necessary to the scale up of renewable energy sources, telling consumers, for instance, that wind power without natural gas would be like "fish without chips, peanut butter without jelly, and bread without butter."[60]

66.   Yet LNG produces more emissions than natural gas due to the liquefaction process; only a small fraction of natural gas products is paired with the deployment of wind, solar, or other clean energy sources; and gas is not necessary to scaling up clean energy resources, which can be accomplished, instead, with battery storage or other zero-emission technologies. By focusing only on consumer use ("cleaner burning") and ignoring natural gas's significant greenhouse gas emissions during production and transportation, these advertisements (as well as countless others like them) tell a half-truth and create the misleading impression that expanding the production of

---

[57] Shell, *The Making of Sustainable Mobility*, *supra* note 37.

[58]   ExxonMobil, Peanut Butter & Jelly, Natural Gas & Renewables (Aug. 26, 2020), https://www.youtube.com/watch?v=6K9f2uy2JzU.

[59] Facebook Ad Library, https://www.facebook.com/ads/library/?id=452326435699710.

[60] *See* BP, *Blade runners*, https://web.archive.org/web/20191130192545/https://www.bp.com/en/global/corporate/who-we-are/possibilities-everywhere/wind-and-natural-gas.html.

natural gas is a win-win investment in the fight against climate change, with little to no downsides for the planet or its people.

67.     Defendants have advanced a similar tactic when advertising their investments in biofuels, hydrogen fuels, and other so-called "alternative energy resources." In ads directed to NYC consumers, Defendants misleadingly downplay the emissions produced by these resources in order to greenwash their corporate image, distinguish themselves from competitors by exaggerating their environmental credentials, build brand loyalty, and attract customers to their products.

68.     To take one stark example: In a *New York Times* advertisement, Shell promoted its hydrogen fuel cells as "[o]ne of the cleaner sources" that power electric vehicles, telling consumers that "[h]ydrogen fuel cell vehicles . . . emit nothing from their tailpipes but water vapor."[61] Yet Shell failed to disclose that almost all of the hydrogen fuel in the United States is produced by reforming natural gas, a process that releases significant amounts of greenhouse gases. Shell's focus on tailpipe emissions is therefore highly misleading, because it creates the false impression that hydrogen fuel is a zero-emission fuel for transportation.

69.     These advertisements are illustrative of ExxonMobil, Shell, and BP's efforts to greenwash their corporate image by exaggerating the climate benefits of their investments in natural gas and other "alternative fuels." They are not exhaustive, however. The Appendix identifies additional advertisements of this kind, and NYC consumers are viewing many more on a daily basis through newspapers, social media, and other advertising platforms. These greenwashing advertisements are deceptive and violate the CPL.

---

[61] Shell, *The Mobility Quandary*, *supra* note 51.

IV.     **API Misleadingly Greenwashes Fossil Fuels' Role in Climate Change**

70.     In lockstep with its member companies—including three of its largest and most influential members, ExxonMobil, Shell, and BP—API's public messaging, including in advertising and statements directed at NYC consumers, misleadingly greenwashes fossil fuels' role in climate change. API touts its members' purported commitments to reducing their products' carbon footprints while continuing its core mission of promoting its members' extraction, production, and sale of fossil fuels to consumers in New York City and throughout the United States at unprecedented rates.

71.     During the 2017 Super Bowl, the most-watched television program in the United States, API debuted its "Power Past Impossible" campaign, with advertisements that told Americans that the petroleum industry could help them "live better lives." From November 2017 to the end of January 2018, the campaign specifically targeted New York City with billboards in Times Square.[62] As of July 21, 2020, the Power Past Impossible website called oil and natural gas "Energy for a Cleaner Environment," language API still uses on its website.[63] In touting the environmental benefits of fossil fuels, the website induces a false consumer affinity for oil and natural gas products that cannot be reconciled with those products' leading role in contributing to climate change and its attendant environmental and human health risks.

72.     A 2018 study of the advertisements by Dr. Kim Sheehan, a professor at the University of Oregon, concluded that the "campaign provides evidence of greenwashing through

---

[62] American Petroleum Institute, *'Power Past Impossible' Hits Times Square* (Nov. 28, 2017), https://www.api.org/news-policy-and-issues/blog/2017/11/28/power-past-impossible-hits-new-yorks-times-square.

[63] American Petroleum Institute, "Energy for a Cleaner Environment," https://www.api.org/news-policy-and-issues/state-of-american-energy/soae-2019-cleaner.

both explicit communications (such as unsubstantiated claims that 'gas comes cleaner' and 'oil

runs cleaner') and implicit communications (the use of green imagery)."[64]

73.     Recently, API has run ads in the *Washington Post* touting the environmental and

climate benefits of natural gas with titles like "natural gas will thrive in the age of renewables,"

"real climate solutions won't happen without natural gas and oil," and "low and no carbon future

starts with natural gas."[65] These statements are deceptive without providing information that the

very products they claim to be the "solution" to climate change—natural gas and oil—are also its

primary cause.

74.     Many of API's television, radio, and social media advertisements, including those

that reached NYC consumers, directed viewers to a website for a campaign run by API entitled

"Energy for Progress," which falsely portrays the oil and gas industry as a leader in reducing

greenhouse gas emissions. For at least six months, the campaign's website cast natural gas as a

"clean" fuel before that description was revised to "cleaner" sometime in summer 2020. Among

many articles and images promoting fossil fuel companies' claimed contributions to clean energy,

the website advertises "5 Ways We're Helping to Cut Greenhouse Gas Emissions" and "4 Ways

We're Protecting Wildlife."[66] These messages misleadingly portray the oil and gas industry as an

environmental leader by focusing on marginal improvements in operational emissions while

ignoring the much greater emissions from continued and expanded fossil fuel production.[67] By

obfuscating the reality that fossil fuels are the driving force behind climate change, API's

---

[64] Kim Sheehan, *This Ain't Your Daddy's Greenwashing: An Assessment of the American Petroleum Institute's Power Past Impossible Campaign*, *in* INTELLECTUAL PROPERTY AND CLEAN ENERGY 301–21 (Matthew Rimmer ed., 2018).

[65] Sponsored Content, API, WP Brand Studio, WASH. POST https://www.washingtonpost.com/brand-studio/wp/tag/api/.

[66] American Petroleum Institute, "Energy for Progress," https://energyforprogress.org.

[67] American Petroleum Institute, "5 Ways We're Using Energy for Progress," https://energyforprogress.org/the-basics.

promotional messages are designed to increase NYC consumers' use of fossil fuels—and to reassure NYC consumers that choosing fossil fuel products is compatible with their environmental values—in order to advance API's core mission of growing its member companies' oil and natural gas businesses.



*Figure 12: API advertisement from its Energy for Progress campaign, used as the campaign's Facebook banner.*

75.     As part of its Energy for Progress campaign, API has run a series of Facebook advertisements, many of which have reached a substantial number of NYC consumers. The social media ads are among thousands from the American Petroleum Institute that have reached New York. For example, in 2020, API ran advertisements with statements such as:

- "We can tackle climate change and meet the world's energy needs by embracing new innovations together."[68]

---

[68] *See* Facebook Ad Library, API, Facebook Ad ID: 1554734221395483, https://www.facebook.com/ads/library/?id=1554734221395483.

- "We can all agree we need strong climate solutions—and with natural gas as a dominant energy source, U.S. carbon emissions are the lowest levels in a generation." [69]

- "Let's work together to find climate solutions while meeting our essential energy needs."[70]

These statements are deceptive because they falsely paint the fossil fuel industry as a leader on climate change action while omitting key information about the role of fossil fuels in causing the climate crisis.

### FIRST CAUSE OF ACTION
*Engaging in deceptive trade practices in violation of NYC Code § 20-700*

*(Against Defendants ExxonMobil, Shell, and BP)*

***ExxonMobil, Shell, and BP have deceived NYC consumers by misrepresenting the purported environmental benefit of using their fossil fuel products and failing to disclose the risks of climate change caused by those products.***

76.     The City realleges each and every allegation contained above, as though set forth herein in full.

77.     NYC Code § 20-700 prohibits any "person" from "engag[ing] in any deceptive or unconscionable trade practice in the sale . . . of any consumer goods or services[.]" NYC Code § 20-700. "Any false, falsely disparaging, or misleading oral or written statement, visual description or other representation of any kind made in connection with the sale . . . or in connection with the offering for sale . . . of consumer goods or services, . . . which has the capacity, tendency or effect of deceiving or misleading consumers" is a deceptive trade practice. NYC Code

---

[69] *See* Facebook Ad Library, API, Facebook Ad ID: 306269540617537, https://www.facebook.com/ads/library/?id=306269540617537.

[70] *See* Facebook Ad Library, API, Facebook Ad ID:  1252693268407536, https://www.facebook.com/ads/library/?id=1252693268407536.

§ 20-701(a). Deceptive trade practices include "representations that goods or services have . . . characteristics, ingredients, uses, [or] benefits . . . that they do not have" and "the use, in any oral or written representation, of exaggeration, innuendo, or ambiguity as to a material fact or failure to state a material fact if such use deceives or tends to deceive[.]" NYC Code § 20-701(a).

78.     NYC Code § 20-700 is to be liberally construed to safeguard consumers and the public.

79.     ExxonMobil, Shell, and BP are "persons" within the meaning of NYC Code § 20-700 and are required to comply with the provisions of NYC Code § 20-700 in their representations made in connection with the sale or offering for sale of their fossil fuel products and services.

80.     Fossil fuel products, including but not limited to gasoline and diesel fuel, constitute "consumer goods or services" within the meaning of NYC Code § 20-701(c).

81.     ExxonMobil, Shell, and BP violated NYC Code § 20-700, and each Defendant is liable for penalties of $350 for each violation, or $500 if the violation was knowing. NYC Code § 20-703(b). These defendants knew or should have known at the time of making or disseminating these statements that the material misrepresentations in their advertising and promotional materials directed to NYC consumers were and are deceptive and/or had the tendency to deceive reasonable consumers. Their omissions, which are deceptive and misleading in their own right, render even seemingly truthful statements about fossil fuel use false and misleading.

82.     ExxonMobil, Shell, and BP's deceptive practices involved the sale and offering for sale of consumer goods or services, in the form of gasoline, motor oil, natural gas, and other fossil fuel-related goods or services, within the meaning of NYC Code § 20-700. ExxonMobil, Shell,

and BP market and sell these products to NYC consumers primarily for personal, household, or family purposes, making their products consumer goods. NYC Code § 20-701(c).

83.     ExxonMobil, Shell, and BP violated NYC Code § 20-700 by affirmatively misrepresenting the environmental benefits of various fossil fuel products sold at their gasoline stations in New York City. In advertisements and promotional materials published in connection with the sale or offering for sale of their fossil fuel products and services, ExxonMobil, Shell, and BP portray these fuels as good for the climate and the environment, without disclosing the material facts that those products significantly increase greenhouse gas emissions and are one of the primary drivers of climate change. Those representations, omissions, and half-truths create a misleading impression, are deceptive, and have the tendency and capacity to mislead and deceive consumers.

84.     ExxonMobil, Shell, and BP's false and misleading representations and omissions are material because they are relevant and important to a consumer's decision to purchase their fossil fuel products, are capable of influencing a consumer's decision to purchase their fossil fuel products, have the capacity to affect consumer energy, transportation, and consumption choices, and deter consumers from adopting cleaner, safer alternatives to their fossil fuel products.

### SECOND CAUSE OF ACTION
*Engaging in deceptive trade practices in violation of NYC Code § 20-700*
*(Against Defendants ExxonMobil, Shell, and BP)*

**ExxonMobil, Shell, and BP have deceived NYC consumers by**
**engaging in false and misleading greenwashing campaigns.**

85.     The City realleges each and every allegation contained above, as though set forth herein in full.

86.     NYC Code § 20-700 prohibits any "person" from "engag[ing] in any deceptive or unconscionable trade practice in the sale . . . of any consumer goods or services[.]" NYC Code

§ 20-700. "Any false, falsely disparaging, or misleading oral or written statement, visual description or other representation of any kind made in connection with the sale . . . or in connection with the offering for sale . . . of consumer goods or services, . . . which has the capacity, tendency or effect of deceiving or misleading consumers" is a deceptive trade practice. NYC Code § 20-701(a). Deceptive trade practices include "representations that goods or services have . . . characteristics, ingredients, uses, [or] benefits . . . that they do not have" and "the use, in any oral or written representation, of exaggeration, innuendo, or ambiguity as to a material fact or failure to state a material fact if such use deceives or tends to deceive[.]" NYC Code § 20-701(a).

87.     NYC Code § 20-700 is to be liberally construed to safeguard consumers and the public.

88.     Defendants ExxonMobil, Shell, and BP are "persons" within the meaning of NYC Code § 20-700 and are required to comply with the provisions of NYC Code § 20-700 in their representations made in connection with the sale or offering for sale of their fossil fuel products and services.

89.     Fossil fuel products, renewable energy, and other alternative energy sources constitute "consumer goods or services" within the meaning of NYC Code § 20-701(c).

90.     ExxonMobil, Shell, and BP violated NYC Code § 20-700. Each Defendant is liable for penalties of $350 for each violation, or $500 if the violation was knowing. NYC Code § 20-703(b). These defendants knew or should have known at the time of making or disseminating these statements that the material misrepresentations in their advertising and promotional materials directed to NYC consumers were and are deceptive and/or had the tendency to deceive reasonable consumers. Their omissions, which are deceptive and misleading in their own right, render even seemingly truthful statements about fossil fuel use false and misleading.

91.     ExxonMobil, Shell, and BP violated NYC Code § 20-700 by engaging in a number

of deceptive practices in connection with the sale or offering for sale of their fossil fuel products

and services, including:

a.  By creating a misleading impression of the role of renewables in their businesses

through advertisements and other promotional statements directed at and viewed

by NYC consumers. ExxonMobil, Shell, and BP deceitfully represent themselves

as leaders in renewable energy, including by exaggerating the proportion of their

investments in clean energy as a purportedly substantial proportion of their

business, when in fact their investments in clean energy are negligibly small.

Further, ExxonMobil, Shell, and BP make exaggerated or otherwise misleading

claims about steps they have taken to reduce their overall carbon footprints, all the

while failing to state material facts about continuing and increasing their fossil fuel

production and thus directly contributing to climate change. In so doing,

ExxonMobil, Shell, and BP used exaggeration as to material facts and failed to state

material facts that tended to deceive consumers regarding their commitments to

environmental sustainability. NYC Code § 20-701(a). Finally, by falsely

representing that they operated diversified energy portfolios with meaningful

renewable and low-carbon fuel components, ExxonMobil, Shell, and BP made

representations that their goods or services had characteristics or benefits that they

do not in fact possess, which tended to deceive consumers about the environmental

sustainability of these defendants' practices. NYC Code § 20-701(a).

b.  By exaggerating or otherwise misrepresenting the purported environmental benefits

of their fossil fuel products. Such deceptive practices include asserting misleading

claims that natural gas is "cleaner burning" while omitting the lifecycle emissions

information for gas, misleading claims that natural gas only performs a back-up

function in electricity generation, and misleading statements that gas is a "perfect

pair" with renewables.

92.     ExxonMobil, Shell, and BP's false and misleading representations and omissions

are material because they are relevant and important to a consumer's decision to purchase fossil

fuel products, are capable of influencing a consumer's decision to purchase fossil fuel products,

have the capacity to affect consumer energy, transportation, and consumption choices, and deter

consumers from adopting cleaner, safer alternatives to fossil fuel products.

### THIRD CAUSE OF ACTION
*Engaging in deceptive trade practices in violation of NYC Code § 20-700*
*(Against Defendant American Petroleum Institute)*

### *API has deceived NYC consumers by*
### *engaging in false and misleading greenwashing campaigns.*

93.     The City realleges each and every allegation contained above, as though set forth

herein in full.

94.     NYC Code § 20-700 prohibits any "person" from "engag[ing] in any deceptive or

unconscionable trade practice in the sale . . . of any consumer goods or services[.]" NYC Code

§ 20-700. "Any false, falsely disparaging, or misleading oral or written statement, visual

description or other representation of any kind made in connection with the sale . . . or in

connection with the offering for sale . . . of consumer goods or services, . . . which has the capacity,

tendency or effect of deceiving or misleading consumers" is a deceptive trade practice. NYC Code

§ 20-701(a). Deceptive trade practices include "representations that goods or services have . . .

characteristics, ingredients, uses, [or] benefits . . . that they do not have" and "the use, in any oral

or written representation, of exaggeration, innuendo, or ambiguity as to a material fact or failure to state a material fact if such use deceives or tends to deceive[.]" NYC Code § 20-701(a).

95.     NYC Code § 20-700 is to be liberally construed to safeguard consumers and the public.

96.     Defendant API is a "person" within the meaning of NYC Code § 20-700 and is required to comply with the provisions of NYC Code § 20-700 in its representations made in connection with the sale or offering for sale of its members' fossil fuel products and services.

97.     Fossil fuel products, renewable energy, and other alternative energy sources constitute "consumer goods or services" within the meaning of NYC Code § 20-701(c).

98.     API violated NYC Code § 20-700 and is liable for penalties of $350 for each violation, or $500 if the violation was knowing. NYC Code § 20-703(b). API knew or should have known at the time of making or disseminating these statements that the material misrepresentations in their advertising and promotional materials directed to NYC consumers were and are deceptive and/or had the tendency to deceive reasonable consumers. API's omissions, which are deceptive and misleading in their own right, render even seemingly truthful statements about fossil fuel use false and misleading.

99.     API violated NYC Code § 20-700 by engaging in a number of deceptive practices in connection with the sale or offering for sale of its members' fossil fuel products and services, including:

a.  By misrepresenting the extent of their members' investments in clean energy and the role of oil and natural gas in combatting climate change through their advertisements and other promotional statements directed at and viewed by NYC consumers. API deceitfully represents its oil and gas industry members as leaders

in renewable energy, including by exaggerating the proportion of their investments in clean energy as a purportedly substantial proportion of their business, when in fact their investments in clean energy are negligibly small.

b. By exaggerating or otherwise misrepresenting the purported environmental benefits of API's members' fossil fuel products. Such deceptive practices include asserting misleading claims that natural gas is "cleaner burning" while omitting the lifecycle emissions information for gas, misleading claims that natural gas only performs a back-up function in electricity generation, and misleading statements that gas is a "partner to" renewables.

100.    API's false and misleading representations and omissions are material because they are relevant and important to a consumer's decision to purchase fossil fuel products, are capable of influencing a consumer's decision to purchase fossil fuel products, have the capacity to affect consumer energy, transportation, and consumption choices, and deter consumers from adopting cleaner, safer alternatives to fossil fuel products.

### RELIEF SOUGHT

WHEREFORE, Plaintiff requests that the Court enter a judgment in its favor and grant relief against Defendants as follows:

a. Permanently enjoin Defendants, pursuant to NYC Code § 20-703(d), from engaging in any acts that violate the CPL, including, but not limited to, the deceptive acts and practices alleged herein;

b. Award civil penalties in an amount to be proven at trial and as authorized per violation of the CPL, pursuant to NYC Code § 20-703(a), (b);

c. Award Plaintiff the costs of this action and reasonable attorney's fees, pursuant to NYC

Code § 20-703(c).

d. Grant such further relief as the Court deems just and proper.

Respectfully Submitted,

Dated: April 22, 2021          JAMES E. JOHNSON
                               Corporation Counsel of the City of New York

                               */s/ Hilary Meltzer*
                               Hilary Meltzer [506619]
                                 Chief, Environmental Law Division
                               Alice R. Baker [5023916]
                                 Senior Counsel
                               Tess Dernbach [5752290]
                                 Assistant Corporation Counsel
                               Samantha Peltz[71]
                               100 Church Street
                               New York, NY 10007
                               212-356-2070
                               hmeltzer@law.nyc.gov
                               albaker@law.nyc.gov
                               tdernbac@law.nyc.gov
                               speltz@law.nyc.gov

                               **SHER EDLING LLP**
                               Matthew K. Edling [1020217]
                               Victor M. Sher (*pro hac vice* forthcoming)
                               Michael Burger [4233094]
                               Katie H. Jones (*pro hac vice* forthcoming)
                               Quentin C. Karpilow (*pro hac vice* forthcoming)
                               100 Montgomery St., Ste. 1410
                               San Francisco, CA 94104
                               (628) 231-2500
                               matt@sheredling.com
                               vic@sheredling.com
                               michael@sheredling.com
                               katie@sheredling.com
                               quentin@sheredling.com

                               *Attorneys for Plaintiff*
                               *The City of New York*

---

[71] Special Assistant Corporation Counsel (passed the October 2020 Uniform Bar Exam).

## **VERIFICATION**

Hilary Meltzer, an attorney admitted to practice in the State of New York affirm under penalty of perjury:

I am the Chief of the Environmental Law Division for the New York City Law Department and am counsel for the Plaintiff.

I have read the foregoing Complaint and Appendix and know the contents thereof, which are to my knowledge true, except to those matters stated to be alleged on information and belief, and to these matters I believe them to be true. I base this verification on my personal knowledge, my review of books and records of the City of New York, my review of documents referred to in the Complaint and Appendix, and my discussions with employees of the City of New York.

Date:        New York, New York
             April 22, 2021


                        _/s/ Hilary Meltzer_____

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| The City of New York,<br><br>                    Plaintiff,<br><br>      -against-<br><br>Exxon Mobil Corp., ExxonMobil Oil<br>Corporation, Royal Dutch Shell plc, Shell Oil<br>Company, BP p.l.c., BP America Inc., and<br>American Petroleum Institute,<br><br>           Defendants. | **APPENDIX** |

Case 1:1-cv-0000 Document Entry 06-11 Page 74 of 249

1.     The advertisements, promotional materials, and other public statements contained in this

Appendix provide non-exhaustive examples of ExxonMobil, Shell, BP, and API's deceptive

conduct. Each was targeted at or disseminated to New York City consumers during the past three

years.

2.     **ExxonMobil's Misleading Marketing of Fossil Fuel Products**

| DESCRIPTION | ADVERTISING PLATFORM | EXAMPLES OF DECEPTIVE CONDUCT |
|---|---|---|
| a. Synergy™ fuel | Various locations, including ExxonMobil's website and ExxonMobil-branded gas stations in NYC. | • ExxonMobil's website contains promotional materials for Synergy™ that feature a photograph of a mountain sunrise with trees in the foreground and text expressly representing Synergy products as helping to reduce greenhouse gas emissions. These materials misleadingly suggest that purchasing Synergy™ fuels is good for the climate, while concealing the material fact that these fuels emit large quantities of greenhouse gas emissions that harm the planet and its people. For example:<br>• "Environmental performance . . . Conscientious practices. Rigorous standards . . . Continually improving environmental performance while pursuing reliable and affordable energy."<br>• "We're continually innovating to develop products that enable customers *to reduce their energy use and CO2 emissions*. For example, we have: Developed specially formulated synthetic lubricants for cars, trucks and industrial equipment that last longer and help end-users reduce their energy consumption . . . Created tire liners that retain air better than their predecessors, thereby improving vehicle fuel efficiency . . . Developed a technology to improve the separator films used in lithium-ion batteries, which are used in laptops, cell phones and, increasingly, hybrid vehicles."<br>• "Engineered Fuel Technology Synergy™ fuels to help improve fuel economy and reduce CO2 emissions." |

Case 24-15441, 09/20/2024, DktEntry 56.1, Page75 of 249

| DESCRIPTION | ADVERTISING PLATFORM | EXAMPLES OF DECEPTIVE CONDUCT |
|---|---|---|
|  |  | • ExxonMobil claims, including at its branded gas stations in New York City, that the fuel will "take you further," and contains more detergents than required by the Environmental Protection Agency. These representations are deceptive because they play up the fuel's environmental benefits while failing to disclose the material facts that these fuels are a driving cause of climate change. |



Business lines · Global brands                                    Select location

Exxon Mobil | Fuels          Our fuel    Rewards and payment    My accounts    Get help    About us    Q

Exxon › Home › Environmental performance

⚠ Important Additional Information Regarding Proxy Solicitation:
This website contains information on a variety of topics that may be of interest to shareholders, some of which may be related to the Company's solicitation materials.
Click here for more information.

## Environmental performance
Conscientious practices. Rigorous standards.

### Continually improving environmental performance while pursuing reliable and affordable energy

Ten years ago, we introduced *Protect Tomorrow. Today.* – a set of expectations that serves as the foundation for our environmental performance. Guided by a scientific understanding of the environmental impacts and related risks of our operations, these rigorous standards and good practices have become an integral part of our day-to-day operations in every country in which we do business including those with minimal regulations in place.

As well, we consider the long-term social and economic needs of the communities in which we work and continually engage stakeholders in the process.

The following are the three major areas in which we've concentrated our efforts to reduce environmental impacts.

#### Improve the efficiency of our operations
ExxonMobil invested more than $1.5 billion over the last six years to improve efficiency and reduce greenhouse gas emissions from our operating facilities, such as refineries and chemical plants. In the past ten years we have reduced greenhouse gas emissions in our operations by more than 7 million metric tons, which is the equivalent of taking about 1.4 million cars off the road.

#### Improve efficiency in consumer use of fuels
We're continually innovating to develop products that enable customers to reduce their energy use and CO2 emissions. For example, we have:
• Developed specially formulated synthetic lubricants for cars, trucks and industrial equipment that last longer and help end-users reduce their energy consumption
• Created tire liners that retain air better than their predecessors, thereby improving vehicle fuel efficiency
• Developed a technology to improve the separator films used in lithium-ion batteries, which are used in laptops, cell phones and, increasingly, hybrid vehicles
• Engineered Fuel Technology Synergy™ fuels to help improve fuel economy and reduce CO2 emissions**

2

| DESCRIPTION | ADVERTISING PLATFORM | EXAMPLES OF DECEPTIVE CONDUCT |
|---|---|---|
| b. Synergy Diesel Efficient™ fuel[1] | Various locations, including ExxonMobil-branded gas stations in NYC. | • ExxonMobil advertises its Synergy™ Diesel Efficient fuel as the "latest breakthrough technology" and the "first diesel fuel widely available in the US" that helps "[i]ncrease fuel economy" and "[r]educe emissions and burn cleaner," and "was created to let you drive cleaner, smarter and longer." <br><br> • Such statements create a misleading impression of the fuel's environmental impacts because they fail to disclose the material fact that diesel fuels, including this one, emit substantial quantities of greenhouse gases that contribute significantly to climate change. |
| c. Synergy™ Supreme +[2] | Various locations, including ExxonMobil-branded gas stations in NYC. | • In advertising its Synergy™ Supreme+ gasoline, ExxonMobil emphasizes environmental qualities like "2X cleaner" and "lower emissions," with the smaller text explaining that it *can* lead to lower emissions." <br><br> • These statements misrepresent the emissions benefits from using Synergy™ Supreme+ by omitting the material fact that this fuel generates significant amounts of greenhouse gas emissions and plays a key role in exacerbating climate change. <br><br>  |
| d. Synergy™ product line | Various locations, including ExxonMobil website. | • In ExxonMobil's annual Energy and Carbon Summary, the company promotes its Synergy™ fossil fuel product line as "help[ing] customers reduce their emissions." It states: "Premium fuels such as |

---

[1] ExxonMobil, Fuels, https://web.archive.org/web/20180623074309/https://www.exxon.com/en/synergy-diesel-efficient-passenger.

[2] ExxonMobil, Fuels, https://www.exxon.com/en/unleaded-gasoline.

3

| DESCRIPTION | ADVERTISING PLATFORM | EXAMPLES OF DECEPTIVE CONDUCT |
|---|---|---|
| ExxonMobil Energy & Carbon Summaries[3] | | Synergy™ gasoline and diesel also help consumers improve gas mileage. By improving engine efficiency and fuel economy, these products can help reduce greenhouse gas emissions compared to conventional lubricants and fuels. ExxonMobil is progressing several multibillion-dollar refinery expansion projects to supply the growing demand for these advanced products." <br>• These representations are deceptive and misleading because they fail to disclose that ExxonMobil's "[p]remium fuels" still generate large amounts of greenhouse gas emissions that contribute significantly to climate change. |



**Providing products to help customers reduce their emissions**

Over the next few decades, population and income growth, and an unprecedented expansion of the global middle class, are expected to create new demand for energy and hydrocarbon-based products, even under 2°C scenarios. ExxonMobil is responding to this growth in product demand by delivering solutions that enable customers to reduce their emissions and improve energy efficiency.

**NATURAL GAS**

Natural gas is a versatile, abundant and lower-emission fuel. The use of natural gas in power generation plays an important role in reducing global emissions. When considering life cycle emissions, natural gas emits up to 60 percent lower greenhouse gases and produces significantly fewer air pollutants than coal for power generation. Many national and state governments have recognized the contributions natural gas can make to reducing greenhouse gas emissions and have included transitioning to natural gas in their carbon-reduction programs.[49][40] In fact, the power sector's switch from coal to natural gas is one of the main reasons why U.S. emissions have declined more than any other country since 2000.[40]

Natural gas also provides a reliable source of power to supplement renewable energy when wind or solar power is not available. LNG enables transportation of natural gas from supply centers to customers safely and cost-effectively. ExxonMobil is one of the largest natural gas producers in the world and a leader in LNG.

**LIGHTWEIGHT MATERIALS & PACKAGING**

Demand for auto parts, housing materials, electronics and other products made from petrochemicals continues to grow. ExxonMobil produces weight-reducing materials for automobiles, resulting in an estimated 7 percent fuel economy improvement for every 10 percent reduction in vehicle weight. ExxonMobil's butyl rubber helps tires retain air pressure and this can improve fuel efficiency by up to 2 percent and can increase electric vehicle range by up to 7 percent. Santoprene TPV, a high-performance elastomer, enables up to 45 percent weight reduction versus thermoset rubber. ExxonMobil also provides lightweight packaging materials for consumer goods reducing transport-related energy use and greenhouse gas emissions. Advanced packaging also helps extend the shelf life of fresh food by days or even weeks, improving safety and reducing food waste and emissions from agricultural processes. Many recent technology breakthroughs, such as battery-powered electric vehicles, would not be possible without lightweight materials, including those developed by ExxonMobil.

**ADVANCED FUELS & LUBRICANTS**

ExxonMobil's high-performance synthetic lubricants and premium fuels deliver improved vehicle efficiency and improved gas mileage, which can help customers reduce their emissions. The Company's synthetic lubricants require less frequent replacement than conventional motor oils. Mobil 1™ Advanced Fuel Economy synthetic motor oil can improve fuel economy compared to other motor oils. SpectraSyn HiVis and LoVis PAO underpin the Company's synthetic lubricant oils that can deliver up to 2 percent better fuel economy and longer lubricant change intervals. Premium fuels such as Synergy™ gasoline and diesel also help consumers improve gas mileage. By improving engine efficiency and fuel economy, these products can help reduce greenhouse gas emissions compared to conventional lubricants and fuels. ExxonMobil is progressing several multibillion-dollar refinery expansion projects to supply the growing demand for these advanced products.

---

[3] ExxonMobil, 2021 Energy & Carbon Summary (Jan. 2021), at 31, https://corporate.exxonmobil.com/-/media/Global/Files/energy-and-carbon-summary/Energy-and-Carbon-Summary.pdf. In previous years ExxonMobil has released similar Energy & Carbon Summary reports with similar deceptive statements about ExxonMobil fuels helping to reduce greenhouse gas emissions.

4

### 3.    ExxonMobil's Misleading and Deceptive Greenwashing Campaigns

| Description | Advertising Platform | Examples of Deceptive Conduct |
|---|---|---|
| a. The Future of Energy? It May Come From Where You Least Expect (ExxonMobil paid post)[4] | *New York Times* | • ExxonMobil claims that the company is "working to decrease our overall carbon footprint," markets itself as an innovator in the development of alternative fuels, such as fuel from algae and from farm waste, and falsely represents itself as an environmentally responsible company, concluding the post with the statement: "A Greener Energy Future: Literally. That's Unexpected Energy." |



---

[4] ExxonMobil, *The Future of Energy? It May Come From Where You Least Expect*, N.Y. TIMES, https://www.nytimes.com/paidpost/exxonmobil/the-future-of-energy-it-may-come-from-where-you-least-expect.html.

5

| DESCRIPTION | ADVERTISING PLATFORM | EXAMPLES OF DECEPTIVE CONDUCT |
|---|---|---|
| b. School of ExxonMobil: Algae Biofuel (social media and marketing video)[5] | YouTube and other social media and Internet locations | • The ad features an ExxonMobil researcher explaining to a child that ExxonMobil is "looking for alternative forms of energy that are better for the environment for your generation" (screenshot below). The researcher tells the child that algae exist everywhere, including "in a polar bear's fur," so "if you ever see a picture of a green polar bear, that's actually algae." The company evokes polar bears despite their product via climate change being associated with the decimation of the species.<br>• Overall, the video misleadingly portrays ExxonMobil as a leader in clean energy research despite investing relatively little in these efforts.<br>• The YouTube upload alone has over 209,229 views as of April 20, 2021.<br>• The video was repeatedly promoted elsewhere.[6] |
|  |  | |

School of ExxonMobil: Algae Biofuel

We are looking for alternative forms of energy that are better for the environment for your generation

---

[5] YouTube, *School of ExxonMobil: Algae Biofuel*, ExxonMobil, https://www.youtube.com/watch?v=9IuAkMJqb7Y (accessed June 4, 2020).
[6] *E.g.*, Energy Factor by ExxonMobil, *What Algae-powered Fuels Mean to Kids* (Jan. 17, 2019), https://energyfactor.exxonmobil.com/reducing-emissions/alternative-fuels/what-algae-powered-fuels-mean-to-kids/.

| Description | Advertising Platform | Examples of Deceptive Conduct |
|---|---|---|
| c. From Farm Waste to Fuel Tank (ExxonMobil paid post)[7] | *New York Times* | • The paid video post promotes Exxon's conversion of crop leftovers, wood waste, and switch grass into biofuel, which the company says its scientists are "exploring how to use . . . on a vast scale." Exxon claims that biomass is "cheap and abundant" and biofuels made from it have "the power to make a big difference."<br>• However, the company does not mention that producing biofuel feedstocks is itself resource intensive, and depending on production processes, biofuels can emit even more greenhouse gas emissions than some fossil fuels. |
| d. Social media post[8] | LinkedIn | • The LinkedIn post states: "We recently announced a plan to further reduce greenhouse gas emissions in our global operations by 2025, while aiming for industry-leading GHG performance by 2030. We are positioning for a lower-carbon-energy future and this plan represents some of the most aggressive reductions in the industry."<br>• It then adds: "Our 2025 plans are expected to reduce absolute greenhouse gas emissions by an estimated ~30% for the company's upstream business."<br>• These statements portray ExxonMobil as centrally focused on transitioning to clean energy resources, despite the fact that the company's business remains laser-focused on producing fossil fuels. Statements about reducing greenhouse gases from ExxonMobil's upstream operations (i.e. exploration and production operations) are misleading because they omit the downstream emissions from combusting fossil fuels, which far outstrip upstream emissions and which contribute significantly to climate change. |

---

[7] https://www.nytimes.com/paidpost/exxonmobil/from-farm-waste-to-fuel-tank.html#100000006080624.
[8] LinkedIn, *ExxonMobil*, https://www.linkedin.com/posts/exxonmobil_energy-carbon-summary-activity-6769727442681655296-CoDp.

| DESCRIPTION | ADVERTISING PLATFORM | EXAMPLES OF DECEPTIVE CONDUCT |
|---|---|---|
| | |  |
| e. Social media ad[9] | Instagram | • Discussing the "dual challenge" of "finding ways to provide affordable energy to a growing population while addressing the risks of climate change."<br>• One image slide boasts: "Over the last 40 years, we have cumulatively captured the most CO2 of any company."<br>• Such statements deceptively imply that ExxonMobil is significantly contributing to the fight against climate change—when, in fact, its investments in clean energy resources are negligible and the company is ramping up fossil fuel production. |

---

[9] @exxonmobil, Instagram (Nov. 24, 2020), https://www.instagram.com/p/CH_JQugBNjc.

8

| DESCRIPTION | ADVERTISING PLATFORM | EXAMPLES OF DECEPTIVE CONDUCT |
|---|---|---|
| | |  |
| f. Social media ad[10] | Facebook | • "Chips and guacamole are an ideal combination. Kind of like natural gas and renewable energy." The accompanying video graphic then adds: "When it comes to cleaner energy, some things just work better together. We're leaders in natural gas which is reliable and abundant and supports renewable energy. Combined they're the perfect pair for a cleaner energy future."<br>• This ad misleading portrays natural gas as a "cleaner" energy despite the fact that it produces significant greenhouse gas emissions. |

---

[10] Facebook Ad Library, https://www.facebook.com/ads/library/?id=452326435699710.

9

| DESCRIPTION | ADVERTISING PLATFORM | EXAMPLES OF DECEPTIVE CONDUCT |
|---|---|---|
| | |  |
| g. Social media ad[11] | Facebook | • "See how natural gas is shaping a cleaner world . . . From cooking to cleaning to commuting, it's generating electricity and fueling the everyday with up to 60% fewer CO2 emissions than coal."<br>• That statement about the emissions impact of gas is misleading because it associates natural gas with being "cleaner" and omits the full picture of natural gas's methane emissions and their contribution to climate change. |

[11] Facebook Ad Library, https://www.facebook.com/ads/library/?id=431115604500094.

| DESCRIPTION | ADVERTISING PLATFORM | EXAMPLES OF DECEPTIVE CONDUCT |
|---|---|---|
| | |  |
| h. Social media bio | Instagram | • "ExxonMobil: Working to meet the world's growing #energy needs while addressing the risks of climate change [green planet emoji]."<br>• This promotional material is deceptive and misleading in light of ExxonMobil's negligible investments in clean energy resources and massive investments in fossil fuel extraction, development, and production.<br><br> |
| i. Natural gas webpage[12] | ExxonMobil Website | • "The abundance and versatility of natural gas make it a valuable energy source to meet a variety of needs while also helping the world shift to less carbon-intensive sources of energy."<br>• This representation that natural gas will "help[] the world shift to less carbon-intensive sources of energy" is misleading |

---

[12] ExxonMobil, "Natural Gas," https://corporate.exxonmobil.com/Operations/Natural-gas.

11

| DESCRIPTION | ADVERTISING PLATFORM | EXAMPLES OF DECEPTIVE CONDUCT |
|---|---|---|
| | | because ExxonMobil fails to disclose that natural gas produces significant quantities of greenhouse gas emissions that substantially contribute to climate change. |
| j. CCS webpage[13] | ExxonMobil Website | • "With our demonstrated leadership in carbon capture and emissions reduction technologies, ExxonMobil is committed to meeting the demand for affordable energy while reducing emissions and managing the risks of climate change."<br>• "ExxonMobil is the leader in carbon capture, with current carbon capture capacity totaling about 9 million tonnes per year."<br>• On Feb. 1, 2021, ExxonMobil announced the creation of a new business—ExxonMobil Low Carbon Solutions—to commercialize and deploy emission-reduction technologies. It will initially focus on carbon capture and storage, one of the critical technologies required to achieve net zero emissions and the climate goals outlined in the Paris Agreement.<br>• These statements misleadingly exaggerate Exxon's efforts to reduce emissions and combat climate change by omitting the material facts that (1) that the 9 million tonnes of captured carbon represents less than 2 percent of the company's annual emissions (roughly 730 million tons in 2019); and (2) that its investments in carbon capture are negligible when compared to its current and planned investments in fossil fuel production.[14] |

---

[13] ExxonMobil, "Carbon capture and storage (CCS)," https://corporate.exxonmobil.com/Energy-and-innovation/Carbon-capture-and-storage.

[14] *Greenwashing Files: ExxonMobil*, ClientEarth, https://www.clientearth.org/the-greenwashing-files/exxonmobil/#about.

4.      **Shell's Misleading Marketing of Fossil Fuel Products**

| DESCRIPTION | ADVERTISING PLATFORM | EXAMPLES OF DECEPTIVE CONDUCT |
|---|---|---|
| a. V-Power Nitro+ Premium | Various locations, including Shell's website[15] and Shell-branded gas stations in NYC. | • All grades of Shell gasoline sold in New York City have the Shell Nitrogen Enriched Cleaning System, and Shell introduced a line for its premium-grade gasoline called V-Power Nitro+ Premium. <br> • Shell advertises on its website that these fuels "produce[] fewer emissions" and that not using them can lead to "higher emissions." <br> • Those advertisements are misleading because they fail to disclose that these fuels emit significant quantities of greenhouse gas emissions that are contributing substantially to climate change. <br><br>  |

5.      **Shell's Misleading and Deceptive Greenwashing Campaigns**

| DESCRIPTION | ADVERTISING PLATFORM | EXAMPLES OF DECEPTIVE CONDUCT |
|---|---|---|
| a. Social media ad[16] | Facebook | • "🚗 Hydrogen cars, 🏍 electric bikes or 👟 leg work. Which will win the cleaner transport crown? #MakeTheFuture." <br> • The ad reached hundreds of thousands of consumers in New York State. <br> • The ad misleadingly portrays Shell as a company that invests substantially in clean energy, despite its much greater investment in fossil fuels. |

---

[15] Shell, "Shell V-Power NiTRO+ Premium Gasoline," https://www.shell.us/motorist/shell-fuels/shell-v-power-nitro-plus-premium-gasoline.html.

[16] Facebook Ad Library, https://www.facebook.com/ads/library/?id=330811114263195.

| DESCRIPTION | ADVERTISING PLATFORM | EXAMPLES OF DECEPTIVE CONDUCT |
|---|---|---|
| b. The Making of Sustainable Mobility[17] (Shell paid post) | *Washington Post* | <ul><li>In this paid post, Shell refers to LNG as "sustainable" and a "lower-carbon fuel" that could "help decrease" $CO_2$ emissions. The ad emphasizes Shell's leadership in "setting the course" for a "lower-carbon mobility future." It also calls natural gas "part of a mosaic of alternative energy sources," and it implies that natural gas is a sustainable energy source on par with other alternative and renewable energy sources.</li><li>This advertisement is deceptive and misleading because it omits the material facts that (1) natural gas produces significant quantities of greenhouse gas emissions, and (2) the unabated use of natural gas is incompatible with preventing catastrophic climate change.</li></ul> |



Thankfully, an array of scientists, innovators and businesses are hard at work creating more efficient ways of moving around. Shell is one of them. In addition to its traditional business, the company is investing in lower-carbon transport fuels, such as biomass energy sources and liquified natural gas (LNG). They're also taking steps towards developing the infrastructure to support growth in electric and hydrogen-fuel-cell vehicles.

---

[17] *The Making of Sustainable Mobility* (Content from Shell), WASH. POST, https://www.washingtonpost.com/brand-studio/shell/the-making-of-sustainable-mobility.

| DESCRIPTION | ADVERTISING PLATFORM | EXAMPLES OF DECEPTIVE CONDUCT |
|---|---|---|
| | |  |
| c. The Mobility Quandary[18] (Shell paid post) See ¶ 11 for image. | *Washington Post* | • The ad emphasizes Shell's role in working to counteract climate change through supposedly significant investments in alternative energy: "Shell is a bigger player than you might expect in this budding movement to realize a cleaner and more efficient transportation future."<br>• The ad falsely promotes hydrogen fuel cells as "sustainable in the long-term" and "[o]ne of the cleaner sources" that power electric vehicles, stating that "[h]ydrogen fuel cell vehicles . . . emit nothing from their tailpipes but water vapor."<br>• Despite the ad's framing, Shell invests relatively little in renewable energy compared to its investments in fossil fuel. |
| d. Moving Forward: A | *New York Times* | • The ad promotes and makes claims about biofuels and hydrogen fuel as solutions to global warming. Shell |

[18] *The Mobility Quandary* (Content from Shell), WASH. POST., https://www.washingtonpost.com/brandstudio/shell/the-mobility-quandary.

| DESCRIPTION | ADVERTISING PLATFORM | EXAMPLES OF DECEPTIVE CONDUCT |
|---|---|---|
| Path to Net Zero Emissions[19] (Shell paid post)<br><br>See ¶ 12 for image. | | defines biofuels as a solution for "the next few decades." The ad also promotes hydrogen fuel, claiming it "emit[s] only water vapor from the tailpipe." The ad also states that hydrogen fuel is "unlike electric batteries" – which the ad calls "pricey" – because hydrogen "refueling is quick and it is able to power longer drives."<br><br>• For cargo shipping, the ad states that the expansion of liquefied natural gas (LNG) would "help prevent climate change from advancing". "Why should LNG be a marine fuel?" asks a Shell manager in the ad. "But that question is rapidly becoming, 'Why should it not be?'" The manager states that within 22 to 25 years, Shell will have built the infrastructure to supply LNG to marine shipping as oil is supplied today. The ad closes its discussion of cargo shipping by stating that hydrogen could also fuel ships "with low to no emissions." However, LNG is a fossil fuel that produces significant greenhouse gas emissions at all stages of its lifecycle.<br><br>• For air travel, the ad touts a partnership between Shell Aviation and SkyNRG to supply "sustainable aviation fuel" from "used cooking oil." The ultimate purpose of the project is "reducing the carbon emissions of flights."<br><br>• The ad closes by portraying Shell as a driver of change toward sustainable, low-carbon energy and government and consumers as impediments. "[T]he paths to a future of net-zero emissions […] won't happen overnight. […] It'll involve forming supportive government policies and getting consumers to embrace lower-carbon options. It'll also require changing existing infrastructure, which could take decades. To help navigate this multistage challenge, [Shell] calls for the advancement of emerging technologies […] if solutions beyond the power sector – including biofuels, hydrogen and some degree of carbon capture and storage – are fully embraced, it may be enough to enable a net-zero emissions world by 2070." David Hone, Shell's Chief Climate Change Advisor, goes on to identify "political will and, underlying that, societal will" as the main obstacle to addressing global warming, while ignoring Shell's own obstruction of |

---

[19] New York Times, *Moving Forward: A Path to Net Zero Emissions*, Shell, https://www.nytimes.com/paidpost/shell/ul/moving-forward-a-path-to-net-zero-emissions-by-2070.html.

| DESCRIPTION | ADVERTISING PLATFORM | EXAMPLES OF DECEPTIVE CONDUCT |
|---|---|---|
| | |     non-fossil energy systems and global warming policies, as well as the company's promotion of disinformation. <br> • Despite this public-facing endorsement of an overhaul of the energy system and the possibility of addressing climate change, a disclaimer in Shell's recent public "Climate Target" reveals their misleading and illusory nature: "As of February 11, 2021, Shell's operating plans and budgets do not reflect Shell's Net-Zero Emissions targets. Shell's aim is that, in the future, its operating plans and budgets will change to reflect this movement towards its new Net-Zero Emissions target. However, these plans and budgets need to be in step with the movement towards a Net Zero Emissions economy within society and among Shell's customers." <br> • The ad had over 1 million viewers in New York and Houston.[20] |
| e. Social media bios[21] | Instagram and Twitter | • "Powering progress together with more and cleaner energy solutions ⚡ #PoweringProgress." In a separate tweet, Shell states: "We power progress together by providing more and cleaner energy solutions for the world." <br> • These descriptions falsely portray Shell as substantially invested in clean energy without any mention of its primary business being fossil fuel extraction, development, and production. |
| |  | |

[20] *Shell Envisioning a Lower-Carbon Future,* N.Y. TIMES, T Brand Studio, https://www.tbrandstudio.com/projects/shell-moving-forward.
[21] @ Shell_US, Twitter, https://twitter.com/shell_us?lang=en/

| DESCRIPTION | ADVERTISING PLATFORM | EXAMPLES OF DECEPTIVE CONDUCT |
|---|---|---|
|  |  |  |
| f. Social media post[22] | Instagram | • Shell's posts often tout their renewable energy investments, for instance in wind power: "Scaling new heights! 🙋 This maintenance crew member works on a turbine hub 81 metres up at our onshore Mount Storm wind farm in West Virginia. Shell is now also entering offshore wind generation in the USA, where our joint ventures intend to develop wind farms off New Jersey and Massachusetts ⚡ Another example of how we're building our renewable power business. #renewableenergy #windfarm #windmill #windturbine #wind."<br><br>• These posts are deceptive and misleading because they fail to disclose the material facts that Shell's actual investments in wind and other clean renewable energy sources are negligible, and that the company is taking steps to ramp up its fossil fuel production. |

---

[22]@Shell, Instagram (Dec. 2018), https://www.instagram.com/p/BrnYIIzn-27.

| DESCRIPTION | ADVERTISING PLATFORM | EXAMPLES OF DECEPTIVE CONDUCT |
|---|---|---|
| | |  |
| g. Social media posts[23] | Instagram | • Shell's posts often tout their alternative energy investments, for instance in electric vehicle infrastructure: " ⚡ Expanding our electric vehicle charging network. Shell has signed an agreement to acquire @ubitricity, a leading #EV on-street charging provider, in its latest step to support drivers making the switch to lower-carbon transport. Founded in Berlin, Germany, ubitricity operates in a number of European countries, and is the largest public EV charging network in the UK with over 2,700 charge points. #electricvehicle #evcharging." <br><br> • Again, these posts are deceptive and misleading because Shell's investments in electric vehicle infrastructure are dwarfed by their investments in fossil fuels. |

---

[23] @Shell, Instagram (Jan. 25, 2021), https://www.instagram.com/p/CKeXn5VHFTl.

19

Case 24-1588, Document 144, Entry 36-11, Page 93 of 249

| DESCRIPTION | ADVERTISING PLATFORM | EXAMPLES OF DECEPTIVE CONDUCT |
|---|---|---|
| | |  |

## 6. BP's Misleading Marketing of Fossil Fuel Products

| DESCRIPTION | ADVERTISING PLATFORM | EXAMPLES OF DECEPTIVE CONDUCT |
|---|---|---|
| a. Invigorate Fuels | Various locations, including BP's website and BP-branded gas stations in NYC. | • All grades of BP gasoline sold in the New York City have Invigorate, an additive that BP describes on its website as better than "ordinary fuels" that have problems like "increased emissions."<br>• BP's website advertises its fuel selection as "including a growing number of lower-carbon and carbon-neutral products."<br>• These advertisements are misleading because they fail to disclose that these fossil fuel products emit significant quantities of greenhouse gas emissions and, therefore, contribute substantially to climate change. |

20

Case 1:24-cv-03583 Document 1 (Entry 05-11) Page 94 of 249

7.    **BP's Misleading and Deceptive Greenwashing Campaigns**

| DESCRIPTION | ADVERTISING PLATFORM | EXAMPLES OF DECEPTIVE CONDUCT |
|---|---|---|
| a. Possibilities Everywhere[24] | Multi-platform campaign, including *Wall Street Journal*, *The Economist*, *Financial Times*, CNN, Twitter, Facebook. and others | • The Possibilities Everywhere campaign misleadingly portrayed BP as heavily involved in non-fossil energy systems, including wind, solar, and electric vehicles, when the company's investments in clean energy resources actually represent a tiny sliver of its business.<br>• One Possibilities Everywhere advertisement (titled "Better fuels to power your busy life") stated: "We [] want—and need—[ ] energy to be kinder to the planet. At BP, we're working to make our energy cleaner and better. […] At BP, we're leaving no stone unturned to provide [the] extra energy the world needs while finding new ways to produce and deliver it with fewer emissions. […] We're bringing solar and wind energy to homes from the US to India. We're boosting supplies of cleaner-burning natural gas. […] More energy with fewer emissions? We see possibilities everywhere to help the world keep advancing."[25] The accompanying video added: "We all want more energy, but with less carbon footprint. That's why at BP we're working to make energy that's cleaner and better."[26]<br>• In another advertisement in BP's "Possibilities Everywhere" campaign (this one called "Blade runners," BP describes itself as "one of the major wind energy businesses in the US.[27]<br>• These advertisements misleadingly imply that clean energy investments represent a substantial part of BP's business and operations. In fact, those investments are negligible when compared to the company's investments in fossil fuels. |

---

[24] *See* Campaign US, *BP Launches Biggest Campaign in a Decade* (Jan. 21, 2019), https://www.campaignlive.com/article/bp-launches-biggest-global-campaign-decade/1523391.

[25] *See* BP, *Better fuels to power your busy life*, https://web.archive.org/web/20191130155554/ https://www.bp.com/en/global/corporate/who-we-are/possibilities-everywhere/energy-for-busy-lives.html.

[26] *Id.*

[27] *See* BP, *Blade runners*, https://web.archive.org/web/20191130192545/https://www.bp.com/ en/global/corporate/who-we-are/possibilities-everywhere/wind-and-natural-gas.html.

J.A. 91
22 of 38

| DESCRIPTION | ADVERTISING PLATFORM | EXAMPLES OF DECEPTIVE CONDUCT |
|---|---|---|
| | |  |
| b. Rise and shine[28] | Multi-platform campaign | • In a web promotion titled "Rise and shine," BP states that "[its] economics gurus believe [solar power] could account for 10% of the world's power by 2040," adding: "to help make that a reality, we've teamed up with Europe's largest solar company, [Lightsource BP]."<br>• The ad highlighted Lightsource BP's 6.3 MW floating solar power station near London and Lightsource BP's deal with Budweiser to supply renewable energy to its U.K. breweries. "Projects like these are advancing the possibilities of solar," BP claims, "and even rainy days can't dampen the excitement for this fast-growing energy source. That's because, whatever the weather, our cleaner-burning natural gas can play a supporting role to still keep your kettle ready for action."<br>• This portrayal of BP's primary interest as solar power, with natural gas used only as a backup, is misleading and deceptive. BP's investments in natural gas outstrip its solar investments by a factor of approximately one hundred or more, and only a small fraction of its natural gas products, an estimated 5% or less, are used to backup renewables. Thus, the overall impression given by the advertisements—that BP is primarily active in solar energy, with its natural gas used only for backup—is materially misleading to consumers. |

[28] BP, *Rise and Shine*, https://web.archive.org/web/20190329004210/https://www.bp.com/en/global/corporate/who-we-are/possibilities-everywhere/solar-and-natural-gas.html.

22

Case 24-1965, Document 84, Entry 3612, Page 96 of 249

| DESCRIPTION | ADVERTISING PLATFORM | EXAMPLES OF DECEPTIVE CONDUCT |
|---|---|---|
| c. Blade runners[29] | Multi-platform campaign | • In this "Blade runners" advertisements, BP misleadingly describes the role played by its natural gas as both necessary to compensate for wind power's intermittency and only used for that purpose. The ad promotes natural gas as "a simple answer" to "keep the lights on when the wind stops blowing" and intones that wind without natural gas would be like "fish without chips, peanut butter without jelly, and bread without butter." It further describes how natural gas is used only on "rare still days" when the wind doesn't blow.<br><br>• But natural gas is not necessary for wind power to be viable, as BP claims. And the vast majority—more than 95%—of BP's natural gas products are not used to back up renewables, in stark contrast to the impression given to consumers in the company's advertisement. |
| d. Better fuels to power your busy life[30] | Multi-platform campaign | • In other advertisements, BP promotes natural gas as "cleaner-burning," "burn[ing] 50% cleaner than coal in power generation," and providing "more energy with fewer emissions."<br><br>• These statements misleadingly exaggerate the climate benefits of natural gas because they fail to disclose that natural gas creates significant quantities of greenhouse gas emissions that are substantially contributing to climate change.<br><br>• By focusing only on consumer use ("cleaner burning") and ignoring natural gas's significant greenhouse gas emissions during production and transportation, these advertisements tell a half-truth and create the misleading impression that expanding the production of natural gas is a win-win investment in the fight against climate change, with little to no downsides for the planet or its people. |
| e. BP's Shift to Gas[31] (social media | YouTube and other social media. | • In a marketing video, BP tells consumers that the company is "advancing the energy transition, and natural gas has a crucial role." It adds: "The world needs fuels |

---

[29] *See* BP, *Blade runners*, https://web.archive.org/web/20191130192545/https://www.bp.com/
en/global/corporate/who-we-are/possibilities-everywhere/wind-and-natural-gas.html.
[30] *See* BP, *Better fuels to power your busy life*,
https://web.archive.org/web/20191130155554/https://www.bp.com/
en/global/corporate/who-we-are/possibilities-everywhere/energy-for-busy-lives.html.
[31] Youtube, *BP's Shift to Gas,* BP, December 6, 2017,
https://www.youtube.com/watch?v=ILwpc5MUmUM.

| DESCRIPTION | ADVERTISING PLATFORM | EXAMPLES OF DECEPTIVE CONDUCT |
|---|---|---|
| and marketing video) | | that are abundant, affordable, and lower carbon – fuels like natural gas." <br> • This advertisement exaggerates the climate benefits of natural gas by failing to disclose that natural gas emits significant amounts of greenhouse gas emissions and that continued consumption of natural gas will result in deadly climate change. |
| f. Social media ad[32] | Facebook | • A number of BP Facebook ads, with an example shown below, tout the ability and necessity of oil and gas to be part of the climate solution, while failing to disclose that these fossil fuels emit significant amounts of greenhouse gas emissions that contributing substantially to climate change. <br> • Although these ads feature a prominent image of renewable wind energy, they actually advertise a different message of natural gas as the "centerpiece" of a "net zero carbon economy." <br><br>  |
| g. Social media ad[33] | Facebook | • Another BP Facebook ad deceptively associates oil and gas with "cleaner" energy: "Oil and gas will be needed to meet energy demand for the growing population. See how we're making ours cleaner and better." The ad fails to |

---

[32] Facebook Ad Library, https://www.facebook.com/ads/library/?id=680453289147451.
[33] Facebook Ad Library, https://www.facebook.com/ads/library/?id=497972544144556.

| DESCRIPTION | ADVERTISING PLATFORM | EXAMPLES OF DECEPTIVE CONDUCT |
|---|---|---|
| | | disclose, however, the fact that BP's oil and gas products produce large quantities of greenhouse gas emissions that are pushing the world towards deadly levels of global warming.  |
| h. Social media ad[34] | Facebook | • This Facebook post claims that BP is "working to make all forms of energy cleaner and better" because the company "agree[s]" that "the world needs fewer emissions."<br>• This add exaggerates BP's efforts to reduce greenhouse gas emissions while failing to disclose that its investments in clean energy resources form a negligible share of its overall business. |

---

[34] Facebook Ad Library, https://www.facebook.com/ads/library/?id=435441174014180.

| DESCRIPTION | ADVERTISING PLATFORM | EXAMPLES OF DECEPTIVE CONDUCT |
|---|---|---|
| | |  |
| i. Social media profiles | Instagram[35] Twitter[36] | • BP's bios on Instagram and Twitter read: "Reimagining energy for people and our planet #bpNetZero." <br> • This statement deceptively paints BP as a leader in the energy transition, while failing to disclose that BP's investments in clean energy resources are minimal compared to their fossil fuel portfolio. <br><br>  |

---

[35] @bp_plc, Instagram, https://www.instagram.com/bp_plc.
[36] @bp_plc, Twitter, https://twitter.com/bp_plc.



| DESCRIPTION | ADVERTISING PLATFORM | EXAMPLES OF DECEPTIVE CONDUCT |
|---|---|---|
| j. Social media post[37] | Instagram | • BP writes: "📢 ICYMI: Our #bpNetZero ambition is supported by 🔟 Aims to help bp & the world get to net zero by 2050 or sooner 🎯 Aim 1 is to be net zero across our entire operations on an absolute basis 🔽 So, by 2030 we're aiming to reduce our operational emissions by 30-35%."<br>• These representations are deceptive and misleading because BP focuses on operational emissions without disclosing that end-use emissions are the most significant contributor to climate change from its products. |
| k. Advancing Low Carbon | YouTube and other social media. | • BP advertises: "All across BP, we are changing, encouraging our people to innovate, create, partner, and |

[37] @ bp_plc, Instagram (Feb. 17, 2021), https://www.instagram.com/p/CLZn3A_n-vo.

27

| DESCRIPTION | ADVERTISING PLATFORM | EXAMPLES OF DECEPTIVE CONDUCT |
|---|---|---|
| 2020[38] (social media and marketing video) | | invest, exploring activities that you might not expect to support our net-zero ambition." The ad continues: "We are reimagining energy for people and our planet. We've been investing in new businesses: car batteries that in the future can charge in under five minutes; a charging infrastructure in the world's largest EV market; and intelligent systems to help optimize power supply and streamline the charging experience. We're exploring more ways to capture carbon with technology to remove $CO_2$ from industrial processes and helping restore native woodlands and forests. We're creating new and improved carbon products: helping our customers reduce emissions by improving our existing products; using sustainable biofeed stocks to make diesel and developing advanced lubricants; technology that can convert waste biomass into jet fuel and diesel; using natural gas to fuel cars; and we're developing lower carbon and energy efficient solutions for producing chemicals to make everyday products. We're working with others to store and manage the energy we all need by developing solar projects in more countries, exploring smart grids to help homes harness and share solar energy, working with startups on AI technologies that can maximize energy efficiency within the home and commercial buildings. We're continuing to reduce emissions in our operations…So what's next? Even more . . . Our people will continue to drive action across our businesses, to find new ways to help BP and the world reach net zero." <br><br>• This promotional material is misleading because it exaggerates BP's investments in clean energy resources (which are minimal) and omits the material facts that BP's primary business remains laser-focused on fossil fuel production, and that its fossil fuel products are a leading cause of deadly climate change. |

---

[38] Youtube, *Advancing Low Carbon 2020*, BP (May 19, 2020), https://www.youtube.com/watch?v=R7Afe8qSrcM.

28

**18. American Petroleum Institute's Misleading and Deceptive Greenwashing Campaigns**

| DESCRIPTION | ADVERTISING PLATFORM | EXAMPLES OF DECEPTIVE CONDUCT |
|---|---|---|
| a. Why natural gas will thrive in the age of renewables[39] (API paid post) | *Washington Post* | • As shown in the screenshots below, API has run ads in *the Washington Post* touting the environmental and climate benefits of natural gas. For example, one states: "The goal of generating 100 percent renewable energy may not be achievable. But in the coming decades natural gas can help meet the growing global demand for sustainable energy."<br>• It continues: "[W]hile high-capacity, low-cost batteries may one day enable more solar and wind supply, uncovering that innovation will take billions more in R&D costs in the hopes of achieving that breakthrough. . . . There is one sphere of innovation, however, that has already proven to be transformative—the expansion of domestic natural gas production and consumption."<br>• It then concludes: "Natural gas is part of the solution," stressing that "[n]atural gas burns much cleaner than coal and offers a stable energy supply that utilities can use in conjunction with solar and wind power."<br>• This advertisement misleadingly exaggerates the climate impacts of natural gas products by failing to disclose the material facts that natural gas emits significant amounts of greenhouse gas emissions and is a primary driver of climate change. |

---

[39] *Why natural gas will thrive in the age of renewables*, WASH. POST, Sponsored Content, API, WP Brand Studio, https://www.washingtonpost.com/brand-studio/api-why-natural-gas-will-thrive-in-the-age-of-renewables/.

| **DESCRIPTION** | **ADVERTISING PLATFORM** | **EXAMPLES OF DECEPTIVE CONDUCT** |
|---|---|---|
| | |  |
| b. Real climate solutions won't happen without natural gas and oil[40] (API paid post) | *Washington Post* | • In a paid post crafted to resemble a real news article, API writes: "Energy from U.S. natural gas and oil is fundamental to economic recovery and addressing climate change goals." It continues: "We're capturing emissions and using them for other manufacturing processes. So yes—we proudly recycle." <br><br> • "Amid unprecedented challenges, we've maintained our focus on reducing greenhouse gas emissions and investing in technology to help us further reduce our environmental footprint," including "[t]ransitioning to [c]leaner [n]atural [g]as," "[r]educing |

---

[40] *Real climate solutions won't happen without natural gas and oil*, WASH. POST, Sponsored Content, API, WP Brand Studio, https://www.washingtonpost.com/brand-studio/wp/2020/12/14/real-climate-solutions-wont-happen-without-natural-gas-and-oil/.

| DESCRIPTION | ADVERTISING PLATFORM | EXAMPLES OF DECEPTIVE CONDUCT |
|---|---|---|
| | | [m]ethane [e]missions," and "[r]amping [u]p [c]arbon [c]apture." |
| | | • "We understand that there is much more to do to meet the challenges of our times. But the natural gas and oil industry recognizes the magnitude of what we face, and we are confident that we can help to bring about change that serves both people and our planet." |
| | | • These statements are false and misleading because API fails to disclose that oil and gas are primary drivers of climate change, and that continued use of those fossil fuels will lead to deadly levels of global warming. |



ADVERTISEMENT: Content supplied by American Petroleum Institute ⓘ

## Real climate solutions won't happen without natural gas and oil

By Mike Sommers, President and CEO, American Petroleum Institute
December 14, 2020

*Energy from U.S. natural gas and oil is fundamental to economic recovery and addressing climate change goals.*

Any student of U.S. history knows that America met the greatest challenges of our past — the Great Depression, World War II, the Cold War, the space race — by eclipsing the politics of the moment and working together. People put our country first. That's not to say that everyone agreed, but Americans came together for the greater good and a common purpose.

With a pandemic that has tested Americans in ways few others have, it is once again time to focus on problem solving and progress, not partisanship. As President-elect Joe Biden, Vice President-elect Kamala Harris and new members of the House and Senate have indicated in preparing to take office, their first task will be supporting distribution of a historic vaccine.

But other priorities await, including solutions to three other important 21st-century challenges that remain — rebuilding the economy after a devastating pandemic, providing the affordable energy needed to fuel recovery and our modern way of life and addressing global climate challenges.

Content From
API American Petroleum Institute

More From API

Why Pipelines and Production are pathways to progress

| c. Low- and no-carbon future starts with natural gas[41] (API paid post) | *Washington Post* | • In another paid post, API writes: "The fossil fuel is the surprising catalyst for a sustainable power supply." |
| | | • The promotional material continues: "Rather than getting a bad rap, natural gas should be viewed as a powerful tool to reduce emissions—while improving air quality. Natural gas can help increase the use of renewable energy like wind and solar because |

---

[41] *Low- and no-carbon future starts with natural gas*, WASH. POST, Sponsored Content, API, WP Brand Studio, https://www.washingtonpost.com/brand-studio/wp/2019/02/15/low-and-no-carbon-future-starts-with-natural-gas/.

31

| DESCRIPTION | ADVERTISING PLATFORM | EXAMPLES OF DECEPTIVE CONDUCT |
|---|---|---|
| | | it offers a low-cost backup capacity that's critical for the power grid."<br>• It then concludes: "Natural gas is an economical, environmentally friendly complement to renewable energy. The sooner green activists realize that, the more effective they'll be at continuing to slash emissions."<br>• This promotional material is deceptive and misleading because it conceals the material facts that natural gas produces significant quantities of greenhouse gas emissions, and that continued use of natural gas increases the risks of catastrophic climate change. |
| | |  |
| d. Power Past Impossible[42] | Multi-platform campaign | • As of July 21, 2020, the Power Past Impossible website called oil and natural gas: "Energy for a Cleaner Environment." In touting the environmental benefits of oil, the website also made the following false or misleading assertions: "This is Energy for a Cleaner Environment," "99% Fewer Vehicle Emissions," and "Cleanest Air in More Than a Decade."[43] |

---

[42] *See* Michael Tadeo, *API Launches Power Past Impossible Campaign During Super Bowl Showing Natural Gas and Oil Benefit to Consumers in Everyday Life*, AMERICAN PETROLEUM INSTITUTE (Feb. 5, 2017), https://www.api.org/news-policy-and-issues/news/2017/02/05/api-launches-power-past-impossible-campa.

[43] *See* American Petroleum Institute, *Energy for a Cleaner Environment*, https://web.archive.org/web/20200602111024/https://powerpastimpossible.org/state-of-american-energy/energy-for-a-cleaner-environment.

Case 21-1563, Document 42, 08/20/2021, Page 106 of 249

| DESCRIPTION | ADVERTISING PLATFORM | EXAMPLES OF DECEPTIVE CONDUCT |
|---|---|---|
| e. Energy for Progress[44] | Multi-platform campaign | • API touts its members' purported commitments to reducing their carbon footprint, while failing to disclose that its core mission continues to be promoting its members' extraction, production, and sale of fossil fuels to consumers in New York City and throughout the United States at unprecedented rates.<br><br>• Many of API's television, radio, and internet advertisements, including those that reached New York City consumers, led to a website for a campaign run by API entitled "Energy for Progress," which portrays the oil and gas industry as a leader in reducing greenhouse gas emissions.<br><br>• The opening advertisement for the campaign states that "natural gas and oil companies have […] reduced carbon emission levels to the lowest in a generation." This statement is misleading because (1) global carbon emissions have not declined, but rather increased; (2) although carbon dioxide emissions have declined slightly in the United States, "carbon emissions" includes both carbon dioxide and methane, which in total have not been shown to have declined; and (3) the advertisement credits the natural gas and oil industry for this claimed decline in U.S. emissions, when in fact carbon dioxide emissions have reduced in part from the adoption of renewable energy systems as well as from macroeconomic factors such as recession and changes in economic activity.<br><br>• For at least six months, the campaign's website cast natural gas as a "clean" fuel before that description was revised to "cleaner" sometime in summer 2020.<br><br>• Among many articles and images promoting fossil fuel companies' claimed contributions to clean energy, the website advertises "4 Ways We're Protecting Wildlife" and "5 Ways We're Helping to Cut Emissions," which |

---

[44] *See* ENERGY FOR PROGRESS, American Petroleum Institute, https://energyforprogress.org.

| DESCRIPTION | ADVERTISING PLATFORM | EXAMPLES OF DECEPTIVE CONDUCT |
|---|---|---|
| | | misleadingly portrays the oil and gas industry as an environmental leader by focusing on marginal improvements in operational emissions while ignoring the much greater emissions from the industry's products.[45]<br>• These messages are not meant to encourage consumers to transition to low carbon energy sources—just the opposite. By obfuscating the reality that fossil fuels are the driving force behind anthropogenic climate change, they are designed to increase consumers' use of fossil fuels in order to advance API's core mission of growing its member companies' oil and natural gas businesses. |
| f. Social media ad[46] | Facebook | • As part of its "Energy for Progress" campaign, API has run a series of Facebook advertisements, many of which have reached a substantial number of New York consumers, that falsely paint the fossil fuel industry as a leader on climate change action, e.g., "We can tackle climate change and meet the world's energy needs by embracing new innovations together," "Let's create climate solutions together."<br><br> |
| g. Social media ad[47] | Facebook | • "We can all agree we need strong climate solutions—and with natural gas as a dominant energy source, U.S. carbon emissions are the lowest levels in a generation." |

---

[45] *See* American Petroleum Institute, *5 Ways We're Using Energy for Progress*, ENERGY FOR PROGRESS, https://energyforprogress.org/the-basics.

[46] *See* Facebook Ad Library, https://www.facebook.com/ads/library/?id=1554734221395483.

[47] *See* Facebook Ad Library, https://www.facebook.com/ads/library/?id=306269540617537.

| DESCRIPTION | ADVERTISING PLATFORM | EXAMPLES OF DECEPTIVE CONDUCT |
|---|---|---|
| | | • Such statements are misleading because they omit the significant methane emissions from natural gas that are potent greenhouse gases. |
| | |  |
| i. Social media ad[48] | Twitter | • "Our economic and environmental picture is incomplete without sufficient and modern natural gas and oil infrastructure. Pipelines bolster...Job Creation . . . Economic Prosperity Renewable Energy Growth . . . Environmental Progress."<br>• Such representations are deceptive because they portray fossil fuels as part of "environmental progress" and fail to disclose |

---

[48] @APIenergy, Twitter (Apr. 12, 2021), https://twitter.com/APIenergy/status/1381620887569494019.

35

| DESCRIPTION | ADVERTISING PLATFORM | EXAMPLES OF DECEPTIVE CONDUCT |
|---|---|---|
| | | the fact that oil and gas generate large quantities of greenhouse gas emissions that have severe, adverse effects on the climate.  |
| j. Social media ad[49] | Twitter | • "Natural gas will continue to play a foundational role in the world's energy mix for decades to come. Not only is it an essential partner to intermittent renewables, but it has also helped lower U.S. CO2 emissions to their lowest levels in a generation." <br><br> • That statement is false because natural gas is not necessary to scale up renewables, which can be accomplished with zero-emission technologies such as battery storage. <br><br> • The statement deceptively exaggerates the climate benefits of gas by (1) omitting the fact that natural gas emits large quantities of greenhouse gas emissions that have significant, |

---

[49] @APIenergy, Twitter (Apr. 5, 2021), https://twitter.com/APIenergy/status/1379170983647580169.

| DESCRIPTION | ADVERTISING PLATFORM | EXAMPLES OF DECEPTIVE CONDUCT |
|---|---|---|
| | | adverse effects on the planet's climate, and (2) crediting the natural gas and oil industry for this claimed decline in U.S. emissions, when in fact carbon dioxide emissions have reduced in part from the adoption of renewable energy and from macroeconomic factors such as recession and changes in economic activity |
| | |  |

37

Case 24-1563-cv  Document 24  Page 11 of 249



**JAMES E. JOHNSON**
*Corporation Counsel*

THE CITY OF NEW YORK
LAW DEPARTMENT

100 CHURCH STREET
NEW YORK, NY 10007

**ALICE R. BAKER**
*Assistant Corporation Counsel*

phone: 212.356.2314
email: albaker@law.nyc.gov

April 22, 2021

Clerk's Office
Supreme Court of the State of New York
New York County Courthouse
60 Center Street – Room 161
New York, New York 10007

       Re: <u>City of New York v. Exxon Mobil Corp., ExxonMobil Oil Corporation,</u>
<u>Royal Dutch Shell plc, Shell Oil Company, BP p.l.c, BP America Inc., and</u>
<u>American Petroleum Institute</u>

Dear Sir or Madam,

       Please be advised that, pursuant to CPLR 8017(a), 8018(d)(1), and 8019(d), and pursuant to Section 7-102 of the New York City Administrative Code, the New York City Law Department is exempt from filing and other fees.

       Thank you for your cooperation.

Sincerely,

*/s/ Alice R. Baker*

Alice R. Baker
Assistant Corporation Counsel

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE CITY OF NEW YORK,<br><br>                    Plaintiff,<br><br>          v.<br><br>EXXON MOBIL CORPORATION,<br>EXXONMOBIL OIL CORPORATION, ROYAL<br>DUTCH SHELL PLC, SHELL OIL COMPANY,<br>BP P.L.C., BP AMERICA INC., and AMERICAN<br>PETROLEUM INSTITUTE,<br><br>                    Defendants. | Case No.<br><br>Date: |

<u>**NOTICE OF REMOVAL**</u>

## TABLE OF CONTENTS

**Page**

NOTICE OF REMOVAL ........................................................................... 1

TIMELINESS OF REMOVAL ................................................................ 2

NATURE OF THE ACTION .................................................................. 2

GROUNDS FOR REMOVAL ................................................................ 12

I.    The City's Claims Are Governed by Federal Common Law and Therefore Are Subject to Removal. .................................................................. 14

    A.    The City's Claims Necessarily Arise under Federal Common Law. .................... 14

        1.    The City's Claims Implicate Transboundary Pollution. ......................... 15

        2.    The City's Claims Implicate Foreign Affairs. ........................................ 20

    B.    The Artful Pleading Doctrine Supports This Court's Jurisdiction. ....................... 26

    C.    Jurisdiction Is Independently Authorized by *Grable*. ............................................. 27

II.    This Action Is Removable under the Federal Officer Removal Statute. .......................... 30

    A.    The Courts Construe the Federal Officer Removal Statute Broadly in Favor of Removal. .................................................................. 30

    B.    Defendants Satisfy All Elements of the Federal Officer Removal Statute. .......... 32

        1.    Defendants "Acted Under" Federal Officers. ............................................. 33

            (a)    Defendants Acted under Federal Officers by Supplying Highly Specialized Fuels for Military Use. ................................... 36

            (b)    Defendants Acted under Federal Officers during the Korean War and World War II. ................................... 42

            (c)    Defendants Acted under Federal Officers by Constructing Pipelines for Oil Transportation. ................................... 47

            (d)    Defendants Acted under Federal Officers by Constructing, Operating, and Managing Government Petroleum Production Facilities. ................................... 49

            (e)    Defendants Acted under Federal Officers by Supplying and Managing the Strategic Petroleum Reserve and Allocating Products Pursuant to the Emergency Petroleum Allocation Act. ................................... 52

            (f)    Defendants Acted under Federal Officers by Developing Mineral Resources on the Outer Continental Shelf and Other Federal Lands. ................................... 55

        2.    The City's Claims Are Related to Defendants' Activities "Under Color of Federal Office." .......................................... 67

        3.    Defendants Have Colorable Federal Defenses. ........................................ 71

III.    This Action Is Removable under the Outer Continental Shelf Lands Act........................ 75

IV.    This Action Arises Out of Federal Enclaves.................................................. 80

V.    This Court Has Diversity Jurisdiction under the Fraudulent Joinder Doctrine. ............... 82

VI.    This Representative Action on Behalf of New York City Consumers Is Removable under the Class Action Fairness Act............................................ 86

VII.    The City's Claims Include Federal Constitutional Elements............................................ 90

COMPLIANCE WITH OTHER REMOVAL REQUIREMENTS ............................................. 93

ii

**J.A. 111**

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE THAT Defendants Exxon Mobil Corporation and ExxonMobil Oil Corporation hereby remove this action from the Supreme Court of the State of New York, New York County, to the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §§ 1331, 1332(a), 1332(d), 1441, 1442(a), and 1453(b); and 43 U.S.C. § 1349(b)(1). To the extent any part of the City of New York's causes of action can be construed as non-federal, this Court has supplemental jurisdiction over them under 28 U.S.C. § 1367(a) because they form part of the same case or controversy as those causes of action over which the Court has original jurisdiction. All other defendants that have been properly joined and served, or purported to be served, have consented to this Notice of Removal.[1]

While artfully pleaded as a consumer protection action brought under municipal law, this lawsuit by the City of New York (the "City") is in reality a transparent attempt to re-litigate issues of federal law the Second Circuit has already decided against it in *City of New York* v. *Chevron Corp.*, 993 F.3d 81 (2d Cir. 2021) ("*City of New York II*"), *aff'g*, *City of New York* v. *BP p.l.c.*, 325 F. Supp. 3d 466 (S.D.N.Y. 2018) (Keenan, J.) ("*City of New York I*"). The City's second bite at the apple again seeks to wade into complex areas of federal regulation on climate change and to substitute the City's judgment for that reflected in longstanding decisions by the federal government about national and international energy policy and environmental protection. A suit of this nature should be heard by a federal court.

---

[1] Consenting defendants are Royal Dutch Shell plc and Shell Oil Company; BP p.l.c., and BP America Inc.; and the American Petroleum Institute ("API"). By filing or consenting to this Notice of Removal, Defendants do not waive any right, defense, affirmative defense, or objection, including without limitation any challenges to personal jurisdiction, insufficient process, and/or insufficient service of process. *See, e.g.*, *Rivera* v. *Bally's Park Place, Inc.*, 798 F. Supp. 2d 611, 615-16 (E.D. Pa. 2011). Where used in this Notice, "Defendants" refers to two or more defendants named in this lawsuit.

## TIMELINESS OF REMOVAL

1.      The City filed this action in the Supreme Court of the State of New York, County of New York, as Index No. 451071/2021, on April 22, 2021.  No Defendant was served prior to April 29, 2021.

2.      This Notice of Removal is timely because it is filed within 30 days of service.  *See* 28 U.S.C. § 1446(b).

## NATURE OF THE ACTION

3.      This action is the City of New York's attempt to re-litigate *City of New York I*, in which this Court dismissed—in a ruling affirmed by the Second Circuit—the City's complaint that sought to limit and ultimately end Defendants' production of fossil fuels because of their connection to climate change.

4.      Plaintiffs' strategy in both cases was developed over many years.  In June 2012, climate activists and plaintiffs' lawyers assembled in La Jolla, California for a "Workshop on Climate Accountability, Public Opinion, and Legal Strategies." Ex. 1.[2]  There, they hatched the strategy for this and many other lawsuits currently pending against Defendants.  Participants at the La Jolla conference—including Matthew Pawa, founder of the "Global Warming Legal Action Project"—discussed using civil litigation and enforcement authority to "maintain[] pressure on the [fossil fuel] industry that could eventually lead to its support for legislative and regulatory responses to global warming." *Id.* at 27.  Some participants noted that "pressure from the courts offers the best current hope for gaining the energy industry's cooperation in converting to renewable energy." *Id.* at 27-28.  In particular, they saw civil litigation as a vehicle for accomplishing their goals, with one commentator observing: "Even if your ultimate goal might be

---

[2]   "Ex." refers to an Exhibit attached to this Notice of Removal.

to shut down a company, you still might be wise to start out by asking for compensation for injured parties." *Id.* at 13.

5.    The climate activists, including Pawa, reconvened in New York City in January 2016 to implement their plan to use law enforcement and tort suits to target the fossil fuel production of the largest oil and gas companies in the world.  Together, they agreed on an "Exxon campaign" to undermine Exxon Mobil Corporation's ability to conduct business.  Ex. 2.  The campaign's goals included:

- "delegitimiz[ing] [Exxon] as a political actor,"

- "establish[ing] in [the] public's mind that Exxon is a corrupt institution that has pushed humanity (and all creation) toward climate chaos and grave harm," and

- "driv[ing] divestment from Exxon." *Id.*

6.    With the contours of the campaign in place, Pawa recruited prospective litigants. Initially, he found them in a group of state attorneys general for whom he conducted a secret briefing on climate-change litigation in early 2016.  *See* Ex. 3.  Soon thereafter, twenty attorneys general, calling themselves the "Green 20," held a press conference with Al Gore where they pledged to regulate the speech of energy companies, including Defendants, whom they perceived as an obstacle to enacting their preferred policy responses to climate change.  *See* Ex. 4 at 2.  Over the past several years, many of the attorneys general associated with the Green 20 have filed lawsuits against Exxon Mobil Corporation and other energy companies, all with the goal of limiting—if not terminating—these companies' production and sales of fossil fuels, including by stifling speech on political issues and questions.[3]

---

[3]    *See State* v. *Exxon Mobil Corp.*, Civ. No. 20-6132568 (Conn. Super. Ct. Sept. 14, 2020); *State* v. *BP America Inc.*, Case No. N20C-09-097 (Del. Super. Ct. Sept. 10, 2020); *District of Columbia* v. *Exxon Mobil Corp.*, Civ. No. 20-2892 (D.C. Sup. Ct. June 25, 2020); *State* v. *Am.*

3

7. Pawa next promoted the climate activists' playbook to include tort suits filed by municipal litigants. In turn, numerous municipalities—including the City of New York—joined in the effort to file lawsuits against energy companies to shape national and international energy policy.[4]

8. A trial court in Texas recently concluded that these lawsuits amounted to a "crusade" against Exxon Mobil Corporation "aimed to chill and suppress ExxonMobil's speech through legal actions and related campaigns." *City of San Francisco* v. *Exxon Mobil Corp.*, 2020 WL 3969558, at *3, *8 (Tex. App. June 18, 2020) (internal quotation marks omitted). A Texas appellate court likewise expressed dismay over California municipalities' "[l]awfare," which it considered "an ugly tool by which to seek the environmental policy changes the California Parties

_____

*Petrol. Indus.*, Civ. No. 20-3837 (Minn. Dist. Ct. June 24, 2020); *Commonwealth* v. *ExxonMobil Corp.*, Civ. No. 19-3333 (Mass. Super. Ct. Oct. 24, 2019); *People* v. *ExxonMobil Corp.*, Civ. No. 18-452044 (N.Y. Sup. Ct. Oct. 24, 2018); *State* v. *Chevron Corp.*, Civ. No. 18-4716 (R.I. Super. Ct. July 2, 2018).

4  *See Anne Arundel County* v. *BP P.L.C.*, Civ. No. 21-565 (Md. Cir. Ct. April 26, 2021); *City of Annapolis* v. *BP P.L.C.*, Civ. No. 21-250 (Md. Cir. Ct. Feb. 22, 2021); *County of Maui* v. *Sunoco LP*, Civ. No. 20-283 (Haw. Cir. Ct. Oct. 12, 2020); *City of Charleston* v. *Brabham Oil Co.* Civ. No. 2020-CP-10-3975 (S.C. Com. Pl. Sept. 9, 2020); *City of Hoboken* v. *Exxon Mobil Corp.*, Civ. No. 20-3179 (N.J. Super. Ct. Sept. 2, 2020); *City & County of Honolulu* v. *Sunoco LP*, Civ. No. 20-380 (Haw. Cir. Ct. Mar. 9, 2020); *Mayor & City Council of Baltimore* v. *BP p.l.c.*, Civ. No. 18-4219 (Md. Cir. Ct. July 20, 2018); *King County* v. *BP p.l.c.*, Civ. No. 18-11859 (Wash. Super. Ct. May 9, 2018); *Bd. of Cnty Comm'rs of Boulder Cnty.* v. *Suncor Energy (U.S.A.), Inc.*, Civ. No. 18-30349 (Colo. Dist. Ct. Apr. 17, 2018); *City of Richmond* v. *Chevron Corp.*, Civ. No. 18-55 (Cal. Super. Ct. Jan. 22, 2018); *City of Santa Cruz* v. *Chevron Corp.*, Civ. No. 17-3243 (Cal. Super. Ct. Dec. 20, 2017); *County of Santa Cruz* v. *Chevron Corp.*, Civ. No. 17-3242 (Cal. Super. Ct. Dec. 20, 2017); *City of Oakland* v. *BP p.l.c.*, Civ. No. 17-87588 (Cal. Super. Ct. Sept. 19, 2017); *City of San Francisco* v. *BP p.l.c.*, Civ. No. 17-561370 (Cal. Super. Ct. Sept. 19, 2017); *City of Imperial Beach* v. *Chevron Corp.*, Civ. No. 17-1227 (Cal. Super. Ct. July 17, 2017); *County of Marin* v. *Chevron Corp.*, Civ. No. 17-2586 (Cal. Super. Ct. July 17, 2017); *County of San Mateo* v. *Chevron Corp.*, Civ. No. 17-3222 (Cal. Super. Ct. July 17, 2017).

4

desire, enlisting the judiciary to do the work that the other two branches of government cannot or will not do." *Id.* at *20.

9.      The City's first action—brought in 2018 against many of the same Defendants here—is no exception.[5]  The City's suit asserted nuisance and trespass claims under New York law, seeking to impose liability on defendants' "worldwide fossil fuel production and the use of their fossil fuel products, [which] continue[] to emit greenhouse gases and exacerbate global warming." *City of New York I*, 325 F. Supp. 3d at 471 (quoting Amended Complaint); *see id.* at 468 (noting that defendants were allegedly "collectively responsible, through their production, marketing, and sale of fossil fuels, for over eleven percent of all the carbon and methane pollution from industrial sources that has accumulated in the atmosphere since the Industrial Revolution"). Quoting the City's pleadings, the Court described the City's suit as follows:

> Despite their early knowledge of climate change risks, Defendants extensively promoted fossil fuels for pervasive use, while denying or downplaying these threats. ([Am. Compl.] ¶¶ 93-94). . . .
>
> The City alleges that Defendants' ongoing conduct continues to exacerbate global warming and cause recurring injuries to New York City. (*Id.* ¶ 9.)  Defendants continue to produce, market, distribute, and sell fossil fuels in massive quantities; to promote fossil fuel consumption in these massive quantities; and to downplay the threat posed by climate change. (*Id.* ¶ 131.)  This ongoing conduct will cause increasingly severe injuries to New York City, including new and more significant encroachments upon and interferences with City property, and increasingly severe threats to public health. (*Id.*)  The City brings this suit to "shift the costs of protecting the City from climate change impacts back onto the companies that have done nearly all they could to create this existential threat." (*Id.* ¶ 2.)

*City of New York I*, 325 F. Supp. 3d at 469-70.

10.      In a July 2018 opinion, this Court dismissed the City's complaint "with prejudice in its entirety." *Id.* at 476.  In particular, this Court held that the City's climate change-based

---

[5]      Defendants in *City of New York* were BP p.l.c., Chevron Corporation, ConocoPhillips, ExxonMobil Corporation, and Royal Dutch Shell plc.

claims were necessarily governed by federal common law, not state law, because "a federal rule of decision is necessary to protect uniquely federal interests." *Id.* at 471 (quoting *Tex. Indus., Inc.* v. *Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981)). The City contended that its claims were not governed by federal common law because "the City bases liability on defendants' production and sale of fossil fuels—not defendants' direct emissions of [greenhouse gases]." *Id.* at 471. This Court disagreed: "[R]egardless of the manner in which the City frames its claims . . . , the amended complaint makes clear that the City is seeking damages for global-warming related injuries resulting from greenhouse gas emissions, and not only the production of Defendants' fossil fuels." *Id.* at 471-72. Because the City's claims were "based on the 'transboundary' emission of greenhouse gases," this Court concluded that the City's "claims arise under federal common law and require a uniform standard of decision." *Id.* at 472.

11.     The Second Circuit affirmed, holding that "the City's claims must be brought under federal common law" because they are "federal claims," and state law is not competent to address these issues, which "demand a unified federal standard." *City of New York II*, 993 F.3d at 95, 98. The Second Circuit thus sustained the district court's determination that federal common law necessarily applied to the City's claims. Federal common law, and not state law, governs claims seeking redress for global climate change, the court explained, because climate change is a "uniquely international problem of national concern" that is "not well-suited to the application of state law." *Id.* at 85-86. Although the City had pleaded only state-law claims in its amended complaint, the Second Circuit explained that "[a]rtful pleading cannot transform" a complaint seeking redress for the effects of climate change into "anything other than a suit over greenhouse gas emissions." *Id.* at 91. The court concluded that the City could not "disavow[] any intent to address emissions" while "identifying such emissions" as the source of its harm. *Id.* The court

rejected the City's framing of the action as a local issue, and found instead that the true nature of the claims amounted to a "clash over regulating worldwide greenhouse gas emissions and slowing global climate change." *Id.* "Such a sprawling case," the court held, "is simply beyond the limits of state law." *Id.* at 92.

12. In addition, the Second Circuit held that the City's action raised "significant federalism concerns." *Id.* Permitting the suit to proceed under state law, the court reasoned, would risk "upsetting the careful balance" struck by Congress and the Executive between preventing climate change, on the one hand, and "energy production, economic growth, foreign policy, and national security, on the other." *Id.* at 93. The Second Circuit also rejected the City's attempt to sidestep "numerous federal statutory regimes and international treaties" regulating greenhouse gas emissions by pressing state-law claims seeking to recover damages for harms allegedly caused by those emissions. *Id.* at 86.

13. Three weeks after the Second Circuit's ruling, the City commenced this action as an end-run around that decision. Although purportedly brought under municipal consumer protection law, this action is really a veiled attempt to achieve the same ends this Court and the Second Circuit denied in the City's first suit. The City has filed this lawsuit, like its predecessor, to influence national energy policy and the United States' international position on climate change, and to limit—and ultimately stop—the production and sale of fossil fuels. Indeed, the City has done little to mask the core purpose of this lawsuit.

14. In a press release announcing the action, Mayor de Blasio proclaimed that this lawsuit—filed on Earth Day—was an important part of the City's efforts to "do everything in [its] power to . . . stop climate change in its tracks." Press Release, City of New York, New York City Sues ExxonMobil, Shell, BP, and the American Petroleum Institute for Systematically and

7

Intentionally Deceiving New Yorkers (Apr. 22, 2021), https://www1.nyc.gov/office-of-the-mayor/news/293-21/new-york-city-sues-exxonmobil-shell-bp-the-american-petroleum-institute-systematically.  The City's allegations make clear what it believes is required to "stop climate change in its tracks":  reductions in, if not the cessation of, the production and sale of fossil fuels in an effort to curb global greenhouse gas emissions.  *See* Ex. 5 ¶ 3 ("[T]he extraction, refinement, and combustion of [Defendants'] fossil fuels are the primary driver of climate change.").  Tellingly, the press release included statements from City agencies not charged with enforcing consumer protection laws: the Mayor's Office of Climate and Sustainability, the Mayor's Office of Climate Resiliency, and the Department of Health and Mental Hygiene.  *See* Press Release, *supra*.  Indeed, as the Director of the Mayor's Office of Climate Resiliency asserted in the press release:

> There's undeniable scientific evidence that oil, gas, and coal are warming our planet and making climate disasters more frequent and more severe.  We won't be able to protect New York City from climate change unless we stop these companies from lying to New Yorkers — and that's what we intend to do.

*Id.*

15.    The City's choice of counsel speaks volumes, too.  The Complaint's signature block includes counsel from Sher Edling LLP, Ex. 5 at 58, which reportedly received grants worth $1.75 million from Resources Legacy Fund, a San Francisco-based non-profit organization that advocates for climate policies aimed at curbing the production and sale of fossil fuels, *see* Spencer Walrath, *Law Firm Behind Washington D.C. Climate Lawsuit Received Over $1.7 Million in Grant Money from Activist Foundation*, Energy In Depth (July 7, 2020), https://eidclimate.org/law-firm-behind-washington-d-c-climate-lawsuit-received-over-1-7-million-in-grant-money-from-activist-foundation/.  It includes the Chief of the Corporation Counsel's Environmental Law Division, which "represent[s] the City and its agencies in an extensive range of environmental matters,

including . . . Clean Air Act compliance and enforcement; . . . natural resources preservation; [and] sustainability and resilience issues." *Environmental Law*, N.Y.C. L. Dep't, https://www1.nyc.gov/site/law/divisions/environmental-law.page (last visited May 25, 2021).

16.     Unsurprisingly, the Complaint's allegations confirm the City's public statements about the lawsuit's purpose. For example, the Complaint alleges that using Defendants' "products still significantly increases greenhouse gas emissions," which "are the primary cause of climate change." Ex. 5 ¶ 26. According to the Complaint, Defendants' alleged "deception" is actionable because it allegedly "enabled the unabated and expanded *extraction, production*, promotion, marketing, and sale of fossil fuel products." *Id.* ¶ 8 (emphasis added); *see also id.* ¶ 84 (Defendants' allegedly "false and misleading representations are material because they . . . deter consumers from adopting cleaner, safer alternatives to their fossil fuel products."); *id.* ¶¶ 92, 100 (same). Indeed, the Complaint asserts that "the extraction, refinement, and combustion of [Defendants'] fossil fuels are the primary driver of climate change." *Id.* ¶ 3; *see also id.* (Defendants' fossil fuels play a "central role in causing" climate change). And it alleges that climate change is, in turn, "driving up global temperatures, increasing the frequency of deadly weather events, eroding coastal shorelines, and creating other unprecedented threats to people in New York City and elsewhere." *Id.* ¶ 18; *see also id.* ¶ 3 (alleging that "continued use of [Defendants'] fossil fuel products will wreak havoc on the planet, causing irreversible changes to the climate system with severe and deadly consequences for people and the environment"). The only solution, in the City's view, is to cease reliance on fossil fuels. *See id.* ¶ 1 ("Climate change is one of the greatest threats facing humanity."); ¶ 37 (describing Defendants' business as posing an "existential threat[]"). Indeed, the Complaint alleges that Defendants "have not wavered in their commitment to maintaining fossil fuels as the core driver of their business model during the

9

next decade, the crucial window of time in which the world must dramatically slash greenhouse gas emissions in order to avoid the most catastrophic effects of the climate crisis." *Id.* ¶ 42. In short, the City sued Defendants (again) because they have allegedly "cut greenhouse gas emissions from their brand but not their business." *Id.* ¶ 37.

17. These allegations make clear that the fundamental issue raised in the Complaint is not the accuracy of representations made in advertisements about the nature of the products being sold, but whether Defendants' products should be sold *at all.* *See, e.g.*, *id.* ¶ 20 ("Defendants' investment in clean energy sources is miniscule and their business models continue to center on developing, producing, and selling more of the very same fossil fuel products driving climate change."); ¶ 35 ("ExxonMobil, Shell, and BP each spend negligible amounts on clean energy resources, and they continue to ramp up fossil fuel production and investment in new fossil fuel development."); ¶ 42 (accusing Defendants of "doubling down on fossil fuel extraction, production, and sales"). With this lawsuit, the City functionally seeks to force Defendants to significantly reduce, if not cease, their fossil fuel activities altogether, in an effort to curb global greenhouse gas emissions.

18. Indeed, the City's Complaint is merely a repackaged version of its 2018 lawsuit, advancing many of the same allegations and relying on the same theories of liability. There, as here, the City claimed that defendants "ha[d] known for decades that their fossil fuel products pose a severe risk to the planet's climate," and yet "downplayed the risks and continued to sell massive quantities of fossil fuels, which has caused and will continue to cause significant changes to the City's climate." 993 F.3d at 86-87; *compare with* Ex. 5 ¶ 3 (alleging that Defendants have known that their fossil fuel products "warm the planet by creating greenhouse gas pollution," and yet

continue to market their products to consumers, thereby "causing irreversible changes to the climate system").  There, as here, the City alleged that Defendants have:

- "promote[d] disinformation," *compare* Ex. 6 ¶ 100, *with* Ex. 5 ¶ 14(c);

- "bombard[ed] . . . consumers" with allegedly misleading advertisements, *compare* Ex. 6 ¶ 109, *with* Ex. 5 ¶ 40;

- portrayed fossil fuels as "environmentally responsible," and "environmentally beneficial," *compare* Ex. 6 ¶ 6, *with* Ex. 5 ¶ 6;

- misleadingly portrayed natural gas as "cleaner-burning," *compare* Ex. 6 ¶ 109(b), *with* Ex. 5 ¶ 65; and

- used strategies akin to those the tobacco industry purportedly used to "downplay" the risks of cigarettes, *compare* Ex. 6 ¶ 6, *with* Ex. 5 ¶ 27;

- all while maintaining "business plans . . . based upon more of the same: exploration, production, and sale of fossil fuels," Ex. 6 ¶ 9, *see* Ex. 5 ¶ 20 (alleging that Defendants' "business models continue to center on developing, producing, and selling more of the very same fossil fuel products driving climate change.").

19.    The only difference is that the City now attempts to bypass the adverse decision in its earlier case by focusing on an even "earlier moment," 993 F.3d at 97, in the causal chain than Defendants' production and sale of fossil fuels—namely, statements in Defendants' marketing materials that purportedly created the demand for Defendants' products in the first instance, *see, e.g.*, Ex. 5 ¶ 26.  But as the Second Circuit correctly recognized in the prior case, the City's case still "hinges on the link between the release of greenhouse gases and the effect those emissions have on the environment generally."  993 F.3d at 97.  The City's focus on the "earlier moment" of

11

Defendants' advertising "is merely artful pleading and does not change the substance of its claims." *Id.*

20.     At bottom, then, this lawsuit is merely the City's attempt to have a do-over.  The product of a well-organized, long-term campaign by climate activists, this action, just like the City's first, is a thinly veiled effort to compel Defendants to curb greenhouse gas emissions by reducing—if not eliminating—their fossil fuel production efforts.  The City's attempt to judicially enforce its policy preferences cannot be countenanced and should be heard in federal court.

## GROUNDS FOR REMOVAL

21.     A defendant may remove "any civil action brought in State court of which the district courts of the United States have original jurisdiction."  28 U.S.C. § 1441(a).  Regardless of the City's characterization of its claims, this Court has original jurisdiction on multiple grounds.[6]

22.     With this lawsuit, the City seeks to impermissibly re-litigate issues the Second Circuit has already decided against it in *City of New York*.  The City's claims in this action—just like those in *City of New York*—represent a blatant effort to extraterritorially regulate Defendants' fossil fuel production and sales activities.  Accordingly, this action is removable on multiple independent grounds.  *First*, the City's claims necessarily concern transboundary pollution and foreign affairs, and therefore "must be brought under federal common law."  *City of New York II*,

---

[6]     Removal jurisdiction under 28 U.S.C. § 1441(a) is coextensive with original jurisdiction under 28 U.S.C. § 1331.  *See Wis. Dep't. of Corr.* v. *Schactz*, 524 U.S. 381, 390 (1998) ("Since a federal court would have original jurisdiction to hear this case had [the plaintiff] originally filed it there, the defendant may remove the case from state to federal court." (citing 28 U.S.C. § 1441(a))); *see also* 14C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3722 (4th ed. Apr. 2020 Update) ("Generally, then, removal based on Section 1441(a) embraces the same class of cases as is covered by Section 1331, the original federal-question jurisdiction statute.").

993 F.3d at 95. Accordingly, the City's claims are subject to removal as necessarily federal claims, under the artful-pleading and *Grable* doctrines. **Second**, this action meets the elements of the federal officer removal statute, 28 U.S.C. § 1442, because the City's claims are "connected or associated" with fossil fuel production activities that Defendants have undertaken at federal direction for decades. **Third**, this action is removable under the Outer Continental Shelf Lands Act ("OCSLA") because this case arises out of, or in connection with, operations Defendants conducted on the Outer Continental Shelf. **Fourth**, the City's claims arise out of Defendants' substantial fossil fuel production activities on federal enclaves, warranting the exercise of federal enclave jurisdiction.

23.     The City, for its part, will likely respond to this Notice of Removal by claiming that this action asserts more modest, consumer protection claims under municipal law. But even if the City's post hoc characterization of its lawsuit was accurate (it is not), this case would *still* be properly removed for several independent reasons. **Fifth**, there is diversity jurisdiction. The lone named Defendant (ExxonMobil Oil Corporation) that is a citizen of the same state as the City (New York) is fraudulently joined in this action. Disregarding that fraudulently joined Defendant creates complete diversity, and the amount-in-controversy plausibly exceeds $75,000—thus, there is diversity jurisdiction. *See* 28 U.S.C. § 1332(a). **Sixth**, under Plaintiff's characterization of this suit, it is "in substance" a class action brought on behalf of New York City consumers, thereby creating removal jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d).[7] **Seventh**, assuming *arguendo* that the City's claims focus on Defendants' promotions, by challenging

---

[7]     If the City challenges this Court's jurisdiction, Defendants reserve the right to further elaborate on these grounds. *Cf. Betzner* v. *Boeing Co.*, 910 F.3d 1010, 1014-16 (7th Cir. 2018) (holding that district court erred by requiring evidentiary submissions by defendant to support removal in advance of ruling on jurisdiction).

Defendants' speech on an issue of public concern—climate change—the City's lawsuit necessarily incorporates federal-law elements mandated by the First Amendment to the United States Constitution into its cause of action.

**I.      The City's Claims Are Governed by Federal Common Law and Therefore Are Subject to Removal.**

24.      Section 1331 supplies this Court with jurisdiction over this suit because federal common law governs the City's claims.  Plaintiff's claims arise under federal common law because federal law exclusively governs claims for interstate and international pollution, as well as claims implicating the foreign affairs and navigable waters of the United States.  This Court's jurisdiction is therefore warranted under the artful pleading doctrine, *Grable* and its progeny, or both.

**A.      The City's Claims Necessarily Arise under Federal Common Law.**

25.      Under the Second Circuit's decision in *City of New York II*, the City's claims here must arise, if at all, under federal common law; accordingly, "those federal claims," 993 F.3d at 95, are subject to federal question jurisdiction, *see, e.g.*, *Sam L. Majors Jewelers* v. *ABX, Inc.*, 117 F.3d 922, 926 (5th Cir. 1997).

26.      Although "there is no federal *general* common law," *City of New York II*, 993 F.3d at 89 (quoting *Erie R. Co.* v. *Tompkins*, 304 U.S. 64, 78 (1938)), there remain "some limited areas" in which the governing legal rules are supplied not by state law, but by "what has come to be known as 'federal common law,'" *Tex. Indus.*, 451 U.S. at 640 (1981) (quoting *United States* v. *Standard Oil Co.*, 332 U.S. 301, 308 (1947).  In particular, federal common law governs areas implicating "uniquely federal interests," *City of New York II*, 993 F.3d at 90, such as where the issue is, by nature, "within the national legislative power" and there is a "demonstrated need for a federal rule of decision" on that issue, *Am. Elec. Power Co.* v. *Connecticut* ("*AEP*"), 564 U.S. 410, 421-22 (2011) (internal quotation marks and citation omitted).  Such uniquely federal interests are

14

**J.A. 125**

also present where "the interstate or international nature of the controversy makes it inappropriate for state law to control." *Tex. Indus.*, 451 U.S. at 641. As the Supreme Court has repeatedly recognized, "if federal common law exists, it is because state law cannot be used." *City of Milwaukee* v. *Illinois* ("*Milwaukee II*"), 451 U.S. 304, 314 n.7 (1981); *see Boyle* v. *United Techs. Corp.*, 487 U.S. 500, 508 (1988).

27.     Here, as in *City of New York*, the City's claims necessarily arise under federal common law because they implicate two "uniquely federal interests":  transboundary pollution and foreign affairs. 993 F.3d 81, 90 (2d Cir. 2021).

**1.     *The City's Claims Implicate Transboundary Pollution.***

28.     The United States Supreme Court has long recognized that "[e]nvironmental protection is undoubtedly an area within national legislative power" for which "federal courts may . . . fashion federal [common] law." *AEP*, 564 U.S. at 421 (internal quotation marks and citation omitted); *see also Illinois* v. *City of Milwaukee* ("*Milwaukee I*"), 406 U.S. 91, 103 (1972) ("When we deal with air and water in their ambient or interstate aspects, there is a federal common law."). Thus, federal common law is to be applied to "transboundary pollution suits." *Native Vill. of Kivalina* v. *ExxonMobil Corp.*, 696 F.3d 849, 855 (9th Cir. 2012); *see, e.g.*, *Int'l Paper Co.* v. *Ouellette*, 479 U.S. 481, 487-88 (1987).

29.     *City of New York* demonstrates this principle in action. There, the City sued several energy companies—including several Defendants here—for their "worldwide fossil fuel production and the use of their fossil fuel products, [which] continue[] to emit greenhouse gases and exacerbate global warming." 325 F. Supp. 3d at 471. The City advanced causes of action for public nuisance, private nuisance, and trespass under New York law stemming from defendants' "production, ***promotion***, and sale of fossil fuels." 993 F.3d at 88 (emphasis added). Specifically, the City argued that defendants' production, marketing, promotion, distribution, and sale of fossil

15

fuels "downplay the threat posed by climate change[, which] will cause increasingly severe injuries to New York City." 325 F. Supp. 3d at 470. There, as here, the City attacked defendants' promotion and marketing of fossil fuels.

30. In a July 2018 opinion, this Court dismissed the City's complaint "with prejudice in its entirety." *Id.* at 476. In particular, this Court held that the City's climate change-based claims were necessarily governed by federal common law, not state law, because "a federal rule of decision is necessary to protect uniquely federal interests." *Id.* at 471 (quoting *Tex. Indus.*, 451 U.S. at 640). Although the City conceded that "federal common law has long applied to" suits against "direct emitters of interstate pollution," it nonetheless contended that its claims were not governed by federal common law because "the City bases liability on defendants' production and sale of fossil fuels–not defendants' direct emissions of [greenhouse gases]." *Id.* at 471. This Court disagreed: "[R]egardless of the manner in which the City frames its claims . . . , the amended complaint makes clear that the City is seeking damages for global-warming related injuries resulting from greenhouse gas emissions, and not only the production of Defendants' fossil fuels." *Id.* at 472. Because the City's claims were "ultimately based on the 'transboundary' emission of greenhouse gases," the Court concluded that the City's "claims arise under federal common law and require a uniform standard of decision." *Id.*

31. The Second Circuit affirmed last month, holding that federal common law, not state law, governs claims seeking redress for global climate change, a "uniquely international problem of national concern" that is "not well-suited to the application of state law." *City of New York II*, 993 F.3d at 85-86. That court rejected the City's effort to characterize its action as challenging only defendants' "production, promotion, and sale of fossil fuels," not the "regulation of emissions":

Though the City admits (as it must) that greenhouse gas emissions play a role in the case, the City insists that such emissions are only a link in "the causal chain" of the City's damages. So, because it is not seeking to directly penalize emitters, and because it seeks damages rather than abatement, the City argues that its claims will not result in the regulation of global emissions. In other words, we are told that this is merely a local spat about the City's eroding shoreline, which will have no appreciable effect on national energy or environmental policy. We disagree.

Artful pleading cannot transform the City's complaint into anything other than a suit over global greenhouse gas emissions. It is precisely *because* fossil fuels emit greenhouse gases – which collectively "exacerbate global warming" – that the City is seeking damages. . . . Put differently, the City's complaint whipsaws between disavowing any intent to address emissions and identifying such emissions as the singular source of the City's harm. But the City cannot have it both ways.

*Id.* at 88, 91.

32.     The "goal" of the City's action, the court summarized, is "to effectively impose strict liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were released (or who released them)." *Id.* at 93. But "[s]uch a sprawling case is simply beyond the limits of state law." *Id.* at 92. The application of federal common law was necessary, the court explained, because the "City would effectively regulate the Producers' behavior far beyond New York's borders." *Id.* The City sought to impose massive liability on defendants to limit—if not cease—their production and promotion of fossil fuels. And because "[g]reenhouse gases once emitted 'become well mixed in the atmosphere,'" meeting the City's preferred fossil fuel emission levels would require fossil fuel producers to "cease *global* production altogether." *Id.* at 92-93. Any actions the producers take "must undoubtedly take effect across every state . . . all without asking what the laws of those other states require." *Id.* at 92. The City's transboundary emissions claims thereby "implicate the conflicting rights of [s]tates," and thus "pose[] the quintessential example of when federal common law is most needed." *Id.*

33.     *City of New York* follows a "mostly unbroken string of cases" which have "applied federal law to disputes involving interstate air or water pollution." 993 F.3d at 91.

34.     In *Milwaukee I*, a unanimous Supreme Court held that a suit for interstate water pollution arose under federal law and was within the jurisdiction of the federal district courts. 406 U.S. at 108.  In that case, the State of Illinois filed a motion for leave to pursue an original action in the Supreme Court.  *Id.* at 94.  The proposed action sought to abate a nuisance allegedly created by Milwaukee and its sewerage authorities by their discharges of inadequately treated sewerage into Lake Michigan.  *Id.* at 93.  The Court denied the motion to invoke its original jurisdiction, but held that Illinois could seek relief in federal district court under the federal common law of nuisance.  *See id.* at 107-08.  The Court characterized the issue before it as whether "pollution of interstate or navigable waters creates actions arising under the 'laws' of the United States within the meaning of [28 U.S.C. §] 1331(a)."  *Id.* at 99.  It ruled in the affirmative, giving "laws" its "natural meaning" and holding that an action based on federal common law, as much as an action based on a federal statute, supports federal question jurisdiction.  *Id.* at 99-100.  The Court was explicit: "federal common law . . . is [an] ample basis for federal jurisdiction under 28 U.S.C. [§] 1331(a)."  *Id.* at 102 n.3.

35.     The Supreme Court subsequently reaffirmed the jurisdictional holding of *Milwaukee I* in *AEP*.  In that case, plaintiffs sued several electric utilities, contending that the utilities' greenhouse gas emissions contributed to global climate change and created a "substantial and unreasonable interference with public rights, in violation of the federal common law of interstate nuisance, or, in the alternative, of state tort law."  564 U.S. at 418 (internal quotation marks and citation omitted).  In determining whether plaintiffs had properly stated a claim for relief, the Court determined that federal common law governs claims involving "air and water in their ambient or interstate aspects."  *Id.* at 421 (internal quotation marks and citation omitted).  The Court rejected the notion that state law could govern public nuisance claims related to global

18

climate change, reasoning that "borrowing the law of a particular State would be inappropriate." *Id.* at 422 (internal quotation marks and citations omitted).

36.     Here, the City now purports to assert claims under municipal consumer protection law, as opposed to state public nuisance law in its earlier suit. But the City cannot so easily sidestep the application of federal common law that *City of New York*, *Milwaukee I*, and *AEP* demand. Just as in *City of New York*, this is a transboundary pollution suit that aims to "effectively regulate the Producers' behavior far beyond New York's borders." *City of New York II*, 993 F.3d at 92.

37.     The Complaint alleges that using Defendants' "products still significantly increases greenhouse gas emissions," which "are the primary cause of climate change." Ex. 5 ¶ 26. It claims that Defendants' "deception" is actionable because it allegedly "enabled the unabated and expanded *extraction*, *production*, promotion, marketing and sale of fossil fuel products." *Id.* ¶ 8 (emphasis added); *see also id.* ¶ 84 (Defendants' allegedly "false and misleading representations and omissions are material because they . . . deter consumers from adopting cleaner, safer alternatives to fossil fuel products."); *id.* ¶¶ 92, 100 (same).

38.     The Complaint also asserts that "the extraction, refinement, and combustion of [Defendants'] fossil fuels" play a "central role" in causing climate change. *Id.* ¶ 3. And it alleges that climate change is, in turn, "driving up global temperatures, increasing the frequency of deadly weather events, eroding coastal shorelines, and creating other unprecedented threats to people in New York City and elsewhere." *Id.* ¶ 18.

39.     In other words, it "is precisely *because* fossil fuels emit greenhouse gases—which collectively 'exacerbate global warming'—that the City" seeks to hold Defendants liable here. *City of New York II*, 993 F.3d at 91; *see* Ex. 5 ¶¶ 1, 37, 41. The City has sued Defendants because

they have allegedly "cut greenhouse gas emissions from their brand but not their business." *Id.* ¶ 37.

40.     These allegations demonstrate that the core issue raised in the Complaint is not the accuracy of representations made in advertisements about Defendants' products, but rather whether Defendants should continue to extract, produce, and sell fossil fuel products. *See, e.g.*, *id.* ¶ 20 ("Defendants' investment in clean energy sources is miniscule and their business models continue to center on developing, producing, and selling more of the very same fossil fuel products driving climate change."); ¶ 35 ("ExxonMobil, Shell, and BP each spend negligible amounts on clean energy resources, and they continue to ramp up fossil fuel production and invest in new fossil fuel development."); ¶ 42 (accusing Defendants of "doubling down on fossil fuel extraction, production, and sales").

41.     This lawsuit thus directly implicates the transboundary pollution of fossil fuel activities and "must be brought under federal common law." *City of New York II*, 993 F.3d at 95.

## 2.     *The City's Claims Implicate Foreign Affairs.*

42.     It is well settled that actions involving foreign affairs arise under federal common law. *See, e.g.*, *Banco Nacional de Cuba* v. *Sabbatino*, 376 U.S. 398, 425 (1964) (holding that issues involving "our relationships with other members of the international community must be treated exclusively as an aspect of federal law."); *Crosby* v. *Nat'l Foreign Trade Council*, 530 U.S. 363, 381, 388 (2000) (striking down a Massachusetts law barring state entities from transacting with companies doing business in Myanmar because the law "undermine[d] the President's capacity . . . for effective diplomacy"). The Supreme Court has made clear that claims that significantly implicate the "exercise of state power that touches on foreign relations must yield to the National Government's policy." *Am. Ins. Ass'n* v. *Garamendi*, 539 U.S. 396, 413 (2003).

20

**J.A. 131**

43.    The Second Circuit, too, has explained that "there is federal question jurisdiction over actions having important foreign policy implications." *Republic of Philippines* v. *Marcos*, 806 F.2d 344, 353 (2d Cir. 1986); *see also In re Assicurazioni Generali, S.P.A.*, 592 F.3d 113, 118 (2d Cir. 2010) (reasoning that state laws that prevent the President from "wield[ing] the full coercive power of the national economy as a tool of diplomacy in negotiating a process for settling claims . . . compromise[] the very capacity of the President to speak for the Nation with one voice in dealing with other governments." (internal quotation marks and citation omitted)).

44.    In *Marcos*, the Second Circuit held that federal jurisdiction existed over a state-law action seeking an injunction barring defendant from transferring or encumbering certain New York properties.  806 F.2d at 354.  This was so, the court held, because defendant was a former Philippine dictator, such that the action had clear "implications . . . for United States foreign relations."  *Id.* at 354.  Similarly, in *Banco Nacional de Cuba*, the Supreme Court considered an action brought by an instrumentality of the Cuban government against a commodities broker. Justice Harlan wrote that the Court was "constrained to make it clear" that an action concerning "our relationships with other members of the international community must be treated exclusively as an aspect of federal law," 376 U.S. at 425, and thus federal jurisdiction over such actions is appropriate.

45.    Indeed, actions like this one, which "implicat[e] . . . our relations with foreign nations," are "the quintessential example of when federal common law is most needed." *City of New York II*, 993 F.3d at 92.

46.    The City's new lawsuit, just like its predecessor, is a transparent attempt to force Defendants to reduce—if not eliminate—their fossil fuel production activities to achieve the City's preferred greenhouse gas emissions levels. *See supra* ¶¶ 13-19.  But given the way in which

greenhouse gases spread, doing so would require Defendants to undertake systemic changes not only across the country, but across the world. The City's claims thus "effectively" seek to require Defendants to take action "across every state (and country)" all "without asking what the laws of those other states (or countries) require." 993 F.3d at 92. In sum, the City is requesting a global remedy for its alleged injuries—one that cannot be achieved without the engagement of foreign companies and governments.

47. The upshot of this purported extraterritorial regulation is that the City's claims will necessarily interfere with a carefully calibrated network of "international treaties" that struck a "balance . . . between the prevention of global warming, a project that necessarily requires national standards and global participation, on the one hand, and energy production, economic growth, foreign policy, and national security, on the other." *City of New York II*, 993 F.3d at 93.

48. That complex web of agreements can be traced to at least 1959, when President Eisenhower invoked statutory authority to proclaim quotas on imports of petroleum and petroleum-based products into the United States "to avoid discouragement of and decrease in domestic oil production, exploration and development to the detriment of the national security." Adjusting Imports of Petroleum and Petroleum Products into the United States, Proclamation No. 3279, 24 Fed. Reg. 1781 (Mar. 10, 1959); *see* Act of July 1, 1954, 68 Stat. 360, ch. 445, § 2, as amended by Pub. L. No. 85-686, 72 Stat. 678, § 8(a) (Aug. 20, 1958).

49. The import system was "mandatory" and "necessary" to "preserve to the greatest extent possible a vigorous, healthy petroleum industry in the United States and to regulate 'patterns of international trade.'" Statement by the President Upon Signing Proclamation Governing Petroleum Products, 1 Pub. Papers 240-41 (Mar. 10, 1959). President Eisenhower further explained the United States' foreign and domestic policy: "Petroleum, wherever it may be

produced in the free world, is important to security, not only of ourselves, but also of the free people of the world everywhere." *Id*.

50.    After the 1973 oil embargo, the United States signed a treaty that requires member countries of the International Energy Agency to hold emergency oil stocks—through government stocks or industry-obligated stocks—equivalent to at least 90 days of net oil imports.  *See* Agreement on an International Energy Program art. 2, Nov. 18, 1974, 1040 U.N.T.S. 271.  The United States meets part of its obligation through government-owned stocks held in the U.S. Strategic Petroleum Reserve.[8]

51.    In the 1990s, in response to President Clinton's signing of the Kyoto Protocol, an international commitment to reduce greenhouse gas emissions, the Senate resolved that the nation should not be a signatory to any protocol that "would result in serious harm to the economy or fail to regulate the emissions of developing nations."  *See* S. Res. 98, 105th Cong., 1st Sess. (1997).

52.    Subsequently, President Obama promoted shale oil and natural gas development as a means to reduce greenhouse gas emissions and to encourage "greater energy independence." Jude Clemente, *President Obama's Support for America's Shale Oil and Natural Gas*, Forbes (Dec. 31, 2019), https://www.forbes.com/sites/judeclemente/2020/12/31/president-obamas-support-for-americas-shale-oil-and-natural-gas/#4bd1e46b1883.    During President Obama's presidency, domestic gas production increased 35%, and domestic crude oil production increased 80%.  *Id.*  President Obama also issued a series of directives in May 2011, "which included additional lease sales, certain offshore lease extensions, and steps to streamline permitting, all

---

[8]    *See, e.g.*, 42 U.S.C. § 6231(b); Nat'l Energy Pol'y Dev. Grp., National Energy Policy, 8-17 (2001), https://www.nrc.gov/docs/ML0428/ML042800056.pdf.

towards the President's goal of expanding safe and responsible domestic oil and gas production . . . as part of his long-term plan to reduce our reliance on foreign oil."[9]

53.     In 2016, the United States under President Obama joined the Paris Agreement[10] under the United Nations Framework Convention on Climate Change.  The Agreement calls upon signatories to reduce greenhouse gas emissions by determining, planning, and regularly reporting on the contributions that they undertake to mitigate climate change.  Joining the Paris Agreement, President Obama proclaimed, would "help other nations ratchet down their dangerous carbon emissions over time, and set bolder targets as technology advances, all under a strong system of transparency that allows each nation to evaluate the progress of all other nations."  Remarks by the President on the Paris Agreement, White House (Oct. 5, 2016), https://obamawhitehouse .archives.gov/the-press-office/2016/10/05/remarks-president-paris-agreement.

54.     President Trump subsequently cited foreign affairs implications in his decision to withdraw from the Paris Agreement, a decision based, in large part, on his Administration's conclusion that the treaty did not strike the right balance between environmental protection, on the one hand, and economic growth and national security, on the other.  *See* The White House, Statement by President Trump on the Paris Climate Accord (June 1, 2017), https://it.usembassy.gov/statement-president-trump-paris-climate-accord/.

---

[9]     Press Release, Off. of the Press Sec'y, Obama Administration Holds Major Gulf of Mexico Oil and Gas Lease Sale (Dec. 13, 2011), https://obamawhitehouse.archives.gov/the-press-office/2011/12/13/obama-administration-holds-major-gulf-mexico-oil-and-gas-lease-sale.

[10]     *See* Paris Agreement to the United Nations Framework Convention on Climate Change, Dec. 12, 2015, T.I.A.S. No. 16-1104.

55.     The United States reversed course when President Biden rejoined the Paris Agreement on his first day in office.  *See* Depositary Notification, Acceptance by the United States of America, Paris Agreement, Reference C.N. 10.2021.Treaties-XXVII.7.d (Jan. 20, 2021).

56.     Subsequent presidential administrations may strike a different "balance" between the "prevention of global warming" and "energy production, economic growth, foreign policy, and national security, on the other."  *City of New York II*, 993 F.3d at 93.  But under the City's view, it would be left to a New York state court judge or jury to strike that balance among competing national and international policy imperatives.

57.     The very existence and purpose of this lawsuit conflicts with the national position of the United States on international affairs.  The United States has consistently opposed the "establishment of sovereign liability and compensation schemes" to address climate change on the international level.  Brief for the United States, *City of Oakland* v. *BP PLC*, No. 18-16663 (9th Cir. May 17, 2019) (citing Todd Stern, Special Envoy for Climate Change, Special Briefing (Oct. 28, 2015), https://2009-2017.state.gov/s/climate/releases/2015/248980.htm), Dkt. 97; *see also City of New York I*, 325 F. Supp. 3d at 475.

58.     In reaction to this and similar lawsuits, foreign governments might adopt their own "liability and compensation" schemes for past use of fossil fuels, contrary to the foreign policy of the United States.  Thus, this lawsuit infringes upon the foreign policy of the United States regarding the proper way to address the issue of climate change on the international stage.

59.     By asking a state court to weigh in on precisely those issues, this case would "implicate countless foreign governments and their laws and policies."  *City of New York I*, 325 F. Supp. 3d at 475.

60.     The City's claims thus infringe on the federal government's environmental, trade, and energy policies, which require the United States to speak with one voice in coordinating with other nations. *See United States* v. *Pink*, 315 U.S. 203, 233 (1942) ("Power over external affairs is not shared by the States; it is vested in the national government exclusively.").

**B.     The Artful Pleading Doctrine Supports This Court's Jurisdiction.**

61.     Although the City purports to assert claims exclusively under municipal law, courts have long recognized that claims may arise under federal common law regardless of the label a plaintiff affixes to its claims. *See, e.g.*, *Standard Oil Co.*, 332 U.S. at 307 (holding that certain claims asserted under state law must be governed by federal common law because they involved "matters essentially of federal character"); *City of New York II*, 993 F.3d at 91 (holding that "[a]rtful pleading cannot transform the City's complaint into anything other than a suit over global greenhouse gas emissions"); *Marcos*, 806 F.2d at 352 (holding that plaintiff's state law claims arose under federal common law, and that federal question jurisdiction thus existed); *Nordlicht* v. *New York Tel. Co.*, 799 F.2d 859, 862 (2d Cir. 1986) (holding that the plaintiff's claims concerning interstate telecommunications "ar[o]se under federal common law," even though the complaint "purport[ed] to rely solely on state law"), *abrogated on other grounds by Marcus* v. *AT&T Corp.*, 138 F.3d 46 (2d Cir. 1998).

62.     "Artful pleading cannot transform" the City's complaint into "anything other than a suit over global greenhouse gas emissions." *City of New York II*, 993 F.3d at 91. The City may not use "[a]rtful pleading" to disguise this lawsuit as a "local issue," when in reality it amounts to a "clash over regulating worldwide greenhouse gas emissions and slowing global climate change." *Id.* Although the City has pleaded only local law here, the well-pleaded complaint rule does not allow a plaintiff to "exalt form over substance," *Standard Fire Ins. Co.* v. *Knowles*, 568 U.S. 588, 595 (2013), by affixing a local-law label to a claim that is necessarily federal in nature. *Accord*

*Federated Dep't Stores, Inc.* v. *Moitie*, 452 U.S. 394, 398 n.2 (1981) (noting courts will "determine whether the real nature of the claim is federal, regardless of plaintiff's characterization"). The nature of the City's claims is federal, and the artful pleading doctrine thus provides for federal jurisdiction here.

### C.     Jurisdiction Is Independently Authorized by *Grable*.

63.     The *Grable* doctrine provides a separate and independently sufficient basis for jurisdiction. *See Grable & Sons Metal Prod., Inc.* v. *Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005). Under the *Grable* doctrine, a lawsuit "arises under" federal law, warranting federal question jurisdiction, if a plaintiff's claims (i) "necessarily raise" stated federal issues (ii) that are "actually disputed" and (iii) "substantial," and (iv) that are "capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn* v. *Minton*, 568 U.S. 251, 258 (2013) (citing *Grable*, 545 U.S. at 314). Where these requirements are met, federal jurisdiction is proper "because there is a 'serious federal interest in claiming the advantages thought to be inherent in a federal forum.'" *Id.*

64.     *First*, an action "necessarily raise[s]" federal issues, warranting the exercise of *Grable* jurisdiction, where it requires applying "principles of federal common law." *Newton* v. *Cap. Assur. Co., Inc.*, 245 F.3d 1306, 1309 (11th Cir. 2001). Put differently, claims that implicate an area where "federal common law alone governs" necessarily raise a federal question. *Battle* v. *Seibels Bruce Ins. Co.*, 288 F.3d 596, 607-08 (4th Cir. 2002).

65.     In both *Newton* and *Battle*, plaintiffs asserted claims relating to Standard Flood Insurance Policy ("SFIP") contracts. *See* 245 F.3d at 1308; 288 F.3d at 607. In both cases, plaintiffs purported to assert claims solely under state law. But because SFIP contracts "are interpreted using principles of federal common law rather than state contract law," *Newton,* 245 F.3d at 1309, each court held that "federal common law *alone* govern[ed]" plaintiffs' claims,

regardless of how plaintiffs characterized them, *Battle*, 288 F.3d at 607. And because the plaintiffs' right to relief thus "necessarily depend[ed] on resolution of a substantial question of federal law," *Grable* jurisdiction was properly exercised. *Id.*

66.     So, too, here. As described *supra*, "federal common law *alone* governs" the City's claims which, like *City of New York II*, directly implicate the transboundary pollution of fossil fuel activities. 993 F.3d at 91. The allegations asserted in the Complaint—coupled with the context in which the City brought this suit—make clear that this action is not about how Defendants advertise their products, but whether their products should be sold at all. The Complaint is a vehicle for "maintaining pressure on the [fossil fuel] industry that could eventually lead to its support for legislative and regulatory responses to global warming." Ex. 1 at 27.

67.     Just like transboundary pollution claims, claims that implicate foreign policy and foreign affairs also "must be treated *exclusively* as an aspect of federal law," *Banco Nacional de Cuba*, 376 U.S. at 425 (emphasis added), and thus "necessarily depend[] on [the] resolution of a substantial question of federal law," *Battle*, 288 F.3d at 607-08. As described *supra* ¶¶ 42-60, the City's claims implicate the United States' international climate-change policy, which has, for decades, carefully calibrated and balanced environmental policy with economic development. Climate-change litigation necessarily involves the relationship between the United States and all other nations, because such claims "depend on a global complex of geophysical cause and effect involving all nations of the planet." *California* v. *BP p.l.c.*, 2018 WL 1064293, at *5 (N.D. Cal. Feb. 27, 2018), *vacated on other grounds*, 969 F.3d 895 (9th Cir. 2020). Because the City's claims implicate the "exercise of state power that touches on foreign relations," municipal law "must yield to the National Government's policy, given the concern for uniformity in this country's dealings

with foreign nations that animated the Constitution's allocation of the foreign relations power to the National Government." *Garamendi*, 539 U.S. 413 (internal quotation marks omitted).

68.    In sum, the City's claims—which strongly implicate both transboundary pollution and U.S. foreign affairs—must be governed by federal common law, and therefore necessarily raise a question of federal law.

69.    *Second*, the City cannot deny that the federal questions presented here are disputed. Among other things, the City's claims question whether, pursuant to a host of longstanding international agreements, the United States should have struck a different balance between the benefits and alleged harms of Defendants' conduct.

70.    *Third*, the federal questions raised here are also substantial.  This action sits at the intersection of federal energy and environmental regulations, which implicate foreign policy and national security considerations.  This action also implicates the proper constitutional relationship among the states and also between the states and the federal government.  The substantiality inquiry is satisfied where the federal issues in a case concern even *one* of these subjects.  *See, e.g.*, *NASDAQ OMX Grp., Inc.* v. *UBS Sec., LLC*, 770 F.3d 1010, 1029 (2d Cir. 2014) (issues related to "fair and orderly market[s]"); *In re Nat'l Sec. Agency Telecomms. Recs. Litig.*, 483 F. Supp. 2d 934, 943 (N.D. Cal. 2007) (issues relating to the state secrets privilege); *Grynberg Prod. Corp.* v. *British Gas, p.l.c.*, 817 F. Supp. 1338, 1356 (E.D. Tex. 1993) (issues relating to allocation of international mineral resources).

71.    *Fourth*, the exercise of federal jurisdiction is fully consistent with the principles of federalism: federal courts are the traditional and appropriate fora for litigation regarding the intersection of national energy and environmental law, and foreign policy.  *See Massachusetts* v.

29

*EPA*, 549 U.S. 497, 519 (2007) (explaining that the "sovereign prerogatives" to force reductions in greenhouse gas emissions "are now lodged in the [f]ederal [g]overnment").

## II.     This Action Is Removable under the Federal Officer Removal Statute.

72.     The federal officer removal statute allows removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). "To invoke the statute, a defendant who is not himself a federal officer must demonstrate that (1) the defendant is a 'person' under the statute, (2) the defendant acted 'under color of federal office,' and (3) the defendant has a 'colorable federal defense.'" *Agyin* v. *Razmzan*, 986 F.3d 168, 174 (2d Cir. 2021). So long as federal officer jurisdiction is necessary as to one defendant, jurisdiction over the entire action is permissible. *See* 28 U.S.C. § 1367. Defendants satisfy these criteria here.

### A.     The Courts Construe the Federal Officer Removal Statute Broadly in Favor of Removal.

73.     The federal officer removal statute is to be "liberally construed" in favor of a federal forum. *Watson* v. *Philip Morris Cos.*, 551 U.S. 142, 147 (2007); *accord Isaacson* v. *Dow Chem. Co.*, 517 F.3d 129, 136 (2d. Cir. 2008). Courts have repeatedly held that "defendants enjoy much broader removal rights under the federal officer removal statute than they do under the general removal statute." *Leite* v. *Crane Co.*, 749 F.3d 1117, 1122 (9th Cir. 2014); *see also Gordon* v. *Air & Liquid Sys. Corp.*, 990 F. Supp. 2d 311, 316 (E.D.N.Y. 2014) (distinguishing federal officer removal statute from general removal statute). The Supreme Court has emphasized that the policy of providing the protection of a federal forum to federal officers "should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1)." *Willingham* v. *Morgan*, 395 U.S. 402, 407 (1969). Thus, courts must apply a "broad construction" of the statute—"particularly with respect to private parties who claim to be 'acting under' a federal officer." *Agyin*, 986 F.3d at 175.

30

74.     "Not only must the words of § 1442 be construed broadly but a court also 'must credit [the d]efendants' theory of the case' when evaluating the relationship between the defendants' actions and the federal officer." *Id*. at 175 (citing *Isaacson*, 517 F.3d at 137); *see also Jefferson County* v. *Acker*, 527 U.S. 423, 432 (1999)) ("[W]e credit the [defendants]' theory of the case for purposes of [all] elements of our jurisdictional inquiry"); *accord Baker* v. *Atl. Richfield Co.*, 962 F.3d 937, 947 (7th Cir. 2020). At this stage, a defendant's allegations "in support of removal" need only be "facially plausible," and the defendant receives the "benefit of all reasonable inferences from the facts alleged." *Baker*, 962 F.3d at 941, 945. Defendants need not, at this juncture, affirmatively prove that they will prevail on the merits of any federal issue, because the sole issue is *where* such merits will be adjudicated. *See Willingham*, 395 U.S. at 407 (holding that a defendant invoking section 1442(a)(1) "need not win his case before he can have it removed").

75.     Despite the City's attempt to characterize its claims otherwise, the City's suit arises from Defendants' production and sale of fossil fuels—including such activities conducted under the direction of federal officers for decades—which the City claims were "enabled" by Defendants' allegedly deceptive promotions. *See* Ex. 5 ¶¶ 8, 27. As explained above, the Complaint is aimed at stopping or reducing Defendants' promotion, and thereby their production and sale, of fossil fuels, which are allegedly "the primary driver[s] of climate change." *See, e.g.*, *id*. at ¶ 3. Where "[b]oth the [plaintiffs] and the [defendants] have reasonable theories of this case," the court's role is "to credit only the [defendants'] theory" so long as the theory is "plausible.'" *Baker*, 962 F.3d at 941, 947. Defendants' theory that the City's purported injuries necessarily rely on Defendants' production and sale of fossil fuels is more than plausible, and thus should be credited by this Court.

31

**B.**     **Defendants Satisfy All Elements of the Federal Officer Removal Statute.**

76.     Defendants satisfy all three elements of the federal officer removal statute here.

77.     *First*, Defendants are "persons" within the meaning of the statute who "acted under" a federal officer. Defendants are corporations, Ex. 5 ¶¶ 11-14, which qualify as "persons" within the meaning of Section 1442. *Isaacson*, 517 F.3d at 135-36. Defendants have "acted under" federal officers because the U.S. government has exerted extensive subjection, guidance, or control over Defendants' production and supply of oil and gas, and Defendants, "through contractual relationships with the Government, perform[ed] jobs that the Government otherwise would have performed" itself. *Id.* (citing *Watson*, 551 U.S. at 154). Defendants have "acted under" federal officers in numerous ways, including by: (1) supplying the federal government with highly specialized, noncommercial-grade fuels for military use; (2) producing oil and gas for the U.S. military during wartimes under specific government guidance and directives; (3) constructing pipelines for oil transportation at the federal government's direction and control; (4) building, operating, and managing government petroleum production facilities; (5) supplying fuel for and managing the Strategic Petroleum Reserve and allocating their products pursuant to the Emergency Petroleum Allocation Act; and (6) developing mineral resources on the Outer Continental Shelf ("OCS") and other federal lands through highly technical leases that were overseen and managed by federal supervisors. Defendants refer to the declarations of two prominent historians, Professor Tyler Priest of the University of Iowa and Professor Mark Wilson of the University of North Carolina at Charlotte, attached as Exhibits 7 and 70 to this Notice, that explain in detail how Defendants "acted under" the direction, guidance, supervision, and control of federal officers.

78.     *Second*, the City's claims relate to the actions Defendants performed "under color of federal office" because the claims are "*connected* or *associated*, with acts under color of federal office." *Latiolais* v. *Huntington Ingalls, Inc.*, 951 F.3d 286, 292 (5th Cir. 2020) (en banc). As

32

**J.A. 143**

explained above, the Complaint targets Defendants' production and supply of oil and gas—conduct that occurred, at least in part, "*because of* what [Defendants] were asked to do by the Government." *Isaacson*, 517 F.3d at 137; *see also Baker*, 962 F.3d at 945 (removal appropriate where plaintiffs challenge even a "small, yet *significant*" portion of defendants' conduct under federal officers).[11]

79.     *Third*, Defendants have several "colorable federal defenses," including res judicata based on the preclusive effect of the federal judgment in *City of New York*, as well as the government-contractor defense, preemption, federal immunity, and defenses based on the commerce clause, due process, the foreign affairs doctrine, and the First Amendment.

### 1.     *Defendants "Acted Under" Federal Officers.*

80.     Oil and gas are at the heart of economic, energy, and security policies of the United States, and have been for decades.  It has long been the policy of the United States that fossil "fuels are strategically important domestic resources that should be developed to reduce the growing dependence of the United States on politically and economically unstable sources of foreign oil imports."  42 U.S.C. § 15927(b)(1); *see also* 83 Fed. Reg. 23295, 23296 (Final List of Critical Minerals 2018) ("[F]ossil fuels" are "indispensable to a modern society for the purposes of national

---

[11]   It is generally accepted that greenhouse gases from fossil fuel combustion, such as carbon dioxide, remain in the atmosphere for hundreds, even thousands, of years. *See* Alan Buis, "The Atmosphere:  Getting a Handle on Carbon Dioxide," NASA's Jet Propulsion Laboratory (Oct. 9, 2019), https://climate.nasa.gov/news/2915/the-atmosphere-getting-a-handle-on-carbon-dioxide/#:~:text=Once%20it's%20added%20to%20the,timescale%20of%20many%20human%20lives (explaining that carbon dioxide lasts in the atmosphere "between 300 to 1,000 years").  By targeting Defendants' "expanded extraction, production, promotion, marketing, and sale of fossil fuel products," Ex. 5 ¶ 8, and the localized climate harms that allegedly resulted from billions of consumers' "continued use of [Defendants'] fossil fuel products," *id.* ¶ 3, the Complaint necessarily challenges the decades' worth of Defendants' activities under federal officers discussed in Section II.B.1, including Defendants' production and supply of oil and gas during World War II and the Korean War.

security, technology, infrastructure, and energy production.").  As Professor Wilson explains: "Over the last 120 years, the U.S. government has relied upon and controlled the oil and gas industry to obtain oil and gas supplies and expand the production of petroleum products, in order to meet military needs and enhance national security."  Ex. 7 ¶ 1.

81.     Defendants "acted under" federal officers because the government exerted extensive "subjection, guidance, or control" over Defendants' fossil fuel production and supply and because Defendants engaged in "an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior."  *Watson*, 551 U.S. at 143, 152; s*ee also St. Charles Surgical Hosp., LLC* v. *Louisiana Health Serv. & Indem. Co.*, 990 F.3d 447, 454-55 (5th Cir. 2021) ("[A] removing defendant need not show that its alleged conduct was precisely dictated by a federal officer's directive. . . . Instead, the 'acting under' inquiry examines the *relationship* between the removing party and relevant federal officer, requiring courts to determine whether the federal officer 'exert[s] a sufficient level of subjection, guidance, or control' over the private actor."); *Agyin*, 986 F.3d at 176-77 ("Cases in which the Supreme Court has approved removal involve defendants working hand-in-hand with the federal government to achieve a task that furthers an end of the federal government.") (citing *Ruppel* v. *CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012)).

82.     At root, the City challenges Defendants' production and supply of fossil fuels, including to the federal government.  The federal government relies on private firms like Defendants to produce and supply oil, gas, and petroleum products, which the government otherwise would need to do itself.  Defendants thus have "assist[ed]" the federal government "in fulfilling 'basic governmental tasks' that 'the Government itself would have had to perform' if it had not contracted with a private firm."  *Cty. Bd. of Arlington Cty., Virginia* v. *Express Scripts Pharmacy, Inc.*, 2021 WL 1726106, at *4 (4th Cir. May 3, 2021) (quoting *Watson*, 551 U.S. at

34

**J.A. 145**

153-54).  As the examples below demonstrate, the federal government has relied on Defendants to produce and supply oil and gas and associated products, including from federal lands and specialized jet fuels for the military.  Absent Defendants' production and supply, the government itself would have had to perform these tasks.

83.    Where, as here, a private party has specifically contracted with "the Government to produce an item that [the Government] needs," such assistance "goes beyond simple compliance with the law" and satisfies the "acting under" prong.  *Baker*, 962 F.3d at 942; *see also Arlington*, 2021 WL 1726106, at *4 ("[C]ourts, like this one, 'have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it *manufactured for the government*.'" (quoting *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 255 (4th Cir. 2017))); *Agyin*, 986 F.3d at 175 ("The Supreme Court has said, for example, that a private company acting pursuant to a contract with the federal government has this ['acting under'] relationship.").  Because Defendants have produced and supplied significant quantities of fossil fuel products in furtherance of federal objectives pursuant to contracts with the U.S. government and under the U.S. government's direction, control, and "close supervision," Defendants have a "special relationship" with the U.S. government that satisfies the "acting under" element of the federal officer removal test.  *Isaacson*, 517 F.3d at 137.

84.    Defendants acted under federal officers in many respects, each directly stemming from the U.S. government's policies to promote the production of oil and gas to meet the country's military and national economy needs—even as the public and the world increasingly recognized and understood the link between greenhouse gas emissions and global climate change.  Each of the examples below demonstrates that Defendants have produced or supplied oil and gas under the direction, supervision, and control of the federal government.  Any one of them alone is sufficient

35

**J.A. 146**

to support federal officer removal, and each demonstrates the strong federal interest in petroleum production, which the City now seeks to disrupt.[12]

> **(a)  Defendants Acted under Federal Officers by Supplying Highly Specialized Fuels for Military Use.**

85.  Defendants acted under federal officers by producing and supplying highly specialized, noncommercial-grade fuels for the military that continue to be the "lifeblood of the full range of Department of Defense ["DOD"] capabilities," Ex. 8.  Federal officer removal precisely "covers situations, like this one, where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete." *Ruppel*, 701 F.3d at 1181.

86.  During World War II, for instance, the federal government asserted substantial control over Defendants, directing the development and production of high-octane aviation fuels ("avgas").[13]  Because avgas was "the most critically needed refinery product during World War II and was essential to the United States' war effort," *Shell Oil Co.* v. *United States*, 751 F.3d 1282, 1285 (Fed. Cir. 2014) ("*Shell II*"), the United States government "exercised significant control" over the means of its production, including production by Defendants, during World War II.  "The government exerted substantial control and direction over the refineries' actions, including decisions on how to use raw materials and labor," *Exxon Mobil Corp.* v. *United States*, 2020 WL 5573048, at *1 (S.D. Tex. Sept. 16, 2020), *appeal docketed*, No. 20-20590 (5th Cir. Nov. 13,

---

[12]  These examples are by no means an exhaustive collection of the factual bases that support the grounds for removal asserted herein.  Defendants expressly reserve all rights to include additional support for any and all grounds for removal in any further briefing should the City challenge removal.

[13]  Approximately  80% of the seven billion barrels of crude oil needed to support the U.S. war effort was produced in this country.  Ex. 9, at 169.

2020), in order to maximize production of fuel for the military and direct the allocation of pivotal resources, *see, e.g.*, *United States* v. *Shell Oil Co.*, 294 F.3d 1045, 1049-50 (9th Cir. 2002) ("*Shell I*").

87.     As another example, Shell Oil Company developed and produced for the federal government specialized jet fuel to meet the unique performance requirements of the U-2 spy plane and later the OXCART and SR-71 Blackbird programs during the Cold War.[14]  Shell Oil Company produced millions of gallons of "Processing Fluid (PF-1)" under government contracts with specific testing and inspection requirements, as well as packaging that mandated "no other identification."  Ex. 12; *see* Ex. 13.  Shell Oil Company also constructed "special fuel facilities" to handle and store PF-1, including a hangar, pipelines, and storage tanks at Air Force bases at home and abroad, and "agreed to do this work without profit" under special security restrictions per detailed government contracts for the OXCART program.  Exs. 14-19.  Under the OXCART program, Shell Oil Company "tested" "refinery procedures" to ensure fuels were "up to standard."  Ex. 20 at 4.  In providing specialized fuel and facilities under contracts for the federal government's overhead reconnaissance programs, Shell Oil Company acted under federal officers, *see, e.g.*, Ex. 14 at 1 ("This work is under the technical direction of Colonel H. Wilson[.]"), and helped the government to produce an essential item that it needed for national defense purposes*, see Watson*, 551 U.S. at 153.

---

[14]   *See* Ex. 10, at 61-62 ("Gen. James H. Doolittle (USAF, Ret.) . . . arranged for Shell to develop a special low volatility, low-vapor-pressure kerosene fuel for the craft. The result was a dense mixture, known as LF-1A, JP-TS (thermally stable), or JP-7, with a boiling point of 300℉ at sea level.  Manufacturing this special fuel required petroleum byproducts."); Ex. 11 at 24 ("The Government stated that the need for the 'Blackbird' was so great that the program had to be conducted despite the risks and the technological challenge. . . . The extreme environment presented a severe cooling problem . . . A new fuel and a chemical lubricant had to be developed to meet the temperature requirements . . . . Shell, and [other] [c]ompanies[,] took on the task of developing these fluids.").

88.    To this day, Defendants continue to supply DOD with highly specialized fuels to meet its need to power planes, ships, and other vehicles, and to satisfy other national defense requirements.  U.S. Navy Captain Matthew D. Holman recently explained that "[f]uel is truly the lifeblood of the full range of DOD capabilities, and, as such, must be available on specification, on demand, on time, every time.  In meeting this highest of standards, we work hand-in-hand with a dedicated team of Sailors, civil servants and contractors to deliver fuel to every corner of the world, ashore and afloat."  Ex. 8.  "By 2010, the U.S. military [was] the world's biggest single purchaser and consumer of petroleum products" and, "[a]s it had for decades, the military continued to rely on oil companies to supply it under contract with specialty fuels, such as JP-5 jet aviation fuel and other jet fuels, F-76 marine diesel, and Navy Special Fuel."  Ex. 7 ¶ 40.  Shell Oil Company, BP, and Exxon Mobil Corporation (or their predecessors, subsidiaries, or affiliates) have been three of the top four suppliers of fossil fuel products to the U.S. military, whose energy needs are coordinated through the Defense Energy Support Center ("DESC").[15]  *See* Anthony Andrews, Cong. Rsch. Serv., R40459, Department of Defense Fuel Spending, Supply, Acquisition, and Policy 10 (2009), https://fas.org/sgp/crs/natsec/R40459.pdf.  DESC procures a range of military-unique, petroleum-based products from Defendants, including JP-8 fuel (MIL-DTL-83133) for the U.S. Air Force and Army, JP-5 fuel (MIL-DTL-5624 U) for the U.S. Navy, and a variety of other alternative fuels.  In fiscal year 2008, for example, the DESC purchased 134.9 million barrels of fuel products in compliance with military specifications, totaling $17.9 billion

---

[15]    The Complaint improperly conflates the activities of defendants with the activities of their separately organized predecessors, subsidiaries, and affiliates.  Although Defendants reject the City's attempt to attribute the actions of predecessors, subsidiaries, and affiliates to the named Defendants, for purposes of this Notice of Removal only, Exxon Mobil Corporation and ExxonMobil Oil Corporation describe the conduct of certain predecessors, subsidiaries, and affiliates of certain Defendants to show that the Complaint, as pleaded, can and should be removed to federal court.

38

in procurement actions. *See id.* at 2. And "[t]he U.S. military services and the North Atlantic Treaty Organization forces use an estimated 5 billion gallons of JP-8 [jet fuel] each year."[16]

89. In addition, from at least 2010-2013, Shell Oil Company or its affiliates entered into billion-dollar contracts with DOD's Defense Logistics Agency ("DLA") to supply specialized JP-5 and JP-8 military jet fuel.[17] *See* Exs. 21-29. DOD's detailed specifications for the makeup of the military jet fuels require that they "shall be refined hydrocarbon distillate fuel oils" made from "crude oils" with "military unique additives that are required by military weapon systems." *See* Ex. 30, at 5, 10, §§ 3.1, 6.1; *id.* Ex. 31 at 5, 11, §§ 3.1, 6.1.

90. Similarly, BP entities contracted with DLA to provide a significant quantity of specialized military fuels over decades—including approximately 1.5 billion gallons of specialized military fuels for DOD's use *in the past four years alone*. Ex. 32, at 5. Since 2016, BP entities entered into approximately 25 contracts to supply various military-specific fuels, such as JP-5, JP-8, and F-76, together with fuels containing specialized additives, including fuel system icing inhibitor ("FSII"), corrosion inhibitor/lubricity improver ("CI/LI") and, for F-76 fuels, lubricity improver additive ("LIA"). *Id.* Such additives are essential to support the high performance of the military engines they fuel.

91. DOD exerted significant control over the BP entities' actions in fulfilling these contracts, requiring that these specialized military fuels (1) ignite, and do not freeze, at low temperatures from high altitudes; (2) rapidly dissipate accumulated static charge so as not to

---

[16] Subcommittee on Jet-Propulsion Fuel 8, Committee on Toxicology, National Research Council, Toxicologic Assessment of Jet-Propulsion Fuel 8 (2003), https://www.ncbi.nlm.nih.gov/books/NBK207616/.

[17] These contract examples are not an exhaustive collection of the contracts that Defendants executed with the federal government to supply specialized military fuels during the relevant time period.

produce sparks or fires during rapid refueling (such as on an aircraft carrier where such a fire would be devastating); (3) efficiently combust to allow for longer flights on less fuel; and (4) maintain the integrity of the fuel handling systems over a long period of time.[18]

92.     To meet its unique operational needs, DOD required the BP entities to supply each fuel in accordance with highly specialized, DOD-mandated specifications. These fuel contracts are far more specialized and prescriptive than for fuel intended for consumer-type vehicles.

93.     In particular, the specifications require particular amounts of "military unique additives that are required by military weapons systems," such as SDA, FSII, and CI/LI.[19] "[T]his [additive] requirement is unique to military aircraft and engine designs,"[20] and each additive served a vital role in allowing the DOD to fulfill its mission safely and efficiently:

- DOD *required* the BP entities to use SDA, a conductivity improver additive, to dissipate static charge created during military jet distribution and refueling. If the charge is not dissipated, refueling could result (and has resulted) in a spark or fire, especially when rapid refueling is necessary during combat with hot military engines.[21]

- DOD *required* the BP entities to use FSII to depress the freezing point of military jet fuels. FSII ensures that the fuels' natural water content does not freeze at low temperatures encountered by military jets at high altitudes, which would result in slush or ice crystal formation causing blockages of fuel filters, pumps, or lines and could ultimately cause engine flameout.[22]

---

[18]  Ex. 33 § 1.2.2 (MIL-HDBK-510A); Ex. 34, tbl. 1, 2-9 (Air Force Wright Aeronautical Lab., *Military Jet Fuels, 1944-1987*, AFWAL-TR-87-2062 (Dec. 1987)) [hereinafter, "Air Force Lab, *Military Jet Fuels*"]; NREL, *Investigation of Byproduct Application to Jet Fuel*, NREL/SR-510-30611, at 4-6 (Oct. 2001), https://www.nrel.gov/docs/fy02osti/30611.pdf.

[19]  Ex. 35 at 15 ¶ 6.1 (MIL-DTL-83133J (JP-8) specs). Several of the BP entities' DLA contracts to supply JP-8 required that the BP entities meet the specifications of MIL-DTL-83133J. Ex. 36, at 14.

[20]  Ex. 35, at 15, § 6.1 (MIL-DTL-83133J (JP-8) specs.

[21]  Ex. 33 at 9, § 1.4.1.2 (MIL-HDBK-510A); Ex. 34 at 35 ("This electrical charge can accumulate and produce incendiary spark discharges; many aircraft fuel system fires have resulted.").

[22]  Ex. 37 (MIL-DTL-85470B (FSII) specs); Ex. 33 at 9, § 1.4.1.1 (MIL-HDBK-510A); Ex. 34, at 30, 41-44; Ex. 38 (Department of Army Technical Manual, *Petroleum Handling Operations*

40

- DOD *required* the BP entities to use additives such as CL/LI and LIA to (1) improve lubricity, which reduces friction and ensures that the military engines do not seize during operation; and (2) prevent corrosion in military fuel handling, transportation, and storage equipment, primarily constructed of uncoated steel.[23]

94.    In addition, DOD specifications required the BP entities to conform the fuels to specific chemical and physical requirements, such as enumerated ranges for conductivity, heat of combustion, thermal stability, and freezing point, specifications which are essential to the performance of the military function.[24]  The specifications also required adherence to specific testing methods for the various additives and chemical and physical requirements in accordance with enumerated American Society for Testing and Materials ("ASTM") standards, such as ASTM D2624 for conductivity and ASTM D3241 for thermal stability.[25]  If the fuels did not conform to the exact specifications, DOD exerted control over the BP entities by requiring them to either repair or replace the products at no increase in contract price.

95.    DOD's detailed specifications for the makeup of these military jet fuels and "the compulsion to provide the product to the government's specifications" demonstrate the necessary "acted under" special relationship between Defendants and the government.  *See Baker*, 962 F.3d at 943 (holding that the government's detailed specifications for the makeup of materials and the

---

*for Aviation Fuel*, TM 10-1107 at 6 (Feb. 1960)) ("The jet aircraft is subject to wider and more rapid changes of temperature. . . . Consequently, any water present may freeze before it can reach the sumps of jet aircraft. When this happens, ice particles may clog the fuel screens and cause fuel starvation.")

[23]   Ex. 39 (Dep't of Defense, Performance Specification, Inhibitor, Corrosion / Lubricity Improver Fuel Soluble, MIL-PRF-25017H (CI/LI) specs); Ex. 33 § 1.4.1.3 (MIL-HDBK-510A); Ex. 34, at 28, 30, 38-39; Ex. 40 (MIL-PRF-32490 (LIA) specs).

[24]   Ex. 34, at 17-35 (describing the necessity for specific physical and chemical requirements in military jet fuels); Exs. 41-44 (the JP-5 specs (MIL-DTL-5624W); (MIL-DTL-16884N and -16884P (NATO-76) specs); and Def Stan 91-091 Issue 9 Jet A-1) specs).

[25]   *See* Ex. 45 (ASTM D1655-20 Jet A specs).

compulsion to provide the product to the government's specifications demonstrated the necessary "acted under" relationship to support federal officer removal); *Arlington*, 2021 WL 1726106, at *5-6 (finding "acting under" prong satisfied where defendants had provided services to federal officers pursuant to detailed contracts requiring special formulations and imposing pricing, delivery, and audit/inspection rights). These specialized jet fuels are not the category of heavily regulated civilian products such as those described by the Supreme Court in *Watson*; rather, they are designed specifically to assist the military in fulfilling its unique and essential missions and thus fall into the category of specialized military products that support federal officer jurisdiction. *See Watson*, 551 U.S. at 154 ("Dow Chemical fulfilled the terms of a contractual agreement by providing the Government with a product that it used to help conduct a war."); *Winters* v. *Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398-99 (5th Cir. 1998); *Baker*, 962 F.3d at 946.

### (b) Defendants Acted under Federal Officers during the Korean War and World War II.

96.     At the advent of the Korean War, President Truman established the Petroleum Administration for Defense ("PAD") under authority of the Defense Production Act of 1950, Pub. L. No. 81-774 ("DPA"). The PAD issued production orders to Defendants and other oil and gas companies, including to ensure adequate quantities of avgas for military use.[26] As Professor Wilson explains, the DPA "gave the U.S. government broad powers to direct industry for national security purposes," and "PAD directed oil companies to expand production during the Korean War, for example, by calling on [the] industry to drill 80,000 wells inside the United States, and more than 10,000 more wells abroad, in 1952." Ex. 7 ¶ 28.

---

[26]  *See* Ex. 46 at 122. *See also Exxon Mobil Corp.*, 2020 WL 5573048, at *15 (detailing the government's use of the DPA "to force" the petroleum industry to "increase their production of wartime . . . petroleum products").

97.     The government also invoked the DPA immediately after the 1973 Oil Embargo to address immediate and critical petroleum shortages by the military.  Interior Priority Regulation 2 authorized "directives" to ensure "normal supply of petroleum products required by the [DOD]" and provided companies that complied with immunity from "damages or penalties."  Petroleum Products Under Military Supply Contracts, 38 Fed. Reg. 30572 §§ 1, 3 (Nov. 6, 1973).  The Interior Department subsequently "issued directives to 22 companies [including Defendants or their predecessors or subsidiaries] to supply a total of 19.7 million barrels of petroleum during the two-month period from November 1, 1973, through December 31, 1973, for use by the DOD."[27]  By complying with these production orders, Defendants "*assist[ed]*" with "the duties or tasks of the federal superior" to alleviate petroleum shortages that posed a grave threat to the nation's security forces. *Watson*, 551 U.S. at 152.

98.     Decades earlier, as the United States prepared to enter World War II, its need for large quantities of oil and gas to produce avgas for planes, oil for ships, lubricants, and synthetic rubber far outstripped the nation's current capacity. The government created agencies to control the petroleum industry, including Defendants, to build refineries; direct the production of certain petroleum products; and manage scarce resources for the war effort.  "No one who knows even the slightest bit about what the *petroleum industry* contributed to the war can fail to understand that it was, without the slightest doubt, *one of the most effective arms of this Government* . . . in bringing about a victory."  Ex. 49 at 1 (emphases added); *see also* Ex. 50.

---

[27]   Ex. 47 at 78.  The companies included Amoco Oil Co., Atlantic Richfield Co., Exxon Co., U.S.A., Mobil Oil Corp., and Shell Oil Co.  *Id.* (listing companies and quantities); Ex. 48 (reporting on directives).

99.     In 1941, President Roosevelt created the Office of Petroleum Coordinator and designated Interior Secretary Harold Ickes as the Petroleum Coordinator for National Defense. *See* 2020 WL 5573048, at *10 (S.D. Tex. Sept. 16, 2020).  President Roosevelt explained that:

> [r]ecent significant developments indicate the need of coordinating existing Federal authority over oil and gas and insuring that the supply of petroleum and its products will be accommodated to the needs of the Nation and the national defense program ... One of the essential requirements ... which must be made the basis of our petroleum defense policy ... is the development and utilization with maximum efficiency of our petroleum resources and our facilities, present and future, for making petroleum and petroleum products available, adequately and continuously, in the proper forms, at the proper places, and at reasonable prices to meet military and civilian needs.

*Id.*  The Office of Petroleum Coordinator issued "directives" and "recommendations" to the oil and gas industry, requiring refineries to prioritize the production of aviation gasoline.

100.    In 1942, President Roosevelt established several agencies to oversee wartime production. Among those with authority over petroleum production were the War Production Board ("WPB") and the Petroleum Administration for War ("PAW").  The WPB established a nationwide priority ranking system to identify scarce goods, prioritize their use, and facilitate their production; it also limited the production of nonessential goods.  The PAW centralized the government's petroleum-related activities.   It made policy determinations regarding the construction of new facilities and allocation of raw materials, had the authority to issue production orders to refineries and contracts that gave extraordinary control to federal officers, and "programmed operations to meet new demands, changed conditions, and emergencies."  *See generally Shell I* (discussing federal control).  The "PAW told the refiners what to make, how much of it to make, and what quality."[28]  The Office of the Petroleum Coordinator for National

---

[28]    *Shell II*, 751 F.3d at 1286 (quoting John W. Frey & H. Chandler Ide, *A History of the Petroleum Administration for War, 1941-1945*, at 219 (1946)); *see also* Statement of Ralph K. Davies, Deputy Petroleum Administrator of War, S. Res. 96 at 11 (Nov. 28, 1945) ("The supply of crude to each refinery, the finished and intermediate products to be made in each plant, and the

Defense stated that "[i]t is *essential*, in the national interest that the supplies of all grades of aviation gasoline for military, defense and essential civilian uses *be increased immediately to the maximum*."[29]

101.    The government dictated where and how to drill, rationed essential materials, and set statewide minimum levels for production. Ex. 7 ¶¶ 11, 14-15. As Professor Wilson explains: "PAW instructed the oil industry about exactly which products to produce, how to produce them, and where to deliver them." *Id*. ¶ 11. Professor Wilson establishes that "[s]ome directives restricted the use of certain petroleum products for high-priority war programs; others dictated the blends of products; while others focused on specific pieces of the industry, such as the use of individual pipelines." *Id.*

102.    The PAW's directives to Defendants were often coercive. The PAW's message to the oil and gas industry was clear: It would "get the results" it desired, and if "we can't get them by cooperation, then we will have to get them some other way." Ex. 51 at 8. The PAW maintained "disciplinary measures" for noncompliance, including "restricting transportation, reducing crude oil supplies, and withholding priority assistance." Ex. 52 at 1. In sum, the federal government deployed an array of directions, threats, and sanctions to ensure Defendants assented to PAW's production directives. The structure of the wartime relationship between PAW and Defendants was one of "subjection, guidance, or control" over Defendants' petroleum production, which

---

disposition of the products were all closely scheduled, by daily telegraphic directives when necessary."); Ex. 50 at 212 ("PAW was further expected to designate for the military forces the companies in a given area from which the product could be secured, as well as the amount to be produced by each company and the time when the product would be available.").

[29]    Statement of Ralph K. Davies, Deputy Petroleum Administrator of War, S. Res. 96 (Nov. 28, 1945) (quoting Office of Petroleum Coordinator for National Defense Recommendation No. 16).

satisfies the "acting under" requirement of Section 1442(a)(1). *St. Charles Surgical Hosp.,* 990 F.3d at 455.

103.    The court in *Exxon Mobil Corp.* v. *United States* acknowledged the long history of federal government control over Defendants' lawful oil production-related activities in finding that the government was responsible for certain environmental response costs under CERCLA: "By controlling the nation's crude oil supply, the federal government controlled the nation's petroleum industry." 2020 WL 5573048, at *11. The court rejected the argument that private refiners "voluntarily cooperated" and instead found that they had "no choice" but to comply with the federal officers' direction. *Id.* at *11-12 (J. Howard Marshall, the former Chief Counsel for the Petroleum Administration for War, testified that "companies that 'weren't making essential war materials' were simply not able to run their refineries."). In fact, the federal government "insiste[d] on having the plants operate 24 hours a day, 7 days a week, year round." *Id.* at *8. Put simply, the federal government "exerted significant control over the operations of refinery owners or operators that contracted to manufacture avgas, synthetic rubber, and other war materials." *Id.* at *14. Certain Defendants or their predecessors or subsidiaries also produced toluene, a component of the explosive TNT, under "direct contract with the Army Ordnance Department." Ex. 9 at 222; *see Exxon Mobil Corp.*, 2020 WL 5573048, at *13. The controls placed on the production of petroleum during World War II extended through the Korean War. *See* 2020 WL 5573048 at *15 (detailing the government's use of the Defense Production Act of 1950 "to force" the petroleum industry to "increase [its] production of wartime . . . petroleum products").

104.    DOD is the nation's single largest consumer of energy, and one of the world's largest users of petroleum fuel. *See* Ex. 53 (discussing FY 2019 military fuel procurement). For more than a century, "these products [have been] used for the war effort," including "many

'ordinary' products [that are] *crucial* to the national defense, such as . . . fuel and diesel oil used in the Navy's ships; and lubricating oils used for various military machines." *Exxon Mobil Corp.*, 2020 WL 5573048, at *31 (emphasis added); *see also id.* at *47 (noting the "value of [the] petroleum industry's contribution to the nation's military success"). As two former Chairmen of the Joint Chiefs of Staff explained, the "history of the Federal Government's control and direction of the production and sale of gasoline and diesel to ensure that the military is 'deployment-ready'" spans "more than a century," and during their tenure, petroleum products were "crucial to the success of the armed forces." Ex. 54, at 2-3. "Because armed forces have used petroleum-based fuels since the 1910s, oil companies have been essential military contractors, throughout the last century." Ex. 7 ¶ 2. The "U.S. government has controlled and directed oil companies in order to secure and expand fuel supplies for its military forces and those of its allies, both in wartime and in peacetime." *Id.* Defendants' decades-long contractual relationship with the federal government to produce critical fuels that it needs for the U.S. military and during times of war—products that, "in the absence of Defendants, the Government would have had to produce itself"—is a classic example of the "special relationship" with federal officers sufficient to satisfy the "acting under" prong. *Isaacson*, 517 F.3d at 137.

### (c) Defendants Acted under Federal Officers by Constructing Pipelines for Oil Transportation.

105. Defendants also acted under the federal government as agents in constructing and operating pipelines transporting oil for war. During World War II, oil transportation by tankers "experienced major disruption as a result of attacks by German submarines." Ex. 55, at 3. "To [e]nsure adequate supplies of petroleum through the east during the late World War II, the Government caused to be constructed, between the Texas oilfields and the Atlantic seaboard, two large pipelines, commonly known as the 'Big Inch' and the 'Little Big Inch,' respectively"

47

(together, the "Inch Lines"). *Schmitt* v. *War Emergency Pipelines, Inc.*, 175 F.2d 335, 335 (8th Cir. 1949) ("*WEP II*"). War Emergency Pipelines, Inc. ("WEP"), "a Delaware corporation created by eleven of the major oil companies," including predecessors or affiliates of Defendants,[30] constructed and operated the Inch Lines "under contracts" and "as agent" for the federal government. *WEP II*, 175 F. 2d at 335; *Schmitt* v. *War Emergency Pipelines, Inc.*, 72 F. Supp. 156, 158 (E.D. Ark. 1947) ("*WEP I*").[31]

106.   Federal officers exerted operational control over the Inch Lines and Defendants' affiliates.  WEP operated wholly on capital from the government, and "received no fee or profit." *WEP II*, 175 F.2d at 336; *see also, e.g.*, *WEP I*, 72 F. Supp. at 158.  The government also required approval and set the salaries of all personnel that WEP employed.  *See WEP II*, 175 F.2d at 336.

107.   Petroleum Directives 63 and 73 governed the Big Inch and Little Big Inch pipelines, respectively, and exerted substantial control over WEP, and thus Defendants.  The government required WEP to prepare and file "daily reports" and a monthly "forecast" regarding its operation of the Inch Lines.[32]   The government had power to "direct such affirmative action as may be necessary to accomplish the purposes" of the Inch Lines—namely, "relieving shortages" and

---

[30]   The eleven companies that constituted WEP were Shell Oil Company, Inc., Standard Oil Company (New Jersey), The Texas Company, Gulf Refining Company, Pan American Petroleum & Transport Company, Cities Service Company, Atlantic Pipe Line Company, Sinclair Oil Corporation, Sun Pipe Line Company (Texas), Socony Vacuum Oil Company, Inc., and Tidal Pipe Line Company.  Several of these companies are predecessors or affiliates of current Defendants.  *See* Ex. 56.

[31]   These decisions provide details of the construction contracts under which the government "delegat[ed] operating function to [WEP]" "by a document called 'Agency Agreement.'" *WEP I*, 72 F. Supp. at 157.

[32]   Utilization of War Emergency Pipeline, 8 Fed. Reg. 1068-69 (Jan. 20, 1943) (Petroleum Directive 63); War Emergency Petroleum Products Pipeline, 8 Fed. Reg. 13343 (Sept. 30, 1943) (Petroleum Directive 73).

"augmenting supplies for offshore shipments" while replacing "tankers normally engaged in the transportation of petroleum products from the United States Gulf Coast to Atlantic ports" that were "los[t] through enemy action." *Id.* The goal was to ensure "maximum operating capacity for the prosecution of the war and most effective utilization of petroleum." *See* Ex. 57, at 25-26 ("Under wartime operation, the oil business operated under directives of the Petroleum Administration for War. . . . [Oil companies] w[ere] ordered to divert oil and deliver at the receiving terminals of the big lines sometimes by expensive means to keep these lines running to capacity, and that was done in the interest of the war effort because we needed every barrel of oil we could deliver to the East.").

108.    The government controlled all oil that WEP moved through the pipelines on its behalf.[33]  During their operation by WEP, the Inch Lines provided "life lines to the east," delivering "379,207,208 barrels of crude oil and refined products" and serving "military necessity" for "the cross-Atlantic fronts." Ex. 9, at 104-05, 108.  Defendants thus "provided the federal government with materials that it needed to stay in the fight at home and abroad." *Baker*, 962 F.3d at 942. Without Defendants as contractors and agents (via WEP), "the Government itself would have had to perform" these essential wartime activities. *Watson*, 551 U.S. at 154.

### (d)    Defendants Acted under Federal Officers by Constructing, Operating, and Managing Government Petroleum Production Facilities.

109.    Defendants also acted under the federal government by operating and managing government-owned and/or government-funded petroleum production facilities.  During World War II, the government built "dozens of large government-owned industrial plants" that were

---

[33]    8 Fed. Reg. at 1069, § 1555.1(e)(4) ("No petroleum or petroleum products shall be transported through the facilities of the War Emergency Pipeline System except in pursuance of this Directive or amendments and supplements thereto."); *id.* at 13343, § 1555.2(d)(3) (same).

"*managed by private companies under government direction*." Ex. 7 ¶ 14 (emphasis added). These "oil companies were not merely top World War II prime contractors, but also served as government-designated operators of government-owned industrial facilities" or of government-owned equipment within industrial facilities. *Id.* at ¶ 19. Some Defendants or their predecessors operated such production equipment and facilities for the government, building plants and manufacturing war products for the Allied effort. *Id.* at ¶ 20.

110.     For example, "[o]n January 22, 1942, Shell entered into a contract with the United States on behalf of the Army Ordnance Department for the purchase of 20 million to 25 million gallons of nitration grade toluene over a two-year period. The contract provided that Shell would construct a toluene plant at Shell['s] Wilmington, California refinery and that the Government would advance 30% of the contract price or $2,040,000 for construction of the plant. . . . Shell completed a toluene plant in 1943 and produced toluene for the remainder of the war" "to manufacture TNT" and later "as a blending agent" to make "avgas." Ex. 58 at 94; *see also* Ex. 7 ¶ 23.

111.     In addition, the government's need for highly specialized fuels, discussed in Section II.B.I.a, *supra*, necessitated changes to Defendants' refining equipment and operations. *See* Ex. 59 at 40 ("The refiner cannot build the equipment for making the fuel without knowing what its composition must be to meet the needs of the engine."). The impacts of the government's particular fuel specifications on Defendants' operations were typically long-lasting. For example, JP-4 was developed in 1951 and was the most heavily used Air Force fuel until it was phased out around 1998. *See* Ex. 60.

112.    The federal government entered into contracts with predecessors or affiliates of Defendants Shell Oil Company and ExxonMobil to obtain "vast quantities of avgas."[34]  These contracts provided federal officers with the power to direct the operations of Defendants' facilities. For instance, the government's contract with Shell Oil Company's predecessor or affiliate specified that it "*shall* use its best efforts" and work "*day and night*" to expand facilities producing avgas "*as soon as possible* and not later than August 1, 1943."[35]  To maximize production of this critical product, "[t]he Government directed [those companies] to undertake extraordinary modes of operation which were often uneconomical and unanticipated at the time of the refiners' entry into their [avgas] contracts." *Shell II*, 751 F.3d at 1287 (internal citations omitted).  At the federal government's direction, the oil companies, including certain Defendants here, increased avgas production "over twelve-fold from approximately 40,000 barrels per day in December 1941 to 514,000 barrels per day in 1945, [which] was crucial to Allied success in the war." *Id.*

113.    With respect to Exxon Mobil Corporation's affiliates, the federal government "exerted substantial control and direction over the refineries' actions, including decisions on how [and when] to use raw materials and labor." *Exxon Mobil Corp.*, 2020 WL 5573048, at *1, *8. Courts have concluded that, "[b]y controlling the nation's crude oil supply, the federal government controlled the nation's petroleum industry," and that it "exerted significant control over the operations of refinery owners or operators that contracted to manufacture avgas, synthetic rubber, and other war materials." *Id.* at *11, *14.  By helping the government produce essential items that

---

[34]   Several prior decisions discuss these contracts and the power that the federal government held over Defendants to control production of oil and gas.  *See, e.g.*, *Shell II*, 751 F.3d at 1286; *Exxon Mobil Corp.*, 2020 WL 5573048, at *31.

[35]   *Shell Oil Co.* v. *United States*, No. 1:06-cv-00141-SGB (Fed. Cl. Nov. 20, 2012), ECF No. 106-1 (emphases added).

51

it needed for national defense purposes, *see Watson*, 551 U.S. at 153, Defendants "acted under" a federal officer for purposes of the removal statute.

> **(e)** **Defendants Acted under Federal Officers by Supplying and Managing the Strategic Petroleum Reserve and Allocating Products Pursuant to the Emergency Petroleum Allocation Act.**

114.    In response to the Oil Embargoes of the 1970s, Congress also created the Strategic Petroleum Reserve ("SPR") in the Energy Policy and Conservation Act of 1975, Pub. L. No. 94-163, 89 Stat. 871 (1975), to protect the country's energy security. The SPR was a "stockpile of government-owned petroleum managed by the [Department of Energy ("DOE")] [created] as a response to gasoline supply shortages and price spikes . . . to reduce the impact of disruptions in supplies of petroleum products and to carry out U.S. obligations under the 1974 Agreement on an International Energy Program."[36] Several Defendants "acted under" federal officers in producing oil for the SPR and managing it for the federal government.

115.    The Act "declar[ed] it to be U.S. policy to store up to 1 billion barrels of petroleum products, provid[ed] for an early reserve, to contain at least 150 million barrels by December 1[9]78, and for an eventual storage system of at least 500 million barrels by December 1982." Ex. 61 at 30. From 1999 through December 2009, the U.S. government's "primary means of acquiring oil for the SPR" was by taking its royalties from oil produced from federal offshore leases as royalties "in kind" as part of the so-called Royalty In Kind ("RIK") program.[37] During that time,

---

[36]    *See* H.R. Rep. No. 115-965, at 3 (2018), https://www.congress.gov/115/crpt/hrpt965/CRPT-115hrpt965.pdf.

[37]    U.S. Dep't of Energy, *Filling the Strategic Petroleum Reserve*, https://www.energy.gov/fe/services/petroleum-reserves/strategic-petroleum-reserve/filling-strategic-petroleum-reserve (last visited May 25, 2021).

"the Strategic Petroleum Reserve received 162 million barrels of crude oil through the RIK program" valued at over $6 billion. Ex. 62 at 18, 37.

116. The federal government required certain Defendants (and/or their predecessors, subsidiaries, or affiliates), as lessees of federal offshore leases on the OCS, to pay these royalties "in kind," which the government used for its strategic stockpile, a crucial element of U.S. energy security and treaty obligations. *See* Ex. 63. The federal government also contracted with some of the Defendants (including their predecessors, subsidiaries, or affiliates) to deliver to the SPR millions of barrels of oil under the RIK program, Ex. 64, and contracted with those Defendants to assist in the physical delivery of these RIK payments to the Strategic Petroleum Reserve. *See, e.g.*, Ex. 65, at 19. Some Defendants also acted under federal officers by operating the SPR infrastructure for the government.[38]

117. The SPR subjects Defendants to the federal government's supervision and control in the event of the President's call for an emergency drawdown.[39] The United States has exercised

---

[38] For example, from 1997 to 2019, the DOE leased to Defendant Shell Oil Company affiliates the Sugarland/St. James Terminal and Redstick/Bayou Choctaw Pipeline in St. James, Louisiana. *See* Ex. 62 at 16. Under the lease agreement, "Shell provide[d] for all normal operations and maintenance of the terminal and [wa]s required to support the Strategic Petroleum Reserve as a sales and distribution point in the event of a drawdown. *Id.* In January 2020, the DOE leased the St. James facilities to an affiliate of Defendants Exxon Mobil Corporation and ExxonMobil Oil Corporation (ExxonMobil Pipeline Company). *See* U.S. Dep't of Energy, *Department of Energy Awards Strategic Petroleum Reserve Lease to ExxonMobil* (Oct. 28, 2019), https://www.energy.gov/articles/department-energy-awards-strategic-petroleum-reserve-lease-exxonmobil. Similarly, ExxonMobil Pipeline Company was required to "make monthly lease payments; be responsible for operations and maintenance of the facility; and provide use of the facility in support of Government emergency oil drawdowns." *Id.* And the DOE has leased to the same ExxonMobil affiliate two government-owned pipelines that are part of the SPR near Freeport, Texas. *See* U.S. Dep't of Energy, *DOE Signs Major Agreement with Exxon Pipeline to Lease Idle Pipelines at Strategic Reserve* (Jan. 14, 1999), https://fossil.energy.gov/techline/techlines/1999/tl_bmlse.html.

[39] *See* 42 U.S.C. § 6241(d)(1) ("Drawdown and sale of petroleum products from the Strategic Petroleum Reserve may not be made unless the President has found drawdown and sale are

this control, including as a result of President Bush's Executive Order to draw down the reserve in response to Hurricane Katrina in 2005 and President Obama's Executive Order to draw down the reserve in response to disruptions to oil supply in Libya in 2011. *See* Ex. 66; Ex. 67 at 1, 17, 18, 21. Thus, the hundreds of millions of barrels of oil flowing through these facilities—the sale and combustion of which are necessarily part of the causal chain that forms the basis of the City's claims—were subject to federal government direction, control, and supervision. *See generally* U.S. Dep't of Energy, *2018-2022 Strategic Vision*, https://www.energy.gov/sites/prod/files/ 2019/12/f69/FE%20Strategic%20Vision.pdf (last visited May 25, 2021).

118. Also in response to the oil embargoes of the 1970s, Congress passed the Emergency Petroleum Allocation Act of 1973, Pub. L. No. 93-159, 87 Stat. 627 (1973), to manage shortages and "distribute [petroleum products] fairly across the total spectrum of petroleum use in this country." Ex. 68 at 35. Pursuant to the Act, from 1974 to 1981, the federal government implemented an "omnibus mandatory allocation program covering every facet of the petroleum industry and affecting, if not dictating, virtually every domestic transaction involving crude oil and covered petroleum products."[40] This program required that Defendants distribute available gasoline supplies to wholesale purchasers (largely service stations) on a pro rata basis. *See* Ex. 68 at 37. Further, the program mandated that Defendants regularly report to the federal government on their crude oil supplies and refining activities; when a Defendant's crude oil supplies exceeded

---

required by a severe energy supply interruption or by obligations of the United States under the international energy program.").

[40] *Emergency Petroleum Allocation Act Extension: Hearing on H.R. 15905, H.R. 151000, H.R. 15491, H.R. 16116, H.R. 16303, H.R. 16757, and S. 3717 (and all identical bills) Before the Subcomm. on Communications and Power of the H. Comm. on Interstate and Foreign Commerce*, 93d Cong. 8 (1974) (statement of Hon. John C. Sawhill, Deputy Administrator, Federal Energy Office).

54

a certain benchmark, it was forced to sell to others who fell below that benchmark. *See id.* at 41. Congress deemed the allocation system, and the oil companies' participation in it, necessary due to "shortages of crude oil" that constituted "a national energy crisis which is a threat to the public health, safety, and welfare" requiring "prompt action by the Executive branch."[41] By "work[ing] hand-in-hand with the government, assisting the federal government" to achieve a task that furthers the objectives of the federal government, Defendants were "acting under" federal officers. *Ruppel*, 701 F.3d at 1181.

> **(f)   Defendants Acted under Federal Officers by Developing Mineral Resources on the Outer Continental Shelf and Other Federal Lands.**

119.   Congress first passed OCSLA in 1953, providing federal control over the OCS to ensure the "expeditious and orderly development" of what it recognized to be a "vital national resource" in "a manner which is consistent with . . . national needs." 43 U.S.C. § 1332(3). The initial regulations "went well beyond those that governed the average federally regulated entity at that time." Ex. 70 ¶ 19. As Professor Priest explains: "An OCS lease was a contractual obligation on the part of lessees to ensure that all operations *'conform to sound conservation practice'* . . . and *effect the 'maximum economic recovery'* of the natural resources on the OCS." *Id.* (citing 19 Fed. Reg. 90 (May 8, 1965), C.F.R. § 250.11, 2656) (emphases added). Notably, the federal government retained the power to "direct how oil and gas resources would be extracted and sold from the OCS." *Id.* ¶ 20.

120.   Federal officials in the Department of the Interior—whom the Code of Federal Regulations called "supervisors"—exerted substantial control and oversight over Defendants' operations on the OCS from the earliest OCS exploration. *See id.* ¶ 19. Federal supervisors had

---

[41]   Pub. L. No. 93-159, sec. 2(a)(1) & (3), 87 Stat. 628.

complete authority to control and dictate the "rate of production from OCS wells," *id.* ¶ 26, and had authority to suspend operations in certain situations, *id.* ¶ 20. The supervisors also "had the final say over methods of measuring production and computing royalties," which were based on "the estimated reasonable value of the product as determined by the supervisor." *Id.* (internal quotation marks omitted). As Professor Priest explains, these federal officials "did not engage in perfunctory, run-of-the-mill permitting and inspection." *Id.* ¶ 22. Rather, they "provided direction to lessees regarding when and where they drilled, and at what price, in order to protect the correlative rights of the federal government as the resource owner and trustee" of federal lands. *Id.* ¶ 28.

121. In addition, the federal government exerted substantial control by issuing highly specific and technical orders, known as "OCS Orders," which, among other things: "specified how wells, platforms, and other fixed structures should be marked"; "dictated the minimum depth and methods for cementing well conduct casing in place"; "prescribed the minimum plugging and abandonment procedures for all wells"; and "required the installation of subsurface safety devices . . . on all OCS wells." *Id.* ¶ 24 (citations omitted). Professor Priest observes that through these OCS Orders, federal officials "exercised active control on the federal OCS over the drilling of wells, the production of hydrocarbons, and the provision of safety." *Id.* ¶ 25. These controls went far beyond typical regulations, as the federal government imposed requirements as the resource owner to achieve its economic and policy goals. *E.g.*, *id.* ¶¶ 28, 32.

122. During the 1960s, U.S. domestic oil consumption increased 51%, compared to 36% during the previous decade. Ex. 77 at 17. Demand continued to climb into the early 1970s, and domestic supply failed to keep pace, so the United States soon found itself facing a precarious shortage of oil. *See id.* The United States increasingly turned to foreign countries, particularly in

the Middle East, for oil. Ex. 78, at 591. The amount of oil that the United States imported grew from 3.2 million barrels per day in 1970 to 6.2 million barrels per day in 1973. *Id*. at 591. By April 1973, President Nixon warned Congress of an impending national energy crisis. *See* Ex. 79. To avert the impending crisis, President Nixon ordered a dramatic increase in production on the OCS. *Id*.

123. Before the nation's precarious energy balance could stabilize, events abroad would exacerbate the crisis. The 1973 OPEC Oil Embargo "led to nationwide shortages of petroleum, a $60 billion drop in GNP, [and] more rapid inflation," among other harms.[42] The government called upon the oil and gas industry, including Defendants, to address this shortage. *See infra* ¶¶ 124-130.

124. The nation's energy woes continued to mount in the mid-to-late 1970s, with a natural gas shortage caused by an abnormally cold winter in 1976-77, a national coal strike in 1978, and a substantial reduction in crude oil supplies following the Iranian Revolution of 1979. *National Energy Plan II*, at 1. Yet the nation's dependency on imported oil continued to increase. By 1977, the United States was importing up to 8.8 million barrels per day—fully half of the nation's total domestic oil consumption. *Id.* at 77, tbl. IV-1. The growing influence of OPEC, the quadrupling of oil prices during the energy crises of the 1970s, the staggering loss in GNP, and the now-infamous gas lines, price controls, and rationing that accompanied these energy crises spurred the U.S. government to take action over the ensuing decades to quickly and dramatically increase domestic oil production.

---

[42] U.S. Dep't of Energy, National Energy Plan II, at 1 (May 1979), https://books.google.com/books?id=VR7PpPbRKFgC&printsec=frontcover#v=onepage&q&f=false.

125.    In 1973, President Nixon established the goal of energy independence for the U.S. by 1980.  President Nixon dubbed this plan "Project Independence 1980" and, among other things, ordered the Secretary of the Interior "to increase the acreage leased on the [OCS] to 10 million acres beginning in 1975, more than tripling what had originally been planned."  Special Message to the Congress on the Energy Crisis, 1 Pub. Papers 17, 29 (Jan. 23, 1974), https://quod.lib.umich.edu/p/ppotpus/4731948.1974.001/69?rgn=full+text;view=image.

126.    In 1978, Congress amended OCSLA to further encourage the leasing of the OCS to meet national energy and security needs created by the oil embargoes of the 1970s.  Congress's express purpose in amending the statute was to foster "expedited exploration and development of the OCS in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments."[43]  Congress expressly underscored the national public interest in "develop[ing] oil and natural gas resources in the [OCS] in a manner which is consistent with the need . . . to make such resources available to meet the Nation's energy needs as rapidly as possible."  43 U.S.C. § 1802(2).

127.    During the debate over the 1978 amendments, Senator Fritz Hollings proposed that the federal government create a national oil company to facilitate the development of oil and gas on the OCS.  Ex. 70 ¶ 52.  "In essence, Hollings called for the creation of a national oil company that would 'conduct this program by using the same drilling and exploration firms that are usually hired by oil companies.'"  Id. (internal citation omitted).  The proposal to create a government agency to develop the OCS was ultimately rejected—instead, the government decided to contract

---

[43]    43 U.S.C. § 1802 (1); see California ex rel. Brown v. Watt, 668 F.2d 1290, 1296 (D.C. Cir. 1981).

with private energy companies to perform these essential tasks on its behalf with expanded oversight and control by the government. *See* Ex. 80, at 9275-76.

128. This was not the only proposal at the time to create a national oil company. *See* Ex. 70 ¶¶ 52-53; 121 Cong. Rec. H4490 (daily ed. Feb. 26, 1975) (statement of Rep. McFall); Ex. 80, at 9275-76. Another proposal "would have formally established a 'Federal Oil and Gas Corporation'" that would be "'owned by the federal government' and 'in case of any shortage of natural gas or oil and serious public hardship, could itself engage in production on Federal lands in sufficient quantities to mitigate such shortage and hardship.'" Ex. 70 ¶ 53. Yet another proposal, from Representatives Harris and McFall, "would provide for the establishment of a National Energy and Conservation Corporation—to be called Ampower—similar to the Tennessee Valley Authority." 121 Cong. Rec. 4490 (daily ed. Feb. 26, 1975) (statement of Rep. McFall). These proposals were ultimately rejected in favor of an arrangement by which the government would contract with private companies, including Defendants—*acting as agents*—to achieve this federal objective with expanded federal supervision and control. *See* Ex. 70 ¶ 55. The result was a closely supervised leasing program directed by the Department of the Interior and providing the federal government with control over the production sufficient to protect the national interests. *See id*. ¶ 46. As the Supreme Court has explained, removal is appropriate where private companies have "performed a job that, in the absence of a contract with a private firm, the Government itself would have had to perform." *Watson*, 551 U.S. at 154.

129. One of the Federal Energy Administration's first undertakings in 1974 was to propose significantly expanding the OCS leasing program, because "[r]ecent world events have spotlighted the growing dependence of the United States on imported crude oil and petroleum products" and "[i]nterruptions in oil imports impose severe costs on the United States due to the

pervasive economic role of petroleum in almost every sector of the economy." Ex. 69 at App'x 2. This increased OCS leasing represented a crucial federal policy, because "the Outer Continental Shelf represents one of the most important potential sources of increased domestic energy production, [and so] the President has called for an accelerated leasing program as a mechanism to [e]nsure that the most favorable OCS exploration prospects become available for near-term development." *Id.*

130.    The 1978 OCSLA amendments greatly increased the Secretary of the Interior's control over the OCS leasing program to align production with national goals.[44]  The amendments instructed the Secretary of the Interior to create an oil and gas leasing program on a five-year review cycle that provides as precisely as possible the size, timing, and location of leasing activities "which [the Secretary] determines will best meet national energy needs for the five-year period following its approval or reapproval."  43 U.S.C. § 1344(a)-(e).  Since 1977, several federal statutes have further expanded the OCS leasing program to promote the development of national energy supplies, including reductions in royalty payments to increase participation by Defendants to explore and develop deepwater resources.[45]

131.    In the 1990s, the Clinton Administration amended OCSLA to permit the Secretary of the Interior to grant certain royalty relief payments aimed at "reduc[ing] America's dependence on unreliable sources of imported oil by helping unlock an estimated 15 billion barrels of oil in the

---

[44]    *See* H.R. Rep. No. 95-590, at 53 (Aug. 29, 1977), reprinted in 1978 U.S.C.C.A.N. 1450 (recognizing that the amendments provided the federal government with the power and oversight capability to "expedite the systematic development of the OCS, while protecting our marine and coastal environment").

[45]    *See, e.g.*, Outer Continental Shelf Deep Water Royalty Relief Act, Pub. L. No. 104-58, 109 Stat. 557 (1995); Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (2005); Gulf of Mexico Energy Security Act of 2006, Pub. L. No. 109-432, 120 Stat. 2922 (2006).

60

**J.A. 171**

central and western Gulf of Mexico" for energy companies' exploration and production. Press Secretary, White House Office of Communications, *Statement on North Slope Oil Bill Signing*, 1995 WL 699656, at *1 (Nov. 28, 1995). And in the 2000s, the Bush Administration opened up approximately 8 million additional acres of OCS lands for leasing in the Gulf of Mexico, stating: "By developing these domestic resources in a way that protects the environment, we will help address high energy prices, protect American jobs, and reduce our dependence on foreign oil."[46]

132. As Professor Priest explains, these OCS leases are "*not merely commercial transactions* between the federal government and the oil companies. They reflect the creation of a valuable national security asset for the United States over time." Ex. 70 ¶ 7(1) (emphasis added). The federal OCS program "procured the services of oil and gas firms to develop urgently needed energy resources on federal offshore lands that the federal government was unable to do on its own." *Id.* The federal government "had no prior experience or expertise," and "[t]herefore . . . had little choice but to enlist the service of the oil firms who did." *Id.* ¶ 18. But it was the federal government, not the oil companies, that "dictated the terms, locations, methods and rates of hydrocarbon production on the OCS" in order to advance federal interests and accordingly, "[t]he policies and plans of the federal OCS program did not always align with those of the oil firms interested in drilling offshore." *Id.* ¶ 7(2). "Federal officials viewed these firms as agents of a larger, more long-range energy strategy to increase domestic oil and gas reserves." *Id.* The importance of the OCS to domestic energy security and economic prosperity has continued to the present, and across every administration. *See id.* ¶ 79. For example, in 2010, President Obama

---

[46] George W. Bush, *Statement By President George W. Bush Upon Signing [H.R. 6111]*, White House Press Release, 2006 U.S.C.C.A.N. S73, S75 (2006).

announced "the expansion of offshore oil and gas exploration" because "our dependence on foreign oil threatens our economy." *Id.* ¶ 78.

133.    The leases require Defendants to "maximize the ultimate recovery of the hydrocarbons from the leased area"; require that drilling take place "in accordance with a government approved exploration plan (EP), development and production plan (DPP) or development operations coordination document (DOCD) [as well as] approval conditions"; and specify that the federal government retains the right to oversee the lessee's rate of production from its leases.[47] Prior to exploration, development, or production, lessees must prepare and comply with detailed plans that are subject to comment and amendment by BOEM, state reviewers, or other agencies.[48]   Under these requirements, OCS lessees are subject to exacting oversight by BOEM and the Bureau of Safety and Environmental Enforcement ("BSEE") over each stage in developing the leasehold property.[49]   BSEE carefully monitors compliance with the approved plan and must approve any significant modification thereof.

134.    The federal government retains the right to control a lessee's rate of production on the OCS from its lease.[50]   In particular, BSEE may set the Maximum Efficient Rate ("MER") for production from a reservoir—that is, a cap on the production rate from all of the wells producing

---

[47]    *See generally* Exs. 71-74; Adam Vann, Congressional Research Service, RL33404, Offshore Oil and Gas Development: Legal Framework (2018), https://fas.org/sgp/crs/misc/RL33404.pdf (describing the multistep process for approval of development plans and BOEM oversight procedures).

[48]    *See* Offshore Oil and Gas Development: Legal Framework at 11-13.

[49]    *See, e.g.*, 30 C.F.R. §§ 250.101-115, 250.130-146, 250.168-295, 250.400-463 (BSEE) & 550.101-147 (BOEM).

[50]    *See* Ex. 71 § 10; 43 U.S.C. § 1334(g) (The lessee "shall produce any oil or gas, or both, . . . at rates consistent with any rule or order issued by the President in accordance with any provision of law.").

from a reservoir.[51]  This requirement has existed since 1974,[52] and the government adopted this "significant burden" to control production from its leases for the purpose of responding to "a period of oil shortages and energy crises."[53]

135.     The United States controls federal mineral lessees like Defendants in other ways. An OCS lessee does not have an absolute right to develop and produce; rather, it has only an exclusive right to seek approval from the United States to develop and produce under the lease. *See Sec'y of the Interior* v. *California*, 464 U.S. 312, 337-39 (1984); *Vill. of False Pass* v. *Clark*, 733 F.2d 605, 614-16 (9th Cir. 1984).  Nor may a federal lessee assign its lease to another person without express government approval.  30 U.S.C. § 187; 43 C.F.R. § 3106 (onshore leases); 30 C.F.R. §§ 556.701(a), 556.800 (OCS leases).  The government conditions OCS leases with a right of first refusal to purchase all minerals "[i]n time of war or when the President of the United States shall so prescribe."  Ex. 71 § 14; Ex. 72 § 15(d); *see* 43 U.S.C. § 1341(b).  The federal government also maintains certain controls over the disposition of oil, gas, and other minerals extracted from federally owned property.  The government reserves the right to purchase up to approximately 16% of lease production, less any royalty share taken in-kind.  43 U.S.C. § 1353(a)(2).  The Secretary of the Interior may direct a lessee to deliver any reserved production to the General Services Administration (government civilian operations), the DOD (military operations), or the DOE (*e.g.*, Strategic Petroleum Reserve).  *Id.* § 1353(a)(3).

136.     Through federal leases, the government balances economic development with environmental considerations.  The Secretary may reduce or eliminate the United States' royalty

---

[51]   30 C.F.R. § 250.1159.

[52]   *See* 39 Fed. Reg. 15885 (May 6, 1974) (approving OCS Order No. 11).

[53]   75 Fed. Reg. 20271, 20272 (Apr. 19, 2010).

share, and thus provide the lessee an additional economic incentive to produce oil and gas.[54]  The

Secretary may suspend production from an OCS lease "if there is a threat of serious, irreparable,

or immediate harm or damage to life (including fish and other aquatic life), to property, to any

mineral deposits (in areas leased or not leased), or to the marine, coastal, or human environment."[55]

137.    As the above statutory and lease provisions demonstrate, a federal oil and gas lease

is the means by which the federal government directs a lessee to develop federal minerals on the

government's behalf, and the government retains extensive supervision and control over the

lessees for many purposes, including in some cases solely to further public policy or achieve purely

governmental objectives.  These are activities that the federal government would itself have to

undertake unless the Defendants did it for the government through the obligations of federal leases

on federal lands.  Under *Watson*, this is not run-of-the-mill regulation.  On the contrary, it is the

kind of "special relationship" that supports federal officer removal.  *Watson*, 551 U.S. at 157;

*Isaacson*, 517 F.3d at 137.

138.    In 2019, oil production by private companies, including some Defendants, from

federal offshore and onshore leases managed by the Interior Department was nearly one billion

barrels.  Historically, annual oil and gas production from federal leases has accounted for as much

as 35% of domestic oil production and 25% of domestic natural gas production.[56]  The federal

---

[54]  43 U.S.C. § 1337(a)(3) ("The Secretary may, in order to promote increased production on the lease area, through direct, secondary, or tertiary recovery means, reduce or eliminate any royalty or net profit share set forth in the lease for such area.").

[55]  43 U.S.C. § 1334(a)(1); *see* 43 U.S.C. § 1334(a)(2) (authority to cancel any lease for similar reasons).

[56]  *See* Cong. Research. Serv., R42432, U.S. Crude Oil and Natural Gas Production in Federal and Nonfederal Areas 3, 5 (updated Oct. 23, 2018), https://crsreports.congress.gov/product/pdf/R/R42432.

government has reaped enormous financial benefits from the ongoing policy decision to contract for the production of oil and gas from federal lands through royalty regimes that have resulted in billions of dollars of revenue to the federal government. If not for the lessees' activities under the direction and control of federal resource-management agencies, the federal government would have needed to perform those activities itself to implement Congress's directives regarding production of oil and gas from the OCS in furtherance of the federal government's energy policy objectives.

139. Defendants similarly acted under the federal government's direction, supervision, and control in developing mineral resources on federal lands onshore.[57] The Interior Department's Bureau of Land Management ("BLM") leases, like OCS leases, are contracts to develop federal minerals on the government's behalf, and the government retains extensive supervision and control over the lessees. For instance, the Secretary of the Interior may also direct lessees to deliver any reserved production to the General Services Administration (government civilian operations), the DOD (military operations), or the DOE (*e.g.*, Strategic Petroleum Reserve)[58]; take any royalty owed on oil and gas production in-kind and "retain the same for the use of the United States"[59]; reduce or eliminate the United States' royalty share, thereby providing lessees with an additional economic incentive to produce oil and gas[60]; compel lessees to offer a percentage of lease

---

[57] "Oil and gas produced from the [onshore] Federal and Tribal mineral estate are significant parts of the nation's energy mix. For fiscal year (FY) 2018, sales of oil, gas, and natural gas liquids produced from the Federal and Tribal mineral estate accounted for approximately 8 percent of all oil, 9 percent of all natural gas, and 6 percent of all natural gas liquids produced in the United States." Ex. 75 at 1.

[58] 43 U.S.C. § 1353(a)(3).

[59] 30 U.S.C. § 192.

[60] 43 C.F.R. § 3103.4-1(a) ("[T]he Secretary . . . may waive, suspend or reduce . . . the royalty on an entire leasehold, or any portion thereof.") (Mineral Leasing Act ("MLA") leases).

65

production "small" refiners[61]; and even direct or grant suspensions of operations.[62]  The federal

government also uniquely reserves the authority to determine the value of production for purposes

of determining how much royalty a lessee owes, which is a provision included in BLM leases.[63]

BLM leases further provide that the United States "reserves the right to specify rates of

development and production in the *public interest*."[64]  As with OCS leases, BLM leases require

lessees to cease any operations that would result in the destruction of threatened or endangered

species or objects of historic or scientific interest.  Ex. 74 § 6.

140.    The federal government's control over onshore and offshore oil and gas production

is thus fundamentally different from the government's regulation of tobacco products, which the

Supreme Court addressed in *Watson*.  There, the Court recognized that a private party does not

come within the scope of the federal officer removal statute "simply [by] *complying* with the law."

*Watson*, 551 U.S. at 152.  Accordingly, "a highly regulated firm cannot find a statutory basis for

removal in the fact of federal regulation alone," even "if the regulation is highly detailed and even

if the private firm's activities are highly supervised and monitored."  *Id.* at 153.  This is because

mere regulation does not indicate that the federal government would undertake the regulated

activity if private actors did not—the government regulates tobacco products because of their

health risks, not because tobacco production is a federal imperative.  The City's claims, by contrast,

seek to punish Defendants for activities conducted under the close supervision of the federal

---

[61]   43 USC 1353(b).

[62]   *See* 30 U.S.C. § 226(i); 43 C.F.R. § 3103.4-4.

[63]   *See* Ex. 74 § 2 ("Lessor reserves the right . . . to establish reasonable minimum values on
       products . . . .").  A typical commercial private lease would never reserve similar unilateral
       authority to one contracting party to control a material economic term of the lease contract.
       *See* Ex. 76 (Commercial Lease – Texas Association of Realtors, Form TAR-2101).

[64]   *Id.* § 4 (emphasis added).

government that effectuate national energy policy and support the national defense.  The City's claims thus implicate precisely the type of "special relationship" between private contractors and the federal government that supports federal officer removal.  *Id.* at 157.

## 2. *The City's Claims Are Related to Defendants' Activities "Under Color of Federal Office."*

141.    The City's claims are "for or relating to" acts Defendants performed "under color of federal office."  To meet this prong, there need only be "a connection or association between the act in question and the federal office."  *Sawyer*, 860 F.3d at 258 (4th Cir. 2017) (internal citation omitted); *In re Commonwealth's Mot. to Appoint Counsel Against or Directed to Def. Ass'n of Philadelphia*, 790 F.3d 457, 471 (3d Cir. 2015) ("*Def. Ass'n of Philadelphia*").  The Removal Clarification Act of 2011 inserted the words "or relating to" into the federal officer removal statute, which "broaden[ed] the universe of acts that enable Federal officers to remove to Federal court."  *Def. Ass'n of Philadelphia*, 790 F.3d at 467 (quoting H.R. Rep. 112-17, at 6, 2011 U.S.C.C.A.N. 420, 425).  Even before the Removal Clarification Act, a removing party was required only to "'demonstrate that the acts for which they [we]re being sued' occurred *at least in part* '*because of* what they were asked to do by the Government.'"  *Id.* at 471 (quoting *Isaacson*, 517 F.3d at 137) (emphasis added).  The Act, however, "broadened federal officer removal to actions, not just *causally* connected, but alternatively *connected* or *associated*, with acts under color of federal office."  *Latiolais*, 951 F.3d at 292; *see also Agyin*, 986 F.3d at 174 n. 2 (discussing *Def. Ass'n of Philadelphia*, 790 F.3d at 467, and noting that Congress's addition of "the 'or relating to' language [was] 'intended to broaden'" the statute's application).

142.    It is, therefore, not necessary "that the complained-of conduct *itself* was at the behest of a federal agency"; rather, it is "sufficient" if the City's "allegations are directed at the relationship between the [Defendants] and the federal government" for at least *some* of the time

frame relevant to the City's claims. *Baker*, 962 F.3d at 944-45; *accord Def. Ass'n of Philadelphia*, 790 F.3d at 470-71; *Papp* v. *Fore-Kast Sales Co.*, 842 F.3d 805 (3d Cir. 2016). For instance, in *Baker*, an analogous case, the federal officer removal statute applied where certain products that allegedly contributed to plaintiff's purported pollution-based harms had, at times, been "critical wartime commodities" subject to "price control[s]," detailed federal oversight, and mandatory orders "setting aside" a portion of the defendants' products for the government's own use. *Id.* at 940-41, 945. The defendants did not have to show that federal officers directed the alleged pollution itself, or even the defendants' storage and waste disposal practices; rather it was "enough for the present purposes of removal that at least some of the pollution arose from the federal acts." *Id.* at 945. Similarly, in *Def. Ass'n of Philadelphia*, the "for or relating to" element was satisfied even though the Federal Community Defender was *not* directed by the government in the specific conduct at issue in the suit (representing defendants in state post-conviction proceedings) because that conduct was "related to" acts that were done under federal direction (representing defendants in federal habeas proceedings). 790 F.3d at 471-72. And in *Papp*, the "for or relating to" element was satisfied in a failure-to-warn lawsuit where the defendant established a "connection" between manufacturing aircraft for the federal government and plaintiff's alleged asbestos exposure, even though the government had not directly prohibited the defendants from issuing asbestos-related warnings. 842 F.3d at 812-813.

143. Courts in the Second Circuit have long taken a broad reading of the connection required for federal officer removal. As one court explained, "In *Isaacson*, it was enough that the contractual relationship [between defendants and the government] gave rise to [the plaintiff's harm], even if the contract did not call for it." *Gordon*, 990 F. Supp. 2d at 318; *see also Isaacson*, 517 F.3d at 137-38 (The hurdle erected by the "for or relating to" requirement is "quite low, as the

statute does not require that the prosecution must be for the very acts [that] . . . have been done . . . under federal authority."). Under Defendants' theory of the case, the City's claims relate to numerous federal activities, especially when construed "in the light most favorable to the" existence of federal jurisdiction, *Def. Ass'n of Philadelphia*, 790 F.3d at 466, and giving Defendants the "benefit of all reasonable inferences from the facts alleged," *Baker*, 962 F.3d at 945.

144. The City alleges that Defendants' promotions "enabled the unabated and expanded extraction, production, promotion, marketing, and sale" of fossil fuel products, which, in turn, "are the primary cause of climate change." Ex. 5 ¶¶ 8, 26; *see also id.* ¶ 20 (Defendants' "business models continue to center on developing, producing, and selling more of the very same fossil fuel products driving climate change."); ¶ 35 (alleging that ExxonMobil, Shell, and BP have "continue[d] to ramp up fossil fuel production and invest in new fossil fuel development"); ¶ 42 ("[Defendants] have been doubling down on fossil fuel extraction, production, and sales").

145. The City's suit, at its core, targets Defendants' production and supply of oil and gas, and Defendants' promotion of that oil and gas—which includes oil and gas that Defendants extracted and produced under federal officers. The City takes issue with Defendants' advertisements *because* they allegedly enabled Defendants to continue to produce and sell fossil fuels—which necessarily encompasses production of fossil fuels that Defendants carried out under the guidance, supervision, and control of the federal government. By challenging Defendants' production, promotion, and sales of *all* oil and gas products, the City's allegations are necessarily "directed at the relationship between the [Defendants] and the federal government." *Baker*, 962 F.3d at 945 (internal citations omitted). A clear "connection" or "association" thus exists between Defendants "acting under" federal officers by extracting and producing oil and gas pursuant to

federal contracts and specifications to help carry out the federal government's objectives to bolster the country's military and economic security, and the City's attempt to attack Defendants for that very same conduct. *See Latiolais*, 951 F.3d at 292.

146. A recent decision from the Fourth Circuit, *County Board of Arlington County, Virginia*, confirms that the City's claims are "related to" Defendants' production and sale of oil and gas products under the direction and control of federal officers. In *Arlington*, a municipality sued pharmacies in state court, asserting that they "caused an opioid epidemic" because "they were 'keenly aware of the oversupply of prescription opioids'" but "failed to 'tak[e] any meaningful action to stem the flow of opioids into the communities.'" 2021 WL 1726106, at *2 (citation omitted). The defendants there removed to federal court on the ground that they "operate the [TRICARE Mail Order Pharmacy ('TMOP')] as subcontractors," serving as part of a "federal health insurance program administered by DOD to 'provide[] medical care to current and retired service members and their families.'" *Id.* (citation omitted). Relying on "guideposts" established in *Watson* v. *Philip Morris Cos.*, 551 U.S. 142 (2007), the Fourth Circuit applied the liberal policy favoring federal officer removal to conclude that the defendants "acted under" a federal officer "in operating the TMOP in accordance with the DOD contract." *Arlington*, 2021 WL 1726106, at *2.

147. The Fourth Circuit reiterated that Congress has abandoned "the old 'causal nexus' test," such that a removing defendant need show only "a *connection or association* between the act in question and the federal office." *Id.* at *8 (emphasis added) (internal citations omitted). Although the plaintiff in that case argued that "this requirement is not met" because the "Complaint did not even mention the distribution of opioids to veterans, the DOD contract or the operation of the [TMOP]," the Fourth Circuit held that this "position would elevate form over substance"

insofar as "Arlington's claims seek monetary damages due to harm arising from 'every opioid prescription' filled by pharmacies" such as the ones operated by defendants. *Id.* at *9.

148.   So, too, here.  Although the City tries to characterize its claims as involving only alleged misrepresentations about oil and gas rather than the production and sale of those products (including to the federal government), this disregards the substance of the Complaint, which makes clear that the City seeks to force Defendants to stop or substantially curtail fossil fuel extraction and production to "drastically slash greenhouse gas emissions in order to avoid the most catastrophic effects of the climate crisis."  Ex. 5 ¶ 42.  Indeed, the Complaint alleges that Defendants' supposed "deception . . . ha[s] enabled the unabated and expanded *extraction*, *production*, promotion, marketing, and sale of fossil fuel products."  *Id.* ¶ 8 (emphasis added).

149.   At a minimum, Defendants have shown that—as in the City's first suit—they are being sued, at least in part, "*because of*" their production and supply of oil and gas products under the direction, control, and supervision of the federal government, *Isaacson*, 517 F.3d at 137, and thus Defendants have acted "under color of federal office."

### 3.   *Defendants Have Colorable Federal Defenses.*

150.   "Courts have imposed few limitations on what qualifies as a colorable federal defense."  *Id.*, 517 F.3d at 138.  This element of the federal officer removal statute requires only that a defendant "raise a claim that is defensive and based in federal law."  *Id.* (internal quotation marks and citations omitted).  Here, Defendants intend to raise several meritorious federal defenses, including the government-contractor defense, *see Boyle* v. *United Techs. Corp.*, 487 U.S. 500, 504-14 (1988); *Maguire* v. *Hughes Aircraft Corp.*, 912 F.2d 67, 70 (3d Cir. 1990); federal immunity, *see Campbell-Ewald* v. *Gomez*, 577 U.S. 153, 166-69 (2016); res judicata based on a federal judgment, *see Winters* v. *Taylor*, 333 F. App'x 113, 114, 117 (7th Cir. 2009); preemption, *see Farina* v. *Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010); and others.

151.    *Boyle* is analogous.  In *Boyle*, the Supreme Court applied a federal common-law government-contractor defense in a state-law product liability action because (1) the suit involved a unique federal interest; and (2) a state law holding government contractors liable for design defects in military equipment would present a significant conflict with federal policy.  487 U.S. at 504-13.  In addition, as the Court acknowledged in *Campbell-Ewald*, "[w]here the Government's 'authority to carry out the project was validly conferred,'" a contractor "who simply performed as the Government directed," may be immune from liability.  577 U.S. at 167 (quoting *Yearsley* v. *W.A. Ross Const. Co.*, 309 U.S. 18, 20-21 (1940)).  Here, Defendants produced oil and gas at the direction of the federal government, and thus have a colorable argument that they are immune from liability.

152.    Further, the doctrine of res judicata bars the City from litigating its claims, which were or could have been raised in *City of New York*.  The preclusive effect of a federal court decision is a federal defense.  *See Winters*, 333 F. App'x at 114 ("[The defendant] again removed the case to federal court, citing the federal defenses of claim preclusion, issue preclusion, and sovereign immunity."); *Bazuaye* v. *United States*, 41 F. Supp. 2d 19, 27 n.12 (D.D.C. 1999) ("[T]he claim of res judicata effect of prior federal judgment . . . is a federal defense." (citing *Rivet* v. *Regions Bank of Louisiana*, 522 U.S. 470, 476 (1998)).  The City's claims are barred by res judicata because the *City of New York* judgment is "(1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case involving the same parties or their privies, and (4) involving the same cause[s] of action."  *EDP Med. Comput. Sys., Inc.* v. *United States*, 480 F.3d 621, 624 (2d Cir. 2007) (internal citations omitted).  While the City has recast its claims as violations of a municipal consumer protection law, they nevertheless satisfy the fourth prong because the City's new causes of action share "a common nucleus of operative facts," *Lucky Brand*

*Dungarees, Inc.* v. *Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589, 1594-95 (2020), with the claims that the City asserted in *City of New York*, and "could have been raised in that action," *Monahan* v. *New York City Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir. 2000). Indeed, the Complaint shares many of the same theories—and indeed, the same language—as the complaint in *City of New York*. *See* ¶ 18, *supra*.

153.    Because the relief the City seeks would have "the practical effect" of "control[ling] conduct beyond the boundaries of [New York]," its claims are barred by the Commerce Clause, which "protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." *Healy* v. *Beer Inst.*, 491 U.S. 324, 336-37 (1989). Similarly, imposing such extraordinary extraterritorial liability on lawful, government-encouraged conduct would constitute "a due process violation of the most basic sort." *Bordenkircher* v. *Hayes*, 434 U.S. 357, 363 (1978). The foreign affairs doctrine also precludes exercises of state law that would "impair the effective exercise of the Nation's foreign policy." *Garamendi*, 539 U.S. at 419 (quoting *Zschernig* v. *Miller*, 389 U.S. 429, 440 (1968)). This prohibition extends to state-law causes of action. *See Pink*, 315 U.S. at 230-31 ("[S]tate law must yield when it is inconsistent with or impairs the policy or provisions of a treaty or of an international compact or agreement."). As explained above, the City's claims would interfere with the U.S. government's control of foreign policy, now and prospectively, including governmental efforts to address climate change and the allocation of costs through multilateral negotiations. *See In re Assicurazioni Generali*, *S.P.A.*, 592 F.3d 113, 115, 119-20 (2d Cir. 2010).

154.    To the extent the City's claims target Defendants' statements, they are barred by the First Amendment. As the Supreme Court has held, lobbying activity is protected from civil liability. *See E. R.R. Presidents Conf.* v. *Noerr Motor Freight, Inc.*, 365 U.S. 127, 145 (1961);

73

*United Mine Workers of Am.* v. *Pennington*, 381 U.S. 657, 671 (1965); *see also In re Dr. Reddy's Lab'ys, Ltd.*, 2002 WL 31059289, at *13 (S.D.N.Y. Sept. 13, 2002) (*Noerr-Pennington* immunity "encompass[es] state law . . . claims that arise from government action"). This is true even if "the campaign employs unethical and deceptive methods." *Allied Tube & Conduit Corp.* v. *Indian Head, Inc.*, 486 U.S. 492, 499-500 (1988).

155.    Finally, the City's claims are barred by the U.S. Constitution and related doctrines, including: the Interstate and Foreign Commerce Clause, U.S. Const. art. I, § 8, cl. 3; Due Process Clauses, *id.* amends. V & XIV, § 1, *State Farm Mut. Auto. Ins. Co.* v. *Campbell*, 538 U.S. 408, 421 (2003), *BMW of N. Am.* v. *Gore*, 517 U.S. 559, 572-73 & n.19 (1996); derivative sovereign immunity, *see Yearsley*, 309 U.S. at 20-21; and the foreign affairs doctrine, *see Pink*, 315 U.S. at 230-31.

156.    These and other federal defenses are more than colorable, and thus satisfy the test for federal officer removal under the statute. *See Willingham*, 395 U.S. at 407 (defendant invoking § 1442(a)(1) "need not win his case before he can have it removed"); *Isaacson*, 517 F.3d at 139 ("colorable" federal defense need not be "clearly sustainable" at removal stage because "the purpose of the statute is to secure that the validity of the defense will be tried in federal court"); *Gordon*, 990 F. Supp. 2d at 319 (noting that the "evidentiary standard" should not be "too high at the remand stage, given that the purpose of federal officer removal was to encourage the trial of such complex evidentiary questions in federal court"). *See also Cuomo* v. *Crane Co.*, 771 F.3d 113, 117 (2d Cir. 2014) (reversing remand in a failure-to-warn case where defendant produced asbestos materials for the government under "detailed and comprehensive specifications"; although such specifications "made no mention of asbestos warnings," the defendant had

"provided sufficient evidence to create at this preliminary stage a 'colorable' possibility" of a federal defense). Accordingly, removal under Section 1442 is proper.

### III. This Action Is Removable under the Outer Continental Shelf Lands Act.

157.    This Court also has original jurisdiction under OCSLA. 43 U.S.C. § 1349(b); *see Tenn. Gas Pipeline* v. *Houston Cas. Ins. Co.*, 87 F.3d 150, 155 (5th Cir. 1996).

158.    OCSLA grants federal courts original jurisdiction over all actions "arising out of, or in connection with . . . any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil or seabed of the outer Continental Shelf, or which involves rights to such minerals." 43 U.S.C. § 1349(b). The "language" of § 1349(b) is "straightforward and broad." *In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014). The OCS includes all submerged lands that belong to the United States but are not part of any State. 43 U.S.C. §§ 1301, 1331.

159.    Congress passed OCSLA "to establish federal ownership and control over the mineral wealth of the OCS and to provide for the development of those natural resources." *EP Operating Ltd.* v. *Placid Oil Co.*, 26 F.3d 563, 569 (5th Cir. 1994). "[T]he efficient exploitation of the minerals of the OCS . . . was . . . a primary reason for OCSLA." *Amoco Prod. Co.* v. *Sea Robin Pipeline Co.*, 844 F.2d 1202, 1210 (5th Cir. 1988). Indeed, OCSLA declares it "to be the policy of the United States that . . . the [OCS] . . . should be made available for expeditious and orderly development." 43 U.S.C. § 1332. The statute further provides that "since exploration, development, and production of the minerals of the outer Continental Shelf will have significant impacts on coastal and non-coastal areas of the coastal States . . . such States, and through such States, affected local governments, are entitled to an opportunity to participate, *to the extent consistent with the national interest*, in the policy and planning decisions made by the Federal

Government relating to exploration for, and development and production of, minerals of the [OCS]." *Id.* § 1332(4) (emphasis added).

160.     Under OCSLA, the U.S. Department of the Interior administers an extensive federal leasing program aiming to develop and exploit the oil and gas resources of the federal OCS.  *Id.* § 1334 *et seq.*  Under this authority, the Interior Department "administers more than 5,000 active oil and gas leases on nearly 27 million OCS acres.  In FY 2015, production from these leases generated $4.4 billion in leasing revenue . . . [and] provided more than 550 million barrels of oil and 1.35 trillion cubic feet of natural gas, accounting for about sixteen percent of the Nation's oil production and about five percent of domestic natural gas production." *The Impact of the President's FY 2017 Budget on the Energy and Min. Leasing and Production Missions of the Bureau of Ocean Energy Management (BOEM), the Bureau of Safety and Environmental Enforcement (BSEE), and the Bureau of Land Management (BLM): Hearing Before the Subcomm. on Energy and Min. Resources of the H. Comm. on Nat. Resources*, 114th Cong. 3 (2016) (Statement of Abigail Ross Hopper, Director, Bureau of Ocean Energy Mgmt., Dep't of the Interior), https://www.boem.gov/FY2017-Budget-Testimony-03-01-2016.[65]  In 2019, OCS leases supplied more than 690 million barrels of oil, a figure that has risen substantially in each of the preceding six years, together with 1.034 trillion cubic feet of natural gas.  Bureau of Safety & Envtl. Enf't, Outer Continental Shelf Oil and Gas Production, https://www.data.bsee.gov/Production/OCSProduction/Default.aspx.

---

[65]  The Court may look beyond the facts alleged in the Complaint to determine that OCSLA jurisdiction exists.  *See, e.g.*, *Plains Gas Sols., LLC* v. *Tenn. Gas Pipeline Co., LLC*, 46 F. Supp. 3d 701, 703 (S.D. Tex. 2014); *St. Joe Co.* v. *Transocean Offshore Deepwater Drilling Inc.*, 774 F. Supp. 2d 596, 2011 608 (D. Del. 2011) (citing *Amoco Prod. Co.*, 844 F.2d at 1205).

161.    Defendants and their affiliates operate a large share of the more than 5,000 active oil and gas leases on nearly 27 million OCS acres administered by the U.S. Department of the Interior under OCSLA.  Hopper, *supra*.

162.    For example, from 1947 to 1995, Defendant Exxon Mobil Corporation produced more than one billion barrels of crude oil and more than five billion barrels of natural gas from the federal OCS in the Gulf of Mexico alone.  U.S. Dep't of Interior, Mins. Mgmt. Serv., Gulf of Mexico Region, Production by Operator Ranked by Volume (1947-1995), https://www.data.boem.gov/Production/Files/Rank%20File%20Gas%201947%20-%201995.pdf. In 2020, Exxon Mobil Corporation produced more than 12 million barrels of crude oil from the OCS in the Gulf of Mexico, while affiliates of Royal Dutch Shell plc and BP p.l.c. produced over 139 million and 108 million barrels of crude oil, respectively.  U.S. Dep't of Interior, Bureau of Safety & Envtl. Enf't, Gulf of Mexico Region, Production by Operator Ranked by Volume (2020), https://www.data.boem.gov/Production/Files/Rank%20File%20Gas%202020.pdf.

163.    Moreover, OCSLA makes clear that oil and gas activities on the OCS can only be governed by federal law.  As the Supreme Court recently confirmed, "OCSLA defines the body of law that governs the OCS."  *Parker Drilling Mgmt. Servs., Ltd.* v. *Newton*, 139 S. Ct. 1881, 1887 (2019).  In particular, OCSLA extends "[t]he Constitution and laws and civil and political jurisdiction of the United States" to the OCS.  43 U.S.C. § 1333(a)(1)(A).  Federal law applies "to the same extent as if the [OCS] were an area of exclusive Federal jurisdiction located within a State."  *Id.*  Disputes under OCSLA may borrow from the law of adjacent states, but such claims remain creatures of federal law.  "[T]he civil and criminal laws of each adjacent State . . . are declared to be the law of the United States for that portion of the subsoil and seabed of the [OCS]."  *Id.* § 1333(a)(2)(A).

164.    A substantial part of the City's claims "arise[] out of, or in connection with," Defendants' "operation[s] conducted on the outer Continental Shelf" that involve "the exploration and production of minerals." *In re Deepwater Horizon*, 745 F.3d at 163.  The City's claims arise out of Defendants' OCS operations because fossil fuel production on the OCS is part of the production about which Defendants allegedly misled New York City consumers.  The Complaint alleges that Defendants' supposed "deception . . . ha[s] enabled the unabated and expanded *extraction*, *production*, promotion, marketing, and sale of fossil fuel products." Ex. 5 ¶ 8 (emphasis added).  And the City alleges that, instead of investing in "clean energy sources," "ExxonMobil, Shell, and BP . . . have been doubling down on fossil fuel *extraction*, *production*, and sales." *Id*. ¶ 41-42 (emphasis added).

165.    The Complaint, in fact, challenges Defendants' advertising relating to all of their products, regardless of where they were extracted or produced.  *See id*. ¶ 26 ("ExxonMobil, Shell, and BP . . . never disclose the material fact that fossil fuels—'emissions-reducing' or otherwise— are the primary cause of climate change."); ¶ 18 ("Consumer use of fossil fuel products . . . is a significant contributor to climate change, which is driving up global temperatures, increasing the frequency of deadly weather events, eroding coastal shorelines, and creating other unprecedented threats to people in New York City and elsewhere.").  A substantial quantum of those products are extracted and produced from OCS operations.  *See supra* ¶¶ 119-140.  Therefore, the City's claims necessarily encompass all of Defendants' exploration, production, extraction, and development on the OCS and fall within the "broad . . . jurisdictional grant of section 1349." *EP Operating Ltd.*, 26 F.3d at 569.

166.    Moreover, Congress "intended" that "any dispute that alters the progress of production activities on the OCS," and thus "threatens to impair the total recovery of the

federally-owned minerals from the reservoir or reservoirs underlying the OCS," would fall within OCSLA's "grant of federal jurisdiction." *Amoco Prod. Co.*, 844 F.2d at 1210. Consistent with that intent, courts have repeatedly found OCSLA jurisdiction where the claims involved conduct that occurred on the OCS or resolution of the dispute foreseeably could affect the efficient exploitation of minerals from the OCS. *See, e.g.*, *EP Operating Co.*, 26 F.3d at 569-70; *United Offshore* v. *S. Deepwater Pipeline*, 899 F.2d 405, 406-07 (5th Cir. 1990). That is precisely the case here.

167. Because resolution of this dispute foreseeably could affect the efficient exploitation of minerals from the OCS, this Court has jurisdiction under OCSLA. The City's ultimate goal is to force Defendants to stop or substantially curtail fossil fuel extraction and production to "drastically slash greenhouse gas emissions in order to avoid the most catastrophic effects of the climate crisis." Ex. 5 ¶ 42. According to the Complaint, the alleged deceptive advertisements are purportedly material because without them consumers would have purchased fewer fossil fuels, or more alternative energies, resulting in fewer greenhouse gas emissions. *Id.* ¶ 92 ("ExxonMobil, Shell, and BP's false and misleading representations and omissions are material because they are relevant and important to a consumer's decision to purchase fossil fuel products, are capable of influencing a consumer's decision to purchase fossil fuel products, have the capacity to affect consumer energy, transportation, and consumption choices, and deter consumers from adopting cleaner, safer alternatives to fossil fuel products."). The City repeatedly claims that Defendants' advertisements are misleading *in light of* Defendants' continued "fossil fuel production and sales." *Id.* ¶ 6; *see also id.* ¶ 20 (Defendants' "business models continue to center on developing, producing, and selling more of the very same fossil fuel products driving climate change."). The civil penalties the City seeks to impose on Defendants for "countless" allegedly deceptive

advertisements, *see id.* ¶¶ 47, 52, 66, 81, 90, 98, would likewise discourage OCS production, jeopardizing the federal government's leasing program and impairing national energy security.

168.    Finally, OCSLA jurisdiction exists even if the Complaint pleads no substantive OCSLA claims.  *See, e.g.*, *In re Deepwater Horizon*, 745 F.3d at 163.  This case is removable under OCSLA despite the City's artful pleading and ostensibly municipal claims.  As *Parker Drilling* explains, the choice-of-law "question under the OCSLA" is not one of "ordinary" preemption.  139 S. Ct. at 1893.  "OCSLA makes apparent that federal law is exclusive in its regulation of [the OCS], and that state law is adopted only as surrogate federal law."  *Id.*  (internal quotation marks omitted).  Thus, the courts have affirmed removal jurisdiction where plaintiff's claims, "though ostensibly premised on [state] law, arise under the 'law of the United States' under" 43 U.S.C. § 1333(a)(2) such that "[a] federal question . . . appears on the face of [plaintiff's] well-pleaded complaint."  *Ten Taxpayer Citizens Grp.* v. *Cape Wind Assoc.*, 373 F.3d 183, 193 (1st Cir. 2004).  Accordingly, this lawsuit is removable under OCSLA.

## IV.    This Action Arises Out of Federal Enclaves.

169.    This Court has original jurisdiction under the federal enclave doctrine.

170.    The Constitution's "Enclave Clause" authorizes Congress to "exercise exclusive Legislation in all Cases whatsoever" over all places purchased with the consent of a state "for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings."  U.S. Const., art. I, § 8 cl. 17.  "A suit based on events occurring in a federal enclave . . . must necessarily arise under federal law and implicates federal question jurisdiction under § 1331."  *Jones* v. *John Crane-Houdaille, Inc.*, 2012 WL 1197391, at *1 (D. Md. Apr. 6, 2012).

171.    The "key factor" in determining whether federal enclave jurisdiction exists "is the location of the plaintiff's injury or where the specific cause of action arose."  *Sparling* v. *Doyle*, 2014 WL 2448926, at *3 (W.D. Tex. May 30, 2014).  The "[f]ailure to indicate the federal enclave

80

**J.A. 191**

status and the location of the exposure will not shield plaintiffs from the consequences" of "federal enclave status." *Fung* v. *Abex Corp.*, 816 F. Supp. 569, 571 (N.D. Cal. 1992). Federal jurisdiction is available if some of the events or damages alleged in the complaint occurred on a federal enclave. *See Durham* v. *Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006) (finding defendant was permitted "to remove to federal court" because "some of [plaintiff's] claims arose on federal enclaves").

172.    Despite the City's artful pleading, it is apparent that the gravamen of the purported consumer harms at issue is Defendants' extraction, production, and sale of fossil fuels, and the alleged effects of climate change from the combustion of fossil fuel products. *See, e.g.*, Ex. 5 ¶¶ 18, 24. The City's true aim is to halt Defendants' oil and gas operations and thereby reduce fossil-fuel emissions. By targeting those operations, the City necessarily sweeps in those activities that occur on military bases and other federal enclaves. *See, e.g.*, *Humble Pipe Line Co.* v. *Waggonner*, 376 U.S. 369, 372-74 (1964) (noting that the United States exercises exclusive jurisdiction over certain oil and gas rights within Barksdale Air Force Base in Louisiana); *see also Miss. River Fuel Corp.* v. *Cocreham*, 390 F.2d 34, 35 (5th Cir. 1968) (on Barksdale Air Force Base, "the reduction of fugitive oil and gas to possession and ownership[] takes place within the exclusive jurisdiction of the United States"). Indeed, as of 2000, approximately 14% of the National Wildlife Refuge System "had oil or gas activities on their land," and these activities were spread across 22 different states.[66]

173.    Moreover, the City of New York contains multiple federal enclaves within its borders, including the Statue of Liberty, Ellis Island, and Fort Tilden. In alleging that Defendants

---

[66]    U.S. Gov't Accountability Off., GAO-02-64R, U.S. Fish & Wildlife Service: Information on Oil and Gas Activities in the National Wildlife Refuge System 1 (Oct. 31, 2001), https://web.archive.org/web/20170211132957/http://www.gao.gov/new.items/d0264r.pdf.

are liable for "advertisements and other promotional statements directed at and viewed by NYC consumers," Ex. 5 at 91, the Complaint necessarily sweeps in any of Defendants' allegedly misleading promotional materials that were "directed at and viewed" on those federal enclaves.

174. Because the City's claims arise out of federal enclaves, this Court has original jurisdiction over this action.

**V. This Court Has Diversity Jurisdiction under the Fraudulent Joinder Doctrine.**

175. The City's lawsuit is an effort to extraterritorially regulate Defendants' fossil fuel production activities that is merely cloaked in the garb of consumer protection law. For that reason, removal under the preceding grounds is appropriate. But even assuming—and notwithstanding all the evidence to the contrary—that this lawsuit was *actually* about consumer protection enforcement under municipal law, this action would *still* be removable on multiple grounds. Put differently, no matter how this case is viewed, it belongs in federal court.

176. A matter is removable to federal court where there is diversity of citizenship and an amount in controversy in excess of $75,000, thereby satisfying federal jurisdiction. 28 U.S.C. § 1332(a); 28 U.S.C. § 1441. Here, the Court has diversity of citizenship jurisdiction because the City is a citizen of the State of New York and the only Defendant that is a citizen of New York is fraudulently joined in this action. The Complaint alleges damages in excess of $75,000, thereby satisfying the amount-in-controversy requirement for federal jurisdiction. 28 U.S.C. § 1332(a).

177. For diversity purposes, cities are citizens of the state in which they are located. *Moor* v. *County of Alameda*, 411 U.S. 693, 717 (1973). Accordingly, the City is a citizen of the State of New York.

178. All seven defendants are corporations and thus citizens of the state (or country) in which they have their principal place of business, and are incorporated. 28 U.S.C. § 1332(c)(1). Specifically, Exxon Mobil Corporation is incorporated in New Jersey and has its principal place

of business in Texas.  *See* Ex. 5 ¶ 11.  Royal Dutch Shell plc is incorporated in England and Wales, and has its principal place of business in the Hague, Netherlands.  *See id*. at ¶ 12.  Shell Oil Company is incorporated in Delaware with its principal place of business in Texas.  *See id.*  BP p.l.c. is incorporated in England and Wales with its principal place of business in London, England.  *See id.* at ¶ 13.  BP America Inc. is incorporated in Delaware with its principal place of business in Texas.  *See id.*  API is a non-profit corporation based in Washington, D.C.  *See id.* at ¶ 14.  Thus, the only Defendant that the City alleges is a New York citizen is ExxonMobil Oil Corporation, because it is incorporated in the State of New York.  *Id.* ¶¶ 11-14.

179.    Diversity is normally defeated by the inclusion of at least one plaintiff and one defendant with common citizenship.  Under the fraudulent joinder rule, however, a plaintiff may not defeat federal diversity jurisdiction and a defendant's right of removal by "merely joining as defendants parties with no real connection with the controversy."  *Pampillonia* v. *RJR Nabisco, Inc.*, 138 F.3d 459, 460-61 (2d Cir. 1998).  As relevant here, the fraudulent joinder doctrine requires clear and convincing evidence that there is "outright fraud" in the plaintiff's pleadings.  *Id.* at 461.  Here, the City has committed outright fraud in its pleadings by naming ExxonMobil Oil Corporation as a defendant in an attempt to destroy diversity.

180.    A plaintiff commits outright fraud where it joins a defendant merely as a "strawman to defeat jurisdiction," such as when "the evidence is overwhelming" that a plaintiff has "no real interest in gaining a judgment against" it.  *Rodriguez* v. *Casa Chapa S.A. de C.V.*, 394 F. Supp. 2d 901, 908 (W.D. Tex. 2005) (plaintiffs committed outright fraud on the pleadings when they joined non-diverse defendant but never sought discovery from the defendant).

181.    As in *Rodriguez*, the City has no real interest in obtaining a judgment against ExxonMobil Oil Corporation.  Indeed, in 2018, the City sued Defendants Exxon Mobil

Corporation, Royal Dutch Shell plc, and BP p.l.c., as well as Chevron Corporation and ConocoPhillips, in federal court, asserting causes of action for nuisance and trespass under state law stemming from defendants' production, promotion, and sale of fossil fuels. *See City of New York II*, 993 F.3d at 88. Notably, the City did not include ExxonMobil Oil Corporation as a defendant in that action, reflecting that the City was not interested in a judgment against ExxonMobil Oil Corporation. As explained above, *supra* ¶ 11, the Second Circuit affirmed dismissal of the action, unanimously holding that "[a]rtful pleading cannot transform the City's complaint into anything other than a suit over global greenhouse gas emissions," and that such a suit could not proceed under state law. *Id.*

182. Three weeks after the Second Circuit affirmed dismissal of *City of New York*, the City brought this lawsuit against many of the same defendants, once again attacking Defendants' marketing and promotion of fossil fuels. Although the City claims to seek damages for newly packaged causes of action here, the essential theory and injuries alleged are the same as in *City of New York*. This time, however, in an attempt to avoid federal jurisdiction the City sued Defendants in state court and added ExxonMobil Oil Corporation to destroy diversity.

183. The Complaint contains no factual allegations about ExxonMobil Oil Corporation's activities that would explain why the City sued ExxonMobil Oil Corporation here when it chose not to do so in 2018.

184. Indeed, aside from identifying the location of ExxonMobil Oil Corporation's state of incorporation and principal place of business, and noting that it is a wholly owned subsidiary of Exxon Mobil Corporation, the Complaint contains *no allegations* against ExxonMobil Oil Corporation. Instead, the Complaint refers to ExxonMobil Oil Corporation and Exxon Mobil Corporation collectively as "ExxonMobil" to conflate the two businesses. Ex. 5 ¶ 11.

185.     But ExxonMobil Oil Corporation and Exxon Mobil Corporation are not the same economic or legal entity, and the City cannot fuse the two together.  *See Doe* v. *Exxon Mobil Corp.*, 573 F. Supp. 2d 16, 32 (D.D.C. 2008) (refusing to allow plaintiffs to conflate ExxonMobil Oil Corporation with Exxon Mobil Corporation, and awarding summary judgment to ExxonMobil Oil Corporation where "[n]early all of Plaintiffs' allegations and evidence" referred to Exxon Mobil Corporation and not ExxonMobil Oil Corporation).

186.     Based on the allegations in the Complaint and the City's prior litigation position, it appears the City's only possible interest in adding ExxonMobil Oil Corporation to this action is to defeat federal diversity jurisdiction and avoid dismissal from this Court and the Second Circuit. Its attempt to add ExxonMobil Oil Corporation as a "strawman defendant" amounts to outright fraud and should be rejected.  *See Rodriguez*, 394 F. Supp. 2d at 908.

187.     The City fraudulently joined ExxonMobil Oil Corporation in a transparent effort to avoid federal jurisdiction.

188.     ExxonMobil Oil Corporation's citizenship should be disregarded for the purpose of determining diversity jurisdiction, and diversity of citizenship is therefore present here.

189.     Finally, the amount in controversy plausibly exceeds $75,000, exclusive of interest and costs.  28 U.S.C. § 1332(a).

190.     In noticing removal, a defendant need only include a "plausible allegation that the amount in controversy exceeds the jurisdictional threshold."  *Dart Cherokee Basin Operating Co.* v. *Owens*, 574 U.S. 81, 89 (2014); *see also Jean-Louis* v. *Carrington Mortg. Servs., LLC*, 2021 WL 826213, at *2 n.15 (2d Cir. Mar. 4, 2021).  Here, the Complaint alleges that Defendants are liable under the New York City Code for a sweeping pattern of deception in "countless"

advertisements to consumers, and seeks civil penalties of up to $500 per violation. *See* N.Y.C. Code § 20-703(b); Ex. 5 ¶¶ 47, 81, 90, 98, Prayer for Relief ¶ b.

191.    The City dedicates over fifty pages of its Complaint to cataloging Defendants' advertisements they claim to be deceptive.  And the City has attached a thirty-seven page long appendix to its Complaint containing over 120 "non-exhaustive examples" of allegedly deceptive advertisements and statements. *See generally* Ex. 5, App'x.  At $500 per violation, which the City claims are "countless," there is far more than $75,000 in controversy here.  Accordingly, this Court has diversity jurisdiction.

## VI.    This Representative Action on Behalf of New York City Consumers Is Removable under the Class Action Fairness Act.

192.    This Court also has removal jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because the City seeks to represent a class of New York City consumers and CAFA's other statutory requirements are satisfied.

193.    CAFA permits removal of (i) any "class action" (ii) where minimal diversity exists; (iii) at least 100 class members are represented; and (iv) "the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs."  28 U.S.C. § 1332(d)(1), (2), (5), (11); *Blockbuster, Inc.* v. *Galeno*, 472 F.3d 53, 56 (2d Cir. 2006); *see also* 28 U.S.C. § 1453(b). All four criteria are satisfied here.

194.    CAFA defines a "class action" as "any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action."  28 U.S.C. § 1332(d)(1)(B). CAFA's legislative history provides that "the definition of 'class action' is to be interpreted liberally.  Its application should not be confined solely to lawsuits that are labelled 'class actions' by the named plaintiffs or the state rulemaking authority.  Generally speaking, lawsuits that

resemble a purported class action should be considered class actions for the purpose of applying these provisions." S. Rep. No. 109-14, at 35 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 3, 34 (formatting altered). In other words, CAFA permits removal of a suit that is "in substance a class action" notwithstanding a plaintiff's "attempt to disguise the true nature of the suit." *Addison Automatics, Inc.* v. *Hartford Cas. Ins. Co.*, 731 F.3d 740, 742 (7th Cir. 2013); *see, e.g.*, *Williams* v. *Emprs Mut. Cas. Co.*, 845 F.3d 891, 900-01 (8th Cir. 2017); *Song* v. *Charter Commc'ns, Inc.*, 2017 WL 1149286, at *1 n.1 (S.D. Cal. Mar. 28, 2017).

195. This action is a putative "class action" under CAFA. The suit is filed on behalf of a class of "consumers in New York City," *e.g.*, Ex. 5 ¶ 2, to vindicate "the welfare of [the City's] more than 8.5 million residents, as well as the millions of additional people who work in or visit New York City every day." *Id.* ¶ 10. In seeking to "protect[] the public" from purportedly "deceptive and unconscionable business practices," *id.*, the Complaint alleges (i) efforts by Defendants to mislead *New York City consumers* and (ii) harm allegedly suffered by *New York City consumers*. *See, e.g.*, *id.* ¶ 8 ("Defendants are intentionally depriving *NYC consumers* of information that is material to their purchasing decisions.") (emphasis added); ¶ 18 (noting that climate change "is driving up global temperatures, increasing the frequency of deadly weather events, eroding coastal shorelines, and creating other unprecedented threats to *people in New York City*) (emphasis added); ¶ 25 (Defendants take advantage of *NYC consumers* and prevent them from making informed choices.") (emphasis added); ¶ 40 (Defendants "are bombarding *NYC consumers* with advertisements that give the false impression that renewable and low-carbon energy is an extensive portion of their business.") (emphasis added); ¶ 67 ("In ads directed to *NYC consumers*, Defendants misleadingly downplay the emissions produced by these resources in order to greenwash their corporate image, distinguish themselves from competitors by exaggerating their

87

environmental credentials, build brand loyalty, and attract customers to their products.") (emphasis added).

196.    By suing in a representative capacity on behalf of "consumers in New York City," *id.* ¶ 2, the City has chosen to bring what is in substance a putative class action: a "representative suit[] on behalf of [a] group[] of persons similarly situated," 1 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 1.1 (4th ed. 2002).

197.    Minimal diversity is satisfied here, too.  It demands only that "any member of a class of plaintiffs" be "a citizen of a State different from any defendant."  28 U.S.C. § 1332(d)(2)(A).  According to the Complaint, the putative class of New York City consumers includes citizens of New York State, whereas Defendant Shell Oil Company, for example, is a citizen of only Delaware and Texas.  *See* Ex. 5 ¶¶ 10, 12(c).  In fact, as discussed *supra* ¶¶ 175-191, complete diversity is present because no *properly* joined Defendant is a citizen of New York State.

198.    The number of represented plaintiffs necessary for CAFA jurisdiction is present here because the number of "consumers in New York City," Ex. 5 ¶ 2, plainly exceeds 100. *See* 28 U.S.C. § 1332(d)(5)(B); Ex. 5 ¶ 10 (estimating the City's population as more than 8.5 million residents).

199.    Finally, CAFA's $5,000,000 amount-in-controversy threshold is satisfied for the same reasons identified *supra* ¶ 189-91.  *See* 28 U.S.C. § 1332(d)(2).

200.    CAFA jurisdiction is therefore proper because this suit is in substance a "class action" on behalf of more than 100 purported class members, for which there is (greater than) minimal diversity, and an amount in controversy in excess of $5,000,000.

201.    The exercise of removal jurisdiction over this case not only complies with CAFA's requirements, but also furthers CAFA's legislative purposes.  CAFA's "primary objective" is to

ensure "Federal court consideration of interstate cases of national importance." *Dart Cherokee*, 574 U.S. at 89 (2014); *accord* Pub. L. No. 109-02, § 2(b)(2), 119 Stat. 5 (2005). The "Framers were concerned that state courts might discriminate against interstate businesses and commercial activities, and thus viewed diversity jurisdiction as a means of ensuring the protection of interstate commerce." S. Rep. No. 109-14, at 8; *see generally* John P. Frank, *Historical Bases of the Federal Judicial System*, 13 Law & Contemp. Probs. 3, 22-28 (1948). Prior to CAFA's enactment, however, plaintiffs were able to "'game' the procedural rules and keep nationwide or multi-state class actions in state courts." S. Rep. No. 109-14, at 4. The state courts in which these nationwide cases were brought were effectively "invite[d]" to "dictate to 49 others what their laws should be on a particular issue, thereby undermining basic federalism principles." *Id.* at 24. To Congress, that was untenable. "[A] system that allows state court judges to dictate national policy" from the "local courthouse steps is contrary to the intent of the Framers when they crafted our system of federalism." *Id.* Because Congress "firmly believe[d]" that such "interstate class actions . . . properly belong in federal court," it enacted CAFA "to ensure that qualifying interstate class actions initially brought in state courts may be heard by federal courts if any of the defendants so desire." *Id.* at 5.

202. The City's lawsuit is exactly the type of case Congress did not want to slip through the cracks. If allowed to proceed, the City's action could result in an outsized impact on all other states based on the dictates of a single state-court judgment. This suit is a veiled assault on the national (and international) oil and gas industry, and implicates the entire patchwork of relevant federal legislation and regulation. It is merely one of many coordinated suits brought by attorneys general, municipalities, and climate activists, who have stated clearly that they intend to use targeted litigation, such as this suit, in a concerted effort to stymie the operation of the oil and gas

industry. Such a backdoor attempt to affect and supplant federal regulation of the oil and gas industry deserves a federal forum.

203. CAFA jurisdiction is warranted because all of CAFA's statutory criteria are satisfied, and because CAFA was enacted to vest federal courts with jurisdiction over cases just like this one.

## VII. The City's Claims Include Federal Constitutional Elements.

204. The City's claims directly target speech on a matter of public concern. Indeed, the City alleges that Defendants' advertisements discussing climate change constitute "false, falsely disparaging, or misleading" statements. N.Y.C Code § 20-701; *see, e.g.*, Ex. 5 ¶¶ 83-84. They allege that Defendants' statements misled the public in general and influenced public opinion. *See, e.g.*, *id.* ¶ 20 ("Defendants have sought to mislead consumers, and induce purchases and brand affinity, with greenwashing advertisements designed to represent Defendants as environmentally responsible companies developing innovative green technologies and products."); *id.* ¶ 65 (Defendants "misleadingly portray gas as a 'cleaner burning' or 'sustainable' source of low-emission energy that is critical to combatting climate change."); *id.* ¶ 66 ("[T]hese advertisements (as well as countless others like them) tell a half-truth and create the misleading impression that expanding the production of natural gas is a win-win investment in the fight against climate change, with little to no downsides for the planet or its people."); *id.* ¶ 70 ("API's public messaging, including in advertising and statements directed at NYC consumers, misleadingly greenwashes fossil fuel's role in climate change.").

205. The Supreme Court has made clear that where state-law claims target speech on matters of public concern like climate change, the First Amendment injects affirmative federal-law elements into the plaintiff's cause of action, including factual falsity, actual malice, and proof of causation of actual damages. *See Phila. Newspapers, Inc.* v. *Hepps*, 475 U.S. 767, 774-76

(1986) (state standards "fall here to a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages"); *Milkovich* v. *Lorain J. Co.*, 497 U.S. 1, 20 (1990) ("[A] statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection."); *see also Hustler Magazine, Inc.* v. *Falwell*, 485 U.S. 46, 53, 56 (1988) (extending First Amendment substantive requirements beyond the defamation context to other state-law attempts to impose liability for allegedly harmful speech); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 511 F. Supp. 2d 742, 811 (S.D. Tex. 2005) ("First Amendment protections and the actual malice standard . . . have been expanded to reach . . . breach of contract, misrepresentation, and tortious interference with contract or business."). Because the City's claims therefore necessarily raise issues of federal law, the exercise of federal jurisdiction under the *Grable* doctrine is warranted. *See Grable*, 545 U.S. at 314.

206. These First Amendment issues are not "defenses" but rather constitutionally required elements of the claim on which the City bears the burden of proof—by clear and convincing evidence—as a matter of federal law. *N.Y. Times Co.* v. *Sullivan*, 376 U.S. 254, 280, 286 (1964) (public officials have the burden of proving with "convincing clarity" that a "statement was made with 'actual malice'").

207. These First Amendment issues are substantial and disputed. Although state-law misrepresentation claims are often not removable, such claims typically do not implicate the broader federal interests at issue in this case. As shown above, the federal interests implicated here are unquestionably "substantial" under *Grable*. So is the speech that the City is trying to suppress, because its claims address a subject of national and international importance that falls within the purview of federal authority over foreign affairs and domestic economic, energy, and

91

security policy. "Climate change has staked a place at the very center of this Nation's public discourse," and "its causes, extent, urgency, consequences, and the appropriate policies for addressing it" are "hotly debated." *Nat'l Rev., Inc.* v. *Mann*, 140 S. Ct. 344, 347-48 (2019) (Alito, J., dissenting from denial of certiorari). Moreover, the City is a public entity seeking to use the machinery of its own state courts to impose de facto regulations on Defendants' nationwide speech on issues of national public concern and debate. *Cf. Sullivan*, 376 U.S. at 264, 268 ("[An] action brought by a public official against critics of his official conduct" requires "safeguards for freedom of speech."). But "it is a central tenet of the First Amendment that the government must remain neutral in the marketplace of ideas." *Falwell*, 485 U.S. at 56 (internal quotation marks and citation omitted). First Amendment interests are at their apex where, as here, it is a governmental entity that seeks to use state-law claims to regulate speech on issues of "public concern." *Hepps*, 475 U.S. at 775. Given the compelling federal interests at stake here, federal courts may entertain the claims at issue in this case "without disturbing any congressionally approved balance of federal and state judicial responsibilities," making removal appropriate. *Grable*, 545 U.S. at 314.

208. Indeed, freedom of speech is "most seriously implicated . . . in cases involving disfavored speech on important political or social issues," chief among which in the contemporary context is the question of "[c]limate change," which "is one of the most important public issues of the day." *Mann*, 140 S. Ct. at 346 (Alito, J., dissenting from denial of certiorari) (recourse to a federal forum is especially warranted in suits "concern[ing] a political or social issue that arouses intense feelings," because "a plaintiff may be able to bring suit in whichever jurisdiction seems likely to have the highest percentage of jurors who are sympathetic to the plaintiff's point of view" (citing *Keeton* v. *Hustler Magazine, Inc.*, 465 U.S. 770, 781 (1984))). The City's attempt to

regulate Defendants' speech on the important public matter of climate change through litigation thus necessarily raises substantial First Amendment questions that belong in federal court.

## COMPLIANCE WITH OTHER REMOVAL REQUIREMENTS

209. Based on the foregoing, this Court has original jurisdiction of this action under 28 U.S.C. §§ 1331, 1332(a), 1332(d), 1441, 1442(a), and 1453(b); 43 U.S.C. § 1349(b)(1).

210. The United States District Court for the Southern District of New York is the appropriate venue for removal under 28 U.S.C. § 1441(a) because it is the federal judicial district encompassing the Supreme Court of the State of New York, New York County, where this suit was originally filed.

211. Copies of all process, pleadings, and orders from the state-court action being removed to this Court that Exxon Mobil Corporation and ExxonMobil Oil Corporation have obtained from the Supreme Court of the State of New York, New York County, and which are in the possession of Exxon Mobil Corporation and ExxonMobil Oil Corporation are attached hereto as Ex. 5. Pursuant to 28 U.S.C. § 1446(a), this constitutes "a copy of all process, pleadings, and orders" received by ExxonMobil Corporation and ExxonMobil Oil Corporation in the action.

212. Pursuant to 28 U.S.C. § 1446(d), Exxon Mobil Corporation and Exxon Mobil Oil Corporation will promptly file a copy of this Notice of Removal, as well as a Notice of Filing of this Notice of Removal, with the Clerk of the Supreme Court of the State of New York, New York County, and serve a copy of the same on the City. A copy of this filing (without exhibits) is attached as Ex. 81. This Notice of Removal is signed pursuant to Fed. R. Civ. P. 11, as required by 28 U.S.C. § 1446(a).

213. Exxon Mobil Corporation and ExxonMobil Oil Corporation reserve the right to amend or supplement this Notice of Removal. Exxon Mobil Corporation and ExxonMobil Oil

Corporation also reserve all defenses and objections available under applicable law, and the filing of this Notice of Removal is subject to, and without waiver of, any such defenses or objections.

WHEREFORE, Exxon Mobil Corporation and ExxonMobil Oil Corporation respectfully give notice that this action is hereby removed from the Supreme Court of the State of New York, New York County to the United States District Court for the Southern District of New York.

DATE:  May 28, 2021

Respectfully submitted,

EXXON MOBIL CORPORATION,
EXXONMOBIL OIL CORPORATION

By its attorneys,

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON, LLP

/s/ Theodore V. Wells, Jr.
Theodore V. Wells, Jr.
Daniel J. Toal
twells@paulweiss.com
dtoal@paulweiss.com
1285 Avenue of the Americas
New York, NY 10019-6064
Tel:  (212) 373-3000
Fax:  (212) 757-3990

Justin Anderson
janderson@paulweiss.com
2001 K Street, NW
Washington, DC 20006-1047
Tel:  (202) 223-7300
Fax:  (202) 223-7420

EXXON MOBIL CORPORATION

Patrick J. Conlon
patrick.j.conlon@exxonmobil.com
22777 Springwoods Village Parkway
Spring, TX 77389
Tel:  (832) 624-6336

**J.A. 205**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__11/12/2021__
```

---------------------------------------------------------- X

THE CITY OF NEW YORK, :
:
Plaintiff, :
:
-against- :
:
:
:
EXXON MOBIL CORPORATION, :
EXXONMOBIL OIL CORPORATION, ROYAL :
DUTCH SHELL PLC, SHELL OIL COMPANY, :
BP P.L.C., BP AMERICA INC., and AMERICAN :
PETROLEUM INSTITUTE, :
:
Defendants. :

---------------------------------------------------------- X

21-CV-4807 (VEC)

ORDER

VALERIE CAPRONI, United States District Judge:

WHEREAS on October 5, 2021, the Second Circuit stayed a decision by the District of

Connecticut to remand a case similar to this action to Connecticut state court pending the

defendant's appeal, *see Conn. v. Exxon Mobil Corp.*, No. 21-1446, Dkt. 80 (2d Cir. Oct. 5, 2021);

WHEREAS on October 6, 2021, the Court ordered the parties to show cause in writing why

this case should not be stayed pending the Second Circuit's decision in *Connecticut v. Exxon Mobil*,

Dkt. 55;

WHEREAS on October 19, Plaintiff responded to the Court's order, indicating that

"[a]lthough the Second Circuit would benefit from this Court's analysis of Defendants' removal

grounds, the City understands that the Court may prefer to wait for further guidance in *Connecticut*

before proceeding with the City's pending motion to remand," Dkt. 56; and

WHEREAS on November 3, 2021, Defendants responded, indicating that they do not

oppose a stay pending the Second Circuit's decision, Dkt. 57;

IT IS HEREBY ORDERED that this case is STAYED pending the Second Circuit's decision in *Connecticut v. Exxon Mobil*. The parties must inform the Court within one week of the Second Circuit's final order resolving the appeal in that case.

The Clerk of Court is respectfully directed to stay the open motion at docket entry 37.

**SO ORDERED.**

**Date: November 12, 2021**
**New York, New York**

**VALERIE CAPRONI**
**United States District Judge**

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE CITY OF NEW YORK,

                 Plaintiff,

     -against-

EXXON MOBIL CORPORATION,

                 Defendant.

1:21-CV-04807 (VEC)

<u>ORDER</u>

VALERIE CAPRONI, United States District Judge:

WHEREAS on July 7, 2021, Plaintiff filed a motion to remand to state court, *see* Dkt. 37;

WHEREAS on November 12, 2021, the Court stayed this action pending the Second Circuit's decision in *Connecticut v. Exxon Mobil Corp.*, No. 21-1446, Dkt. 80 (2d Cir. Oct. 5, 2021), *see* Dkt. 58;

WHEREAS on September 27, 2023, the Second Circuit issued its decision in *Connecticut v. Exxon Mobil Corp.*, No. 21-1446, 2023 WL 6279941 (2d Cir. Sept. 27, 2023), affirming the district court's order remanding the case to state court; and

WHEREAS on October 2, 2023, Plaintiff requested that the Court lift the stay and decide Plaintiff's pending motion to remand, *see* Dkt. 62.

IT IS HEREBY ORDERED that the stay of all proceedings entered on November 12, 2021, is LIFTED.

IT IS FURTHER ORDERED that Plaintiff's motion to remand to state court is DENIED without prejudice and with leave to refile. Plaintiff may resubmit its motion for remand, in light of the Second Circuit's decision in *Connecticut v. Exxon Mobil Corp.*, No. 21-1446, 2023 WL 6279941 (2d Cir. Sept. 27, 2023), not later than **Friday, October 20, 2023**. Defendant must

respond by **Tuesday, November 14, 2023**.  Plaintiff's reply brief must be filed not later than

**Friday, December 8, 2023**.

      IT IS FURTHER ORDERED that the Clerk of Court is respectfully directed to terminate

the open motion at docket entry 37.

**SO ORDERED.**

  **Dated:**  **October 4, 2023**
              **New York, New York**

_____
         **VALERIE CAPRONI**
      **United States District Judge**

2

# EXHIBIT B

**Katie Jones**

| | |
|---|---|
| **From:** | Kessler, David <dkessler@paulweiss.com> |
| **Sent:** | Monday, October 16, 2023 10:00 AM |
| **To:** | Katie Jones; Smith, Kyle; Matt Edling; Quentin Karpilow; Hilary Meltzer; Tess Dernbach; Alice Baker; Nathan Taylor |
| **Cc:** | Wells Jr., Theodore V; Toal, Daniel J; Rhee, Jeannie S; Brachman, Paul D; Margolis, Sam C.; Nancy.Milburn@apks.com; Diana.Reiter@arnoldporter.com; Milburn, Nancy; Lombardo, John D.; Barber, Kathryn M.; msimes@mcguirewoods.com; bschmalzbach@mcguirewoods.com; kbarber@mcguirewoods.com; EXT Frederick, D; Webster, James M.; Severson, Daniel S.; Knofczynski, Grace W.; Anderson, Jeremiah J.; Folio, Ryan M.; Howe, Dennis D.; Jaroff, Aaron F.; Tor, Loly; Shenkman, Ethan G.; Birkel, Charlie |
| **Subject:** | RE: City of New York v. Exxon Mobil et al., 21-cv-4807 (SDNY) - Motion to Remand |

Katie –

Thanks very much for your email. We set forth our response here, which we make for purposes of this motion to remand only and while reserving all rights with respect to future appellate proceedings in this case and other matters.

We agree that *Connecticut* controls the third ground for removal (OCSLA).

With respect to the first ground for removal (federal common law/*Grable*), the Second Circuit did not decide the "issue of whether federal common law can *ever* give rise to complete preemption or otherwise convert state claims into federal claims in the same manner as complete preemption under federal statutes." *Connecticut* v. *Exxon Mobil Corp.*, No. 21-1446 (Sept. 27, 2023), at n.4 (internal quotation marks and citation omitted). Defendants reserve the right to argue that, in this case, federal common law does "convert state claims into federal claims in the same manner as complete preemption under federal statutes."

With respect to the second ground for removal (federal officer), the *Connecticut* decision with respect to the federal officer removal statute was based on the factual record before that court. Moreover, Defendants acknowledge that the causal-connection test applied in *Connecticut* controls this motion to remand, but intend to argue, for purposes of potential future appellate review, that, "[b]y the Removal Clarification Act [of 2011], Congress broadened federal officer removal to actions, not just causally connected, but alternatively connected or associated, with acts under color of federal office." *Latiolais* v. *Huntington Ingalls, Inc.*, 951 F.3d 286, 292 (5th Cir. 2020) (en banc). As a result, Defendants intend to argue before Judge Caproni that, under that broader standard and on the record before Judge Caproni, federal officer removal is appropriate.

Defendants do not agree that, because ExxonMobil did not appeal its federal enclave argument to the Second Circuit in *Connecticut*, the *Connecticut* decision forecloses the fourth ground of removal in this case (federal enclaves). Defendants reserve the right to brief that issue before Judge Caproni.

Finally, we agree that the other grounds for removal you identified—Defendants' CAFA, diversity, and First Amendment arguments (the fifth, sixth, and seventh grounds, NOR paragraph 23)—were not addressed in *Connecticut* and remain for further briefing.

The previous briefs in this matter were subject to an expanded 45-page limit. Given the above, we think an expansion of the page limits remains appropriate for the opening and opposition briefs. We suggest 35 pages for each. Assuming the City agrees, we are amenable to entering into a stipulation regarding page limits.

Best,

**J.A. 211**

David

**David K. Kessler** | Counsel
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
212 373 3614 (Direct Phone) | 212 492 0614 (Direct Fax)
dkessler@paulweiss.com | www.paulweiss.com
*Pronouns: He/Him*

---

**From:** Katie Jones <katie@sheredling.com>
**Sent:** Wednesday, October 11, 2023 3:23 PM
**To:** Smith, Kyle <ksmith@paulweiss.com>; Matt Edling <matt@sheredling.com>; Quentin Karpilow <quentin@sheredling.com>; Hilary Meltzer <hmeltzer@law.nyc.gov>; Tess Dernbach <tdernbac@law.nyc.gov>; Alice Baker <albaker@law.nyc.gov>; Nathan Taylor <ntaylor@law.nyc.gov>
**Cc:** Wells Jr., Theodore V <twells@paulweiss.com>; Toal, Daniel J <dtoal@paulweiss.com>; Rhee, Jeannie S <jrhee@paulweiss.com>; Brachman, Paul D <pbrachman@paulweiss.com>; Kessler, David <dkessler@paulweiss.com>; Margolis, Sam C. <smargolis@paulweiss.com>; Nancy.Milburn@apks.com; Diana.Reiter@arnoldporter.com; Milburn, Nancy <Nancy.Milburn@arnoldporter.com>; Lombardo, John D. <John.Lombardo@arnoldporter.com>; Barber, Kathryn M. <KBarber@mcguirewoods.com>; msimes@mcguirewoods.com; bschmalzbach@mcguirewoods.com; kbarber@mcguirewoods.com; EXT Frederick, D <dfrederick@kellogghansen.com>; Webster, James M. <jwebster@kellogghansen.com>; Severson, Daniel S. <dseverson@kellogghansen.com>; Knofczynski, Grace W. <gknofczynski@kellogghansen.com>; Anderson, Jeremiah J. <jjanderson@mcguirewoods.com>; Folio, Ryan M. <rfolio@kellogghansen.com>; Howe, Dennis D. <dhowe@kellogghansen.com>; Jaroff, Aaron F. <AJaroff@mcguirewoods.com>; Tor, Loly <loly.tor@klgates.com>; Shenkman, Ethan G. <Ethan.Shenkman@arnoldporter.com>; Birkel, Charlie <Charlie.Birkel@arnoldporter.com>
**Subject:** RE: City of New York v. Exxon Mobil et al., 21-cv-4807 (SDNY) - Motion to Remand

Thank you, Kyle. To clarify, it's the City's position that *Connecticut* unambiguously controls Defendants' removal arguments under federal common law, *Grable*, federal officer, and OCSLA (the first, second, and third grounds for removal identified in Defendants' Notice of Removal ["NOR"] in paragraph 22). Because Exxon declined to appeal its federal enclave argument to the Second Circuit in *Connecticut*, the City also believes that ground is meritless and that the parties need not brief that issue further in this case (fourth ground, NOR paragraph 22). The issues that were not addressed in *Connecticut* and that remain for further briefing are Defendants' CAFA, diversity, and First Amendment arguments (the fifth, sixth, and seventh grounds, NOR paragraph 23).

Please confirm whether this comports with Defendants' understanding of the issues that the *Connecticut* decision controls. I appreciate Defendants' dialogue on this issue and expect it will lead to an efficient presentation of the issues for Judge Caproni.

Thank you,
Katie

**Katie Jones**

**SHER EDLING LLP**
100 Montgomery St., Ste. 1410
San Francisco CA 94104
628.231.2533 | sheredling.com

---

**From:** Smith, Kyle <ksmith@paulweiss.com>
**Sent:** Tuesday, October 10, 2023 9:15 AM

**To:** Katie Jones <katie@sheredling.com>; Matt Edling <matt@sheredling.com>; Quentin Karpilow <quentin@sheredling.com>; Hilary Meltzer <hmeltzer@law.nyc.gov>; Tess Dernbach <tdernbac@law.nyc.gov>; Alice Baker <albaker@law.nyc.gov>; Nathan Taylor <ntaylor@law.nyc.gov>
**Cc:** Wells Jr., Theodore V <twells@paulweiss.com>; Toal, Daniel J <dtoal@paulweiss.com>; Rhee, Jeannie S <jrhee@paulweiss.com>; Brachman, Paul D <pbrachman@paulweiss.com>; Kessler, David <dkessler@paulweiss.com>; Margolis, Sam C. <smargolis@paulweiss.com>; Nancy.Milburn@apks.com; Diana.Reiter@arnoldporter.com; Milburn, Nancy <Nancy.Milburn@arnoldporter.com>; Lombardo, John D. <John.Lombardo@arnoldporter.com>; Barber, Kathryn M. <KBarber@mcguirewoods.com>; msimes@mcguirewoods.com; bschmalzbach@mcguirewoods.com; kbarber@mcguirewoods.com; EXT Frederick, D <dfrederick@kellogghansen.com>; Webster, James M. <jwebster@kellogghansen.com>; Severson, Daniel S. <dseverson@kellogghansen.com>; Knofczynski, Grace W. <gknofczynski@kellogghansen.com>; Anderson, Jeremiah J. <jjanderson@mcguirewoods.com>; Folio, Ryan M. <rfolio@kellogghansen.com>; Howe, Dennis D. <dhowe@kellogghansen.com>; Jaroff, Aaron F. <AJaroff@mcguirewoods.com>; Tor, Loly <loly.tor@klgates.com>; Shenkman, Ethan G. <Ethan.Shenkman@arnoldporter.com>; Birkel, Charlie <Charlie.Birkel@arnoldporter.com>
**Subject:** RE: City of New York v. Exxon Mobil et al., 21-cv-4807 (SDNY) - Motion to Remand

Counsel:

Thank you for reaching out. Defendants will not agree to "stipulate to withdraw the removal grounds addressed in" *Connecticut* v. *Exxon Mobil Corp*. However, Defendants are amenable to agreeing, for purposes of this remand motion and reserving all rights as to future appellate proceedings, that the *Connecticut* decision controls some of the arguments that defendants previously made about remand, and that the parties need not brief those issues further before Judge Caproni. As a next step, it would be helpful to know the City's view about what are the "issues that are controlled by" *Connecticut*, and what issues remain for further briefing.

Thank you,
Kyle

---

**From:** Katie Jones <katie@sheredling.com>
**Sent:** Thursday, October 5, 2023 12:10 PM
**To:** Wells Jr., Theodore V <twells@paulweiss.com>; Toal, Daniel J <dtoal@paulweiss.com>; janderson@paulweiss.com; patrick.j.conlon@exxonmobil.com; nancy.milburn@arnoldporter.com; diana.reiter@arnoldporter.com; matthew.heartney@arnoldporter.com; john.lombardo@arnoldporter.com; jonathan.hughes@arnoldporter.com; msimes@mcguirewoods.com; amcbride@mcguirewoods.com; Brian D. Schmalzbach <bschmalzbach@mcguirewoods.com>; kbarber@mcguirewoods.com; dfrederick@kellogghansen.com; jwebster@kellogghansen.com; dseverson@kellogghansen.com; gknofczynski@kellogghansen.com
**Cc:** Matt Edling <matt@sheredling.com>; Quentin Karpilow <quentin@sheredling.com>; Hilary Meltzer <hmeltzer@law.nyc.gov>; Tess Dernbach <tdernbac@law.nyc.gov>; Alice Baker <albaker@law.nyc.gov>; Nathan Taylor <ntaylor@law.nyc.gov>
**Subject:** City of New York v. Exxon Mobil et al., 21-cv-4807 (SDNY) - Motion to Remand

Hello all,

I am counsel for New York City and writing to confer about its motion to remand in light of the Court's order yesterday. To avoid spending time re-briefing issues that are controlled by the Second Circuit's recent decision in *Connecticut v. Exxon Mobil Corp.*, please let me know whether Defendants will stipulate to withdraw the removal grounds addressed in that case. And let me know if you'd like to discuss further.

Thank you,
Katie

3

**J.A. 213**

**Katie Jones**

**SHER EDLING LLP**

100 Montgomery St., Ste. 1410
San Francisco CA 94104

628.231.2533 | sheredling.com

**CONFIDENTIAL NOTICE**

**This email is covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521.  This email and any documents accompanying this email contain legally privileged and confidential information belonging to the sender.  The information is intended only for the use of the individual or entity named above.  If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this email communication is strictly prohibited.  If you have received this email in error, please notify us immediately by telephone or email and permanently delete the email, any attachments, and all copies thereof from any networks, drives, cloud, or other storage media and please destroy any printed copies of the email or attachments.  Neither this email nor the contents thereof are intended to nor shall create an attorney-client relationship between Sher Edling LLP and the recipient(s), and no such attorney-client relationship shall be created unless established in a separate, written retainer agreement or by court order.**

This message is intended only for the use of the Addressee and may contain information that is privileged and confidential. If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please erase all copies of the message and its attachments and notify us immediately.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/8/24
```

-------------------------------------------------------X
THE CITY OF NEW YORK,          :
         :
        Plaintiff,     :
         :        21-CV-4807 (VEC)
    -against-     :
         :        OPINION
EXXON MOBIL CORPORATION, EXXON  :
MOBIL OIL CORPORATION, ROYAL DUTCH :
SHELL PLC, SHELL OIL COMPANY, BP  :
P.L.C., BP AMERICA INC., and AMERICAN :
PETROLEUM INSTITUTE,     :
         :
       Defendants. :
-------------------------------------------------------X
```

VALERIE CAPRONI, United States District Judge:

The City of New York (the "City") sued Exxon Mobil Corporation, other fossil fuel companies, and their top trade association ("Defendants") in state court for violations of the City's Consumer Protection Law ("CPL"), New York City Administrative Code ("N.Y.C. Code") §§ 20-700 *et seq. See* Not. of Removal ("Compl."), Dkt. 1-5.[1] Defendants removed the case to federal district court, and the City moved for remand. *See* Pl. Mot., Dkt. 37. Defendants opposed the motion. Defs. Opp., Dkt. 47. This case was then stayed for approximately two years while a remand order entered in the substantively-similar case that had been filed by the State of Connecticut was unsuccessfully appealed by Exxon Mobil. *See* Nov. 12, 2021 Order, Dkt. 58. Upon the Circuit's decision in the Connecticut case, *Connecticut v. Exxon Mobil Corp.*, 83 F.4th 122 (2d Cir. 2023) ("*Connecticut*"), this Court lifted the stay and denied the motion for remand without prejudice to allow the parties to re-brief the issue with the benefit of the Circuit's decision in *Connecticut. See* Oct. 4, 2023 Order, Dkt 63. The City again moved to remand the

---

[1]     This case is one of many similar cases filed throughout the country using consumer protection laws as a way to hold fossil fuel companies responsible for their role in climate change.

1

case to state court, Pl. Mot., Dkt. 68, and, in a never-say-die move, Defendants again opposed. Defs. Opp., Dkt. 72. For the reasons discussed below, the City's Motion to Remand is GRANTED, and the City's request for costs and fees is GRANTED in part.

## BACKGROUND

### A. Allegations in the Complaint

The City commenced this action on April 22, 2021, alleging that Defendants "have systematically and intentionally misled consumers in New York City [] about the central role their products play in causing the climate crisis." Compl. ¶ 2. Such conduct, the City argues, violates the CPL. *Id*. ¶ 9. The Complaint alleges that Defendants misled consumers about the impact of their products on the climate and falsely represented themselves as corporate leaders in the fight against climate change. *Id*. ¶¶ 5–6. Plaintiff alleges that Defendants' failure to disclose the climate risks associated with use of their products deprived consumers of information related to the consequences of their purchasing decisions. *Id*. ¶ 19. According to the Complaint, Defendants use "greenwashing advertisements" to represent falsely that they are "environmentally responsible companies developing innovative green technologies and products," when, in truth, Defendants' investment in clean energy sources is allegedly "miniscule," and their business models are based on pushing the consumption of fossil fuels. *Id*. ¶ 20.

The City brings three causes of action: Counts One and Two allege deceptive trade practices in violation of the CPL against ExxonMobil, Shell, and BP, and Count Three alleges the same against Defendant American Petroleum Institute, the top trade association for oil companies. *Id*. ¶¶ 76–100. As relief, the City seeks to enjoin Defendants from violating the CPL, civil penalties, attorneys' fees, and costs. *Id*. at 53–54.

2

**J.A. 216**

### B. Procedural History

On May 28, 2021, Defendants removed this case to federal court. *See* Not. of Removal, Dkt. 1. Defendants' notice of removal asserted seven bases for federal jurisdiction, one of which has since been abandoned: (1) the City's claims arise under federal common law because they implicate transboundary pollution and foreign affairs; (2) the action falls under the federal officer removal statute, 28 U.S.C. § 1442(a)(1); (3) Defendants' production and sale of fossil fuels occur on "federal enclaves;" (4) the Court has diversity jurisdiction over the action under the fraudulent joinder doctrine; (5) the action is removable under the Class Action Fairness Act, 28 U.S.C. § 1332(d); and (6) the City's claims include federal constitutional elements.[2]

On June 25, 2021, the City moved to remand the action to state court. *See* Pl. Mot., Dkt. 37. Defendants opposed the motion. *See* Defs. Opp., Dkt. 47. On November 12, 2021, this Court stayed the action pending the Second Circuit's decision in *Connecticut v. Exxon Mobil Corp.*, No. 21-1446, a case similar to this action, in which Connecticut sued one of the defendants in this case claiming that it had violated Connecticut's unfair trade practices statute. *See* Nov. 12, 2021 Order. On September 27, 2023, the Second Circuit affirmed the district court's decision to remand the case to state court. *Connecticut*, 83 F.4th at 147. The City requested that the Court lift the stay in this action and decide its pending motion to remand. *See* Dkt. 62. The Court lifted the stay, denied the City's motion to remand without prejudice with leave to refile in light of the decision in *Connecticut*. *See* Oct. 4, 2023 Order. The City filed the instant motion to remand on October 20, 2023. *See* Pl. Mot. Defendants oppose the motion. *See* Defs. Opp.

### J.A. 217

## DISCUSSION

### I.      The City's Motion to Remand is Granted

#### A.  Legal Standard

The federal removal statute allows a defendant to remove to federal court "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." 28 U.S.C. § 1441(a). A motion to remand for lack of subject matter jurisdiction may be brought at any time while the action is pending in federal court, pursuant to 28 U.S.C. § 1447(c). The removing party bears the burden of establishing the propriety of removal. *Cal. Pub. Emps.' Ret. Sys. v. WorldCom, Inc.*, 368 F.3d 86, 100 (2d Cir. 2004). Removal jurisdiction must be "strictly construed," *Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28, 32 (2002), and "there is a presumption against removal," *Harraz v. EgyptAir Airlines Co.*, No. 18-cv-12364, 2019 WL 6700946, at *2 (S.D.N.Y. Dec. 9, 2019). "[O]ut of respect for the limited jurisdiction of the federal courts and the rights of states," *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 488 F.3d 112, 124 (2d Cir. 2007), federal courts must "resolv[e] any doubts against removability," *Connecticut*, 83 F.4th at 132 (citation omitted).

#### B.  Removal and Federal Court Jurisdiction

The "well-pleaded complaint rule" provides that federal question jurisdiction "exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). The artful pleading doctrine is said to be a corollary to the well-pleaded complaint rule. Under the artful pleading doctrine, a plaintiff

---

[2]      Defendants abandoned their argument that the Court has federal question jurisdiction because the action falls under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1349(b). Defendants concede that *Connecticut* forecloses their argument based on OCSLA. *See* Decl. of Katie Jones ("Jones Decl."), Ex. B. at 1, Dkt. 69–1.

4

**J.A. 218**

cannot defeat federal question jurisdiction by pleading its complaint as if it "arises under state law where the plaintiff's suit is, in essence, based on federal law." *Sullivan v. Am. Airlines, Inc.*, 424 F.3d 267, 271 (2d Cir. 2005) (citation omitted). Conversely, federal question jurisdiction cannot be created "on the basis of a federal defense, . . . even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue." *Caterpillar Inc.*, 482 U.S. at 393.

In *Connecticut*, the Second Circuit reaffirmed that there are only three circumstances in which a complaint that does not allege a federal claim may nevertheless "arise under" federal law for purposes of removal: "(1) if Congress expressly provides, by statute, for removal of state-law claims; (2) if the state-law claims are completely preempted by federal law; and (3) in certain cases if the vindication of a state-law right necessarily turns on a question of federal law." *Connecticut*, 83 F.4th at 133 (cleaned up) (citing *Fracasse v. People's United Bank*, 747 F.3d 141, 144 (2d Cir. 2014)).

### 1. Federal Common Law

Defendants argue that this action is removable because the City's claims are completely preempted by federal common law that governs claims based on transboundary pollution and federal common law that implicates foreign affairs. Defs. Opp. at 15–19. In *Connecticut*, the Second Circuit reaffirmed that "a federal cause of action" must "completely preempt[] a state cause of action" to "trigger the potent legal fiction that 'any [state-law] complaint that comes within the scope of th[at] federal cause of action necessarily 'arises under' federal law." 83 F.4th at 137 (citing *Franchise Tax Bd. v. Constr. Laborers Vacation Tr. for S. Cal. et al.*, 463 U.S. 1, 24 (1983)). The Second Circuit rejected the defendant's argument that Connecticut's claims arose under federal common law, finding that the State's unfair trade practice claims had

5

**J.A. 219**

"absolutely nothing to do with" the federal common law of transboundary pollution, *id*. at 142, and, further, that the defendant's argument that Connecticut's allegations necessarily implicate foreign policy and national security "is not grounds for federal jurisdiction," *id*. at 140 n.6 (citation omitted). The City's CPL claims similarly have "absolutely nothing to do with" the federal common law of transboundary pollution or foreign affairs, and, accordingly, are not preempted by federal common law.

Defendants nonetheless argue that there is complete preemption of Plaintiff's claims.[3] Complete preemption occurs when federal law "preempts and replaces all state-law causes of action so 'a claim which comes within the scope of that [federal] cause of action, even if pleaded in terms of state law, is in reality based on federal law.'" *Solomon v. St. Joseph Hosp.*, 62 F.4th 54, 60 (2d Cir. 2023) (citing *In re WTC Disaster Site*, 414 F.3d 352, 372 (2d Cir. 2005)). In other words, "the pre-emptive force of a statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded

---

[3]     In *Connecticut*, the defendant conceded that its "invocation of federal common law [wa]s *not* an argument for complete preemption," *id*. at 138, and the Circuit reserved judgment on "whether federal common law can *ever* give rise to complete preemption or otherwise convert state claims into federal claims in the same manner as complete preemption under federal statutes," *id*. at 138 n.4 (cleaned up).

The City contends that Defendants' argument that federal common law completely preempts the City's municipal law claims is untimely, as Defendants did not assert this argument in their notice of removal or in their opposition to the City's first motion to remand. Pl. Mem. of Law at 7–8. *See also* 28 U.S.C. § 1446(b)(3) ("a notice of removal may be filed within 30 days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading"); *Bernadin v. Am. Airlines, Inc.*, No. 08-cv-1774, 2009 WL 1910964, at *3 (E.D.N.Y. July 1, 2009) (citation omitted) ("[a] notice of removal may not be untimely amended to add a new avenue of jurisdiction"). The City argues that because Defendants never pled complete preemption as a ground for removal and only did so in their current opposition to remand and in response to *Connecticut*, the Court should hold the argument was waived. Pl. Mem. of Law at 8 (citing *Wyant v. Nat'l R.R. Passenger Corp.*, 881 F. Supp. 919, 924 (S.D.N.Y. 1995)).

Although the Second Circuit did not address complete preemption by federal common law in *Connecticut*, it indicated in *dicta* that, but for the defendant's concession that it was not raising complete preemption (which Defendants have not conceded in this action), the Court would have held that the notice of removal "would squarely present the question" of whether federal common law can give rise to complete preemption. 83 F.4th at 138 n.4. Because Defendants' Notice of Removal in this case is essentially identical to the Notice of Removal in *Connecticut*, the Court finds that Defendants have not waived this argument.

6

**J.A. 220**

complaint rule.'" *Id.* (citing *Caterpillar*, 482 U.S. at 393). The Supreme Court has only identified three instances of complete preemption, and the Second Circuit has identified two others; all are based on federal statutes. *Solomon*, 62 F.4th at 60 n.2.

Defendants' preemption argument is based on their argument that the City disguised claims that target Defendants' production and sale of fossil fuels as consumer protection claims; claims directed at production and sale of fossil fuels, according to Defendants, implicate transboundary pollution and foreign affairs. They then argue that federal common law governing transboundary pollution and foreign affairs "utterly dominates" the field, such that any claim touching those areas "necessarily arises under federal law." Defs. Opp. at 16 (citing *Marcus v. AT&T Corp.*, 138 F.3d 46, 53 (2d Cir. 1998)). They have made the same argument in many if not all of the similar consumer protection cases filed by other state and local governments. None has succeeded.[4] The argument does not succeed here either.

There are two problems with Defendants' argument. First, as much as they have tried in this case and similar cases to recharacterize consumer protection claims to be about emissions, that is not what is alleged in the Complaint. The claims in the City's Complaint are about false and misleading advertisements. Those claims do not become claims about transboundary pollution and foreign affairs just because the alleged deception relates to the impact of fossil fuels on the climate. The second problem with Defendants' argument is that there is no indication that Congress expressly authorized or intended to completely preempt state laws that

---

[4]     *See, e.g.*, *City of Hoboken v. Chevron Corp.*, 45 F.4th 699, 707–08 (3d Cir. 2022), *cert. denied*, 143 S. Ct. 2483 (2023); *Minnesota v. Am. Petroleum Inst.*, 63 F.4th 703, 710 (8th Cir. 2023), *cert. denied*, 144 S. Ct. 620 (2024); *Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1262 (10th Cir. 2022), *cert. denied*, 143 S. Ct. 1795 (2023); *Rhode Island v. Chevron Corp.*, 393 F. Supp. 3d 142, 149 (D. R.I. 2019); *District of Columbia v. Exxon Mobil Corp.*, 640 F. Supp. 3d 95, 104 (D.D.C. 2022), *aff'd*, 89 F.4th 144 (D.C. Cir. 2023); *Delaware v. BP Am. Inc.*, 578 F. Supp. 3d 618, 628 (D. Del. 2022), *aff'd sub nom. City of Hoboken v. Chevron Corp.*, 45 F.4th 699 (3d Cir. 2022).

have a glancing relationship to transboundary pollution or foreign affairs.[5]   Defendants argue that Congressional intent does not control the complete displacement of state law in all areas where federal law governs.  Defs. Opp. at 17–18.  Further, Defendants claim that a federal statute is not required because the federal common law governing interstate pollution arises from the constitutional structure and not from a federal statute.  *Id*. at 19.

The Court is not persuaded by Defendants' argument.  The Circuit has indicated that it is an open question whether federal common law can have complete preemptive effect.  *Connecticut*, 83 F.4th at 138 n. 4.  Although this Court would be inclined to hold that federal common law cannot completely preempt state law, the Court need not wade into that thicket.  Even if federal common law could, in the abstract, have complete preemptive effect, it would not preempt Plaintiff's claims, which are garden-variety false advertising claims.  The Supreme Court and the Circuit have made clear that even in areas in which there is a substantial federal interest, when operating in an area traditionally occupied by the state, the Court must "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."  *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485 (1996) (citation omitted).  Because of that presumption, state laws designed to protect the state's citizenry against fraud and deception apply even in otherwise highly regulated areas, such as those involving public health and safety.  *See Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.,* 471 U.S. 707, 715–19 (1985); *see also Fla. Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 144 (1963).

---

[5]      In *Marcus*, the Second Circuit held that complete preemption only applies where Congress has made "some express statement or other clear manifestation . . . that it intends the complete preemption doctrine to apply." *Marcus*, 138 F.3d at 54.

8

**J.A. 222**

Defendants have cited no cases and the Court has found none in which a Court has concluded that because the subject matter of particular advertising relates to a matter of federal interest, state consumer protection laws are preempted. There is simply no conflict between the State's interest in ensuring its consumers are not misled by false advertising and any federal interest in regulating environmental pollution. For the same reason that state consumer protection laws are generally not preempted by federal legislation, *see*, *e.g.*, *Toy Mfrs. of Am., Inc. v. Blumenthal*, 986 F.2d 615 (2d Cir. 1992) (federal Hazardous Substances Act does not preempt Connecticut's consumer protection law); *Pennsylvania v. Navient Corp.*, 967 F.3d 273 (3d Cir. 2020) (federal Higher Education Act does not preempt Pennsylvania's consumer protection law); *WinRed, Inc. v. Ellison*, 59 F.4th 934 (8th Cir. 2023) (Federal Election Campaign Act does not preempt Minnesota's consumer protection law), New York City's consumer protection law is not preempted by whatever federal common law might govern transboundary pollution.

The City's claims also do not implicate the foreign affairs of the United States. According to Defendants, the City's claims touch on a "complex and carefully calibrated network of international treaties" concerning climate change, which would "necessarily require[] national standards and global participation." Defs. Opp. at 22. But, as previously noted, that mischaracterizes the City's complaint. The City is suing Defendants for disseminating false and misleading advertisements to consumers in New York City. With all due respect to the men and women who are devoted to the foreign affairs of this country at the Department of State (and every other agency that touches foreign affairs), this Court cannot imagine any state of affairs under which their work would be affected by an order enjoining Defendants from disseminating misleading ads in New York City. None of the legislation, treaties, executive action, or

9

international agreements cited in the Notice of Removal, Not. of Removal ¶¶ 47–55, would be affected one iota by the remedy Plaintiff is seeking.

In short, even assuming there were a basis for complete preemption in the absence of a federal statute, the City's claims in this case would not be preempted.

### 2. Federal Officer Removal

Defendants argue that this action was properly removed under the federal officer removal statute, 28 U.S.C. § 1442(a)(1).[6]

Defendants acknowledge that the Second Circuit in *Connecticut* "interpreted the federal officer removal statute to impose a strict causal-nexus requirement that would foreclose the statute's application to this suit on the current record;" they raise the argument to preserve for "future appellate review" their argument that the Removal Clarification Act of 2011 broadened federal officer removal to actions "not just *causally* connected, but alternatively *connected* or *associated*, with acts under color of federal office." Defs. Mem. of Law at 25 (citing *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 292 (5th Cir. 2020) (en banc)).

This Court is bound by Second Circuit precedent. The federal officer removal statute does not apply here for the same reason it did not apply in *Connecticut*: there is no causal nexus between Defendants' work for the federal government and Defendants' allegedly false and misleading advertisements.[7]

---

[6] The federal officer removal statute permits removal of a state court civil action "that is against or directed to . . . any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). Because Defendants are not themselves federal officers, they "must satisfy a three-pronged test to determine whether [they] may effect removal" on those grounds. *Connecticut*, 83 F.4th at 142 (citing *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 135 (2d Cir. 2008)). Defendants "must (1) show that [they are] a person within the meaning of the statute who acted under a federal officer, (2) show that [they] performed the actions for which [they are] being sued under color of federal office, and (3) raise a colorable federal defense." *Id.* at 142–43 (cleaned up).

[7] Other Circuit Courts have similarly rejected defendants' arguments in other consumer protection cases in which they advocated for a "relaxed reading . . . of the [] 'nexus prong.'" *Mayor & City Council of Baltimore v. BP*

10

### 3.     Federal Enclave Jurisdiction

In the silliest of all of its arguments, Defendants argue that removal is proper because of federal enclave jurisdiction.  Section 8 of Article I of the U.S. Constitution authorizes Congress "[t]o exercise exclusive Legislation in all Cases whatsoever . . . over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings."  U.S. Const. art. I, § 8, cl. 17.  Some courts have interpreted that provision to establish federal subject matter jurisdiction for tort claims occurring on federal enclaves, even when applying state law.  *See, e.g.*, *Jograj v. Enter. Servs., LLC*, 270 F. Supp. 3d 10, 16 (D.D.C. 2017); *Akin v. Ashland Chem. Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998); *Federico v. Lincoln Mil. Hous.*, 901 F. Supp. 2d 654, 670–73 (E.D. Va. 2012).

Defendants' theory, contrary to fact, is that the City's Complaint targets their extraction, production, and sale of fossil fuels, including "operations that occur on military bases and other federal enclaves."  Defs. Opp. at 29.  Defendants contend that the City "seeks to reduce or eliminate altogether consumers' demand for and use of fossil fuel products," Defs. Opp. at 30, thereby implicating Defendants' actions both on and off federal enclaves.  Additionally, Defendants assert that the advertising the City alleges is false reaches federal enclaves, *i.e.*, "API's Super Bowl ads reach federal enclaves, such as Ellis Island and Fort Tilden."  Defs. Opp. at 30 (citing Compl. ¶ 71).

---

*P.L.C.*, 31 F.4th 178, 233 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 1795 (2023).  *See also Minnesota*, 63 F.4th at 715; *Rhode Island v. Shell Oil Prods. Co.*, 35 F.4th 44, 53 n.6 (1st Cir. 2022), *cert. denied*, 143 S. Ct. 1796 (2023).

Defendants' theory of federal enclave jurisdiction has been rejected by every court to consider it in similar consumer protection cases that touch on deception about climate change.[8] The Court finds no reason to part company with those courts. The Complaint in this action does not target Defendants' extraction, production, or sale of fossil fuels, undercutting Defendants' first argument.

Defendants' second theory – that because their allegedly misleading advertisements reach federal enclaves, the Court has federal question jurisdiction – is ridiculous. Defs. Opp. at 30. The notion that because individuals in a federal enclave may view or hear an allegedly misleading advertisement there exists federal question jurisdiction related to the advertisement is absurd. In essence, Defendants' argument would federalize all consumer protection laws that relate to advertisements (and probably everything else); it is self-evident that all advertisements on the internet, television, radio and in newspapers can be viewed or heard by persons who happen to be in a federal enclave. Defendants' position is unsupported by law or logic and would improperly effect "a sweeping change to the balance between the jurisdiction of state and federal courts." *Connecticut v. Exxon Mobil Corp.*, No. 20-cv-1555, 2021 WL 2389739, at *13 (D. Conn. June 2, 2021).

---

[8]    *Cnty. of San Mateo v. Chevron Corp.*, 32 F.4th 733, 749–51 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 1797 (2023); *City & Cnty. of Honolulu v. Sunoco LP*, 39 F.4th 1101, 1111–12 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 1795 (2023); *Mayor & City Council of Baltimore*, 31 F.4th at 217–19; *Rhode Island*, 35 F.4th at 58; *Minnesota v. Am. Petroleum Inst.*, No. 20-1636, 2021 WL 1215656, at *10–11 (D. Minn. Mar. 31, 2021), *aff'd*, 63 F.4th 703 (8th Cir. 2023); *Bd. of Cnty. Comm'rs of Boulder Cnty.*, 25 F.4th 1238 at 1271–72; *City & Cnty. of Honolulu v. Sunoco LP*, No. 20-00163, 20-cv-00470, 2021 WL 531237, at *8 (D. Haw. Feb. 21, 2021); *Mayor & City Council of Baltimore v. BP P.L.C.*, 388 F. Supp. 3d 538, 564–66 (D. Md. 2019); *Rhode Island*, 393 F. Supp. 3d at 152; *Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 405 F. Supp. 3d 947, 973–975 (D. Co. 2019); *Cnty. of San Mateo v. Chevron Corp.*, 294 F. Supp. 3d 934, 939 (N.D. Cal. 2018); *Platkin v. Exxon Mobil Corp.*, No. 22-cv-6733, 2023 WL 4086353, at *3 n.2 (D.N.J. 2023); *District of Columbia*, 640 F. Supp. 3d at 106–07; *City of Oakland v. BP P.L.C.*, No. 17-06011, 17-06012, 2022 WL 14151421, at *4–5 (N.D. Cal. Oct. 24, 2022), *appeal filed*, No. 22-16810 (9th Cir. Nov. 25, 2022).

#### 4. Diversity Jurisdiction

Defendants next assert that the Court has diversity jurisdiction under 28 U.S.C. § 1332(a) because the only non-diverse party, ExxonMobil Oil Corporation ("EMOC"), is fraudulently joined. Defs. Opp. at 8–9. Fraudulent joinder refers to "the joinder of unnecessary or nominal parties in order to defeat federal jurisdiction." *Kuperstein v. Hoffman-Laroche, Inc.*, 457 F. Supp. 2d 467, 470 (S.D.N.Y. 2006) (citation omitted). Because Defendants are invoking federal court jurisdiction, they have the burden to prove fraudulent joinder. *Id*. To meet this "heavy burden," the "defendant must demonstrate, by clear and convincing evidence, either that there has been outright fraud committed in the plaintiff's pleadings, or that there is *no possibility*, based on the pleadings that [the] plaintiff can state a cause of action against the non-diverse defendant in state court." *Id.* (citation omitted). Courts must consider the complaint at the time of removal to ascertain whether removal was appropriate. *Fed. Ins. Co. v. Tyco Int'l Ltd.,* 422 F. Supp. 2d 357, 368 (S.D.N.Y. 2006). If the complaint would likely survive a motion to dismiss in state court, the court's inquiry ends, and remand is appropriate. *See Kuperstein*, 457 F. Supp. 2d at 471. If state case law or legislation removes all reasonable possibility that the plaintiff would be permitted to litigate the claim, then remand must be denied. *See id*. If the viability of the claim is unclear, doubt must be resolved in favor of the plaintiff, and the case must be remanded. *See id*. The plaintiff's motive in joining the non-diverse party is "irrelevant, so long as the claim against that party is colorable." *See id*. at 470 (citation omitted).

Defendants argue that the City used EMOC as a strawman to destroy diversity and that the City has "no real interest in gaining a judgment" against EMOC. Defs. Opp. at 9. Aside from the Complaint alleging EMOC's state of incorporation and principal place of business and alleging that it is a wholly owned subsidiary of Exxon Mobil Corporation, Defendants note that

13

the City did not make a single allegation in the Complaint specific to EMOC.  *See id*.  Then, in a

*non sequitur*, Defendants argue that the fact that the City did not sue EMOC in a prior suit that it

brought against Exxon Mobil Corp. (hereafter "City Trespass Case") is evidence that the City is

not interested in obtaining a judgment against EMOC in this case and only sued it to destroy

diversity.[9]  *See id*. at 10.

Defendants have not met their "heavy burden" of proving by clear and convincing

evidence that EMOC was fraudulently joined or that there is no possibility, based on the

pleadings, that the City can state a viable cause of action against EMOC.  Federal courts look to

the pleading standards of the forum state when assessing whether a plaintiff's claims could

proceed in state court.  *Kuperstein*, 457 F. Supp. 2d at 471.  The Complaint alleges that EMOC

markets its gasoline to City consumers and has done so using misleading advertisements in

violation of the CPL.  Comp. ¶¶ 11, 31, 76–92.  The Complaint, which appears to meet New

York's "liberal pleading rules," asserts a colorable claim against EMOC arising under municipal

law.  *See Intershoe, Inc. v. Filanto S.P.A.*, 97 F. Supp. 2d 471, 476 (S.D.N.Y. 2000).  *See also*

*Shanahan v. Kolmar Labs., Inc.*, No. 18-cv-8317, 2019 WL 935164, at *1 (S.D.N.Y. Feb. 26,

2019) (cleaned up) (noting that "New York's pleading standards are more lenient than the

plausibility standard applicable in federal courts").

---

[9]        In *City of New York v. BP p.l.c.*, 325 F. Supp. 3d 466, 469 (S.D.N.Y. 2018), *aff'd sub nom. City of New York v. Chevron Corp.*, 993 F.3d 81 (2d Cir. 2021) ("City Trespass Case"), the City sued some of the same defendants as here for public nuisance, private nuisance, and trespass for "exacerba[ing] global warming and caus[ing] recurring injuries to New York City."  Because that case was dismissed, Defendants argue that the City's current claims against EMOC are barred by *res judicata*.  Defs. Opp. at 10–11.  That being the case, they argue, there is "no possibility" that the City can state a viable cause of action against EMOC in state court.  *See id*. at 10 (citing *Pampillonia* v. *RJR Nabisco, Inc.*, 138 F.3d 459, 461 (2d Cir. 1998)).  Defendants acknowledge that the City has brought different causes of action here but argue that the City cannot escape claim preclusion by "dressing up claims based on the same alleged misconduct under a different legal theory."  Defs. Opp. at 12.  Bringing a precluded claim against EMOC to destroy diversity, Defendants assert, demonstrates "the overall fraudulent nature of the City's pleadings."  *See id*. at 13.

14

Defendants have not made a single argument suggesting that the City's allegations against EMOC amount to outright fraud. *See Rosenfeld v. Lincoln Life Ins. Co.*, 239 F. Supp. 3d 636, 639 (E.D.N.Y. 2017) (not finding outright fraud where the defendant argued that the allegations in the amended complaint were contrary to Plaintiff's deposition testimony). Instead, they argue that the City's failure to make "specific allegations" against EMOC demonstrates "the outright fraudulent nature of EMOC's joinder." Defs. Opp. at 2. Although the Court agrees that the Complaint could be more specific as to the culpable actions of EMOC specifically, that is not sufficient to establish outright fraud. Defendants speculate that the City has "no real interest in gaining a judgment" against EMOC. *Id*. at 9. In support of that speculation, Defendants cite an out of circuit case, *Rodriguez v. Casa Chapa S.A. de C.V.*, 394 F. Supp. 2d 901 (W.D. Tex. 2005). In *Rodriguez*, the court found outright fraud based on the fact that the Plaintiffs failed to serve any discovery on the fraudulently-joined defendant and failed to seek a default judgment against the defendant when he failed to answer to the complaint. 394 F. Supp. 2d at 908. The facts here are entirely distinguishable.

Next, Defendants claim that the fact that the City did not name EMOC as a defendant in the City Trespass Case years ago is proof that the City named EMOC in this case only to destroy diversity and to get a second bite at the apple by re-litigating its prior claims in another forum. Defs. Opp. at 12. Such speculation about the City's motives is not convincing nor is it relevant to the fraudulent joinder inquiry. *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543, 2015 WL 3776385, at *3 (S.D.N.Y. June 17, 2015) (finding a plaintiff's subjective motive or intent to recover "irrelevant" to the fraudulent joinder analysis). As the City notes, the City Trespass Case targeted different conduct of Defendants under an entirely different legal theory,

15

and there is nothing improper or fraudulent in naming different defendants in different suits.  Pl. Mem. of Law at 28.

Defendants argue that the City's claims are barred by *res judicata* and, therefore, the City cannot state a viable cause of action against EMOC.[10]  This argument is unpersuasive.  *Res judicata* does not apply here because the City has alleged different causes of action, targeting different conduct during different periods of time, and naming different defendants from the City Trespass Case.[11]  *See City of New York*, 325 F. Supp. 3d at 468–70.  Despite different causes of actions, Defendants insist that the City "cannot escape the preclusive effect of [the prior federal action] by dressing up claims based on the same alleged misconduct under a different legal theory."  Defs. Opp. at 12.

That is a correct statement of the law, but it is not applicable here.  "[A] claim arising subsequent to a prior action is not barred by *res judicata* even if the new claim is premised on facts representing a continuance of the same course of conduct."  *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 499 (2d Cir. 2014) (cleaned up).  As noted in note 11, *supra*, this case focuses on conduct that occurred almost entirely after the City Trespass Case was dismissed. Because *res judicata* does not apply, Defendants have failed to show that the City has "no possibility" of stating a plausible cause of action against EMOC in state court.  *See Briarpatch*

---

[10]      The City argues that Defendants disavowed the "no possibility" prong of the fraudulent joinder inquiry, because Defendants argued in their prior opposition brief, Dkt. 47 at 15, that the second prong of the test is "not at issue here."  Pl. Mem. of Law at 26.  Defendants argue that they did not "disclaim[]" fraudulent joinder under the "no possibility" test but, rather, that they emphasized the outright fraud prong in their prior brief.  Defs. Opp. at 10 n.8.  The Court need not decide whether Defendants abandoned this argument, because their argument fails on the merits.

[11]      The City Trespass Case and the action here focus on different conduct.  In the prior suit, the City brought three causes of action, including public nuisance, private nuisance, and trespass for physical climate harms caused by Defendants' production and sale of fossil fuels.  325 F. Supp. 3d at 470.  In the instant case, the City alleges only violations of the CPL, asserting that Defendants "misrepresent[] the climate impacts of various gasoline products" to City consumers.  Compl. ¶ 5.  The time frame of the two lawsuits is also very different.  The City Trespass Case focused on conduct between 1980 and 2018.  325 F. Supp. 3d at 468–69.  This lawsuit focuses on conduct between 2017 and 2021, almost entirely after the prior case had been dismissed.  Compl. ¶¶ 31, 48, 71.

16

*Ltd. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 302–03 (2d Cir. 2004) (rejecting fraudulent joinder under "no possibility" prong based on a *res judicata* defense).

Defendants have not met their burden of establishing fraudulent joinder. Accordingly, the Court does not have diversity jurisdiction.

### 5.  Class Action Jurisdiction

Second in absurdity to Defendants' federal enclave argument is their claim that the case is removable under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because the Complaint "resembles" a class action "in substance." Defs. Opp. at 31–32. CAFA creates federal jurisdiction for any class action in which "the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs," the proposed plaintiff class has 100 or more members, and "any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. §§ 1332(d)(2), (d)(11)(B)(i). A "class action" filed in state court is removable pursuant to CAFA. 28 U.S.C. § 1453(b); *Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 166 (2014). CAFA defines "class action" as "any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action." 28 U.S.C. § 1332(d)(1)(B). In fashioning a test for what constitutes a "similar State stature or rule of judicial procedure," the Second Circuit has held that "a similar state statute or rule need not contain all of the other conditions and administrative aspects of Rule 23, [but] it must, at a minimum, provide a procedure by which a member of a class whose claim is typical of all members of the class can bring an action not only on his own behalf but also on behalf of all others in the class." *Purdue Pharma L.P. v. Kentucky*, 704 F.3d 208, 217 (2d Cir. 2013) (citation omitted).

17

**J.A. 231**

The Complaint was not filed under Rule 23 or under the N.Y. C.P.L.R. equivalent, but Defendants insist that Congress intended the definition of "class action" "to be interpreted liberally" and argues that CAFA permits removal of a suit that is "in substance a class action." Defs. Opp. at 31 (citing *Addison Automatics, Inc. v. Hartford Cas. Inc. Co.*, 731 F.3d 740, 742 (7th Cir. 2013)).

The CPL grants the City authority to commence a proceeding "[w]henever any person has engaged in any act or practice which constitutes a violation" of the CPL. N.Y.C. Code § 20-703(e). Defendants do not even attempt to compare the requirements for a Rule 23 class action to those for a claim under the CPL. That is understandable because the CPL does not impose any procedural requirements for bringing a suit or "impose any of the familiar hallmarks of Rule 23 class actions."[12] *Purdue Pharma*, 704 F.3d at 216. The CPL does not pass muster under the Second Circuit's similarity test. It provides that only the City can bring an action to enforce it, and it has no mechanism for a class member to bring a "typical" claim on behalf of a class. The CPL does not even require proof that consumers have actually been injured, a far cry from the basic requirement in Rule 23 that a class representative have a representative injury. N.Y.C. Code § 20-703(j) ("To establish a cause of action under this section it need not be shown that consumers are being or were actually injured."). In short, the CPL provides a cause of action only for the City, which means a claim under it bears absolutely no similarity to a class action.[13]

---

[12] Defendants argue that the City's reliance on *Purdue Pharma* is misplaced because that case involved a *parens patriae* suit. Defs. Opp. at 32 n.18. Although it is true that *Purdue Pharma* was filed by the Kentucky Attorney General under his *parens patriae* authority, the Circuit held broadly that to be "similar" to Rule 23 for purposes of CAFA, the statutory basis for the claim must contain a mechanism for a class member to bring an action on behalf of other class members. *Purdue Pharma L.P.*, 704 F.3d at 217. There was no indication that the Court intended its decision to apply only to *parens patriae* suits. In this case, while there is no dispute that the City is not proceeding *parens patriae*, Pl. Reply at 18, Dkt. 75, the Second Circuit's analysis is still binding on this Court.

[13] Defendants cite out of circuit cases that either have no bearing on or are easily distinguishable from the case at hand. In *Williams v. Emps. Mut. Cas. Co.*, 845 F.3d 891 (8th Cir. 2017), for example, the plaintiff actually brought a class action lawsuit. In *Addison Automatics, Inc.*, 731 F.3d at 741–42 , the plaintiff had previously

18

In short, this action is not removable under CAFA.

### 6. First Amendment Defenses

As in *Connecticut*, Defendants argue that there is federal jurisdiction under the so-called *Grable* exception. The *Grable* exception provides that a claim is deemed to arise under federal law for purposes of the well-pleaded complaint rule when the state-law claim implicates significant federal issues. *Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005). This exception applies in only a "slim category" of cases. *Gunn v. Minton*, 568 U.S. 251, 258 (2013). *Grable* jurisdiction exists if a federal issue is: "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance." *Fracasse*, 747 F.3d at 144 (citing *Gunn*, 568 U.S. at 258).

Defendants attempt to invoke this narrow category of jurisdiction by arguing that this false advertising case necessarily implicates affirmative federal constitutional elements based on the First Amendment. For a federal issue to be "necessarily raised," the "mere *presence* of a federal issue in a state cause of action" is inadequate; the question of federal law must be "a *necessary element* of one of the well-pleaded state claims." *Connecticut*, 83 F.4th at 140 (cleaned up). The City's CPL claim would "necessarily raise" a federal issue only if they were "affirmatively 'premised' on a violation of federal law." *Id.* (cleaned up). They are not so premised. To the contrary, to establish a CPL violation the City must prove (1) that Defendants engaged in "deceptive or unconscionable trade practice[s]" and (2) those practices involved

---

brought a class action in state court that had settled and then attempted to double dip when it filed another action fashioned as "an individual declaratory judgment action." The Court held that the lawsuit was an "artificial attempt to disguise" a class action as an individual suit. *Id.* at 742. In *Song v. Charter Commc'n, Inc.*, No. 17-cv-325, 2017 WL 1149286, at *1 (S.D. Cal. Mar. 28, 2017), defendants removed the action under CAFA based on the plaintiff's allegation that he brought his claims "not only for his benefit but also for the benefit of millions of California consumers."

"consumer goods or services." *Polonetsky v. Better Homes Depot, Inc*., 97 N.Y.2d 46, 52 (N.Y. 2001).

Defendants argue that the City's CPL claims "hinge on showing that [Defendants'] protected speech on an issue of public concern was deceptive because it did not parrot the City's approved viewpoint on climate change." Defs. Opp. at 32–33. According to Defendants, the court will not be able to resolve the City's misrepresentation claims without addressing whether the First Amendment protects the companies' commercial speech or speech on matters of public concern. Defs. Opp. at 33.

But Defendants are confusing a defense ("My statements were truthful and therefore protected") with an element of the City's claim ("Defendants' statements were deceptive"). If Defendants' statements were truthful and not misleading, the City will not prevail. The fact that Defendants may have a defense, even a defense rooted in the First Amendment, is not adequate to establish the *Grable* exception. If the law were as Defendants urge, every libel, slander, and false advertising claim in the country would be encompassed within *Grable*, which they plainly are not.[14] *Troung v. Am. Bible Soc'y*, 171 F. App'x 898, 898 (2d Cir. 2006) ("First Amendment defenses . . .cannot establish federal question jurisdiction.").

## C. Fees and Costs

The City seeks costs and expenses incurred in litigating Defendants' removal pursuant to 28 U.S.C. § 1447(c), which provides that "[a]n order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." 28 U.S.C. § 1447(c). The purpose of this fee-shifting provision is to "deter removals sought for

---

[14]     *See*, *e.g., Anne Arundel Cnty. v. BP P.L.C.*, 94 F.4th 343, 351 (4th Cir. 2024) (holding that federal question jurisdiction does not exist even though the first amendment is a defense and noting that "[s]tate courts routinely hear libel, slander, and misrepresentation cases involving matters of public concern.").

20

the purpose of prolonging litigation and imposing costs on the opposing party." *Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 140 (2005). Courts may award costs in cases "where the removing party lacked an objectively reasonable basis for seeking removal." *Id.* at 141. Whether to award fees is "left to the district court's discretion," *id.* at 139, and "does not require a finding of bad faith or frivolity," *Kuperstein*, 457 F. Supp. 2d at 472 (citation omitted). Section 1447(c) "affords . . . flexibility to the district courts in fashioning awards of costs and fees." *Morgan Guar. Tr. Co. of New York v. Republic of Palau*, 971 F.2d 917, 924 (2d Cir. 1992). In deciding whether to award attorneys' fees or costs, district courts look at "overall fairness given the nature of the case, the circumstances of the remand, and the effect on the parties." *Id.*

The City argues that an award of costs and fees is warranted because Defendants continued to assert grounds for removal that were abandoned in *Connecticut*, rejected in *Connecticut*, or have been universally rejected by courts around the country. Pl. Mem. of Law at 34. It would be "unfair," the City argues, to require it to absorb the costs of litigating "Defendants' efforts to rehash the same issues endlessly." *See id.* at 35 (cleaned up). In considering the plaintiff's request for fees in *Connecticut*, the district court noted that multiple district courts throughout the country had rejected similar arguments for removal. Because those courts were in different circuits, however, the *Connecticut* district court found that those decisions did not mean that Exxon Mobil lacked "an objectively reasonable basis for removal." 2021 WL 2389739, at *15. Accordingly, the court denied the state's request for costs and fees. *Id.* Although many of the municipalities and states that have brought similar consumer protection claims against oil companies and have succeeded in having the cases remanded to state court have not sought fees and costs, in the ones that have, the courts have generally not

21

awarded fees.[15]  A notable exception is the First Circuit, which awarded costs to Rhode Island in

*Rhode Island*, 35 F.4th at 62.

In the three years since the Connecticut district court denied fees in *Connecticut*, the

Second Circuit has largely rejected three of the seven grounds for removal that the defendant

argued in *Connecticut* and that Defendants continued to press in this Court.  Defendants argued

three additional bases for removal that were not before the Second Circuit, two of which had

been abandoned on appeal.  While those arguments had not, therefore, been decided by the

Second Circuit, the arguments had been roundly rejected by countless courts throughout the

country.

Although Defendants may have removed this case in good faith in 2021, their opposition

to the City's renewed Motion to Remand, which was briefed in October 2023, made multiple

arguments that had previously been made to and universally rejected by federal courts across the

country.  Defendants conceded that *Connecticut* controlled one of its grounds for removal, Jones

Decl., Ex. B. at 1, but conceded nothing else, despite the string of cases in district and circuit

courts that have rejected the very arguments they were pursuing.  Whatever may have been the

state of play in 2021, this can no longer be considered a good faith litigation strategy. Defendants

are grasping for straws for any way to bring this and the long list of similar consumer

---

[15]     *See Delaware*, 578 F. Supp. 3d at 641 (denying motion for fees and costs because the plaintiff waived its opportunity to request fees and costs by raising the issue for the first time in its reply brief but also noting that despite "the overwhelming weight of authority in other similar cases" the Third Circuit had not yet decided these issues); *Platkin*, 2023 WL 4086353, at *4 (denying motion for fees and costs "[a]lbeit a close call" as Defendants removed to preserve their jurisdictional rights in the event the Supreme Court granted certiorari and reversed *City of Hoboken v. Chevron Corp.*, 45 F.4th 699 (3d Cir. 2022)); *Vermont v. Exxon Mobil Corp., et al.*, No. 21-cv-260, 2024 WL 446086, at *10 (D. Vt. Feb. 6, 2024) (denying motion for fees and costs noting these cases involve "evolving areas of law and present pleadings that are reasonably subject to varying interpretations"); Jones Decl. Ex. A at 13, *City of Charleston v. Brabham Oil Co., Inc.*, No. 20-cv-3579, Dkt. 154 (denying motion for fees and costs because at the time of removal, many of the grounds were contested because the Fourth Circuit had not yet decided *Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178 (4th Cir. 2022)).

22

**J.A. 236**

protection cases into federal court. Defendants removed this case three years ago, and Defendants cite only one out of the countless similar cases decided since then in which a court has accepted a single ground for removal that Defendants have argued here.[16]

For all of these reasons, the Court finds that it is appropriate to award costs and fees incurred by the City in connection with arguments that it was not reasonable for Defendants to press when the City renewed its motion for remand: arguments that had largely been decided by the Circuit in *Connecticut* – federal common law, federal officer removal, and First Amendment defenses,[17] and those that were objectively absurd – federal enclaves and CAFA. Although Defendants' diversity jurisdiction argument was not a winner, the Court cannot say that it was unreasonable for Defendants to press that argument.

Accordingly, the City's request for costs and fees is GRANTED as to five of the six bases for removal at issue in this motion and DENIED as to the sixth. The parties must meet and confer and attempt to reach agreement on the amount of such fees and costs.[18] If the parties cannot reach agreement by June 28, 2024, the City must submit a fees application not later than

---

[16]   In *Pac. Coast Fed'n of Fishermen's Ass'ns v. Chevron Corp.*, No. 18-cv-7477, 2023 WL 7299195, at *1 (N.D. Cal. Nov. 1, 2023), the district court "reluctantly denied" Plaintiff's motion to remand finding that the case was properly removed under CAFA. In that case, however, the complaint pled a representative action authorized by California law. That case is readily distinguishable. It was brought by an association "in a representative capacity on behalf of its members," thus putting it squarely within the definition of class action in CAFA. *See id.*

[17]   Exxon Mobil abandoned its argument regarding First Amendment defenses on appeal in *Connecticut*. Although the Second Circuit did not, therefore, specifically address First Amendment defenses as a ground for removal, the Court did reaffirm that federal question jurisdiction "cannot be triggered on the basis of a federal defense, . . . even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue." *Connecticut*, 83 F.4th at 132 (citing *Caterpillar*, 482 U.S. at 393). Defendants' nuanced distinctions regarding their First Amendment arguments are not objectively reasonable following *Connecticut*.

[18]   The Court is happy to refer the parties to their assigned Magistrate Judge for a settlement conference to assist. If the parties desire such a referral, they should submit a joint letter requesting a referral.

23

**July 19, 2024**, with supporting documentation regarding the fees and costs it incurred in litigating those five grounds for removal.

## CONCLUSION

For the reasons stated above, this Court joins the overwhelming majority of federal district and circuit courts around the country to conclude that these municipal law claims belong in state court. The City's Motion to Remand is GRANTED, and its request for costs and fees is GRANTED in part. The Clerk of Court is directed to terminate the open motion at Dkt. 68 and remand the case to the Supreme Court of the State of New York, County of New York.

**SO ORDERED.**

**Date:** **May 8, 2024**
  **New York, New York**

                                        **VALERIE CAPRONI**
                                        **United States District Judge**

24

**J.A. 238**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE CITY OF NEW YORK,

Plaintiff,

v.

EXXON MOBIL CORPORATION,
EXXONMOBIL OIL CORPORATION, ROYAL
DUTCH SHELL PLC, SHELL OIL COMPANY,
BP P.L.C., BP AMERICA INC. and AMERICAN
PETROLEUM INSTITUTE

Defendants.

Case No. 21-cv-04807 (VEC)

## PROTECTIVE NOTICE OF APPEAL

Defendants Exxon Mobil Corporation; ExxonMobil Oil Corporation; Shell plc (f/k/a Royal Dutch Shell plc); Shell USA, Inc. (f/k/a Shell Oil Company); BP p.l.c.; BP America Inc.; and the American Petroleum Institute appeal to the United States Court of Appeals for the Second Circuit from this Court's order granting in part plaintiff's request for fees and costs under 28 U.S.C. § 1447(c).  ECF No. 81, at 20–24 (May 8, 2024).[1]

Defendants file this notice as a protective matter.  Although an award of attorney's fees is ordinarily not appealable until the award has been quantified, *see, e.g.*, *Pannonia Farms, Inc.* v. *USA Cable*, 426 F.3d 650, 652–53 (2d Cir. 2005), it is unclear whether the Court ultimately will enter any further fee award or relevant order in light of the parties' meet-and-confer ordered by the Court.  To avoid forfeiting the right to appeal, *see, e.g.*, *Bowles* v. *Russell*, 551 U.S. 205, 206–

---

[1] By filing this protective notice of appeal, the defendants do not waive any right, defense, affirmative defense, or objection, including any challenge to personal jurisdiction.

07 (2007), defendants file this protective notice of appeal within 30 days of the order awarding

fees and costs.

DATE:  June 7, 2024

Respectfully submitted,

By:

/s/ Daniel J. Toal

| | |
|---|---|
| Theodore V. Wells, Jr. | David C. Frederick (*pro hac vice*) |
| Daniel J. Toal | James M. Webster, III (*pro hac vice*) |
| | Daniel S. Severson |
| PAUL, WEISS, RIFKIND, WHARTON & | Grace W. Knofczynski (*pro hac vice*) |
| GARRISON, LLP | |
| 1285 Avenue of the Americas | KELLOGG, HANSEN, TODD, FIGEL & |
| New York, NY 10019-6064 | FREDERICK, P.L.L.C. |
| Tel:  (212) 373-3000 | 1615 M Street, NW, Suite 400 |
| Fax:  (212) 757-3990 | Washington, DC 20036 |
| Email: twells@paulweiss.com | Tel:  (202) 326-7900 |
| Email: dtoal@paulweiss.com | Fax:  (202) 326-7999 |
| | Email:  dfrederick@kellogghansen.com |
| *Attorneys for Defendants Exxon Mobil* | Email:  jwebster@kellogghansen.com |
| *Corporation and ExxonMobil Oil* | Email:  dseverson@kellogghansen.com |
| *Corporation* | Email:  gknofczynski@kellogghansen.com |

Loly G. Tor
K&L GATES LLP
599 Lexington Ave.
New York, NY 10022
Tel: (973) 848-4026
Fax: (973) 848-4001
Email: loly.tor@klgates.com

*Attorneys for Defendants Shell plc (f/k/a*
*Royal Dutch Shell plc) and Shell USA, Inc.*
*(f/k/a Shell Oil Company)*

2

**J.A. 240**

Aaron F. Jaroff
MCGUIREWOODS LLP
1251 Avenue of the Americas, 20th Floor
New York, NY 10020-1104
Tel: (212) 548-2133
Email: ajaroff@mcguirewoods.com

Brian D. Schmalzbach (*pro hac vice*)
Jeremiah J. Anderson (*pro hac vice*)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219-3916
Tel: (804) 775-100
Email: bschmalzbach@mcguirewoods.com
Email: jjanderson@mcguirewoods.com

*Attorneys for Defendant American Petroleum
Institute*

Nancy G. Milburn
Diana E. Reiter
ARNOLD & PORTER KAYE SCHOLER
LLP
250 West 55th Street
New York, NY 10019-9710
Tel: (212) 836-8000
Fax: (212) 836-8689
Email: nancy.milburn@arnoldporter.com
Email: diana.reiter@arnoldporter.com

John D. Lombardo (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER
LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Telephone: (213) 243-4000
Facsimile: (213) 243-4199
E-mail: john.lombardo@arnoldporter.com

Jonathan W. Hughes (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER
LLP
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Telephone: (415) 471-3100
Facsimile: (415) 471-3400
Email: jonathan.hughes@arnoldporter.com

*Attorneys for Defendants BP p.l.c.
and BP America Inc.*

**J.A. 241**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _7/10/24_

THE CITY OF NEW YORK,

Plaintiff,

- against -

EXXON MOBIL CORPORATION,
EXXONMOBIL OIL CORPORATION, ROYAL
DUTCH SHELL PLC, SHELL OIL COMPANY,
BP P.L.C., BP AMERICA INC. and AMERICAN
PETROLEUM INSTITUTE,

Defendants.

Case No. 21-CV-4807 (VEC)

**STIPULATION AND ORDER REGARDING COSTS AND FEES**

This Stipulation ("Stipulation") is entered into between Plaintiff The City of New York and Exxon Mobil Corporation, ExxonMobil Oil Corporation, Shell plc (f/k/a Royal Dutch Shell plc), Shell USA, Inc. (f/k/a Shell Oil Company), BP p.l.c., BP America Inc., and American Petroleum Institute (collectively, "Defendants").

WHEREAS, on April 22, 2021, the City of New York brought this action against Defendants in the Supreme Court of the State of New York;

WHEREAS, on May 28, 2021, this action was removed to the United States District Court for the Southern District of New York (ECF No. 1);

WHEREAS, on July 7, 2021, Plaintiff filed a motion to remand this action to state court (ECF No. 37);

WHEREAS, on October 4, 2023, Plaintiff's motion to remand was denied without prejudice and with leave to refile in light of the Second Circuit's decision in *Connecticut* v. *Exxon Mobil Corp.*, 83 F.4th 122 (2d Cir. 2023) (ECF No. 63);

**J.A. 242**

WHEREAS, on October 20, 2023, Plaintiff submitted a renewed motion to remand this action to state court (ECF No. 68);

WHEREAS, on May 8, 2024, this Court granted Plaintiff's motion to remand (the "Remand Order") and, in that order, granted Plaintiff's request for costs and fees as to five of the six bases for removal contested in the renewed remand motion (ECF No. 81);

WHEREAS, the Remand Order found that Plaintiff is not entitled to costs and fees associated with the Defendants' sixth ground for removal, diversity jurisdiction, because "the Court cannot say that it was unreasonable for Defendants to press that argument";

WHEREAS, the Remand Order provided that "[t]he parties must meet and confer and attempt to reach agreement on the amount of such fees and costs. If the parties cannot reach agreement by June 28, 2024, the City must submit a fees application not later than July 19, 2024, with supporting documentation regarding the fees and costs it incurred in litigating those five grounds for removal" (ECF No. 81 at 23–24);

WHEREAS, on June 7, 2024, Defendants timely filed a notice of appeal of the award of costs and fees in the Remand Order (ECF No. 82);

WHEREAS, the parties have met and conferred about the amount of fees and costs, and Plaintiff is seeking $68,262.46;

WHEREAS, Defendants do not agree that any award of costs and fees is warranted and do not concede that the amount of costs and fees sought by Plaintiff accurately reflects the actual costs and expenses incurred by the City and thus compensable under 28 U.S.C. § 1447(c);

WHEREAS, notwithstanding that disagreement and with a reservation of all rights, defenses, affirmative defenses, claims, and objections, including to the lack of personal

jurisdiction, the parties have stipulated that the amount of costs and fees to be owed, in the event the pending appeal results in an affirmance, shall be the amount sought by Plaintiff;

NOW THEREFORE, IT IS HEREBY STIPULATED AND AGREED, as follows:

1. In the event the order awarding Plaintiff costs and fees is affirmed, Defendants agree collectively to pay $68,262.46 to the City within 30 days following entry of the mandate;

2. By agreeing now to pay the City $68,262.46 in the event the appeal results in an affirmance, Defendants do not in any way waive any rights or arguments they have with respect to the pending appeal, nor shall this agreement be asserted by the City or Defendants in support of any argument raised in Defendants' appeal of the award of costs and fees;

3. By entering into this stipulation, the City does not waive any rights or arguments they have with respect to Defendants' pending appeal or with respect to seeking costs and fees incurred in litigating that appeal;

4. Because the parties have reached an agreement as to the amount of costs and fees to be awarded to Plaintiff, Plaintiff will not be submitting a fee application, and no further action from the district court is required. Accordingly, the May 8, 2024 Remand Order is a final order for the purposes of the Second Circuit's appellate jurisdiction under 28 U.S.C. § 1291.

Dated: New York, New York
      July 9, 2024

Respectfully submitted,

*/s/ Hilary Meltzer*                                                    */s/ Theodore V. Wells, Jr.*
Hilary Meltzer                                                       Theodore V. Wells, Jr.
Alice R. Baker                                                      Daniel J. Toal

<div align="center">3</div>

Nathan Taylor
CORPORATE COUNSEL OF THE CITY
OF NEW YORK
100 Church Street
New York, New York 10007
Tel: (212) 356-2072
Email: hmeltzer@law.nyc.gov
Email: albaker@law.nyc.gov
Email: ntaylor@law.nyc.gov

Matthew K. Edling
Victor M. Sher
Michael H. Burger
Katie Jones
Quentin C. Karpilow
SHER EDLING LLP
100 Montgomery St., Ste. 1040
San Francisco, CA 94104
Tel: (628) 231-2500
Fax: (628) 231-2929
Email: matt@sheredling.com
Email: vic@sheredling.com
Email: michael@sheredling.com
Email: katie@sheredling.com
Email: quentin@sheredling.com

*Attorneys for Plaintiff City of New York*

Nancy G. Milburn
Diana E. Reiter
ARNOLD & PORTER KAYE SCHOLER
LLP
250 West 55th Street
New York, NY 10019-9710
Tel: (212) 836-8000
Fax: (212) 836-8689
Email: nancy.milburn@arnoldporter.com
Email: diana.reiter@arnoldporter.com

John D. Lombardo (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER
LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Telephone: (213) 243-4000

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: (212) 373-3000
Fax: (212) 757-3990
Email: twells@paulweiss.com
Email: dtoal@paulweiss.com

*Attorneys for Defendants Exxon Mobil
Corporation and ExxonMobil Oil
Corporation*

David C. Frederick (*pro hac vice*)
James M. Webster, III (*pro hac vice*)
Daniel S. Severson
Grace W. Knofczynski (*pro hac vice*)
KELLOGG, HANSEN, TODD, FIGEL &
FREDERICK, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20036
Tel: (202) 326-7900
Fax: (202) 326-7999
Email: dfrederick@kellogghansen.com
Email: jwebster@kellogghansen.com
Email: dseverson@kellogghansen.com
Email: gknofczynski@kellogghansen.com

Loly G. Tor
K&L GATES LLP
599 Lexington Ave.
New York, NY 10022
Tel: (973) 848-4026
Fax: (973) 848-4001
Email: loly.tor@klgates.com

*Attorneys for Defendants Shell plc (f/k/a Royal
Dutch Shell plc) and Shell USA, Inc. (f/k/a
Shell Oil Company)*

Aaron F. Jaroff
MCGUIREWOODS LLP
1251 Avenue of the Americas, 20th Floor
New York, NY 10020-1104
Tel: (212) 548-2133
Email: ajaroff@mcguirewoods.com

4

Facsimile: (213) 243-4199
E-mail: john.lombardo@arnoldporter.com

Jonathan W. Hughes (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER
LLP
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Telephone: (415) 471-3100
Facsimile: (415) 471-3400
Email: jonathan.hughes@arnoldporter.com

*Attorneys for Defendants BP p.l.c. and BP
America Inc.*

Brian D. Schmalzbach (*pro hac vice*)
Jeremiah J. Anderson (*pro hac vice*)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219-3916
Tel: (804) 775-100
Email: bschmalzbach@mcguirewoods.com
Email: jjanderson@mcguirewoods.com

*Attorneys for Defendant American Petroleum
Institute*

SO ORDERED.                          7/10/24

*Valerie Caproni*

HON. VALERIE CAPRONI
UNITED STATES DISTRICT JUDGE

5

**J.A. 246**